# 25-2680-cv(L), 26-0023-cv(CON)

## United States Court of Appeals
*for the*
## Second Circuit

SUNITA SHAH,

*Plaintiff-Appellee,*

– v. –

DETECTIVE JOHN LISTON, Individually, Police Officer
ANDREW MARTONE, Individually, COUNTY OF NASSAU,
MICHAEL KENNEY, OFFICER MICHAEL KENNEY, DAVID TWOMEY,
DETECTIVE DAVID TWOMEY,

*Defendants-Appellants,*

OFFICERS JANE DOE 1-2, fictitiously named, individually,
OFFICERS JOHN DOE 1-2, fictitiously named,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
**Volume 1 of 5 (Pages A-1 to A-300)**

STEVEN J. HARFENIST
HARFENIST, KRAUT
  & PERLSTEIN LLP
*Attorneys for Plaintiff-Appellee*
3000 Marcus Avenue, Suite 2e1
Lake Success, New York 11042
(516) 355-9600

BEE READY LAW GROUP, LLP
*Attorneys for Defendants-Appellants*
170 Old Country Road, Suite 200
Mineola, New York 11501
(516) 746-5599

CP COUNSEL PRESS   (800) 4-APPEAL • (392984)

i

# TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ................................... | A-1 |
| Jury Verdict, Filed on December 18, 2023 ................ | A-21 |
| Joint Trial Exhibit List .............................................. | A-56 |
| Joint Trial Exhibit 1 - Excerpt Page 45 from the Deposition Transcript of Officer Michael Kenny...................................... | A-57 |
| Joint Trial Exhibit 2 - Excerpts Pages 78-79 from the Deposition Transcript of Officer Andrew Martone .................. | A-58 |
| Joint Trial Exhibit 3 - Excerpt Page 83 from the Deposition Transcript of Officer Andrew Martone ................................... | A-60 |
| Joint Trial Exhibit 4 - Excerpt Page 84 from the Deposition Transcript of Officer Andrew Martone ................................... | A-61 |
| Joint Trial Exhibit 5 - Excerpts Pages 130-134 from the Deposition Transcript of Officer John Liston .......................... | A-62 |
| Joint Trial Exhibit 6 - ADA Fexas Testimony Transcript- Pages 338-346, 348, 350-351 ............................... | A-67 |
| Joint Trial Exhibit 7 - Excerpts Pages 195-196 from the Deposition Transcript of Detective David Twomey................. | A-79 |
| Trial Transcript, dated December 11, 2023................ | A-81 |

ii

| | Page |
|---|---|
| Trial Transcript, dated December 12, 2023 ............... | A-171 |
| Trial Transcript, dated December 13, 2023 ............... | A-445 |
| Trial Transcript, dated December 14, 2023 ............... | A-726 |
| Trial Transcript, dated December 15, 2023 ............... | A-985 |

Memorandum of Law, in Support of Defendants
Andrew Martone and Michael Kenney's Motion,
Pursuant to Fed. R. Civ. P. 59(E),
dated August 27, 2024 ........................................... A-115

Plaintiff's Memorandum of Law, in Opposition to
Defendants' Rule 59 Motion,
dated October 15, 2024.......................................... A-1206

Reply Memorandum of Law, in Support of
Defendants Andrew Martone and Michael
Kenney's Motion, Pursuant to Fed. R. Civ. P.
59(E), dated November 10, 2024........................... A-1221

Plaintiff's Exhibit List................................................ A-1229

Plaintiff's Trial Exhibit 1 -
Nassau County Police Dept (NCPD) Crime
Report for Sunita Shah's Arrest ............................. A-1231

Plaintiff's Trial Exhibit 2 -
NCPD Case Report for Sunita Shah
and Raiesh Shah's Arrest ....................................... A-1234

Plaintiff's Trial Exhibit 4 -
NCPD Fingerprint Response
Summary for Sunita Shah's Arrest ........................ A-1237

Plaintiff's Trial Exhibit 5 -
County of Nassau's Response to Interrogatories ... A-1242

**iii**

**Page**

Plaintiff's Trial Exhibit 7 -
Certificate of Incorporation for
Accessories by Peak, Inc. ..................................... A-1249

Plaintiff's Trial Exhibit 9 -
By-Laws of Accessories by Peak, Inc.................... A-1254

Plaintiff's Trial Exhibit 10 -
Standard Form Store Lease between Sara Hack
and Accessories by Peak, for the use of 120
Hillside Avenue...................................................... A-1262

Plaintiff's Trial Exhibit 11 -
Agreement between Accessories by Peak and
Surrender Bhatty, for Bhatty's use of the
Basement at 120 Hillside Avenue .......................... A-1282

Plaintiff's Trial Exhibit 12 -
District Court Information charging Sunita Shah
with Illegal Use of Nitrous Oxide, under New
York Public Health Law §3380.5(A)...................... A-1283

Plaintiff's Trial Exhibit 13 -
Felony Complaint charging Sunita Shah with
Criminal Possession of a Precursor to a
Controlled Substance, under New York Penal
Law §220.60 .......................................................... A-1284

Plaintiff's Trial Exhibit 14 -
District Court Information charging Sunita Shah
with Reckless Endangerment, under New York
Penal Law §120.20 ................................................ A-1286

Plaintiff's Trial Exhibit 15 -
Certificate of Disposition for the Criminal
Charges Against Sunita Shah................................. A-1287

iv

**Page**

Plaintiff's Trial Exhibit 16 -
Google Maps Photo of Outside of
120 Hillside Avenue ................................................ A-1288

Plaintiff's Trial Exhibit 17 -
Newsday Article Entitled "2500 in Synthetic
Marijuana Found in Spa Basement, Cops Say,"
dated November 12, 2018 ...................................... A-1289

Plaintiff's Trial Exhibit 19 -
The Island Now Article Entitled "Estimated
$250K of Synthetic Marijuana Found at Simply
Foot Spa in Williston Park,"
dated October 5, 2017 ............................................ A-1291

Plaintiff's Trial Exhibit 20 -
(i) WABC-7 Article Entitled "Exclusive: Long
Island Store Owner Says Drugs Not His,"
dated October 6, 2017 ............................................ A-1293

(ii) WABC-7 Video, Entitled "Exclusive: Long
Island Store Owner Says Drugs Not His,"
dated October 6, 2017 (DVD) ............................... A-1295

Plaintiff's Trial Exhibit 21 -
(i) News 12 Article Entitled "Police Arrest
Couple After Discovery of Synthetic Marijuana
Operation," dated October 6, 2017 ........................ A-1296

(ii) News 12 Video Entitled "Police Arrest
Couple After Discovery of Synthetic Marijuana
Operation" (DVD) ................................................. A-1297

Plaintiff's Trial Exhibit 22 -
Hi India Article Entitled "Indian Couple Held
After Drug Haul," dated October 27, 2017 ............ A-1298

v

**Page**

Plaintiff's Trial Exhibit 23 -
The Indian Panorama Article Entitled "Indian
American Long Island Couple Charged in
Synthetic Marijuana Operation,"
dated October 20, 2017 ......................................... A-1299

Plaintiff's Trial Exhibit 24 -
The South Asian Times Article Entitled "Indian
Couple Held After Drug Haul,"
dated February 28, 2019 ....................................... A-1301

Plaintiff's Trial Exhibit 25 -
Connected to India Article Entitled "Indian-
American Couple Arrested for Running Drug
Production in Basement," dated
October 16, 2017 .................................................. A-1302

Plaintiff's Trial Exhibit 26 -
News India Times Article Entitled "Indian-
American Husband and Wife Arrested for
Alleged Drug Production Operation in
Basement," dated October 15, 2017 ...................... A-1304

Plaintiff's Trial Exhibit 27 -
India Broad Article Entitled "Long Island Couple
Wrongfully Accused, Attorney Says,"
dated October 20, 2017 ......................................... A-1306

Plaintiff's Trial Exhibit 28 -
Nassau County Police Department Press Release
"Arrest/Narcotics-Williston Park,"
dated October 5, 2017 ........................................... A-1308

Plaintiff's Trial Exhibit 34 -
Email from ADA Kristen Fexas to Cara Kaplan,
dated October 5, 2017 ........................................... A-1309

Defendants' Exhibit List ........................................... A-1310

vi

**Page**

Defendants' Trial Exhibit A -
District Court Information 217AR0051949,
Against Sunita for Violation of 3380.S(A)
Nitrous Oxide - Illegal Use, A Misdemeanor ........  A-1311

Defendants' Trial Exhibit B -
District Court Information 2l7CR005l949,
Against Sunita for Reckless Endangerment in the
Second Degree, Penal Law § 120.20, A
Misdemeanor ..........................................................  A-1312

Defendants' Trial Exhibit C -
District Court Felony Complaint 2170051949,
Against Sunita for Criminal Possession of a
Controlled Substance, Penal Law §220.60,
Class E Felony ........................................................  A-1313

Defendants' Trial Exhibit D -
Arrest Report 217AR0014748,
dated October 4, 2017.............................................  A-1315

Defendants' Trial Exhibit E -
Crime Report PDCN 85SJ - 2l7CR0051949,
dated October 4, 2017.............................................  A-1317

Defendants' Trial Exhibit F -
Case Report PDCN 32SJ - 217CR005l949, dated
October 5, 2017 ......................................................  A-1320

Defendants' Trial Exhibit G -
Nassau County District Attorney File Jacket,
Indicating Dismissal of Charges on
November 22, 2017, Pursuant to
CPL §170.30(1 )(f)..................................................  A-1323

Defendants' Trial Exhibit I -
ADA Kristen Fexas Files .......................................  A-1326

vii

**Page**

Defendants' Trial Exhibit J -
32B Statement of Charles Water,
dated October 4, 2017 ............................................. A-1340

Memorandum and Order, dated
September 29, 2025, Appealed From ..................... A-1341

Judgment, dated December 15, 2025,
Appealed From ....................................................... A-1356

Notice of Appeal, dated October 21, 2025 ................. A-1358

Notice of Appeal, dated January 6, 2026 ................... A-1359

A-1

APPEAL,ACO

## U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:18–cv–04625–ST

| | |
|---|---|
| Shah v. Liston et al | Date Filed: 08/16/2018 |
| Assigned to: Magistrate Judge Steven Tiscione | Jury Demand: Plaintiff |
| Demand: $3,000,000 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Sunita Shah**                    represented by     **Neil S. Torczyner**
Drachman Katz, LLP
115–06 Myrtle Avenue
Richmond Hill, NY 11418
516–342–8333
Email: ntorczyner@drachmankatz.com
*TERMINATED: 05/16/2024*
*ATTORNEY TO BE NOTICED*

**Steven J. Harfenist**
Harfenist Kraut & Perlstein, LLP
3000 Marcus Avenue
Suite 2e1
Lake Success, NY 11042
516–355–9600
Fax: 516–355–9601
Email: sharfenist@hkplaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Detective John Liston**          represented by     **Ralph J. Reissman**
*individually*                                       Nassau County Attorney's Office
One West Street
Mineola, NY 11501
516–571–3046
Fax: 516–571–6604
Email: Ralphresq@gmail.com
*TERMINATED: 08/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Bergstrom**
Office of the Attorney General
Consumer Protection Division
P. O. Box 12548, MC–010
Austin, TX 78711–2548
512–475–3042
Email: Ian.Bergstrom@OAG.Texas.Gov
*TERMINATED: 12/02/2024*
*ATTORNEY TO BE NOTICED*

**Nicholas C Zotto**
Office of the Nassau County Attorney
One West Street
Mineola, NY 11501
516–571–3012
Email: nzotto@nassaucountyny.gov
*ATTORNEY TO BE NOTICED*

A-2

**Victoria LaGreca**
Gabriel Law Firm, P.C.
2 Lincoln Ave
Suite 400
Rockville Centre, NY 11570
516–360–9101
Email: vlagreca@gabriellegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Andrew Martone**
*individually*

represented by **Ralph J. Reissman**
(See above for address)
*TERMINATED: 08/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Bergstrom**
(See above for address)
*TERMINATED: 12/02/2024*
*ATTORNEY TO BE NOTICED*

**Nicholas C Zotto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria LaGreca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**The County Of Nassau**

represented by **Ralph J. Reissman**
(See above for address)
*TERMINATED: 08/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Bergstrom**
(See above for address)
*TERMINATED: 12/02/2024*
*ATTORNEY TO BE NOTICED*

**Nicholas C Zotto**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria LaGreca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Officers Jane Doe 1–2**
*fictitiously named, individually*

**Defendant**

**Officers John Doe 1–2**
*fictitiously named*

**Defendant**

**Michael Kenney**
*Officer Michael Kenney*

represented by **Ralph J. Reissman**
(See above for address)
*TERMINATED: 08/28/2025*
*LEAD ATTORNEY*

A-3

*ATTORNEY TO BE NOTICED*

**Ian Bergstrom**
(See above for address)
*TERMINATED: 12/02/2024*
*ATTORNEY TO BE NOTICED*

**Victoria LaGreca**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **David Twomey** | represented by | **Ralph J. Reissman** |
| *Detective David Twomey* | | (See above for address) |

*TERMINATED: 08/28/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Bergstrom**
(See above for address)
*TERMINATED: 12/02/2024*
*ATTORNEY TO BE NOTICED*

**Victoria LaGreca**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/16/2018 | 1 | COMPLAINT against All Defendants Was the Disclosure Statement on Civil Cover Sheet completed –No,, filed by Sunita Shah. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Rodin, Deanna) (Entered: 08/16/2018) |
| 08/16/2018 | 2 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Rodin, Deanna) (Entered: 08/16/2018) |
| 08/16/2018 | | Incorrect Document Entry Information; Due to technical difficulties while opening the case, docket entry #1, complaint with attachments, were emailed to and entered by the Clerk's office. (Rodin, Deanna) (Entered: 08/16/2018) |
| 08/16/2018 | | The case of **Shah v. Liston et al**, has been opened in the Eastern District of New York. The case number is **18cv4625**. PLEASE NOTE: You must pay the case filing fee **within seven (7) days**. Select the event (Civil Case Filing Fee) and pay online. (Rodin, Deanna) (Entered: 08/16/2018) |
| 08/16/2018 | | FILING FEE: $400, receipt number 0207–10661560 (Rodin, Deanna) (Entered: 08/21/2018) |
| 08/21/2018 | | Case Assigned to Judge Joan M. Azrack and Magistrate Judge A. Kathleen Tomlinson. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Rodin, Deanna) (Entered: 08/21/2018) |
| 08/21/2018 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Rodin, Deanna) (Entered: 08/21/2018) |

A-4

| | | |
|---|---|---|
| 08/21/2018 | | Proposed summonses are rejected; the section that reads "The answer or motion must be served on plaintiff or plaintiff's attorney, whose name and address are:" has not be completed; additionally, the caption on each summons does not match the caption of the complaint; also, the date on each summons is incorrect as it is added by the Clerk's Office as of the date of issuance; the Clerk's Office cannot issue the summonses. Counsel is advised to submit completed proposed summonses in PDF fillable format using the event Proposed Summons/Civil Cover Sheet. (Rodin, Deanna) (Entered: 08/21/2018) |
| 08/22/2018 | 4 | Proposed Summons. Re 1 Complaint by Sunita Shah (Harfenist, Steven) (Entered: 08/22/2018) |
| 08/22/2018 | 5 | Proposed Summons. Re 1 Complaint by Sunita Shah (Harfenist, Steven) (Entered: 08/22/2018) |
| 08/22/2018 | 6 | Proposed Summons. Re 1 Complaint by Sunita Shah (Harfenist, Steven) (Entered: 08/22/2018) |
| 08/22/2018 | 7 | NOTICE of Appearance by Neil S. Torczyner on behalf of Sunita Shah (notification declined or already on case) (Torczyner, Neil) (Entered: 08/22/2018) |
| 08/23/2018 | 8 | Summons Issued as to John Liston. (Ortiz, Grisel) (Entered: 08/23/2018) |
| 08/23/2018 | 9 | Summons Issued as to Andrew Martone. (Ortiz, Grisel) (Entered: 08/23/2018) |
| 08/23/2018 | 10 | Summons Issued as to The County Of Nassau. (Ortiz, Grisel) (Entered: 08/23/2018) |
| 08/29/2018 | 11 | SUMMONS Returned Executed by Sunita Shah. John Liston served on 8/28/2018, answer due 9/18/2018. (Torczyner, Neil) (Entered: 08/29/2018) |
| 08/29/2018 | 12 | SUMMONS Returned Executed by Sunita Shah. Andrew Martone served on 8/28/2018, answer due 9/18/2018. (Torczyner, Neil) (Entered: 08/29/2018) |
| 08/29/2018 | 13 | SUMMONS Returned Executed by Sunita Shah. The County Of Nassau served on 8/28/2018, answer due 9/18/2018. (Torczyner, Neil) (Entered: 08/29/2018) |
| 10/03/2018 | 14 | NOTICE of Appearance by Ralph J. Reissman on behalf of John Liston, Andrew Martone, The County Of Nassau (aty to be noticed) (Reissman, Ralph) (Entered: 10/03/2018) |
| 10/03/2018 | 15 | ANSWER to Complaint by John Liston, Andrew Martone, The County Of Nassau. (Reissman, Ralph) (Entered: 10/03/2018) |
| 10/10/2018 | | SCHEDULING ORDER: An Initial Conference is set for 10/24/2018 at 2:00 PM before Judge Joan M. Azrack in Courtroom 920 of the Long Island Courthouse. Ordered by Judge Joan M. Azrack on 10/10/2018. (Posillico, Lauren) (Entered: 10/10/2018) |
| 10/24/2018 | 16 | Minute Entry for proceedings held before Judge Joan M. Azrack: Initial Conference Hearing held on 10/24/2018. Case called. Counsel present for all sides. Next telephone status conference scheduled for 12/12/2018 at 11:30 AM. Counsel for the plaintiff shall initiate the call and contact Chambers at 631–712–5600 when all parties are on the line. (Florio, Lisa) (Entered: 10/24/2018) |
| 12/12/2018 | 17 | Minute Entry for proceedings held before Judge Joan M. Azrack: CIVIL CAUSE FOR STATUS CONFERENCE (Tel). Counsel For Plaintiff: Neil Torczyner, Steven Harfenist, present. Counsel For Defendant: Ralph Reissman, present. Status Conference held on 12/12/2018 at 11:30 AM. Parties to submit a proposed discovery schedule to Magistrate Judge Tomlinson. Discovery disputes are respectfully referred to Magistrate Judge Tomlinson. (Ortiz, Grisel) (Entered: 12/12/2018) |
| 12/19/2018 | 18 | Proposed Scheduling Order *(joint) and case management plan* by Sunita Shah (Attachments: # 1 Proposed Order Proposed Discovery Schedule and Case Management Plan) (Torczyner, Neil) (Entered: 12/19/2018) |
| 12/20/2018 | | SCHEDULING ORDER: this matter is being set down for a Telephone Status Conference on January 4, 2019 at 11 a.m. Plaintiff's counsel is directed to call into Chambers at 631–712–5760 with all counsel on the line. Ordered by Magistrate Judge A. Kathleen Tomlinson on 12/20/2018. (Cento, Patrick) (Entered: 12/20/2018) |

A-5

| | | |
|---|---|---|
| 01/04/2019 | | SCHEDULING ORDER: the Court needs to reschedule today's Telephone Status Conference, which will now proceed on January 7, 2019 at 4 p.m. Plaintiff's counsel is directed to call into Chambers at 631–712–5760 with all counsel on the line. Ordered by Magistrate Judge A. Kathleen Tomlinson on 1/4/2019. (Cento, Patrick) (Entered: 01/04/2019) |
| 01/07/2019 | | SCHEDULING ORDER: the Court needs to reschedule today's Telephone Status Conference, which will now proceed on January 8, 2019 at 1:30 p.m. Plaintiff's counsel is directed to call into Chambers at 631–712–5760 with all counsel on the line. Ordered by Magistrate Judge A. Kathleen Tomlinson on 1/7/2019. (Degennaro, Christopher) (Entered: 01/07/2019) |
| 01/09/2019 | 19 | Minute Entry for proceedings held before Magistrate Judge A. Kathleen Tomlinson: Telephone Status Conference held on 1/8/2019. The Discovery Status Conference will be held on May 23, 2019 at 10:30 a.m. SEE ATTACHED ORDER for details. The Case Management and Scheduling Order is being entered separately. (Cento, Patrick) (Entered: 01/09/2019) |
| 01/09/2019 | 20 | CASE MANAGEMENT AND SCHEDULING ORDER: SEE ATTACHED ORDER FOR DISCOVERY DEADLINES AND COURT APPEARANCES. Ordered by Magistrate Judge A. Kathleen Tomlinson on 1/8/2019. (Cento, Patrick) (Entered: 01/09/2019) |
| 01/15/2019 | 21 | Consent MOTION to Amend/Correct/Supplement 19 Status Conference, by Sunita Shah. (Torczyner, Neil) (Entered: 01/15/2019) |
| 01/16/2019 | | ORDER re 21 : the Court is in receipt of counsel's correspondence and is aware of Plaintiff's assertion of the right to seek "garden variety" emotional distress damages in this action. Ordered by Magistrate Judge A. Kathleen Tomlinson on 1/16/2019. (Cento, Patrick) (Entered: 01/16/2019) |
| 03/22/2019 | | Case Reassigned to Judge Carol Bagley Amon and Magistrate Judge Steven Tiscione. Judge Joan M. Azrack, Magistrate Judge A. Kathleen Tomlinson no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (McMahon, Carol) (Entered: 03/22/2019) |
| 03/22/2019 | 22 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (McMahon, Carol) (Entered: 03/22/2019) |
| 03/26/2019 | | SCHEDULING ORDER: This case has been re–assigned to the undersigned magistrate judge for pre–trial supervision. Accordingly, the status conference previously set before Magistrate Judge Tomlinson for 10:30 a.m. on May 23, 2019 will proceed as scheduled before the undersigned in Hearing Room N504 in the North Wing of the Brooklyn Courthouse at 225 Cadman Plaza East. So Ordered by Magistrate Judge Steven Tiscione on 3/26/2019. (Vasquez, Lea) (Entered: 03/26/2019) |
| 04/05/2019 | 23 | First MOTION for Extension of Time to Amend 1 Complaint *on consent* by Sunita Shah. (Torczyner, Neil) (Entered: 04/05/2019) |
| 04/10/2019 | | ORDER granting 23 Motion for Extension of Time to July 1st to Amend Complaint. So Ordered by Magistrate Judge Steven Tiscione on 4/10/2019. (Vasquez, Lea) (Entered: 04/10/2019) |
| 05/27/2019 | 24 | Minute Entry for Status Conference held on 5/23/2019 before Magistrate Judge Steven Tiscione: Torczyner for Plaintiff; Reissman for Defendants. Discovery is proceeding. Parties will advise the Court as soon as a settlement conference would be productive. (FTR Log #11:14 – 11:42.) (Vasquez, Lea) (Entered: 05/27/2019) |

A-6

| | | |
|---|---|---|
| 12/31/2019 | 25 | Letter MOTION for Discovery *to compel responses to Interrogatories & Requests for Production* by Sunita Shah. (Attachments: # 1 Exhibit A – 1st Interrogatories, # 2 Exhibit B – Response to Interrogatories, # 3 Exhibit C – 2nd Requests for Production, # 4 Exhibit D – Third Requests for Production) (Torczyner, Neil) (Entered: 12/31/2019) |
| 01/02/2020 | | ORDER deferring ruling on 25 Motion for Discovery: Defendants shall file a response by January 8th. An in–person hearing will be held at 10:30 a.m. on January 10, 2020 before the undersigned in Hearing Room N504. So Ordered by Magistrate Judge Steven Tiscione on 1/2/2020. (Vasquez, Lea) (Entered: 01/02/2020) |
| 01/07/2020 | 26 | RESPONSE in Opposition re 25 Letter MOTION for Discovery *to compel responses to Interrogatories & Requests for Production* filed by John Liston, Andrew Martone, The County Of Nassau. (Reissman, Ralph) (Entered: 01/07/2020) |
| 01/13/2020 | 27 | Minute Order for Motion Hearing held on 1/10/2020 before Magistrate Judge Steven Tiscione: Torczyner for Plaintiff; Reissman for Defendants. For the reasons discussed on the record, Plaintiff's Letter Motion for Discovery 25 is denied as moot but can be reopened if Defendants do not provide the documents they have agreed to produce. Once these responses are received, discovery will be complete. The deadline for beginning dispositive motion practice is extended to February 28, 2020. For clarity purposes, Plaintiff will amend the complaint to substitute the name of John Doe officers. (FTR Log #10:28 – 10:39.) (Vasquez, Lea) (Entered: 01/13/2020) |
| 01/14/2020 | 28 | Second MOTION to Compel – *renewed motion to compel responses to Plaintiffs' Requests for Production* by Sunita Shah. (Attachments: # 1 Exhibit A – Plaintiff's Second Request for Production, # 2 Exhibit B – Defendants' Opposition to Prior Motion to Compel, # 3 Exhibit C – Defendants' Response to Second Requests for Production, # 4 Exhibit D – Crime Report – Sunita Shah, # 5 Exhibit E – Excerpts of Liston Deposition, # 6 Exhibit F – Crime Report – Rajesh Shah, # 7 Exhibit G – Case Report, # 8 Exhibit H – Excerpts of Kenney Deposition) (Torczyner, Neil) (Entered: 01/14/2020) |
| 01/15/2020 | 29 | MOTION to Withdraw 28 Second MOTION to Compel – *renewed motion to compel responses to Plaintiffs' Requests for Production without prejudice* by Sunita Shah. (Torczyner, Neil) (Entered: 01/15/2020) |
| 01/15/2020 | | ORDER withdrawing 28 Motion to Compel; granting 29 Motion to Withdraw. So Ordered by Magistrate Judge Steven Tiscione on 1/15/2020. (Vasquez, Lea) (Entered: 01/15/2020) |
| 02/11/2020 | 30 | MOTION to Compel *Discovery and extend Plaintiff's time to file Amended Complaint and Dispositive Pre–Motion Conference Letter* by Sunita Shah. (Attachments: # 1 Exhibit A – Plaintiff's 4th Requests for Production, # 2 Exhibit B – January 29, 2020 e–mail chain, # 3 Exhibit C – February 5, 2020 e–mail chain) (Torczyner, Neil) (Entered: 02/11/2020) |
| 02/27/2020 | 31 | Letter MOTION for pre motion conference by John Liston, Andrew Martone, The County Of Nassau. (Reissman, Ralph) (Entered: 02/27/2020) |
| 03/02/2020 | 32 | RESPONSE in Opposition re 31 Letter MOTION for pre motion conference filed by Sunita Shah. (Torczyner, Neil) (Entered: 03/02/2020) |
| 03/04/2020 | | ORDER granting 31 Motion for Pre–Motion Conference: A pre–motion conference on Defendants' anticipated motion for summary judgment will be held on March 20, 2020, at 2:00 p.m., in Courtroom 10D South before Judge Carol Bagley Amon. Ordered by Judge Carol Bagley Amon on 3/4/2020. (Cohn, Caroline) (Entered: 03/04/2020) |
| 03/12/2020 | 33 | Joint MOTION to Appear by Telephone by John Liston, Andrew Martone, The County Of Nassau. (Reissman, Ralph) (Entered: 03/12/2020) |
| 03/13/2020 | | ORDER granting 33 Motion to Appear by Telephone: The in–person pre–motion conference scheduled for next Friday, March 20, before Judge Carol Bagley Amon is converted to a telephone conference. Plaintiff's counsel is directed to coordinate the call to chambers at (718) 613–2410. Ordered by Judge Carol Bagley Amon on 3/13/2020. (Cohn, Caroline) (Entered: 03/13/2020) |

A-7

| | | |
|---|---|---|
| 03/16/2020 | | RESCHEDULING ORDER: The pre–motion conference previously scheduled for Friday, March 20, 2020, is rescheduled to Monday, May 18, 2020 at 2:00 PM in Courtroom 10D South before Judge Carol Bagley Amon. So Ordered by Judge Carol Bagley Amon on 3/16/2020. (Phillips, Alice) (Entered: 03/16/2020) |
| 03/24/2020 | 34 | Consent MOTION for Leave to File Document *for the filing of an Amended Complaint replacing the John Doe parties and for the parties to file Rule 56 motions based on the this proposed schedule* by Sunita Shah. (Torczyner, Neil) (Entered: 03/24/2020) |
| 03/25/2020 | | ORDER granting 34 : On consent of the parties, the pre–motion conference currently scheduled for May 18, 2020 is canceled, and the following briefing schedule is ordered: Plaintiff shall file an amended complaint as specified in the parties' letter on or before Monday, March 30, 2020. Plaintiff shall serve a Rule 56 motion on or before April 29, 2020. Defendants shall serve a cross–motion on or before June 10, 2020. Plaintiff shall serve an opposition to the cross–motion and reply in support of the Plaintiff's motion on or before July 1, 2020. Defendants shall serve a reply in support of the cross–motion, and the fully briefed motions shall be filed on the docket, on or before July 13, 2020. Ordered by Judge Carol Bagley Amon on 3/25/2020. (Cohn, Caroline) (Entered: 03/25/2020) |
| 03/25/2020 | 35 | AMENDED COMPLAINT against John Liston, Andrew Martone, The County Of Nassau, Michael Kenney, David Twomey, filed by Sunita Shah. (Torczyner, Neil) (Entered: 03/25/2020) |
| 03/25/2020 | 36 | Proposed Summons. Re 35 Amended Complaint by Sunita Shah (Torczyner, Neil) (Entered: 03/25/2020) |
| 03/25/2020 | 37 | Proposed Summons. Re 35 Amended Complaint by Sunita Shah (Torczyner, Neil) (Entered: 03/25/2020) |
| 03/26/2020 | 38 | Summons Issued as to Michael Kenney, David Twomey. (Attachments: # 1 Kenney Summons) (Fernandez, Erica) (Entered: 03/26/2020) |
| 04/22/2020 | 39 | ANSWER to 35 Amended Complaint by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 04/22/2020) |
| 04/24/2020 | | ORDER deferring ruling on 30 Motion to Compel: Counsel for plaintiff shall file a letter no later than May 1st informing the Court if the motion to compel still needs to be addressed by the Court. So Ordered by Magistrate Judge Steven Tiscione on 4/24/2020. (Vasquez, Lea) (Entered: 04/24/2020) |
| 04/27/2020 | 40 | SUMMONS Returned Executed by Sunita Shah. David Twomey served on 4/23/2020, answer due 5/14/2020. (Torczyner, Neil) (Entered: 04/27/2020) |
| 04/27/2020 | 41 | SUMMONS Returned Executed by Sunita Shah. Michael Kenney served on 4/23/2020, answer due 5/14/2020. (Torczyner, Neil) (Entered: 04/27/2020) |
| 04/28/2020 | 42 | Consent MOTION for Extension of Time to File *motions for Summary Judgment* by Sunita Shah. (Torczyner, Neil) (Entered: 04/28/2020) |
| 04/28/2020 | | ORDER granting 42 Extension of Time to File: On consent of the parties, the briefing schedule shall be as follows: Plaintiff shall serve the contemplated Rule 56 motion by May 20, 2020; Defendants shall serve a cross–motion by July 1, 2020; Plaintiff shall serve an opposition to the cross–motion/reply in support by July 22, 2020; Defendants serve a reply, and the fully briefed motions shall be filed on the docket, by August 5, 2020. Ordered by Judge Carol Bagley Amon on 4/28/2020. (Cohn, Caroline) (Entered: 04/28/2020) |
| 05/01/2020 | 43 | STATUS REPORT *to Magistrate Tiscione advising as to discovery* by Sunita Shah (Torczyner, Neil) (Entered: 05/01/2020) |
| 05/01/2020 | | ORDER finding as moot 30 Motion to Compel in light of plaintiff's letter dated 5/1/20. So Ordered by Magistrate Judge Steven Tiscione on 5/1/2020. (Vasquez, Lea) (Entered: 05/01/2020) |
| 05/20/2020 | 44 | Letter *advising as to service of Rule 56 Motion pursuant to the Court's Individual Practices* by Sunita Shah (Torczyner, Neil) (Entered: 05/20/2020) |

A-8

| 06/30/2020 | 45 | Letter *re: service of cross−motion for summary judgment upon plaintiff's counsel* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 06/30/2020) |
|---|---|---|
| 08/04/2020 | 46 | MOTION for Summary Judgment *on Liability* by Sunita Shah. (Attachments: # 1 Declaration of Neil Torczyner, # 2 Exhibit A − Excerpts of Sunita Shah Transcript, # 3 Exhibit B− NCPD Crime Report, # 4 Exhibit C − Excerpts of Michael Kenney Transcript, # 5 Exhibit D − Excerpts of Andrew Martone Transcript, # 6 Exhibit E − Excerpts of John Liston Transcript, # 7 Exhibit F − Excerpts of David Twomey Transcript, # 8 Exhibit G − NCPD Case Report, # 9 Exhibit H − County of Nassau Response to Interrogatories, # 10 Exhibit I − Agreement with Bhatty for use of basement, # 11 Exhibit J − District Court Information 1, # 12 Exhibit K − Felony Complaint, # 13 Exhibit L − District Court Information 2, # 14 Exhibit M − Certificate of Disposition, # 15 Exhibit N − Original Complaint, # 16 Exhibit O − Answer, # 17 Exhibit P − Amended Complaint, # 18 Exhibit Q − Answer to Amended Complaint) (Torczyner, Neil) (Entered: 08/04/2020) |
| 08/04/2020 | 47 | AFFIDAVIT/DECLARATION in Support re 46 MOTION for Summary Judgment *on Liability Declaration of Rajesh Shah* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/04/2020) |
| 08/04/2020 | 48 | RULE 56.1 STATEMENT re 46 MOTION for Summary Judgment *on Liability* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/04/2020) |
| 08/04/2020 | 49 | MEMORANDUM in Support re 46 MOTION for Summary Judgment *on Liability Memorandum of Law in Support of Plaintiff's Rule 56 Motion* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/04/2020) |
| 08/05/2020 | 50 | Cross MOTION for Summary Judgment by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Attachments: # 1 Notice of Motion PART 2 OF NOTICE OF MOTION WITH EXHIBITS, # 2 Rule 56.1 Statement, # 3 Memorandum in Support, # 4 COUNTERSTATEMENT TO PLTF 56.1 STATEMENT) (Reissman, Ralph) (Entered: 08/05/2020) |
| 08/05/2020 | 51 | AFFIDAVIT/DECLARATION in Opposition re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Declaration of Neil Torczyner as*, REPLY in Support re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Declaration of Neil Torczyner in opposition to Cross−Motion* filed by Sunita Shah. (Attachments: # 1 Exhibit R − Excerpts of Deposition of Kristen Fexas, # 2 Exhibit S − Liston's Response to Interrogatories) (Torczyner, Neil) (Entered: 08/05/2020) |
| 08/05/2020 | 52 | AFFIDAVIT/DECLARATION in Opposition re 46 MOTION for Summary Judgment *on Liability* filed by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Attachments: # 1 Memorandum in Support) (Reissman, Ralph) (Entered: 08/05/2020) |
| 08/05/2020 | 53 | AFFIDAVIT/DECLARATION in Opposition re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Declaration of Sunita Shah*, REPLY in Support re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Declaration of Sunita Shah in opposition* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/05/2020) |
| 08/05/2020 | 54 | MEMORANDUM in Opposition re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Reply Memorandum of Law in Support of Plaintiff's Rule 56 Motion*, REPLY in Support re 46 MOTION for Summary Judgment *on Liability*, 50 Cross MOTION for Summary Judgment *Memorandum of Law in opposition to Cross−Motion* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/05/2020) |
| 08/05/2020 | 55 | RULE 56.1 STATEMENT re 50 Cross MOTION for Summary Judgment *Counter−Statement of Material Facts in Response to Statement of Material Facts filed by Defendants in support of Cross−Motion* filed by Sunita Shah. (Torczyner, Neil) (Entered: 08/05/2020) |
| 08/05/2020 | 56 | Letter *advising the Court that bundle filing has been made and that hard copies are being sent to the Court* by Sunita Shah (Torczyner, Neil) (Entered: 08/05/2020) |

A-9

| | | |
|---|---|---|
| 08/06/2020 | | SCHEDULING ORDER: Oral argument on the parties' cross motions for summary judgment 46 50 will be held via telephone on December 17, 2020 at 2:00 p.m. before Judge Carol Bagley Amon. The parties are directed to call the toll free number 888–398–2342, no later than 1:50 p.m. on December 17, 2020, and enter the access code 1840743, followed by the pound key. These proceedings will be recorded by a court reporter. The attorneys are reminded that they are not to independently record any court proceedings, pursuant to Local Civil Rule 1.8. Ordered by Judge Carol Bagley Amon on 8/6/2020. (Cohn, Caroline) (Entered: 08/06/2020) |
| 08/06/2020 | 57 | Letter MOTION for Leave to File Document *motion for leave to file Sur–Reply Brief limited to Defendants' Revised Collective Knowledge Doctrine Argument* by Sunita Shah. (Attachments: # 1 Memorandum in Support Proposed Sur–Reply Brief) (Torczyner, Neil) (Entered: 08/06/2020) |
| 08/10/2020 | | ORDER granting 57 : Plaintiff's motion to file a sur–reply is granted. The sur–reply is deemed filed. Ordered by Judge Carol Bagley Amon on 8/10/2020. (Cohn, Caroline) (Entered: 08/10/2020) |
| 10/21/2020 | | ORDER: Plaintiff's Memorandum in Support of her Motion for Summary Judgment 49 cites, at page 11, "Liston Tr. at pp. 68–69." The Memorandum further states that "References to Liston Tr. at p._ refer to the corresponding pages of the deposition transcript... appended... as Exhibit 'E.'" The Exhibit E that Plaintiff filed [46–6] does not include pages 68–69 of the identified deposition transcript. Plaintiff is directed to file an amended version of Exhibit E including pages 68–69 of this deposition transcript no later than October 23, 2020. Ordered by Judge Carol Bagley Amon on 10/21/2020. (Marks, Aaron) (Entered: 10/21/2020) |
| 10/21/2020 | 58 | REPLY in Support re Order,, 46 MOTION for Summary Judgment *on Liability*, 49 Memorandum in Support *Cover Letter and substitute Exhibit E containing the erroneously omitted pages of the Liston Transcript* filed by Sunita Shah. (Attachments: # 1 Exhibit Amended Exhibit E) (Torczyner, Neil) (Entered: 10/21/2020) |
| 12/17/2020 | | Minute Entry and Order: Oral argument on the parties' cross–motions for summary judgment 46 50 was held on December 17, 2020 at 2:00p.m. before Judge Carol Bagley Amon. Appearances: For Plaintiff: Neil Torczyner, Esq.; Steven Harfenist, Esq.; For Defendants: Ralph Reissman, Esq.<br><br>As stated on the record, the motions are DENIED because I find that there exist genuine disputes of material fact that preclude the granting of summary judgment. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986). The disputes of material fact include the conduct of Plaintiff and her husband during the October 4, 2017 investigation, e.g., (1) the extent to which Plaintiff interacted with Defendants during the investigation, (2) whether Plaintiff provided Defendants with the basement sub–lease, (3) whether Plaintiff provided Defendants with business cards for Accessories by Peak, and (4) the extent to which Plaintiff's husband indicated to Defendants that Plaintiff had no role in his business. These factual disputes preclude a determination, as a matter of law, that Defendants did or did not have probable cause––or "arguable probable cause"––to arrest and prosecute Plaintiff. See Dufort v. City of New York, 874 F.3d 338, 350–51, 354 (2d Cir. 2017). As to Defendants' argument regarding the malice element of Plaintiff's malicious prosecution claim, the factual disputes likewise preclude summary judgment because prosecuting a plaintiff without probable cause generally creates an inference of malice. See Boyd v. City of New York, 336 F.3d 72, 78 (2d Cir. 2003). As to Defendants' argument regarding the favorable termination element of malicious prosecution, a reasonable jury could conclude that the termination here was favorable and on the merits, especially in light of the prosecutor's testimony in this case. See Virgil v. City of New York, No. 17–CV–5100 (PKC) (SMG), 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019).<br><br>No later than December 21, 2020, the parties shall jointly file a letter to the Honorable Steven Tiscione, United States Magistrate Judge, requesting a settlement conference and proposing dates for that conference which allow counsel sufficient time to obtain realistic settlement authority. Ordered by Judge Carol Bagley Amon on December 17, 2020. (Court reporter: Georgette Betts.) (Marks, Aaron) (Entered: 12/17/2020) |
| 12/18/2020 | 59 | Letter *requesting a settlement conference as per directive of USDJ Amon* by Sunita Shah (Torczyner, Neil) (Entered: 12/18/2020) |

| | | |
|---|---|---|
| 12/18/2020 | | SCHEDULING ORDER: A settlement conference will be held by phone before the undersigned at 2:00 p.m. on January 11, 2020. Counsel for Plaintiff shall call into the conference with the client on the line at 2:00 p.m. and counsel for the Defendants shall call into the conference with the client on the line at 2:30 p.m. The parties shall connect to the conference through dial–in number 888–557–8511 with access code 3152145. Settlement positions are to be filed via ex parte electronic filing through the Court's ECF system no later than January 7th. A MOTION TO FILE EX PARTE IS NOT REQUIRED. Counsel shall refer to the Settlement Section of this Court's Individual Rules to further prepare for the conference.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 12/18/2020. (Vasquez, Lea) (Entered: 12/18/2020) |
| 01/06/2021 | 60 | Joint MOTION to Adjourn Conference *scheduled for January 11, 2021* by Sunita Shah. (Torczyner, Neil) (Entered: 01/06/2021) |
| 01/06/2021 | | ORDER granting 60 Motion to Adjourn Conference. The settlement conference scheduled for January 11th will instead be held at 4:00 p.m. on February 8th. Counsel for Plaintiff shall call into the conference at 4:00 p.m. with the client on the line and counsel for Defendants shall call into the conference with the clients on the line at 4:30 p.m. Settlement positions will now be due by February 4th. Counsel are to use the dial–in information previously provided.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 1/6/2021. (Vasquez, Lea) (Entered: 01/06/2021) |
| 02/03/2021 | 61 | Letter *Ex Parte settlement position letter* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 02/03/2021) |
| 02/03/2021 | 62 | Letter *Ex Parte Pre–Settlement Conference Letter* by Sunita Shah (Torczyner, Neil) (Entered: 02/03/2021) |
| 02/08/2021 | 63 | Minute Entry for Settlement Conference held on 2/8/2021 before Magistrate Judge Steven Tiscione: Shah for Plaintiff; Reissman for Defendants. Settlement discussions were held but the parties were unable to reach a disposition. Parties shall file the Joint Pretrial Order by April 8, 2021. (Vasquez, Lea) (Entered: 02/08/2021) |
| 04/01/2021 | 64 | Joint MOTION for Extension of Time to File *joint pre–trial Order to May 7, 2021* by Sunita Shah. (Torczyner, Neil) (Entered: 04/01/2021) |
| 04/02/2021 | | ORDER granting 64 Motion for Extension of Time to File. Upon consent of the parties, the motion for extension of time is granted. Accordingly, the time to file a joint pre–trial order is extended until May 7, 2021. Ordered by Judge Carol Bagley Amon on 4/2/2021.(Watson, Thomas) (Entered: 04/02/2021) |
| 05/03/2021 | 65 | Proposed Pretrial Order *and cover letter, jointly submitted by the parties* by Sunita Shah (Attachments: # 1 Proposed Order Joint Pre–Trial Order) (Torczyner, Neil) (Entered: 05/03/2021) |
| 05/04/2021 | | ORDER re 65 . The parties' proposed pretrial order [DE 65] is respectfully referred to U.S. Magistrate Judge Steven Tiscione for review, including for compliance with the Court's Individual Rules regarding pretrial orders. Ordered by Judge Carol Bagley Amon on 5/4/2021. (Watson, Thomas) (Entered: 05/04/2021) |

A-11

| | | |
|---|---|---|
| 05/05/2021 | | SCHEDULING ORDER re Order, <u>65</u> Proposed Pretrial Order filed by Sunita Shah: A telephone conference will be held at 2:30 p.m. on May 19, 2021 before the undersigned to review and discuss the proposed pretrial Order. Counsel for all parties must participate. The parties shall connect to the conference through dial–in number 888–557–8511 with access code 3152145.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 5/5/2021. (Vasquez, Lea) (Entered: 05/05/2021) |
| 05/21/2021 | <u>66</u> | Minute Entry for Telephone Conference held on 5/19/2021 before Magistrate Judge Steven Tiscione: Torczyner for Plaintiff; Reissman for Defendants. Court reviewed the Proposed Pretrial Order <u>65</u> with the parties and it substantially complies with the District Court's Individual Rules regarding pretrial orders. Accordingly, the case is certified to be ready for trial, on a date to be set by United States District Judge Carol B. Amon. (FTR Log #AT&T 2:30 – 2:45.) (Vasquez, Lea) (Entered: 05/21/2021) |
| 05/24/2021 | | SCHEDULING ORDER: On Monday, June 14 at 2:00PM, the the Court will hold a telephonic status conference on the parties' JPTO and trial date. The parties are directed to call the toll free number 888–398–2342, no later than 1:50PM on June 14, and enter the access code 1840743, followed by the pound key. Ordered by Judge Carol Bagley Amon on 5/24/2021. (Watson, Thomas) (Entered: 05/24/2021) |
| 06/04/2021 | | SCHEDULING ORDER: Due to a conflict in the Court's schedule, the conference previously set for June 14 is rescheduled. The telephonic conference will now take place on Wednesday, June 16, 2021 at 11:00AM. The parties are directed to call the toll free number 888–398–2342, no later than 10:50AM on June 16, and enter the access code 1840743, followed by the pound key. Ordered by Judge Carol Bagley Amon on 6/4/2021.(Watson, Thomas) (Entered: 06/04/2021) |
| 06/16/2021 | | Minute Entry for Pre–Trial Conference before Judge Carol Bagley Amon, held June 16, 2021 (Court Reporter: Georgette Betts). For Plaintiff – Steven J. Harfenist and Neil S. Torczyner; For Defendants: Ralph J. Reissman. Trial date was set for January 31, 2022. Parties were directed to file their proposed instructions (including, principally, the elements of the claims and any special instructions, if applicable) two weeks prior to January 31, 2022. Parties represented that three days would likely be sufficient time for trial, despite estimates given in the Joint Pre–Trial Order. Parties also represented that no motions in limine were contemplated at this time and that they would seek to jointly resolve other anticipated evidentiary objections before trial. (Watson, Thomas) (Entered: 06/16/2021) |
| 12/15/2021 | | RESCHEDULING ORDER: The trial currently scheduled to begin on January 31, 2022 is now rescheduled to June 13, 2022. Parties are directed to file their proposed instructions (including, principally, the elements of the claims and any special instructions, if applicable) by May 31, 2022. So ordered by Judge Carol Bagley Amon on December 15, 2021. (Shire, Emily) (Entered: 12/15/2021) |
| 12/29/2021 | | SCHEDULING ORDER: In preparation for the trial scheduled to begin on June 13, 2022, the Court will hold a telephonic conference on June 7, 2022 at 11:00 a.m. The parties are directed to call the toll–free number 888–398–2342, no later than 10:50 a.m. on June 7, and enter the access code 1840743, followed by the pound key. So Ordered by Judge Carol Bagley Amon on December 29, 2021. (Shire, Emily) (Entered: 12/29/2021) |
| 05/20/2022 | <u>67</u> | NOTICE of Appearance by Ian Bergstrom on behalf of Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (aty to be noticed) (Bergstrom, Ian) (Entered: 05/20/2022) |
| 05/25/2022 | | SCHEDULING ORDER: This case has been referred to me for jury selection on **June 6, 2022**. The parties must appear promptly at **9:00 a.m.** to begin selection, in Courtroom 2A South. The parties must file no later than **May 31, 2022** a joint letter that includes the following: anticipated length of trial, proposed questions to ask |

| | | |
|---|---|---|
| | | prospective jurors during *voir dire*, a short description of the case, and a list of the names of all persons, entities, and locations that the parties expect to be mentioned during the trial. Only questions specifically addressing the issues to be tried should be submitted; routine background questions are not necessary.<br><br>A final Pre–Trial Conference is scheduled by telephone for **June 2, 2022 at 9:00 a.m.** before Magistrate Judge Peggy Kuo. The parties are directed to call toll free **(877) 336–1274** and input the Access Code **1453850** at the time of the Conference. Once all parties are on the line, the call will be connected. (The parties are reminded that, pursuant to Local Civil Rule 1.8, they may not independently record any court proceedings. A transcript of the proceedings may be ordered from the Clerk's Office.) Ordered by Magistrate Judge Peggy Kuo on 5/25/2022. (O'Neil–Berven, Ryan) (Entered: 05/25/2022) |
| 05/26/2022 | 68 | Letter *requesting change of jury selection from June 6 to June 8, 2022 due to religious observance* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 05/26/2022) |
| 05/26/2022 | 69 | Letter *to Magistrate Judge Kuo with parties joint trial submission as per May 25, 2022 docket order* by Sunita Shah (Harfenist, Steven) (Entered: 05/26/2022) |
| 05/27/2022 | | SCHEDULING ORDER granting 68 . The jury selection previously referred to Magistrate Judge Peggy Kuo has been reassigned to Magistrate Judge James R. Cho. The jury selection previously scheduled for June 6, 2022 is adjourned to **June 8, 2022** at **9:00 a.m.** in a courtroom to be determined. The Telephonic Final Pretrial Conference previously scheduled for June 2, 2022 is adjourned to **June 7, 2022 at 4:30 p.m.** before Judge Cho. The parties are directed to call toll free (888) 808–6929 and use access code 106–5334. The Court anticipates discussing the parties' proposed *voir dire* 69 and logistics of the jury selection at the conference. Ordered by Magistrate Judge James R. Cho on 5/27/2022. (Gillespie–Cardo, Saudia) (Entered: 05/27/2022) |
| 05/29/2022 | 70 | Proposed Jury Instructions/Verdict Form by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 05/29/2022) |
| 05/30/2022 | 71 | Proposed Jury Instructions/Verdict Form by Sunita Shah (Attachments: # 1 Proposed Verdict Sheet) (Harfenist, Steven) (Entered: 05/30/2022) |
| 05/31/2022 | 72 | PRETRIAL MEMORANDUM by Sunita Shah (Harfenist, Steven) (Entered: 05/31/2022) |
| 05/31/2022 | | SCHEDULING ORDER: The pretrial conference that was going to be held before Judge Carol Bagley Amon on June 7 at 11:00 a.m. is rescheduled for June 8 at 11:00 a.m. The parties are directed to call the toll–free number 888–398–2342, no later than 10:50 a.m. on June 8, and enter the access code 1840743, followed by the pound key. So Ordered by Judge Carol Bagley Amon on May 31, 2022. (Shire, Emily) (Entered: 05/31/2022) |
| 06/01/2022 | 73 | Letter MOTION to Adjourn Conference *as 11:00 a.m. conference on July 8, 2022 conflicts with jury selection at 9:00 a.m. on same day* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 06/01/2022) |
| 06/01/2022 | 74 | TRIAL BRIEF *[pre–trial memorandum of law]* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 06/01/2022) |
| 06/01/2022 | | ORDER: The jury selection previously scheduled for June 8, 2022 at 9:00 a.m. before Magistrate Judge James R. Cho will be held in Courtroom 2A South. Ordered by Magistrate Judge James R. Cho on 6/1/2022. (Gillespie–Cardo, Saudia) (Entered: 06/01/2022) |
| 06/01/2022 | | ORDER granting 73 Motion to Adjourn Conference: The conference that was scheduled to be held on June 8, 2022 to June 9, 2022 at 3:00 p.m. The parties are directed to call the toll–free number 888–398–2342, no later than 2:50 p.m. on June 9, and enter the access code 1840743, followed by the pound key. So Ordered by Judge Carol Bagley Amon on June 1, 2022. (Shire, Emily) (Entered: 06/01/2022) |

A-13

| | | |
|---|---|---|
| 06/02/2022 | | SCHEDULING ORDER: The pretrial conference on June 9, 2022 that was to be held via telephone will be held in person in Courtroom 10D South. SO ORDERED by Judge Carol Bagley Amon on June 2, 2022. (Shire, Emily) (Entered: 06/02/2022) |
| 06/03/2022 | 75 | Letter *to Judge Amon requesting a Conference Call to discuss a personal matter* by Sunita Shah (Harfenist, Steven) (Entered: 06/03/2022) |
| 06/03/2022 | | SCHEDULING ORDER: In response to the request from Plaintiff's counsel 75 , the Court will hold a teleconference at 10:00 a.m. on June 6, 2022. The parties are directed to call the toll–free number 888–398–2342, no later than 9:50 a.m. on June 6, and enter the access code 1840743, followed by the pound key. SO ORDERED by Judge Carol Bagley Amon on June 3, 2022. (Shire, Emily) (Entered: 06/03/2022) |
| 06/03/2022 | 76 | Letter MOTION to Adjourn Conference *scheduled for June 6, 2022 to June 7, 2022 due to religious observance* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 06/03/2022) |
| 06/03/2022 | | ORDER granting 76 Motion to Adjourn Conference: The telephonic conference that was scheduled for June 6, 2022 has been rescheduled for June 7, 2022 at 9:30 a.m. The same dial–in instructions apply. SO ORDERED by Judge Carol Bagley Amon on June 3, 2022. (Shire, Emily) (Entered: 06/03/2022) |
| 06/07/2022 | | MINUTE ENTRY FOR PRE–TRIAL CONFERENCE: For Plaintiff – Steven J. Harfenist and Neil S. Torczyner; for Defendants – Ralph J. Reissman and Ian Bergstrom; Linda Marino served as court reporter. As discussed during the June 7, 2022 conference call, the trial will be adjourned sine die. Plaintiffs counsel will let us know by tomorrow whether Plaintiff consents to trial by magistrate judge and, if she does so, will file the appropriate form jointly with defense counsel. SO ORDERED by Judge Carol Bagley Amon on June 7, 2022. (Shire, Emily) (Entered: 06/07/2022) |
| 06/07/2022 | | ORDER: In light of the Minute Entry for Pre–Trial Conference dated 6/7/2022, the Telephonic Final Pretrial Conference scheduled for 6/7/2022 at 4:30 p.m. before Magistrate Judge Cho is adjourned *sine die*. Ordered by Magistrate Judge James R. Cho on 6/7/2022. (Beckham, Joshua) (Entered: 06/07/2022) |
| 06/07/2022 | | ORDER: The jury selection previously scheduled for June 8, 2022 before Magistrate Judge James R. Cho is adjourned *sine die*. Ordered by Magistrate Judge James R. Cho on 6/7/2022. (Beckham, Joshua) (Entered: 06/07/2022) |
| 06/07/2022 | 77 | CONSENT to Jurisdiction by US Magistrate Judge by Sunita Shah. (Attachments: # 1 Exhibit Completed Consent to Proceed before Magistrate) (Torczyner, Neil) (Entered: 06/07/2022) |
| 06/08/2022 | | Case no longer referred to Magistrate Judge Steven Tiscione. (Fernandez, Erica) (Entered: 06/08/2022) |
| 06/08/2022 | 78 | CONSENT to Jurisdiction by US Magistrate Judge Case reassigned to Magistrate Judge Steven Tiscione for all further proceedings. Judge Carol Bagley Amon no longer assigned to case Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Fernandez, Erica) (Entered: 06/08/2022) |
| 06/08/2022 | | SCHEDULING ORDER: This case has been assigned to the undersigned for all purposes. Accordingly, a telephone conference will be held at 10:30 a.m. on June 14, 2022 to set a trial date. Counsel for all parties must participate and shall connect to the conference through dial–in number 888–557–8511 with access code 3152145. **THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.** So Ordered by Magistrate Judge Steven Tiscione on 6/8/2022. (Vasquez, Lea) (Entered: 06/08/2022) |

A-14

| | | |
|---|---|---|
| 06/09/2022 | 79 | Proposed Jury Instructions/Verdict Form by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 06/09/2022) |
| 06/09/2022 | 80 | TRIAL BRIEF *(amended)* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 06/09/2022) |
| 06/15/2022 | 81 | Minute Entry for Telephone Conference held on 6/14/2022 before Magistrate Judge Steven Tiscione: Harfenist, Torczyner for Plaintiff; Reissman, Bergstrom for Defendants. The Court will hold a final pretrial conference by telephone on November 8, 2022 at 10:00 a.m. Counsel for all parties must participate and shall connect to the conference through dial–in number 888–557–8511 with access code 3152145. The jury selection will be held on November 14, 2022 at 10:00 a.m. in Courtroom 910 of the Central Islip Courthouse and the trial, to be held in the same courtroom, will begin immediately following the jury selection. (FTR Log #10:31 – 10:40 AT&T.) (Vasquez, Lea) (Entered: 06/15/2022) |
| 11/01/2022 | 82 | Letter *(joint) advising of filing of proposed voir dire and jury instructions* by Sunita Shah (Torczyner, Neil) (Entered: 11/01/2022) |
| 11/10/2022 | 83 | Minute Entry for Final Pretrial Conference held on 11/8/2022 before Magistrate Judge Steven Tiscione: Harfenist, Torczyner for Plaintiff; Reissman for Defendants. Parties have no in limine motions. The jury selection will be held on November 14, 2022 at 10:00 a.m. in Courtroom 910 of the Central Islip Courthouse and the trial, to be held in the same courtroom, will begin immediately following the jury selection. Trial is expected to last 4–5 days. (FTR Log #AT&T (10:20 – 10:37).) (LV) (Entered: 11/10/2022) |
| 11/10/2022 | 84 | Letter *to Judge Tiscione regarding proposed Amended Jury Instructions* by Sunita Shah (Harfenist, Steven) (Entered: 11/10/2022) |
| 11/10/2022 | 85 | Proposed Jury Instructions/Verdict Form by Sunita Shah (Harfenist, Steven) (Entered: 11/10/2022) |
| 11/10/2022 | 86 | STIPULATION *of Facts* by Sunita Shah (Harfenist, Steven) (Entered: 11/10/2022) |
| 11/15/2022 | 87 | Proposed Jury Instructions/Verdict Form by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 11/15/2022) |
| 11/15/2022 | 88 | Proposed Jury Instructions/Verdict Form by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 11/15/2022) |
| 11/16/2022 | 89 | TRIAL BRIEF *on Issue of Submitting Qualified Immunity to the Jury* by Sunita Shah (Torczyner, Neil) (Entered: 11/16/2022) |
| 11/17/2022 | 90 | Order of Sustenance. ORDERED that the Clerk of the Court supply proper sustenance (lunch) to the seven (7) jurors empaneled while in deliberations. Ordered by Magistrate Judge Steven Tiscione on 11/17/2022. (RB) (Entered: 11/17/2022) |
| 11/18/2022 | 91 | Order of Sustenance. ORDERED that the Clerk of the Court supply proper sustenance (lunch) to the six (6) jurors empaneled while in deliberations. Ordered by Magistrate Judge Steven Tiscione on 11/18/2022. (RB) (Entered: 11/18/2022) |
| 11/18/2022 | 92 | Exhibit List by Sunita Shah. (NM) (Entered: 11/18/2022) |
| 11/18/2022 | 93 | Exhibit List by Michael Kenney, John Liston, Andrew Martone, Officers Jane Doe 1–2, Officers John Doe 1–2, The County Of Nassau, David Twomey. (NM) (Entered: 11/18/2022) |
| 11/18/2022 | 94 | COURT EXHIBITS: Jury Notes (NM) (Entered: 11/18/2022) |
| 11/18/2022 | 95 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione:Jury Trial held and completed on 11/18/2022. (Court Reporter Paul Lombardi, Mary Ann Steiger, Lisa Schmid.) (NM) (Main Document 95 replaced on 11/18/2022) (NM). (Entered: 11/18/2022) |

| | | |
|---|---|---|
| 02/10/2023 | 96 | Letter *regarding retrial* by Sunita Shah (Harfenist, Steven) (Entered: 02/10/2023) |
| 02/10/2023 | | SCHEDULING ORDER re 96 Letter filed by Sunita Shah. A telephone conference will be held at 11:00 a.m. on February 14, 2023 before the undersigned. Counsel for all parties must participate and shall connect to the conference through dial–in number 888–557–8511 with access code 3152145.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 2/10/2023. (LV) (Entered: 02/10/2023) |
| 02/14/2023 | 97 | Minute Entry for Telephone Conference held on 2/14/2023 before Magistrate Judge Steven Tiscione: Harfenist for Plaintiff; Reissman for Defendants. The Court sets the following schedule for the retrial in this matter: Jury selection will be held on September 18, 2023 at 10:00 a.m. in Courtroom 910 of the Central Islip Courthouse and the trial, to be held in the same courtroom, will begin immediately following the jury selection. (Not Recorded.) (LV) (Entered: 02/14/2023) |
| 03/09/2023 | 98 | Letter *to Judge Tiscione regarding trial dates* by Sunita Shah (Harfenist, Steven) (Entered: 03/09/2023) |
| 03/09/2023 | | The jury selection and trial scheduled to begin September 18th will instead begin at 10:00 a.m. on October 30, 2023 in Courtroom 910 of the Central Islip Courthouse before the undersigned. The jury selection will begin at 10:00 a.m. and the trial will begin immediately after the jury selection has been completed. So Ordered by Magistrate Judge Steven Tiscione on 3/9/2023. (LV) (Entered: 03/09/2023) |
| 03/31/2023 | 99 | Letter *MOTION to Adjourn trial on consent* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) Modified on 4/3/2023 to correct event(LV). (Entered: 03/31/2023) |
| 04/03/2023 | | ORDER deferring ruling on 99 Motion to Adjourn Conference. The adjourn date proposed by counsel is not a regular jury return day in this Court. The next available date is December 11, 2023. Accordingly, counsel shall submit a letter to the Court by April 7, 2023 confirming that ALL affected parties have been notified of, and agree to, the new date jury selection and trial start date of December 11, 2023. So Ordered by Magistrate Judge Steven Tiscione on 4/3/2023. (LV) (Entered: 04/03/2023) |
| 04/06/2023 | 100 | Letter MOTION for Extension of Time to File Response/Reply as to Order on Motion to Adjourn Conference, by Sunita Shah. (Harfenist, Steven) (Entered: 04/06/2023) |
| 04/06/2023 | | ORDER granting 100 Motion for Extension of Time to File Response/Reply re 100 Letter MOTION for Extension of Time to File Response/Reply as to Order on *Motion to Adjourn Conference*. Counsel are granted until close of business on April 10, 2023 to submit a letter to the Court confirming that ALL affected parties have been notified of, and agree to, the new date jury selection and trial start date of December 11, 2023. So Ordered by Magistrate Judge Steven Tiscione on 4/6/2023. (LV) (Entered: 04/06/2023) |
| 04/10/2023 | 101 | Letter *in response to the Court's Order of April 6, 2023* by Sunita Shah (Harfenist, Steven) (Entered: 04/10/2023) |
| 04/10/2023 | | ORDER granting 99 Motion to Adjourn Conference: As counsel has confirmed that all affected parties in this case agree to the change of dates for jury selection and trial, the Court sets the following schedule: Jury selection will be held on December 11, 2023 at 10:00 a.m. in Courtroom 910 of the Central Islip Courthouse and the trial, to be held in the same courtroom, will begin immediately following the jury selection. So Ordered by Magistrate Judge Steven Tiscione on 4/10/2023. (LV) (Entered: 04/10/2023) |
| 04/10/2023 | | Jury selection and trial for October 30th is adjourned to December 11, 2023. So Ordered by Magistrate Judge Steven Tiscione on 4/10/2023. (LV) (Entered: 04/10/2023) |

| 11/27/2023 | 102 | Proposed Voir Dire by Sunita Shah (Harfenist, Steven) (Entered: 11/27/2023) |
| 11/27/2023 | 103 | Proposed Jury Instructions/Verdict Form by Sunita Shah (Harfenist, Steven) (Entered: 11/27/2023) |
| 11/28/2023 | 104 | NOTICE of Appearance by Victoria LaGreca on behalf of Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (aty to be noticed) (LaGreca, Victoria) (Entered: 11/28/2023) |
| 11/30/2023 | 105 | Joint MOTION for pre motion conference *RE: USE OF NEWLY DISCOVERED EVIDENCE AT TRIAL COMMENCING DECEMBER 11, 2023* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 11/30/2023) |
| 11/30/2023 | 106 | Proposed Jury Instructions/Verdict Form by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 11/30/2023) |
| 11/30/2023 | 107 | Proposed Voir Dire by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 11/30/2023) |
| 12/01/2023 | | ORDER granting 105 Motion for Pre Motion Conference. A telephone conference will be held at 10:00 a.m. on December 4, 2023 before the undersigned. Counsel for all parties must participate and shall connect to the conference through dial–in number 888–557–8511 with access code 3152145.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 12/1/2023. (LV) (Entered: 12/01/2023) |
| 12/01/2023 | 108 | MOTION to Adjourn Conference by Sunita Shah. (Harfenist, Steven) (Entered: 12/01/2023) |
| 12/01/2023 | | ORDER granting 108 Motion to Adjourn Conference. The telephone conference scheduled for 10:00 a.m. on December 4th will instead begin at 1:30 p.m. on the same date. Counsel shall use the same dial–in information previously provided. So Ordered by Magistrate Judge Steven Tiscione on 12/1/2023. (LV) (Entered: 12/01/2023) |
| 12/04/2023 | 109 | Letter *requesting permission for support staff to bring laptop for trial* by Sunita Shah (Harfenist, Steven) (Entered: 12/04/2023) |
| 12/04/2023 | 110 | Minute Entry for Telephone Conference held on 12/4/2023 before Magistrate Judge Steven Tiscione: Torczyner, Harfenist for Plaintiff; Reissman for Defendants. Newly discovered photos will be admitted only if both parties consent. The Letter requesting permission for support staff to bring laptop for trial 109 is granted. Plaintiff's legal assistant, Laurie Moller, is permitted to bring her laptop to the courtroom for trial in this matter. (#Not Recorded.) (LV) (Entered: 12/04/2023) |
| 12/11/2023 | 111 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione: Jury Selection held on 12/11/2023, Jury Trial held on 12/11/2023. Jury sworn. Court denied Defendants' application to challenge any facts from previous stipulations. Opening Statements completed for both parties. (Court Reporter ToniAnn Lucatorto.) (GD) (Entered: 12/11/2023) |
| 12/11/2023 | 112 | Letter MOTION in Limine by Sunita Shah. (Torczyner, Neil) (Entered: 12/11/2023) |
| 12/12/2023 | 113 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione: Jury Trial held on 12/12/2023. Juror 3 excluded. Plaintiffs presented Motion in Limine. Defendant Officer Michael Kenny's testimony heard outside of presence of the jury. Plaintiffs' Motion denied based upon testimony given. Defendants presented arguments regarding admissibility of photographs. Court adhered to prior ruling and excluded the photographs, but Plaintiff then consented to admissibility of some photos (Defendants K1–3). Plaintiffs began by reading stipulation, dated November 10, 2022. |

| | | |
|---|---|---|
| | | Plaintiffs read response to Defendants Interrogatories 3 and 8. Parties completed Direct Examination and Cross–Examination of Defendant Officer Michael Kenney. Parties completed Direct Examination and Cross–Examination of Defendant Officer Andrew Martone. Parties completed Direct Examination and Cross–Examination of Defendant Detective (now Lieutenant) John Liston. Plaintiffs entered portions of Detective John Liston's prior testimony into evidence after examination was completed. Defendants indicated they plan to make Rule 50(a) Motion at end of Plaintiffs' case. Court will hear parties' arguments then. (Court Reporter Marie Foley.) (GD) (Entered: 12/13/2023) |
| 12/14/2023 | 114 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione: Jury Trial held on 12/13/2023. Defendants request to exclude Chief Schnall since this witness is not on the Joint Pre–trial Order. Court ruled the witness is only allowed to testify as a rebuttal witness for limited issues. Parties completed Direct Examination and Cross–Examination of Rajesh Shah. Parties completed examinations of rebuttal witness Robert Schnall (former volunteer fire department Chief). Parties completed their Direct Examination and Cross–Examination of Robert Schalk, Esq. Parties completed their Direct Examination and Cross–Examination of ADA Kristen Fexas. (Court Reporter Marie Foley.) (GD) (Entered: 12/14/2023) |
| 12/15/2023 | 115 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione: Jury Trial held on 12/14/2023. Court instructed jury that Defendant Officer Martone will not be present today due to being sick, and not to draw any negative inferences based upon his absence. Parties completed Direct and Cross–Examinations of Detective Kathleen Reed. Parties completed Direct and Cross–Examination of Sunita Shah. Defendants made Rule 50(a) Motion after Plaintiff completed its case–in–chief. Court denied Defendants' Motion denied with leave to renew. Parties completed Direct and Cross–Examination of Defendant Detective David Twomey. (Court Reporter Marie Foley.) (GD) (Entered: 12/15/2023) |
| 12/18/2023 | 116 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione: Jury Trial completed on 12/15/2023. Parties discussed Jury Instructions and Verdict Sheet outside of presence of the jury. Defendants re–called Defendant Officer Martone. Parties completed their Direct and Cross–Examinations. Defendants completed their case–in–chief and renewed their Rule 50(a) Motion. Parties completed their closing arguments. Court held jury charge conference. Jury issued verdict. (Court Reporter Paul Lombardi.) (GD) (Entered: 12/18/2023) |
| 12/18/2023 | 117 | ORDER OF SUSTENANCE. Ordered that the Clerk of the Court supply proper sustenance (lunch) to the jury empaneled from December 12, 2023 to December 15, 2023 for trial and deliberations. So Ordered by Magistrate Judge Steven Tiscione on 12/18/2023. (GD) (Entered: 12/18/2023) |
| 12/18/2023 | 118 | COURT EXHIBITS (GD) (Entered: 12/18/2023) |
| 12/18/2023 | 119 | Exhibit List by Sunita Shah. (GD) (Entered: 12/18/2023) |
| 12/18/2023 | 120 | Exhibit List by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, and David Twomey. (GD) (Entered: 12/18/2023) |
| 12/18/2023 | 121 | PARTIES' JOINT EXHIBITS (GD) (Entered: 12/18/2023) |
| 01/10/2024 | 122 | Letter *requesting Court's approval of briefing schedule by all parties* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Reissman, Ralph) (Entered: 01/10/2024) |
| 01/10/2024 | | ORDER re 122 Letter filed by David Twomey, Andrew Martone, The County Of Nassau, Michael Kenney, John Liston. The Court approves the proposed briefing schedule as follows: February 9, 2024 Defendants serve moving papers upon plaintiff's attorneys; March 1, 2024 Plaintiff serves opposing papers upon defendants' attorneys; March 15, 2024 Defendants serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. By March 30, 2024, Plaintiff shall serve the motion for attorneys' fees and costs; by April 20, 2024 Defendants will serve their opposing papers; and, by April 27, 2024, Plaintiff to serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. So Ordered by Magistrate Judge Steven Tiscione on 1/10/2024. (LV) (Entered: 01/10/2024) |

A-18

| | | |
|---|---|---|
| 02/08/2024 | 123 | Joint MOTION for Extension of Time to File *defendants' post−trial motions, and plaintiff's motion for an award of attorney fees* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 02/08/2024) |
| 02/08/2024 | | ORDER granting 123 Motion for Extension of Time to File. the Court approves the proposed amended briefing schedule as follows: February 28, 2024 – Defendants serve moving papers upon plaintiff's attorneys; March 28, 2024 – Plaintiff serves opposing papers upon defendants' attorneys; April 12, 2024 –Defendants serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. By April 26, 2024, Plaintiff shall serve the motion for attorneys' fees and costs; by May 17, 2024, Defendants will serve their opposing papers; and, by May 31, 2024, Plaintiff shall serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. So Ordered by Magistrate Judge Steven Tiscione on 2/8/2024. (LV) (Entered: 02/08/2024) |
| 03/11/2024 | 124 | Joint MOTION for Extension of Time to File *post trial motion and motion for attorney fees* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 03/11/2024) |
| 03/12/2024 | | ORDER granting 124 Motion for Extension of Time to File. March 21, 2024 – Defendants serve moving papers upon plaintiff's attorneys; April 21, 2024 – Plaintiff serves opposing papers upon defendants' attorneys; May 10, 2024 –Defendants serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. By May 24, 2024, Plaintiff shall serve the motion for attorneys' fees and costs; by May 31, 2024, Defendants will serve their opposing papers; and, by June 14, 2024, Plaintiff shall serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court. So Ordered by Magistrate Judge Steven Tiscione on 3/12/2024. (LV) (Entered: 03/12/2024) |
| 04/04/2024 | 125 | Joint MOTION for Extension of Time to File *post trial motion and motion for attorney fees* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey. (Reissman, Ralph) (Entered: 04/04/2024) |
| 04/05/2024 | | ORDER terminating 112 Motion in Limine; granting 125 Motion for Extension of Time to File. Defendants serve moving papers upon plaintiff's attorneys by 4/19/24; Plaintiff serves opposing papers upon defendants' attorneys by 5/24/24; Defendants serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court by 6/7/24; Plaintiff shall serve the motion for attorneys' fees and costs 6/21/24; Defendants will serve their opposing papers by 7/12/24; and, Plaintiff shall serve reply papers upon plaintiff's attorneys, file all motion papers on ECF, and serve courtesy copies of all motion papers to the Court by 7/26/24. So Ordered by Magistrate Judge Steven Tiscione on 4/5/2024. (LV) (Entered: 04/05/2024) |
| 05/16/2024 | 126 | Letter *regarding removal of attorney* by Sunita Shah (Harfenist, Steven) (Entered: 05/16/2024) |
| 05/16/2024 | | Attorney Neil S. Torczyner terminated. So Ordered by Magistrate Judge Steven Tiscione on 5/16/2024. (LV) (Entered: 05/16/2024) |
| 06/20/2024 | 127 | Letter MOTION for Extension of Time to File *Fee Motion* by Sunita Shah. (Harfenist, Steven) (Entered: 06/20/2024) |
| 06/21/2024 | | ORDER granting 127 Motion for Extension of Time to File *Fee Motion*. The Court approves the proposed amended briefing schedule as follows: Plaintiff serves moving papers upon Defendants' attorneys by 6/28/24; Defendants serve opposition papers upon Plaintiff's attorneys by 7/19/24; Plaintiff serves reply papers upon Defendants' attorneys, files all motion papers on ECF, and serves courtesy copies of all motion papers to the Court by 8/2/24. So Ordered by Magistrate Judge Steven Tiscione on 6/21/2024. (AMZ) (Entered: 06/21/2024) |
| 06/28/2024 | 128 | Letter *advising as to service of Plaintiff's Motion pursuant to 42 U.S.C. §1988 for Fees and Costs* by Sunita Shah (Harfenist, Steven) (Entered: 06/28/2024) |

| 08/23/2024 | 129 | Consent MOTION for Leave to File Excess Pages by Michael Kenney, Andrew Martone. (Reissman, Ralph) (Entered: 08/23/2024) |
|---|---|---|
| 08/26/2024 | 130 | Consent MOTION for Leave to File Excess Pages *revised letter motion to DE 129 filed August 23, 2024* by Michael Kenney, Andrew Martone. (Reissman, Ralph) (Entered: 08/26/2024) |
| 08/26/2024 |  | ORDER finding as moot 129 Motion for Leave to File Excess Pages; granting 130 Motion for Leave to File Excess Pages. So Ordered by Magistrate Judge Steven Tiscione on 8/26/2024. (LV) (Entered: 08/26/2024) |
| 11/13/2024 | 131 | Fully Briefed MOTION to Set Aside Verdict *FED R. CIV. P. RULE 59(e) MOTION TO ALTER OR AMEND JURY VERDICT* by Michael Kenney, Andrew Martone. (Attachments: # 1 Declaration RJR DECLARATION, # 2 Exhibit DAY 1 TRANSCRIPT, # 3 Exhibit DAY 2 TRANSCRIPT, # 4 DAY 3 TRANSCRIPT, # 5 Exhibit DAY 4 TRANSCRIPT, # 6 Exhibit DAY 5 TRANSCRIPT, # 7 Exhibit JURY VERDICT, # 8 Memorandum in Support DEFTS MOVING MOL, # 9 Memorandum in Opposition PLTF OPP MOL, # 10 Memorandum in Support DEFT REPLY MOL) (Reissman, Ralph) (Entered: 11/13/2024) |
| 11/14/2024 | 132 | Fully Briefed MOTION for Attorney Fees by Sunita Shah. (Attachments: # 1 Declaration of Steven J. Harfenist, # 2 Declaration of Neil Torczyner, # 3 Declaration of Kathryn Passero, # 4 Exhibit A– Invoices, # 5 Memorandum in Support, # 6 Supplement Supplemental Declaration of Steven J. Harfenist, # 7 Exhibit B– Updated Invoices, # 8 Declaration of Ralph Reissman in Opposition) (Harfenist, Steven) (Entered: 11/14/2024) |
| 11/27/2024 | 133 | Letter MOTION to Withdraw as Attorney *I. Bergstrom – Letter Motion – Withdraw – Attorney – Defendants* by Michael Kenney, David Twomey, John Liston, Andrew Martone, The County Of Nassau. (Bergstrom, Ian) (Entered: 11/27/2024) |
| 12/02/2024 |  | ORDER granting 133 Motion to Withdraw as Attorney. Attorney Ian Bergstrom terminated. So Ordered by Magistrate Judge Steven Tiscione on 12/2/2024. (LV) (Entered: 12/02/2024) |
| 02/03/2025 | 134 | Letter *regarding hourly rates requested in Plaintiff's motion for attorneys fees and costs* by Sunita Shah (Harfenist, Steven) (Entered: 02/03/2025) |
| 08/13/2025 | 135 | NOTICE of Appearance by Nicholas C Zotto on behalf of John Liston, Andrew Martone, The County Of Nassau (aty to be noticed) (Zotto, Nicholas) (Entered: 08/13/2025) |
| 08/28/2025 | 136 | Letter *MOTION to Withdraw as Attorney* Requesting Termination of Previous Deputy County Attorney by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (LaGreca, Victoria) Modified on 8/28/2025 (LV). (Entered: 08/28/2025) |
| 08/28/2025 |  | ORDER granting 136 Motion to Withdraw as Attorney. Attorney Ralph J. Reissman terminated. So Ordered by Magistrate Judge Steven Tiscione on 8/28/2025. (LV) (Entered: 08/28/2025) |
| 09/04/2025 | 137 | Letter *removing Ralph Reissman as representing attorney* by Michael Kenney, John Liston, Andrew Martone, The County Of Nassau, David Twomey (Zotto, Nicholas) (Entered: 09/04/2025) |
| 09/29/2025 | 138 | ORDER denying 131 Motion to Set Aside Verdict and granting in part 132 Motion for Attorneys' Fees. So ordered by Magistrate Judge Steven Tiscione on 9/29/2025. (KY) (Entered: 09/29/2025) |
| 10/21/2025 | 139 | NOTICE OF APPEAL by Michael Kenney, John Liston, Andrew Martone, Officers Jane Doe 1–2, Officers John Doe 1–2, The County Of Nassau, David Twomey. (Van Der Waag, Robert) (Entered: 10/21/2025) |
| 10/22/2025 |  | APPEAL FILING FEE DUE re 139 Notice of Appeal Payment in the amount of $605.00, can be made in person to the clerks office, or mailed in or paid online with the event *Civil Case Appeal Filing Fee*. (KS) (Entered: 10/22/2025) |
| 10/22/2025 |  | Electronic Index to Record on Appeal sent to US Court of Appeals. 139 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or |

A-20

| | | for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (KS) (Entered: 10/22/2025) |

A-21

*Jury Instructions*
*Shah v. Liston et. al., 18-CV-4625*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SUNITA SHAH,

                              Plaintiff,

        -against-

DETECTIVE JOHN LISTON, individually,
POLICE OFFICER ANDREW MARTONE,
individually, POLICE OFFICER MICHAEL
KENNEY, individually, DETECTIVE
DAVID TWOMEY, individually,
and THE COUNTY OF NASSAU,

                              Defendants.
-------------------------------------------------------------------X

18-CV-4625 (ST)

> **COURT'S**
> EXHIBIT NO. _____
> IDENTIFICATION/EVIDENCE
> DKT.# _____
> DATE: _____

## INTRODUCTION

Distinguished members of the jury, I told you at the very start of the trial that your principal function during the trial would be to listen carefully and observe each witness who testified. It is apparent that you have faithfully discharged your duty, and I thank you for your attentiveness and service. I ask that you now give me that same careful attention as I instruct you on the law. The evidence in this case has been presented and the attorneys have concluded their closing arguments, so now it is my responsibility to instruct you as to the law that governs this case. My instructions will be in four parts:

First, I will state some general rules about your role and the way in which you are to review the evidence in this case;

Second, I will instruct you as to the legal elements of the claims in this case, that is, the specific elements that Plaintiff must prove by a preponderance of the credible evidence;

Third, I will instruct you as to damages; and

Fourth, I will give you some general rules regarding your deliberations.

1

A-22

Jury Instructions
*Shah v. Liston et. al.*, 18-CV-4625

You should not single out any one instruction I give you as alone stating the law. Rather, you should consider these instructions as a whole when you retire to the jury room to deliberate.

## PART I: GENERAL RULES

You have now heard all of the evidence as well as the parties' final arguments. My duty at this point is to instruct you as to the law. It is your duty to accept these instructions of law and apply them to the facts as you determine them, just as it has been my duty to preside over the trial and decide what testimony and evidence should be admitted under the law for your consideration.

On these legal matters, you must take the law as I give it to you. If any attorney or party has stated a legal principle that conflicts with a legal principle that I give in my instructions, it is my instructions that you must follow.

You should not be concerned about the wisdom of any rule that I state. Regardless of any opinion that you may have as to what the law is — or ought to be — it would violate your sworn duty to base a verdict upon any other view of the law than that which I give you.

## ROLE OF THE JURY

As members of the jury, you are the sole and exclusive judges of the facts. Your role is to weigh the evidence, determine the credibility of the witnesses, resolve any conflicts in the witnesses' testimony, and draw any reasonable inferences you see fit from the facts as you have determined them.

In determining these issues, you must rely upon your own recollection of the evidence. What the lawyers or parties have said in their opening statements, in their closing arguments, in their objections, or in their questions is not evidence. Nor is what I may have said — or what I may say in these instructions — about a fact of evidence.

I want to reiterate to you that, as jurors, are the sole and exclusive judges of the facts.

2

A-23

Nothing that I say should be construed as an opinion on the facts of this case or what your ultimate verdict should be. Additionally, my rulings during trial should not be construed as having anything to do with my view on whether the Plaintiff has proven her claims.

I also ask you to draw no inference from the fact that, upon occasion, I asked questions of certain witnesses. These questions were only intended to clarify or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses. You are expressly to understand that the court has no opinion as to the verdict you should render in this case. You are to perform the duty of finding the facts without bias or prejudice to any party.

I know you will try the issues that have been presented to you according to the oath you have taken as jurors, in which you promised that you would well and truly try the issues joined in this case and render a true verdict. If you follow that oath and try the issues without fear or prejudice or bias or sympathy, you will arrive at a true and just verdict.

### CONDUCT OF COUNSEL

It is the duty of the Plaintiff and Defendants' attorneys to object when the other side offers testimony or other evidence which the party believes is not properly admissible. The parties also have the right and duty to ask the court to make rulings of law and request conferences at the side bar out of the hearing of the jury. Those questions of law must be decided by me, the Court. You should not show any prejudice against any party because that party or that party's attorney objected to the admissibility of evidence or asked for a conference out of the hearing of the jury or asked the court for a ruling on the law.

As I already explained, my rulings on the admissibility of evidence do not, unless expressly stated by me, indicate any opinion as to the weight or effect of such evidence. You are the sole

3

judges of the credibility of all witnesses and the weight and effect of all evidence. Your verdict should be based on the facts as found by you from the evidence and the law as instructed by the court.

## TYPES OF EVIDENCE

I will now instruct you as to what is evidence and how you should consider it.

The evidence in this case comes has been presented to you in two forms:

1.      Sworn testimony of witnesses, both on direct and cross-examination;

2.      Exhibits that have been received by the court in evidence.

3.      Stipulations of facts agreed to by the parties.

If evidence was received for a limited purpose, you must consider that evidence for that limited purpose only.

Certain things are not evidence and are to be disregarded by you in deciding what the facts are:

1.      Arguments or statements by the attorneys are not evidence.

2.      A lawyer's questions in and of themselves are not evidence.

3.      Objections are not evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection was sustained, ignore the question and answer to it. If the objection was overruled, treat the answer like any other answer.

4.      Any testimony that was stricken by the court is to be disregarded and is not evidence.

5.      Any exhibits identified, but not admitted into evidence by the court, are not evidence.

6.    Obviously, anything you may have seen or heard outside the courtroom is not evidence.

7.    Courtroom Behavior: During the course of the trial, I may have questioned witnesses. I also may have had limited colloquy, debate, and argument with the attorneys or the self-represented party. The jury should not draw any inferences from observing these interactions. They were conducted for the sole purpose of insuring the orderly and clear presentation of evidence to you, the jury.

Your verdict must be based exclusively upon the evidence or the lack of evidence in the case.

Now, I told you that evidence comes in various forms, such as the sworn testimony of witnesses and exhibits, and underlined stipulations of facts as agreed to by parties. There are, in addition, different types of evidence – direct, circumstantial and stipulations.

1.    Direct evidence: Direct evidence is physical evidence or testimony about a fact by an eyewitness or participant who testifies to knowing that fact through one of the five senses.

2.    Circumstantial evidence: Circumstantial evidence is the proof of a chain of circumstances pointing to the existence or nonexistence of certain facts. That is all there is to circumstantial evidence: based on facts that you find have been proven, you draw such reasonable inferences or conclusions as seem justified in light of your experience and common sense.

The law makes no distinction between direct and circumstantial evidence. You may consider both.

3.    Stipulations: Stipulations of fact are facts that the parties have conclusively agreed are true. If the parties stipulated to a particular fact, you must accept that stipulated fact as true.

A-26

*Shah v. Liston et. al.*, 18-CV-4625

## INFERENCES

During the trial you may have heard the attorneys use the term "inference." In the attorneys' arguments, they have asked you to infer, on the basis of your reason, experience and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that you find exists.

There are times when different inferences may be drawn from facts, whether proved by direct or circumstantial evidence. The plaintiff asks you to draw one set of inferences, while the defendant asks you to draw another. It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion that you, the jury, are permitted (but not required) to draw from the facts that have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense.

So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience.

## BIAS AND SYMPATHY

Your verdict must be based solely on the evidence presented at this trial.

It would be improper for you to consider any personal feelings you may have about one of the parties' race, religion, national origin, gender, age, or profession. It would be equally improper for you to allow any feelings you might have about the nature of the claim to influence you in any way. The parties in this case are entitled to a jury that is free from prejudice. The

strength of our judicial system is based on the jury trial, and it is essential that jurors reach verdicts through considering the evidence in a fair and impartial manner.

Similarly, under your oath as jurors you are not to be swayed by sympathy. You should be guided solely by the evidence presented during the trial without regard to the consequences of your decision.

You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy interfere with your clear thinking, there is a risk that you will not arrive at a just verdict. All parties to a civil lawsuit are entitled to a fair trial. You must make a fair and impartial decision so that you will arrive at the just verdict.

## BURDEN OF PROOF

This is a civil case and, as such, the Plaintiff has the burden of proving the material allegations of her claims by a preponderance of the credible evidence. To establish a fact by a preponderance of the credible evidence means to prove that the fact is more likely true than not true. A preponderance of the credible evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a claim has been proven by a preponderance of the credible evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have offered them.

If you find that the credible evidence on a given issue is evenly divided between the Plaintiff and the Defendants — that it is equally probable that one side is right as it is that the other side is right — then you must decide that issue against the Plaintiff. That is because the Plaintiff bears the burden to prove more than simple equality of evidence — she must prove each element at issue by a preponderance of the credible evidence. On the other hand, the Plaintiff needs to prove

A-28

*Jury Instructions*
*Shah v. Liston et. al.*, 18-CV-4625

no more than a preponderance. As long as you find that the scales tip, however slightly, in favor of the Plaintiff, then that element will have been proven by a preponderance of credible evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply to a civil case such as this one and you should put it out of your mind.

## WITNESS CREDIBILITY

You have had the opportunity to observe all of the witnesses. It is now your job to decide how believable each witness was in their testimony. You are the sole judges of the credibility of each witness and you determine the weight of each of the witnesses' testimony.

It must be clear to you by now that you are being called upon to resolve various factual issues raised by the parties in the face of very different pictures painted by both sides. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you decide the truth and the importance of each witness' testimony.

You should use all the tests for truthfulness that you use in your everyday life. You should, for instance, consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case. You should also consider the opportunity the witnesses had to see, hear, and know the things about which they testified; the accuracy of their memory; their candor or lack of candor; intelligence; reasonableness and probability of their testimony and its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony. If you find that a witness has lied, you may disregard all of their testimony or only part of their testimony.

In considering the testimony of any witness, you may take into account:

8

A-29

1.   the opportunity and ability of the witness to see or hear or know the things
     testified to;

2.   the witness' memory;

3.   the witness' manner and demeanor while testifying;

4.   the witness' interest in the outcome of the case and any bias or prejudice he may
     have;

5.   whether other evidence contradicted the witness' testimony;

6.   the reasonableness of the witness' testimony in light of all the evidence; and

any other factors that bear on believability.

### INTERESTED WITNESSES

In evaluating the credibility of the witnesses, you should take into account any evidence that a witness may benefit in some way from the outcome of the case. For example, both Plaintiff and Defendants have interests in prevailing at trial. An interest in the outcome may create a motive to testify falsely and may sway a witness to testify in a way that advances their own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his testimony and accept it with great care.

Keep in mind, though, that it does not automatically follow that testimony given by an interested witness is to be disbelieved. There are many people who, no matter what their interest in the outcome of the case may be, would testify truthfully. It is for you to decide, based on your own perceptions and common sense, to what extent, if at all, the witness' interest has affected his or her testimony.

9

*Shah v. Liston et. al.*, 18-CV-4625

## IMPEACHMENT OF A WITNESS

You have heard evidence that at some earlier time the witness has said or done something which counsel argues is inconsistent with the witness' trial testimony.

Evidence of a prior inconsistent statement is not to be considered by you as affirmative evidence in determining liability. Evidence of a prior inconsistent statement was placed before you for the more limited purpose of helping you decide whether to believe the trial testimony of the witness who allegedly contradicted himself. If you find that the witness made an earlier statement that conflicts with his trial testimony, you may consider that fact in deciding how much of his trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency; and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent and, if so, how much, if any, weight to give to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

## DISCREPANCIES IN TESTIMONY

You have heard evidence of discrepancies in the testimony of certain witnesses, and counsel may have argued that such discrepancies are a reason for you to reject the testimony of those witnesses.

You are instructed that evidence of discrepancies may be a basis to disbelieve a witness' entire testimony. On the other hand, discrepancies in a witness' testimony or between his

10

*Shah v. Liston et. al.*, 18-CV-4625

testimony and that of others do not necessarily mean that the witness' entire testimony should be discredited.

People sometimes forget things and even a truthful witness may be nervous and contradict themselves. It is also a fact that two people witnessing an event will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance, but a willful falsehood always is a matter of importance and should be considered seriously.

It is for you to decide, based on your total impression of the witness, how to weigh the discrepancies in his testimony. You should, as always, use common sense and your own good judgment.

### NOTE TAKING BY JURORS

You were permitted to take notes during the course of this trial. You may not show your notes to any other jurors. You may not substitute your notes for your own recollection of the evidence in the case. Also, the fact that a particular juror has taken notes does not entitle that juror's views to greater weight than the views of any other juror. If, in the course of your deliberations, your recollection of part of the testimony should fail, you may request that a portion of the transcript of these proceedings be provided to you. Please be as specific as possible regarding what portion you wish to review.

### PART II: ELEMENTS OF THE CLAIMS

I will now discuss the second part of these instructions – the principles of law that you must apply to the facts as you determine them to be. You are reminded that the Plaintiff bears the burden of proving every essential element of each of her claims by a preponderance of the credible evidence.

## LAW CONTROLLING THIS CASE

There are two claims in this case – false arrest and malicious prosecution – alleging violations of federal law.

To attempt to simplify your task, I have prepared a verdict sheet for your assistance. You will take this verdict sheet with you into the jury room. The verdict sheet contains questions and the answers to these questions will constitute your verdict.

Later in the charge I will review the verdict sheet in detail with you.

At this time, there are following Defendants in this case: Detectives John Liston and David Twomey, Police Officers Andrew Martone, Michael Kenny, John Doe and Jane Doe, and the County of Nassau. Should there be a reference to the Defendants in this charge, you will understand this reference to be to them.

## 42 U.S.C. SECTION 1983

The Plaintiff, Sunita Shah, asserts federal civil rights claims against the Defendants based on an incident that is alleged to have occurred on October 4, 2017. Plaintiff maintains that Defendants deprived her of her rights under the Fourth Amendment to the United States Constitution by subjecting her to false arrest and malicious prosecution.

The law to be applied in this case is the federal civil rights law, which provides a remedy to individuals who have been deprived of their federal constitutional rights under color of state law. The federal civil rights statute under which the plaintiff's claims are brought is Title 42, Section 1983 of the United States Code. Section 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

To establish a claim under Section 1983, a plaintiff must prove, by a preponderance of the credible evidence, each of the following three elements:

First: That the conduct complained of was committed by a person acting under color of state law;

Second: That this conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States; and

Third: That the Defendants' acts were the proximate cause of the injuries sustained by the plaintiff.

If you find that any of the essential elements of Plaintiff's Section 1983 claim has not been proven by a preponderance of the credible evidence, you must return a verdict for the Defendants. I shall now examine each of the three elements in greater detail.

**FIRST ELEMENT – ACTION UNDER COLOR OF STATE LAW**

The first element of the Plaintiff's claim is that the Defendants acted under color of state law. The phrase "under color of state law" is a shorthand reference to the words of Section 1983, which includes within its scope, action by a state or municipal official under color of any statute, ordinance, regulation, custom or usage, of any state. The term "state" encompasses any political subdivision of a state, such as a county or city, and also any state agencies or a county or city agency.

As to this first element of a civil rights action – that the Defendants acted under color of state law – I instruct you, since the Defendants, Detectives John Liston and David Twomey, Police Officers Andrew Martone, and Michael Kenny are employed by Nassau County at the time of the

A-34

Jury Instructions
*Shah v. Liston et. al.*, 18-CV-4625

acts in question, they were acting under color of state law. In other words, the first statutory requirement is satisfied.

Accordingly, you need not consider the first element of the Section 1983 claim, the requirement that the conduct complained of was under color of state law. The Plaintiff has satisfied this element. That is not an issue that is disputed in this case.

## SECOND ELEMENT – DEPRIVATION OF RIGHT

The second element of the Plaintiff's civil rights claim is that she was deprived of a federal constitutional right by the Defendants. In order for the Plaintiff to establish the second element, she must show the following by a preponderance of the evidence:

First: That in performing the acts alleged, the Defendants acted intentionally or recklessly; and

Second: That acts committed by the Defendants caused plaintiff to suffer the loss of a federal right.

To prove the deprivation of right element of his claim, the Plaintiff must not only show that the Defendants' acts deprived the plaintiff of a federal right but also that the defendants performed those acts intentionally or recklessly, rather than accidentally. If you find that the acts of the Defendants were merely negligent – or even grossly negligent – then, even if you find that the Plaintiff was injured as a result of those acts, you must return a verdict for the Defendants.

An act is intentional if it is done voluntarily and deliberately and not because of mistake, accident, negligence, or other innocent reason. Please note that intent can be proved directly or it can be proved by reasonable inference from circumstantial evidence. An act is reckless if done in conscious disregard of its known probable consequences. In other words, even if a defendant did not intentionally seek to deprive a plaintiff of the plaintiff's rights, if nevertheless he purposely

disregarded the high probability that his actions would deprive the plaintiff of the plaintiff's rights, then the second essential element would be satisfied.

Additionally, for Plaintiff to establish the second element of his claim, she must establish Defendants' actions deprived her of a federal right by a preponderance of the credible evidence. I will now instruct you on the law as to the claimed violations of Plaintiff's federal rights.

In this case, Plaintiff claims that Defendants violated her Fourth Amendment rights by first falsely arresting her and then initiating a malicious prosecution against her.

### FALSE ARREST

First, I will instruct you on Plaintiff's false arrest claim. The Fourth Amendment to the United States Constitution protects persons from unreasonable seizures, including false arrests. The Fourth Amendment has been incorporated against the States under the Fourteenth Amendment. The existence of probable cause is a total defense to a claim of false arrest. Under the United States Constitution, no person may be arrested without probable cause.

At issue in this case is whether the Defendants had probable cause to arrest the Plaintiff. Probable cause exists for an arrest if, at the time of the arrest, a reasonable officer in Defendants' position would believe that the Plaintiff had committed a crime. Probable cause requires more than just a suspicion, but it does not need to be based on evidence that would be sufficient to support a conviction. In a criminal trial, the government has the burden of proving the defendant's guilt beyond a reasonable doubt, which is a much higher standard of proof than probable cause. Thus, the fact that the charges against the Plaintiff were dismissed because the prosecutor could not prove plaintiff's guilt beyond a reasonable doubt does not by itself mean there was no probable cause at the time of the arrest. Probable cause to arrest exists when authorities have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to cause a person

15

A-36

*Shah v. Liston et. al.*, 18-CV-4625

of reasonable caution to believe that the person to be arrested has committed or is committing a crime. It requires only a probability or a substantial chance that a crime has taken or is taking place.

Whether or not there was probable cause to arrest depends on the information available at the time of the arrest judged against the totality of the circumstances. In determining whether probable cause existed, you should consider all facts and circumstances known by each individual Defendant at the time of the arrest but may consider information that was provided by other law enforcement officers investigating the case.

In addition, probable cause determination must be made separately for each individual arrested. In this case, you have heard evidence that both Plaintiff and her husband were arrested. You must consider only the question of whether there was probable cause to arrest Plaintiff. You should not consider whether there was probable cause to arrest Rajesh Shah or anyone else.

In this case Defendants arrested plaintiff for three crimes. First, she was charged with violation of New York Penal Law § 220.60, Criminal Possession of Precursors to Controlled Substances, an E Felony; second, with violation of New York Penal Law § 120.20, Reckless Endangerment in the Second Degree, an A Misdemeanor; and third, with violation of New York Public Health Law § 3380.5(A), Illegal Use of Nitrous Oxide, an A Misdemeanor.

The first charge, New York Penal Law § 220.60, Criminal Possession of Precursors to Controlled Substances, an E Felony, provides, in relevant part: "A person is guilty of criminal possession of precursors of controlled substances when, with intent to manufacture a controlled substance unlawfully, he possesses at the same time: (c) phenylacetone (1-phenyl-2 propanone) and hydroxylamine or ammonia or formamide or benzaldehyde or nitroethane or methylamine."

The second charge, New York Penal Law § 120.20, Reckless Endangerment in the Second

16

*Shah v. Liston et. al.*, 18-CV-4625

Degree, an A Misdemeanor, provides: "A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.

The third charge, New York Public Health Law § 3380.5(A), Illegal Use of Nitrous Oxide, an A Misdemeanor, provides: "No person shall use nitrous oxide for purposes of causing intoxication, inebriation, excitement, stupefaction or the dulling of the brain or nervous system of himself of another."

The critical question for you to decide in this case is whether the arrest was lawful.  To find the arrest to be lawful, you must find that the police had probable cause for each element of at least one of these charged offenses.  Under the law of New York, each of these three charges requires a finding that the Plaintiff had dominion and control over the premises, namely, the basement in which the synthetic marijuana was located. The phrase "dominion and control" means that an individual exercises sufficient control over a space through factors such as physical possession, ownership, rights as leaseholder, authority over others within the space, or otherwise demonstrating a possessory interest over the space.  Mere presence on the location alone is not sufficient to establish dominion and control.

Thus, a finding of probable cause requires that the officers had a reasonable belief that the Plaintiff Sunita Shah had dominion and control over the premises where the drugs and precursors were found.

Therefore, based on the evidence presented to you, including witness testimony and exhibits, if you find that Defendants had probable cause to arrest Plaintiff for one or more of these

17

A-38

*Jury Instructions*
*Shah v. Liston et. al.*, 18-CV-4625

charges, you must find that Defendants did not violate Plaintiff's rights. On the other hand, if you find that Defendants did not have probable cause to arrest Plaintiff, you must find that Defendants violated Plaintiff's rights.

## MALICIOUS PROSECUTION

Next, I will instruct you on Plaintiff's malicious prosecution claim. Plaintiff, Sunita Shah, claims that her constitutional rights were violated as a result of her being maliciously prosecuted.

To establish this claim of malicious prosecution, Plaintiff must prove the following five things by a preponderance of the evidence: First: Defendants initiated or continued a criminal proceeding against Plaintiff. Second: The criminal proceeding ended in Plaintiff's favor. Third: Defendant lacked probable cause to initiate the proceeding. Fourth: Defendant acted maliciously or for a purpose other than bringing Plaintiff to justice. And fifth: The malicious actions of Defendants caused plaintiff to suffer injury, damage, loss or harm.

As to the first element, the Plaintiff claims that Defendants initiated a criminal prosecution against Plaintiff for possession of controlled substances. This is not in dispute. There are three Defendants in this claim because there were three separate charging documents signed by each of the Defendants. A prosecution is commenced by the filing of a charging document. Specifically, Detective Liston signed the charge against Plaintiff for Illegal Use of Nitrous Oxide (District Court Information 217AR0051949); Detective Twomey signed the charge against Plaintiff for Criminal Possession of a Controlled Substance (Felony Complaint 2170051949); and Officer Martone signed the charge against Plaintiff for Reckless Endangerment (District Court Information 17AR0051949). Again, it is clear that Defendants initiated a criminal prosecution against Plaintiff. Therefore, the first element is not in dispute.

18

As to the second element, since the charges against Plaintiff were dismissed and ended without a conviction, I am instructing you, as a matter of law, that the dismissal of the criminal case was a termination of the criminal proceeding in the Plaintiff's favor.

As to the third element, Plaintiff must prove that Defendants acted without probable cause in commencing the criminal proceeding against her. The Defendants on this claim, Detectives Liston and Twomey and Officer Martone do not deny that they were responsible for the prosecution but contend that they had probable cause to initiate the prosecution. Whether probable cause existed depends upon whether a reasonably prudent person would have believed the plaintiff to be guilty of reckless endangerment in the first degree, or criminal possession of precursors to controlled substances, or illegal use of nitrous oxide, on the basis of the facts defendant police officers knew, or that they then reasonably believed to be true, when they instituted the prosecution by forwarding the paperwork to the Nassau County District Attorney's Office. The fact that the criminal prosecution was ultimately discontinued is not evidence that Defendant police officers lacked probable cause at the time that the prosecution was initiated. Each of the Defendants contend that, at the time he initiated the prosecution, the facts as they appeared to him constituted probable cause for the prosecution.

You will then proceed to consider the fourth element as to whether the any of these Defendants acted maliciously in initiating the prosecution. A prosecution is initiated maliciously if it is brought for a purpose other than bringing an offender to justice, out of personal ill will, or if it is brought in reckless disregard of the rights of the person accused. The phrase "reckless disregard of the rights of the person accused" means initiation of the prosecution without any reasonable ground for belief that the plaintiff was guilty.

*Shah v. Liston et. al.*, 18-CV-4625

If you find that the Defendants, Detectives Liston and Twomey and Officer Martone, did not have probable cause for believing that the plaintiff was guilty at the time they initiated the prosecution, you may, although you are not required, infer from that fact alone that any of the Defendants acted maliciously. If you find, however, that any of the Defendants did not act maliciously, you will find for that defendant, even though you find that he did not have probable cause to believe that the plaintiff was guilty. If you find that the plaintiff has proved both that any of the Defendants did not have probable cause and that the defendant acted maliciously, the plaintiff is entitled to recover and you will proceed to consider the question of damages.

### THIRD ELEMENT – PROXIMATE CAUSE

The third element that the Plaintiff must prove is that the Defendants' acts were a proximate cause of injuries sustained by the Plaintiff. An act is a proximate cause of an injury if it was a substantial factor in bringing about that injury, and if the injury was a reasonably foreseeable consequence of the act.

In order to recover damages for any injury, the Plaintiff must show by a preponderance of the evidence that such injury would not have occurred without the conduct of the Defendants. If you find that the Defendants have shown that the Plaintiff complains about an injury which would have occurred or existed even in the absence of Defendants' conduct, you must find that the Defendants *did not* proximately cause the Plaintiff's injury.

A proximate cause need not always be the nearest cause either in time or space. In addition, there may be more than one proximate cause of an injury or damage. Many factors, or the conduct of two or more people, may operate at the same time, either independently or together, to cause an injury.

A defendant is not liable to a plaintiff if such plaintiff's injury was caused by a new or

A-41

*Jury Instructions*
*Shah v. Liston et. al.*, 18-CV-4625

independent source which intervenes between the defendant's acts, or omissions, and which produces a result which was not reasonably foreseeable by the defendant.

## COMPENSATORY DAMAGES

Having completed my instructions to you in the issue of liability, I will now instruct you on the law of damages.

If you find that the Plaintiff is entitled to recover against any of the Defendants, then you will have to determine the amount of damages which will fairly and justly compensate her for those injuries which you find that she has proven by a preponderance of the credible evidence to have sustained as a result of the federal Section 1983 violation. These are called compensatory damages.

Compensatory damages must not be based on speculation or sympathy. They must be based on the evidence presented at trial. You shall award damages only for those injuries that you find Plaintiff has proven by a preponderance of the evidence. Moreover, you may not simply award damages for *any* injury suffered by Plaintiff—you must award damages only for those injuries that are a proximate result of conduct by the Defendants that violated Plaintiff's federal rights under color of law.

It is your sole and exclusive function to determine the sum of money, if any, which will justly and fairly compensate the Plaintiff for the injuries and damages you find, based on the evidence, that she sustained as a consequence of the conduct of the Defendants. If you find for the Plaintiff with respect to her claim, you should award her a sum of money that will compensate her for any injury sustained, loss of ability to enjoy life, and emotional anguish, personal humiliation, and personal indignity and fear suffered by her and proximately caused from the act for which you find liability was established.

That I'm giving you instructions on the subject of damages should not be construed by you as any indication that I believe you should find for the Plaintiff. That's entirely up to you. I must charge you on the law of damages in the event that you, in your deliberations, find that the Plaintiff is entitled to recover. In instructing you on damages, I am not expressing any views one way or the other as to whether Plaintiff should recover in this case.

## CAUSATION AND DAMAGES

I have said that you may award damages only for those injuries which you find the Plaintiff has proven, by a preponderance of evidence, to have been the proximate result of conduct by the Defendants in violation of Section 1983. You must distinguish between, on the one hand, the existence of a violation of the Plaintiff's rights, and on the other hand, the existence of injuries and/or damages naturally resulting from that violation. Thus, even if you find for the Plaintiff on her claims for false arrest and/or malicious prosecution, you must ask yourself whether the Plaintiff has proven, by a preponderance of the evidence, that the violation caused the damages that she claims to have suffered, and award damages only on the damages caused by those violations.

Also, if you find that Plaintiff's injuries were the result of conduct by the Defendants that was partly constitutional or partly unconstitutional, you must award damages only for such portion of the injuries attributable to the unconstitutional conduct. However, if you are unable to separate the two, then you must award damages for the entirety of the injuries.

## PUNITIVE DAMAGES

Whether or not you award the Plaintiff actual damages, you may also, in your discretion, make an award of punitive damages. Punitive damages are awarded, in the discretion of the jury, to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like him from committing such conduct in the future.

22

Case 2:18-cv-04625-ST   Document 118   Filed 12/18/23   Page 23 of 35 PageID #: 1307
Jury Instructions
Shah v. Liston et. al., 18-CV-4625

You may award the Plaintiff punitive damages if you find that the acts or omissions of the Defendants were done maliciously or wantonly. An act or failure to act is maliciously done if it is prompted by ill will or spite towards the injured person. An act or failure to act is wanton if done with a reckless or callous disregard for the rights of the injured person. Plaintiff has the burden of proving, by a preponderance of the evidence, that Defendants acted maliciously or wantonly with regard to the Plaintiff's rights.

If you find by a preponderance of the credible evidence that the Defendants acted with malicious intent to violate the Plaintiff's federal rights or unlawfully injure her, or if you find that Defendants acted with a callous or reckless disregard of the Plaintiff's rights, then you may award punitive damages. An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them.

In making this decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct or to deter him and others like him from performing similar conduct in the future. Thus, in deciding whether to award punitive damages, you should consider whether Defendants may be adequately punished by an award of actual damages only, or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent these Defendants from similar wrongful conduct in the future, if it was in fact wrongful, or whether punitive damages are necessary to provide deterrence. Finally, you should consider whether punitive damages are likely to deter or prevent other persons from performing wrongful acts similar to those Defendants may have committed.

23

If you decide to award punitive damages, these same purposes should be kept in mind as you determine the appropriate sum of money to be awarded as punitive damages. That is, in fixing the sum to be awarded, you should consider the degree to which Defendants should be punished for any wrongful conduct, and the degree to which an award of one sum or another will deter Defendants or persons like them from committing wrongful acts in the future if you indeed find they have committed them.

The extent to which a particular sum of money will adequately punish a defendant, and the extent to which a particular sum will adequately deter or prevent future misconduct, may depend upon the financial resources of a defendant against which damages are awarded. Therefore, if you find that punitive damages should be awarded against the Defendants, you may consider the financial resources of the Defendants in fixing the amount of such damages.

## PART IV: DELIBERATIONS

Now that I have outlined for you the rules of law applicable to the charges in this case and the processes by which you should weigh the evidence and determine the facts, I will give you some guidance for use in your deliberations.

### SELECTION OF A FOREPERSON

When you retire, you should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court. His or her opinion and vote are entitled to no greater weight than that of any other juror.

### DUTY TO DELIBERATE

In order to prevail on a claim, the Plaintiff must sustain her burden of proof as I have explained to you with respect to each element of her claims. If you find that the Plaintiff has succeeded, you should return a verdict in her favor. If you find that the Plaintiff failed to sustain

24

Case 2:18-cv-04625-ST    Document 118    Filed 12/18/23    Page 25 of 35 PageID #: 1309
Jury Instructions
*Shah v. Liston et. al.*, 18-CV-4625

her burden on any element of her claims, you should return a verdict for the Defendants.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for himself or herself, but you should do so only after a consideration of the evidence with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender his or her conscientious beliefs solely for the purpose of returning a unanimous verdict.

### RIGHT TO SEE EVIDENCE

You are about to go into the jury room and begin your deliberations. During those deliberations you may have any of the testimony read back to you. Please remember that it is not always easy to locate the testimony you might want, so be as specific as you possibly can in requesting portions of the testimony. Please provide the name of the witness and describe the subject of the testimony you would like read back. We will send the exhibits that were admitted into evidence into the jury room so that you may consider them during your deliberations.

### COMMUNICATIONS WITH THE COURT

Any communications with the court, including your requests for exhibits or testimony,

should be made to me in writing, dated and signed by your foreperson. To send this to the Court, you will ring a buzzer in the jury room which my Clerk will show you and, once my Clerk arrives, give the note to her. Do not tell, or otherwise indicate to, me, my Clerk, or anyone else how the jury stands on any issue until after a unanimous verdict is reached. You will receive a copy of these instructions.

## COMMUNICATION WITH OTHERS

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case, except among your fellow jurors in the jury room. You may not use any electronic device or media, such as a telephone, a cell phone, smart phone, or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, SnapChat, Instagram, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

## RETURN OF VERDICT

I have prepared a verdict form for you to use in recording your decision. On the verdict form, there are spaces to indicate your verdict on the Plaintiff's claims against the Defendants and, if necessary, to include damages amounts to be awarded. You must return a verdict on the claims. Your verdict must be unanimous and must reflect the conscientious judgment of each juror. The foreperson should record the unanimous decision of the jury by checking the appropriate boxes on the verdict form and initial each mark.

A-47

*Shah v. Liston et. al.*, 18-CV-4625

When you have reached a verdict, simply send me a note signed by your foreperson that you have reached a verdict. Do not indicate in the note what the verdict is. Your foreperson will fill in the verdict sheet that has been given to you, sign and date it, and advise my Clerk, upon ringing the buzzer, that you are ready to return to the courtroom.

I will stress that you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

## CONCLUSION

Your oath, that is the oath you took at the beginning of your service, sums up what your duties are – that is, that you will well and truly try the issues before the court and between the parties according to the evidence that has been given to you and according to the laws of the United States. The Court thanks you for your commitment to that oath as you deliberate.

12/15/2023

COURT'S
EXHIBIT NO. 2
IDENTIFICATION/EVIDENCE
DKT.#
DATE:
PENGAD 800-631-6989

* When did police get copy of offical
lease for 120 Hillside?

* Can we please have Martone's
entire testiment in this
trail.

COURT'S

EXHIBIT NO.

IDENTIFICATION/EVIDENCE

DKT.#

DATE:

12/15/2023

What does nominal mean?
Definition please

COURT'S
EXHIBIT NO.
IDENTIFICATION/EVIDENCE
PENGAD 800-631-6989
DKT.#
DATE:

12/15/2023

We no longer need
MARTONE
testimony.
Thank you.

COURT'S
EXHIBIT NO. 5
IDENTIFICATION/EVIDENCE
DKT.# _____
DATE: _____
PENGAD 800-631-6989

12/15/2023

WE the jury have deliberated and come to a conclusion, and agreed on a Verdict.

A-52

COURT'S
EXHIBIT NO.
IDENTIFICATION/EVIDENCE
DKT.#
DATE:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
SUNITA SHAH,

      **Plaintiff,**

     -against-

DETECTIVE JOHN LISTON, individually,
POLICE OFFICER ANDREW MARTONE,
individually, POLICE OFFICER MICHAEL
KENNEY, individually, DETECTIVE
DAVID TWOMEY, individually, and
THE COUNTY OF NASSAU,

      **Defendants.**
-------------------------------------------------------------------- X

18-CV-04625 (ST)

**JURY VERDICT
SHEET**

**PART 1. False Arrest Claim Against Officers Martone and Kenney**

**Question 1. Did Plaintiff prove by a preponderance of the evidence that in light of the totality of the circumstances, that Officer Martone had no probable cause to arrest her?**

Yes &check;           No _____

*If you answered "Yes," you have found for the Plaintiff on her federal law claim for False Arrest against Officer Martone.  Go to Question No. 2*

**Question 2. Did Plaintiff prove by a preponderance of the evidence that in light of the totality of the circumstances, that Officer Kenney had no probable cause to arrest her?**

Yes &check;           No _____

*If you answered "Yes," you have found for the Plaintiff on her federal law claim for False Arrest against Officer Kenney.*

*If you have reached this point in the Jury Verdict Sheet and you have <u>not</u> answered "Yes" to any of the foregoing questions, you have returned a Verdict completely for Defendants. Please sign this Verdict Sheet and inform the Courtroom Deputy that you have completed your deliberation.*

1

A-53

**PART 2. Malicious Prosecution Claim Against Detective Liston, Detective Twomey and Officer Martone.**

**Question 3. Did Plaintiff prove by a preponderance of the evidence that Detective Liston maliciously prosecuted her?**

Yes _____                         No _√_____

*If you answered "Yes," you have found for the Plaintiff on her federal law claim against Detective Liston for Malicious Prosecution. Go to Question No. 4*

**Question 4. Did Plaintiff prove by a preponderance of the evidence that Detective Twomey maliciously prosecuted her?**

Yes _____                         No _√_____

*If you answered "Yes," you have found for the Plaintiff on her federal law claim against Detective Twomey for Malicious Prosecution. Go to Question No. 5*

**Question 5. Did Plaintiff prove by a preponderance of the evidence that Officer Martone maliciously prosecuted her?**

Yes _____                         No _√_____

*If you answered "Yes," you have found for the Plaintiff on her federal law claim against Officer Martone for Malicious Prosecution.*

*If you reached this point in the Jury Verdict Sheet and you have answered "Yes" to any of the foregoing questions, you have found for the Plaintiff. Please proceed to the next Part entitled "SPECIAL INTERROGATORIES"*

**PART 3. SPECIAL INTERROGATORIES**

*Please complete all questions in this section.*

**Question 6. Do you find Sunita Shah provided the Surrender Bhatty lease agreement to Officer Martone?**

Yes _____                         No _√_____

**Question 7. Do you find Sunita Shah provided the Surrender Bhatty lease agreement to Detective Twomey?**

Yes _____                         No _√_____

2

A-54

**Question 8.** Do you find that Sunita Shah provided a business card to Detective Twomey for Accessories by Peak?

Yes ✓_____                           No _____

**Question 9.** Do you find Sunita Shah had a key to 120 Hillside Avenue?

Yes _____                            No ✓_____

**Question 10.** Do you find Sunita Shah accompanied Rajesh Shah to open the door to 120 Hillside Avenue for the East Williston Fire Department?

Yes _____                            No ✓_____

**Question 11.** Do you find Sunita Shah told the Defendants that she was the owner of the business?

Yes _____                            No ✓_____

**Question 12.** Do you find Rajesh Shah told the Defendants that Sunita Shah was the owner of the business?

Yes _____                            No ✓_____

**Question 13.** Do you find Rajesh Shah told the Defendants that Sunita Shah was not the owner of the business?

Yes ✓_____                           No _____

*Please proceed to the next Part entitled "DAMAGES"*

**PART 4. DAMAGES**

**PROXIMATE CAUSE FOR DAMAGES**

**Question 14.** Did the Plaintiff prove by a preponderance of the evidence that the injuries she suffered were a foreseeable consequence of the False Arrest?

Yes ✓_____                           No _____

**Question 15.** Did the Plaintiff prove by a preponderance of the evidence that the injuries she suffered were a foreseeable consequence of the Malicious Prosecution?

Yes _____                            No ✓_____

3

A-55

**FALSE ARREST**

If you answered "Yes" to Question 1 or Question 2 <u>and</u> "Yes" to Question 14 fill out the monetary sums which represent damages you wish to award Plaintiff on the federal law claim for False Arrest:

Compensatory  $ _500,000.00_
Punitive      $ _Ø_.
Nominal       $ _Ø_.

**MALICIOUS PROSECUTION**

If you answered "Yes" to Question 1 or Question 2 <u>and</u> "Yes" to Question 15, fill out the monetary sums which represent damages you wish to award Plaintiff on the federal law claim for Malicious Prosecution:

Compensatory  $ _Ø_.
Punitive      $ _Ø_.
Nominal       $ _Ø_.

*You have completed the Jury Verdict Sheet. Please sign where indicated and notify the Courtroom Deputy that you have reached a verdict.*

_____
Juror No. 1

_____
Juror No. 2

_____
Juror No. 3 (excused)

_____
Juror No. 4

_____
Juror No. 5

_____
Juror No. 6

_____
Juror No. 7

_____
Juror No. 8

4

A-56

**JOINT TRIAL EXHIBITS**

| | |
|---|---|
| 1 | Officer Kenney Testimony Transcript- Page 45 |
| 2 | Officer Martone Testimony Transcript- Pages 78-79 |
| 3 | Officer Martone Testimony Transcript- Page 83 |
| 4 | Officer Martone Testimony Transcript- Page 84 |
| 5 | Officer Liston Testimony Transcript- Pages 130-134 |
| 6 | ADA Fexas Testimony Transcript- Pages 338-346, 348, 350-351 |
| 7 | Det. Twomey Testimony Transcript- Pages 195-196 |
| | |

EXHIBIT
Joint Ex. 1

*Kenney - Direct/Harfenist*

45

Q.    So at some point, she showed up?

A.    Correct.

Q.    And you just don't recall whether or not when you first came upstairs whether she was there at that point or came afterwards?

A.    I don't recall.

Q.    Okay.

Did there come a time where you ever told any member of the Nassau County Police Department that Rajesh and Sunita Shah were the owners of the premises?

A.    To who?

Q.    To any member of the Nassau County Police Department.

A.    Yes.

Q.    You told them that they were the owners?

A.    I believe so.

Q.    And who did you tell that to?

A.    I don't recall specifically.

Q.    What did you base your conclusion that they were the owners on?

A.    That they had responded once we had asked for the business and the key holder, and at some point, they had identified themselves as those persons.

Q.    So there came a point in time where Rajesh and Sunita advised you that they were the owners of the premises?

A.    For me to reach that conclusion at some point, yes.

A-58

EXHIBIT
Joint Ex. 2

*Martone - Direct/Harfenist*

78

A.   No.  I was waiting to hear their report.

Q.   So did there come a point in time where they did tell you what they found?

A.   That's correct.

Q.   And when they told you what they found, what did you do at that point?

A.   Very investigated ourselves.

Q.   When you say investigated yourself, you went down to the basement?

A.   Barely.  I couldn't take the odor of smell any further.

Q.   So, when you conducted this investigation, did you determine there was an odor coming from the downstairs and you went back upstairs, correct?

A.   That's correct.

Q.   And at that point in time, was Rajesh Shah there?

A.   Yes.

Q.   When was the first time that you saw Rajesh Shah?

A.   When I exited the building the first time.

Q.   So, when you went into the building, he was already there, correct?

A.   Yes.  He let us in.

Q.   So it's your testimony that --

      MR. HARFENIST:  Withdrawn.

Q.   You were let into 120 by Rajesh Shah?

*Marie Foley, RMR CRR*
*Official Court Reporter*

A-59

*Martone - Direct/Harfenist*

79

A.   I believe so.

Q.   So he put the key in the door, turned the door, and let you in, correct?

A.   He let the fire department in first, yes.

Q.   Let the fire department in first.  And then did they lock the door after he let the fire department in?

A.   No.

Q.   Did he have to re-open the --

        MR. HARFENIST:  Withdrawn.

Q.   Did he have to use the key again to open the door to let you guys in?

A.   No.

Q.   So when you say he let you in, what did he do?

A.   He unlocked the door.

Q.   So the door was locked?

A.   He opened the door the first time.

Q.   Let's see if I get this straight.

        He opened the door the first time, let the fire department in.

A.   That's correct.  Then the doors remained open.

Q.   Door remained open, the fire department came out, told you what they saw?

A.   That's correct.

        (Continued on following page.)

*Marie Foley, RMR CRR*
*Official Court Reporter*

EXHIBIT
Joint Ex. 3

Martone  -  Direct/Harfenist

83

You would agree your memory was better back then than it is now, right?  It's just natural, right?  Do you recall?

MR. HARFENIST:  Judge, could I have one moment, please.  I messed up my notes.

THE COURT:  Yes.

(Pause in proceedings.)

BY MR. HARFENIST:

Q.   I'll get back to that.

There came a point in time when you had a conversation with Rajesh Shah about what you found, correct?

A.   That's correct.

Q.   Do you remember where you were when you had that conversation?

A.   Inside the store.

Q.   Had Mrs. Shah shown up at that point in time?

A.   I believe so.

Q.   The store is a small office, right?  It's not very large?

A.   I don't know the exact dimensions of the store, but it was a store, normal size store.

Q.   Now, there came a point in time -- withdrawn.

So you tell Mr. Shah what you found.  Ms. Shah may or may not be sitting next to him at the time.

A-61

EXHIBIT
Joint Ex. 4

Martone - Direct/Harfenist

84

Q. Did he respond to what you told him?

A. Yes.

Q. What did he tell you?

A. He says, I sublease the basement.

Q. Did he tell you to whom he sublet the basement?

A. He provided a document at the time.

Q. He told you he sublet the basement and showed you the lease?

A. She showed me the lease, not him.

Q. Where was she sitting at that point?

A. Behind the desk.

Q. Where was he sitting?

A. He was standing.

Q. Where did she get the lease from?

A. She got it right out of the top drawer of the desk.

Q. So I understand your testimony, was Officer Kenney there with you at the time?

A. He was on scene.

Q. When you were questioning Rajesh Shah and Mrs. Shah was sitting next to you, was he there with you?

A. I don't recall.

Q. You asked him about -- withdrawn.

He tells you that he sublets the property in response to you telling him what you found?

A. That's correct.

Mary Ann Steiger, CSR
Official Court Reporter

A-62

EXHIBIT
Joint Ex. 5

Liston - Direct/Harfenist

130

A.    Okay.

Q.    You would agree that's the case, correct?

A.    Repeat it, please.

        MR. HARFENIST:  Can I actually have that read back, please?

        THE COURT:  Go ahead.

        (Record read.)

A.    Yes.

Q.    Now, you didn't -- I'm going to get to your answer, you didn't conduct that investigation, did you?

A.    No.

Q.    At that point you passed it off to the narcotics detective?

A.    Yes.

Q.    And essentially at that point your involvement in this investigation really ended, right?

A.    The investigation -- yes.

Q.    You were there in an assisting role, correct?

A.    Yes.

Q.    Did you ever have any conversations with Rajesh Shah?

A.    Only in my initial introduction.

Q.    You told him who you were?

A.    Yes.

Q.    Did you ask him any questions?

A.    When I came in I believe I asked, like, I introduced

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

Liston - Direct/Harfenist

131

myself and I said are you the owners.

He's the one that answered me.

Q.   When you came in, Rajesh and Sunita were sitting together, right?

A.   She was behind the desk and he was in front.

Q.   It's a small little office, right?

A.   Yes.

Q.   And when you asked him if they were the owners he said he was, right?

A.   He said yes.

I said I'm Detective Liston.  Are you the owners?  And he said yes.

Q.   And that was the sole conversation you had with Mr. Shah?

A.   He gave me the lease from --

Q.   Okay.

Did you ever ask -- withdrawn.  After Rajesh Shah answered and said he was the owner, did you ever ask Sunita Shah if she was the owner of the store?

A.   No.

Q.   There came a point in time -- withdrawn.

At any point in time did you ever have any conversations with Sunita Shah?

A.   I don't believe so, no.

Q.   You never asked Sunita Shah if she knew what was in

A-64

Liston - Direct/Harfenist

132

the basement, correct?

A.    No.

Q.    Did you ever ask Rajesh Shah if he knew what was in the basement?

A.    No.

Q.    Do you know if anybody else ever asked him that?

A.    I don't recall.

Q.    Other than what you were told by Officer Martone and Officer Kenney, you have no idea as to who owned or controlled that store, correct?

A.    I don't.

Q.    Let's take a look at -- I think you just testified that the only other conversation you had with Rajesh Shah was he gave you the lease.

        Correct?

A.    Yes.

Q.    Can we pull up Exhibit 11.

        (There was a pause in the proceedings.)

BY MR. HARFENIST:

Q.    It's on your screen?

A.    Yes.

Q.    We have everything working today.

        So take a look at what's been marked in evidence as Plaintiff Exhibit 11.  Is that the document that Mr. Shah handed to you?

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

A-65

Liston - Direct/Harfenist

133

A. Yes.

Q. When he handed it to you where was he sitting?

A. I'm not sure he actually handed it to me or somebody but he was standing at the time.

I don't remember him sitting.

Q. Now, there came a point in time -- withdrawn.

At the time that you were investigate -- when you arrived or the initial investigating officer, you had no evidence that Sunita Shah had any relationship to anything that was in the basement, correct, you, personally?

A. No.

Q. And you hadn't been told by any officer that Sunita Shah had a connection to the basement, had you?

A. No.

Q. There came a point in time where you signed -- that there were criminal charges filed against Sunita Shah, correct?

A. Yes.

Q. Did you make the determination to charge her?

A. No.

Q. Do you know who made that determination?

A. I thought it was Detective Twomey but found out later it wasn't.

Q. The answer is you thought he did but as far as you

Liston - Direct/Harfenist

134

know you are not sure who made the --

A.    Not sure.

Q.    So no one ever had a conversation with you based on what you saw, whether or not you should have charged Sunita Shah with a crime?

A.    Well, we talked about that at the station house after.

Q.    That was after she was already arrested, right?

A.    Yes, okay.

Q.    So I'm stalking about before Sunita Shah was arrested you never had -- no one ever asked you whether or not you believed there was probable cause to arrest her, correct?

A.    No.

Q.    Let's take a look at Exhibit 12.

        Exhibit 12 you heard us talking about this yesterday a little bit, right?

A.    Yes.

Q.    You recognize Exhibit 12?

A.    I do.

Q.    Exhibit 12 is -- why don't you tell us -- first of all, that's your signature down at the bottom, right?

A.    Yes.

Q.    Did you prepare this document?

A.    I did not.

Q.    Someone else prepared this document and you signed

A-67

EXHIBIT
Joint Ex. 6

Fexas - Direct/Harfenist

338

A.    25 years.

Q.    What is your current position?

A.    I am the deputy bureau chief of the narcotics firearms and gangs bureau.

Q.    How long have you been the deputy chief there?

A.    I have been a deputy bureau chief in that bureau for about 15 years, although it's only recently had a name changed to the narcotics firearms and gangs bureau.

Q.    But you were doing the same thing basically before that?

A.    Yes.

Q.    As a deputy bureau chief tell us what you do.

A.    I supervise anywhere between eight to 11 assistant district attorneys under me who prosecute and investigate narcotics cases, gun trafficking and gang cases.

Q.    You were holding that position on October of 2017?

A.    Yes.

Q.    I'm going to turn your attention to the arrest of Rajesh and Sunita Shah.

Do you recall that arrest?

A.    Yes.

Q.    You were working on that day?

A.    Yes.

Q.    Oftentimes as a supervisor you will field calls from police officers even off hours --

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

Fexas - Direct/Harfenist

339

A. Yes.

Q. -- when they are involved in an investigation.

A. Correct.

Q. Why do you guys do that?

A. My bureau in particular works closely with the Nassau County narcotics bureau, as well as the gang investigation squad. So we have ADAs that are specialized in the issues that come up in those cases.

As police work is a 24-hour job, there are issues that come up at all hours of the day and night. We are there as a sounding board for the detectives to run ideas off of or just sometimes to give us notice of incoming cases.

Q. You can have conversations with an investigating detective about the fact that they have something going on?

A. Yes.

Q. Or they could ask your opinion as to what necessarily should happen, correct?

A. Yes.

Q. On the 4th of October of 2017 you got a call from Detective Twomey about a potential arrest, correct?

A. Yes.

Q. And he explained to you that he was at 120 Hillside Avenue in East Williston and they had discovered something

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

Fexas - Direct/Harfenist

340

that they believed that may have been a precursor to synthetic marijuana, correct?

A.   When I got the initial phone call I was apprised of the fact he was at a location on Hillside Avenue.

I don't recall the specific address but that sounds about right, and I don't know if at the time I was made aware that they found precursors but just that there was an ongoing investigation at that location.

Q.   Did he tell you what the nature of the investigation was?

A.   Basically that there was a large scene involving the fire department and fire marshals that were responding to a call for a strong gaseous odor.

And at some point the narcotics bureau got called to the scene.

Q.   Did he advise you what they had found at the location?

A.   He did.

I don't recall if it was during that phone call.

Q.   But at some point -- actually, just so that we understand, you spoke to him multiple times on October 4, 2017, correct?

A.   And probably subsequently after, yes.

Q.   Yes, of course.

Have you ever dealt with Detective Twomey

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

A-70

Fexas - Direct/Harfenist

341

before?

A.    Yes, many times.

Q.    So be fair to say you had a professional relationship with him?

A.    Yes.

Q.    And so through the course of this -- his time frame at the scene, he spoke to you at least once and maybe multiple times, right?

A.    At least once, yes.

Q.    Do you recall what he was asking you during those conversations?

A.    I don't think he was asking anything.

It was more just to put us on notice of a case that would be coming through arraignments the following morning.

Q.    Once he did that, why would he have to call you again to tell you to have further conversations with you?

A.    That's the nature of what detectives do.

They constantly notify the ADAs of things as they change and develop.

Q.    But there came a point in time where he told you a case was coming through, correct?

A.    Yes.

Q.    And at that point in time he didn't need to notify you any further about the case because you already knew it

Fexas - Direct/Harfenist

342

was coming through, right?

A. I knew something was coming through, yes.

Q. Did he tell you what he had discovered at that point in time?

A. I don't recall.

Q. At any point did he tell you he was concerned about finding some kind of acetone at the location?

A. Possibly.

Q. At any point in time did he tell you that he had found some thin -- what he believed to be synthetic marijuana but had some concerns as to what sections of the law to charge?

A. I believe I was told that there was vegetative material that they believed to be synthetic marijuana.

But I don't know that there were any questions about what sections to charge.

Q. Okay.

A. And at that point that wouldn't be something that I or my office would get involved in.

Q. Right.

But the determination to make -- to arrest somebody and to charge them with a crime is made solely by the police department, correct?

A. Usually, not solely.

In cases where the district attorneys office is

A-72

Fexas - Direct/Harfenist

343

involved in a joint investigation, we would be involved in that decision-making process.

Q.   That would be through the DA squad investigation unit, right?

A.   It could be.

Q.   Right.

A.   Or it could be an ADA from a particular investigative bureau in conjunction with detectives from a police department.

Q.   You would describe -- this was an atypical situation for the narcotics bureau, correct?

A.   I wouldn't describe it as atypical.

The charge was atypical, but the recovery of vegetative material believed to be drugs or drug-making materials is not atypical at all.

Q.   Do you recall being -- having your deposition taken on November 21, 2019?

A.   Yes.

Q.   Do you recall at that deposition describing this as an atypical case?

A.   Yes, the charge is atypical, yes.

Q.   Let me read you these questions and answers and tell me if they refresh your recollection:

MR. HARFENIST:   Ralph, I'll on page 32, beginning at line 20.

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

Fexas - Direct/Harfenist

344

BY MR. HARFENIST:

Q.   I'm going to get back to one point where it's going to be talked about in this series of questions in a moment:

          Question:  Do you recall having more than one conversation with Maureen or just one?

          Answer:  This was not a normal kind of case, so I probably would have had multiple conversations with her, but I would not, like -- that's not the kind of thing I would note or log every single time I speak with an executive.  But for us to dismiss a case outright that makes it over -- going forward, so I don't know if when I had initially spoken to her about the possible dismissal if we had had the wrong chemical.  I was aware that we had these other complaints.  That's why I needed to review the complaints.

          Question:  What made this an atypical case?

          Answer:  The fact that -- just the way it unfolded.  Normally we deal with long-term investigations where cases involving confidential informants, search warrants, large quantities of narcotics.

          Do you recall those questions and answers?

A.   Yes.

Q.   Do you recall any -- you have investigations that spread out over lengthy periods of time before an arrest

A-74

Fexas - Direct/Harfenist

345

is made, right?

A.   Sometimes, but we also field police investigating cases where arrests happened.

Q.   And somebody can see somebody on the street and they would arrest them and there wouldn't be a long investigation in that case, correct?

A.   Correct.

Q.   At the time that you were first contacted by Mr. -- Detective Twomey and throughout the entire time that you spoke to him, did he ever indicate to you that he was sure that this was a controlled substance?

A.   No, I don't believe so.

Q.   Do you know -- was it ever indicated to you that he had field tested the substance to determine whether it was illegal?

A.   No.

Q.   Some synthetic marijuana is legal, correct?

A.   Correct.

Q.   At the time that the arrest was made, if there had been no field test, there would have been no knowledge as to whether or not the substance that was recovered was illegal.

     Correct?

A.   Correct, but that's the standard -- most of the time when there are arrests made in drug cases, there are not

Fexas - Direct/Harfenist

346

field tests.

Q.   Okay.

You are involved in lengthy investigations, correct?

A.   Not exclusively, but, yes.

Q.   Many times.

There was no rush to arrest the Shahs on that day until you determined whether or not it was -- what they found was illegal, correct?

A.   That wasn't my determination to make.

Q.   Did you ever have any discussion with Detective Twomey about whether or not there was probable cause to arrest the Shahs?

A.   I don't recall if I had that conversation.

That wouldn't be a conversation I would have with him after the arrest.

Q.   Why wouldn't you discuss whether or not they had enough evidence to arrest the people before they got arrested and thrown through the system?

A.   Because I was not at the scene.

The role of the prosecutor in these type of cases is not to second guess what the police are doing at the scene.  I didn't see any evidence.  I didn't speak with any witnesses or look at any documents.

That's not my role.

A-76

Fexas - Direct/Harfenist

348

Q.    Okay.

Now, there came a point in time during your investigation where it was explained to you that Rajesh Shah was the owner of the business, correct?

A.    Correct.

Q.    And that he was the one who let the fire department into the property, correct?

A.    I believe so, yes.

Q.    And it was also explained to you that Sunita had handed Rajesh the keys to the property?

A.    That's my understanding, yes.

Q.    And that she might have worked at the store?

A.    Correct, yes.

Q.    But you also concluded that she didn't, from what you were told, she didn't have an interest in anything that was in the basement?

A.    I don't know.

I was told -- my understanding was at the very least an employee of the business she would have had run of everything in that building.

Q.    Okay.

Now, there came a point in time when the case came in.  After the prosecutorial instruments were filed you had a conversation with your supervisors, correct?

A.    Yes.

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

A-77

Fexas - Direct/Harfenist

350

A.    I think there was media attention.

I don't know that there was a lot, but it was not put out by my office, so I don't know.

Q.    Did you learn from your office of public information director that there had been media attention?

A.    Possibly.

Q.    Is that common?

A.    Is what common?

Q.    Media attention for arrests.

A.    Yes.

Q.    If your office didn't provide the media with notice of this arrest it would have came from the police department, correct?

A.    I wouldn't know.

Q.    Now, did there come a time -- you know Robert Schalk, right?

A.    Yes.

Q.    You know him a long time?

A.    Yes.

Q.    Did there ever come a point in time you had conversations with Mr. Schalk about this case?

A.    Yes, I believe I did.

Q.    You had multiple conversations with him, right?

A.    Yes.

In fact, I think he was the one that provided me

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

A-78

Fexas - Cross/Reissman

351

with the documentation about Mr. Shah being the principal and sole owner of the company.

Q.   Okay.

Do you recall having any conversations with -- withdrawn.

Do you recall a conversation where you ran into him in county court?

A.   More specifically about what?

Q.   About this case.

A.   Possibly.

Q.   And at any point in time did you tell Mr. Schalk that you had advised the police department not to arrest the Shahs?

A.   I don't recall that.

MR. HARFENIST:  I have nothing further of this witness.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. REISSMAN:

Q.   Ms. Fexas, you said you have a working relationship with Detective Twomey?

A.   Yes.

I have called him as an expert witness many times.

Q.   In what context?

Paul J. Lombardi, RMR, FCRR
Official Court Reporter

A-79

TWOMEY/DIRECT/HARFENIST

195

So you get inside.  You believe -- you know this is some kind of company, Accessories by Peak.  You don't know who necessarily owns it.  You see the Shahs sitting there, right?

A.    The Shahs are there.  I was told that they were the owners, so I do see them.

Q.    Okay.  And at that point in time, you have a conversation with Rajesh and Sunita Shah?

A.    Yes.  Not much of a conversation, but yes.

Q.    Okay.  And did you ask them any questions?

A.    Well, by the time I saw them, I had already been in the warehouse.  I had looked at all the glass, pipes, and the glass bongos, and the hookah pipes and all the other smoking accessories and paraphernalia.  Then I went downstairs.  I just giving you how I felt, what I saw.

Q.    I asked a really simple question.  It's not complicated.  I appreciate your narrative, but I asked a simple question.

A.    Okay.  Well, I'm going to just -- I'm going to give you the state of mind when I asked them, too.

Q.    I just want to know.  Let's see if we can stick to my question.  Mr. Reissman will get to ask you anything he needs to ask you.  Okay?  You can tell your story.

Okay.  So you get there.  You see them.  You don't know if they're sitting or standing, and you ask

LISA SCHMID, CCR, RMR
Official Court Reporter

A-80

TWOMEY/DIRECT/HARFENIST

196

them a couple questions. Do you remember what you asked them?

A.   I asked them what was going on in the basement.

Q.   And what -- and Rajesh answered you, correct?

A.   No.

Q.   Sunita Shah answered you?

A.   She answered me, and she got me a piece of paper.

Q.   Okay.  So let's just go with that for a second.

So what did Sunita Shah tell you?

A.   That they were renting the downstairs to a family friend.  This is after -- I think she gave the piece of paper to Officer Martone and to me.  We both saw it.  And that was it.  It was like I looked at it and that was it.

Q.   Okay.  All right.  So we're going to get to that piece of paper in a second.

A.   Okay.

Q.   Were you there before -- was Detective Liston there when you were there?

A.   Yes, he was.

Q.   He arrived before you?

A.   He arrived before me, yes.

Q.   Okay.  And do you know if he had a conversation -- well, you were sitting here.  You heard his testimony.

Do you know if he had a conversation with Rajesh and Sunita Shah before you were there?

LISA SCHMID, CCR, RMR
Official Court Reporter

A-81

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
SUNITA SHAH,                        : 18-CV-4625(SLT)
                                    :
        Plaintiff,                  :
                                    :
                                    : United States Courthouse
    -against-                       : Central Islip, New York
                                    :
                                    :
                                    :
                                    :
                                    : Monday, December 11, 2023
DETECTIVE JOHN LISTON,              : 10:00 A.M.
Individually, POLICE OFFICER        :
ANDREW MARTONE,                     :
individually, POLICE OFFICER        :
MICHAEL KENNEY,
individually, DETECTIVE
DAVID TWOMEY, individually,
and THE COUNTY OF NASSAU,

        Defendants.
- - - - - - - - - - - - - - - - - X

            TRANSCRIPT OF JURY SELECTION AND TRIAL
        BEFORE THE HONORABLE JUDGE STEVEN L. TISCIONE

                A P P E A R A N C E S:

For the Plaintiff:      HARFENIST KRAUT & PERLSTEIN, LLP
                        3000 MARCUS AVENUE
                        LAKE SUCCESS, NEW YORK 11042
                        BY: STEVEN J. HARFENIST, ESQ.

For the Defendants:     OFFICE OF THE NASSAU COUNTY ATTORNEY
                        1 West Street
                        Mineola, New York 11501
                        BY: RALPH J. REISSMAN, ESQ.
                        BY:  VICTORIA LAGRECO, ESQ.


  Official Court Reporter:  ToniAnn Lucatorto, RMR, CRR, RPR
  E-mail:ToniAnnLucatorto@gmail.com
  Proceedings recorded by computerized stenography.
  Transcript produced by Computer-aided Transcription.

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 2 of 90 PageID #: 1343

**Jury Selection**

2

(In open court.)

(JUDGE STEVEN L. TISCIONE enters the courtroom.)

COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

THE COURTROOM DEPUTY:  The court is now in session.  The Honorable Steven Tiscione presiding.

Civil cause for jury selection and trial.  Shah V. Liston, et al.  Docket number 18-CV-4625.

Counsel, please state your appearances for the record beginning with the plaintiff.

MR. HARTFENIST:  Steven Hartfenist.  Hartfenist, Kraut & Perlstein.  3000 Marcus Avenue, Lake Success, New York for plaintiff.  Good morning, your Honor.

THE COURT:  Good morning.

MR. REISSMAN:  Two lawyers for defendants. Deputy County attorney Ralph Reissman.  Office of Nassau County Attorney.  One West Street, Mineola, New York. Good morning, your Honor.

MS. LAGRECA:  Victoria LaGreca on behalf of the defendants as well.  Good morning, your Honor.  Good morning, everyone.

THE COURT:  Good morning.  All right.  So are there any preliminary matters the parties need to discuss before we bring in the jury?

MR. HARTFENIST:  Yes, Judge, a scheduling issue.

A-83

**Jury Selection**

3

As I told your clerk before you had the chance to take the bench, I have a little bit of a scheduling issue with this afternoon.  I'm not going to burden the record with what I have other than say there's a -- I have a funeral I have to go to this afternoon.  If it works for the Court and Mr. Reissman and I are in agreement, what we would like to do is pick a jury and open, see what time we're at at that point.  And then decide whether we with will call one witness.  It would work best for me if we could break sometime around 2:00 or a little before.

THE COURT:  So what I might do then is we'll select the jury, take 15-minute breaks here and there. And instead of letting them go for lunch, we'll just go until 2:00 and then end for the day.

MR. HARTFENIST:  I think that's fine.

THE COURT:  Let's see how long.  We'll pick the jury and at that point, we'll see what time it is.

MR. HARTFENIST:  I just don't want to start a witness and not complete them before we have to leave.

THE COURT:  Yes.  We might just pick the jury and then open.

MR. HARTFENIST:  I mean, from my perspective, we all know what this trial looks like since we've all done it before.  Last time, the deliberations were longer than the trial.  So I think we we're going to move along pretty

A-84

**Jury Selection**

4

quickly.

THE COURT:  Anything else?

MR. HARTFENIST:  There is one issue that Mr. Reissman raised over the weekend or maybe it was on Friday.  In the prior case, there -- obviously, it was a joint pretrial order that has certain stipulated facts. And there's also a stipulations that's on the docket.  I can give you a copy.  Mr. Rissman wants to challenge a couple of them.

MR. REISSMAN:  It's docket 65-1.

THE COURT:  Hand it up, it's easier.

MR. HARTFENIST:  So the issue, Judge, is that there's a number of --the stipulation has 22 individual paragraphs and there's I think there's two of them that Mr. Rissman wants to challenge now at this point.

MR. REISSMAN:  There's three.

MR. HARTFENIST:  I apologize.

THE COURT:  What changed?

MR. HARTFENIST:  Nothing.  So the law is pretty clear.  I mean, he's free to argue.

THE COURT:  I'm pretty sure you're bound to what you previously stipulated to.  I don't think you can change that now.

MR. HARTFENIST:  I'll tell you exactly what the Second Circuit said about it, I looked at it yesterday.

**Jury Selection**

5

It was very easy to find.

THE COURT:  It would be different if one of the facts changed and therefore made the stipulation incorrect.

MR. REISSMAN:  Well, Judge, my reasoning before we get to the law is that based on the trial testimony, the last trial, the facts that were brought out at trial contradicts some -- at least three of the statements in the joint pretrial order that was filed in 2021.  The trial was in November 2022 and now it is December 2023. My argument is that the testimony has contradicted three of the statements that we agreed to in 2021.

THE COURT:  Which three statements?

MR. REISSMAN:  Okay, number three.  The October 2017.  Traditional business importing costume jewelry, hookas and leather animals from India.  Trial testimony established that there was far more going on in that store than these three items.  And of key importance is the existence of a very extensive collection of drug paraphernalia.  And just to read this statement into the record.  As a stipulated fact does not cover the testimony of the facts that came out at trial.  Just quickly go to the other two.  They involve the word lease.

THE COURT:  But that doesn't make that statement incorrect.  You can supplement it with the testimony that

A-86

**Jury Selection**

6

says in addition to importing costume jewelry, hookas and leather animals from India, the store also marketed whatever.

MR. HARTFENIST:  The witnesses will agree to testify what they saw.

THE COURT:  I don't think that makes this stipulation incorrect and it's not inconsistent if the witnesses testify that there's other stuff that the store also sold.

MR. REISSMAN:  I understand, your Honor, so we'll go with that.

The other two questions involve number five.  In October 2017 the objection was leasing the basement at 120 Hillside Avenue to a man named -- the testimony came out at trial that the document itself said this is not a lease.  The defendants testified that they did not consider it to be a valid lease.  By this statement is a concession -- in 2021 that the lease was a valid lease. And there is another statement in here that refers to the lease.

So my argument is by reading to the jury the stipulation that leasing the basement is incorrect because the defendants contend there was no valid lease.  And I'm willing to hear Mr. Hartfenist or your Honor on the issue.

THE COURT:  Does it matter?  Whether there was a

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 7 of 90 PageID #: 1348

**Jury Selection**

7

valid lease or not?  I mean, we're not talking about whether criminal charges were ultimately, you know -- legitimate against the --

MR. REISSMAN:  My argument, your Honor, is that the key to this case is the defendants believe that probable cause existed to arrest --

THE COURT:  Yes.  So what they knew at the time they made the arrest is the only issue.  I don't care whether there was a valid lease or not.  All I care about is what the police knew at the time about the lease or non lease or whatever they knew.

MR. HARTFENIST:  Look, there's no doubt they saw a piece of paper.  We know that.  My view is that, and the law supports the fact that it says it's not a lease.  It's irrelevant.  It is a lease under New York law.

THE COURT:  If I write up a contract that spells out terms and has considerations, but it says this is not a contract.  That has no legal significance.  It's a contract.

MR. HARTFENIST:  You can call a dolphin a fish but it's still a mammal.

THE COURT:  I thought that was the reason that you stipulated.  Was that regardless of what the document said, it's still technically a lease.

MR. HARTFENIST:  So let's talk about terms of

A-88

**Jury Selection**

8

stipulation.

THE COURT:  I'm not sure what your objection is. Are you saying that it's not a valid lease?  Because I kind of think it is.

MR. REISSMAN:  The plaintiffs -- Mr. Shah and Ms. Shah testified that Mr. Shah leased the basement to Mr. Bodhi.  And our contention, certainly as your Honor acknowledged, the defendants did not believe it to be a valid lease.  And for the jury to think or to hear that it is a valid lease is contradicted by the evidence. Especially since the document says this is not a lease.

THE COURT:  But that's it, I don't think it is.

MR. HARTFENIST:  That's the problem.  It is a lease.  They may -- whether they believed it was a lease or not, Judge, is irrelevant because legally it is a lease.

THE COURT:  I thought that was the whole reason that you stipulated was that regardless of what everybody believed, it was a lease.  So you can argue about what people believed it to be.  Whether the officers believed it was a valid lease or not.  But at the end of the day, I think it actually is a lease.

MR. HARTFENIST:  I agree.  The Second Circuit, just for the record, there's a case called PPX Enterprises versus Audio Fidelity, Inc.  746 F.2d 120 and I'm reading

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 9 of 90 PageID #: 1350

**Jury Selection**

9

from page 123.  It's a Second Circuit decision from 1984 and it says; stipulations are admissions in pleadings and binding upon the parties and the Courts having agreed on the set the facts, the parties and the Court are bound by them.  They're not free to pick and choose which one.

The only reason that you can set aside a stipulation under extremely limited circumstances, which are not present here, it would have to show it was manifested unjust.  That's an extraordinarily high standard.  The circuit has never affirmed it.  Or that the facts don't exist.

THE COURT:  Also, look.  At the end of the day, I don't think this matters because frankly whether it's a legal lease or not really doesn't matter.  All that matters is what the officers believed at the time they made the arrest.

MR. HARTFENIST:  This case is really decided on one stipulation.  Whether or not there was probable cause that sun Sunita Shah had immediate control of the basement.  Period.  That's the whole case, there's nothing more than that.  And whether it's a lease or not, I agree with the Court.  Legally it is.  The police officers thought process about it.

MR. REISSMAN:  Well, Judge, the only 2 factors that compel a different interpretation is that the lease,

A-90

**Jury Selection**

10

the piece of paper is not dated.  If it's a lease, it should have terms.  Secondly, it's not signed by the landlord, Mr. Shah.  So how can it be a binding lease if it's not dated and it's not signed by the landlord.

THE COURT:  All of which you knew before you started this case.  So I don't know how you can go back on this stipulation now if you made a mistake.

MR. HARTFENIST:  But, Judge, it's not a mistake.  It's a month-to-month tenancy.  Under New York law, it's a month-to-month tenancy if it doesn't have a term.  And the lease only has to the signed by the party accepting interest over the property.  This is a non-issue.

THE COURT:  I don't think it matters.

MR. REISSMAN:  Okay, Judge.  I go with your ruling.  Thank you.

THE COURT:  I don't think it matters because whether or not it was a valid lease really has no bearing on the issues in the case.  I think it actually is a valid lease, but if it's not, the officers can testify about what they believed at the time.  And whether it's valid or not doesn't really matter.

MR. REISSMAN:  I understand, your Honor.  Thank you.

THE COURT:  You said there was a third one.  What was the third one?

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 11 of 90 PageID #: 1352

**Jury Selection**

11

MR. REISSMAN:  As your Honor may remember last week, I conveyed color photographs and Mr. Hartfenist has said he would review the photographs and possibly agree to some but not all.  We haven't had that opportunity yet this morning.  If your Honor wants to go right to the jury, we can do that and discuss it maybe tomorrow morning.

THE COURT:  That's fine.  I don't think we will be introducing any of these photographs today.

MR. HARTFENIST:  There's not going to be many of them anyway.

THE COURT:  All right.  Let's bring in the jury and we'll start.  Just like last time, three preemptories each.  So we'll seat 14 in the box and as people get excused, we'll replace them.

MR. REISSMAN:  Yes, your Honor.  We pick the first eight, right?

THE COURT:  Yes.

MR. REISSMAN:  But you'll ultimate rely on six for a unanimous verdict or eight?

THE COURT:  No, it would be eight.

MR. REISSMAN:  Okay.  Thank you, your Honor.

THE COURT:  That's just in case we lose a juror or two.

(Jury enters the courtroom.)

A-92

Jury Selection

12

THE COURT:  Good morning ladies and gentlemen. My name is Magistrate Judge Steve Tiscione.  We're here today to select a jury for the trial in the case of Sunita Shah against Detective John Liston and David Twomey. Police Officers Andrew Martone and Michael Kenney, and the County of Nassau.  I'll be presiding over the jury selection and also the trial which will begin as soon as jury selection is over.  We will be ending a little bit early today.

We're going to call out 14 names for potential jurors.  If your name is called, please come sit in the jury box.  For those of you that are not initially called to the panel, I want you to please pay close attention because as jurors from the panel are excused, we will be calling names from the back of the room to fill those spots.  So you will be asked the same questions.  And if you pay attention, it will just make things much more efficient moving forward, all right?  You can call out the first 14 names.

THE COURTROOM DEPUTY:  So when I call your name, it's very important to have you seated in order.  Seat number one is going to be the seat that I'm pointing to. So it will be 1, 2, 3, 4, 5, 6, 7 in that row.  Juror number 8 will start the first seat over here in the back row.

**Jury Selection**

13

So that being said, juror number one:  Maureen Loper.

Juror number 2:  Alison Incarnato.

Juror number 3:  Sydnie Boule.

Juror number 4:  Roxann Weinstein.

Juror number 5:  Anish Patel.

Juror number 6:  Mauro E. Calderone.

Juror number 7:  Shannon M. Clary.

Juror number 8:  You will be starting the next row.  Erick Jiminez.

Juror number 9:  Marshall S. Kapson.

Juror number 10:  Corey Lev.

Juror number 11:  Razia Sultana.

Juror number 12:  Linda A. Esposito.

Juror number 13:  Dominic Cardinale.

And juror number 14:  Mansour Bonskdarian.

I apologize if I mispronounced any of your last names.

THE COURT:  Thank you.  Please swear in the all prospective jurors.

THE COURTROOM DEPUTY:  Sure.

(Jurors Sworn.)

ALL JURORS:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  Ladies and gentlemen,

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 14 of 90 PageID #: 1355

**Jury Selection**

14

the purpose of this procedure is to select a panel of eight fair and impartial jurors to try this case.  I will ask you certain questions about your background.  I apologize in advance for asking you personal questions, which I must, for the purpose of selecting a fair and impartial jury panel.  My questions and your responses enable me to determine if any jurors should be excused for cause.  The questioning also enables the parties to exercise their judgment with respect to the preemptory challenges, which are challenges for which no reason may be given.  Each side has been allotted a certain number of these challenges that they are free to exercise.

If at any time you are to feel uncomfortable for any reason in answering a question in front of the other jurors, please just ask to come up and we can come up to the bench and discuss it with you just in the presence of the attorneys and the court reporter.

If I decide that you that you should not sit as a juror here, please understand it does not in any way reelect badly on you.  We need jurors who are not only totally impartial, but who also lack even the appearance of being partial.  Such an appearance may arise from a prospective juror's relationship to the case, the parties or the subject matter of the case.

If for any reason I decide to excuse you, you

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 15 of 90 PageID #: 1356

**Jury Selection**

15

may still be able to serve as a juror on a different case. So I'll ask you to go back downstairs on the first floor back to the jury room.

At this point, I will introduce the participants in the case.  The plaintiff; Sunita Shah is represented by Steven Hartfenist.  Counsel, can you please rise and introduce yourself and your team to the jury.

MR. HARTFENIST:  Good morning.  My name is Steven Hartfenist.  I'm from the firm of Hartfenist, Kraut, and Perlstein.

THE COURT:  The defendants are Detectives John Liston and David Twomey.  Police Officers Andrew Martone, Michael Kenney, and the County of Nassau are represented by Ralph Reissman.

Counsel, please rise and introduce yourself, your clients, and your team.

MR. REISSMAN:  Good morning, jurors.  My name is Ralph Reissman.  I'm the deputy county attorney for the County of Nassau and the police officer and detective defendants.  And I have co-counsel here.

MS. LAGRECA:  Good morning, everyone.  My name is Victoria LaGreca.

THE COURT:  All right.  Do any of the jurors on the panel recognize the attorneys or the plaintiffs or defendants in this case?

A-96

**Jury Selection**

16

All right.  The trial in this case is expected to last about a week.  It might be a little bit less than that, but let's for the safety of argument about a week. It will begin after the jury selection today and it will continue each weekday until the trial is completed.  The trial will generally be in session from 10:00 a.m. to 5:00 p.m.  Although I tend to try to end the trial a little bit early each day just in case anybody needs to make public transportation.  I know the train schedule is a little wonky and we tend to have to leave a little bit before five in order for people to make the train if you're taking public transportation.

We'll also take a break for lunch and other short breaks as necessary during the day.  To make sure you don't keep each other waiting and that the trial can start on time, it's therefore essential that you arrive at the courthouse no later than 9:30 each morning.

Now is there anyone to whom this would create a serious problem either because of an unavoidable scheduling conflict or because of any difficult getting to and from the courthouse on time?  Okay.  I'm going to pass the microphone to -- just before you say anything, can you just state your name and the juror number if you remember it.

PROSPECTOR JUROR:  Linda Esposito, juror 12.

*TONIANN LUCATORTO, RMR, CRR, RPR*
*Official Court Reporter*

A-97

**Jury Selection**

17

THE COURT:  Okay.  And what's your scheduling conflict?

PROSPECTOR JUROR:  I can do two weeks but after the 23rd, I'm going to away.

THE COURT:  There is no way this trial is lasting two weeks.

PROSPECTOR JUROR:  Okay.  Just to let you know.

THE COURT:  Because I'm going away too, so I can guarantee that this trial is not going to be lasting two weeks.  Pass the microphone over to the last person in the row.

What's your name, sir?

PROSPECTOR JUROR:  Mansour Bonakdarian.  These are the last two weeks of the semester and there's no way I can cover these classes.  It's basically my students education.

THE COURT:  Okay.  What do you teach?

PROSPECTIVE JUROR:  I teach at NYU.  I already asked for postponement until June or a September date and they refused.

THE COURT:  Unfortunately, the timing doesn't work out.  If it was two weeks from now it would be a different story because you would be right in winter break.  I'm going to excuse you.  You can go back down to the first floor and perhaps they can have you come back

**Jury Selection**

18

down on a schedule that works a little bit better.  Thank you.  Just hand that to the person next to you, that's fine.  You can replace juror number 14.

THE COURTROOM DEPUTY:  Juror number 15:  Naomi Paglia.

THE COURT:  All right.  Ms. Paglia.  Do you have any unavoidable scheduling conflicts over the next week?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you recognize any of the attorneys or parties?

PROSPECTOR JUROR:  No.

THE COURT:  All right.

Anyone else with unavoidable scheduling conflicts?  No, all right.

Does anyone have a physical condition that would make it difficult for you to sit as a juror in this case; such as a hearing loss, vision problem, or something that would prevent you from sitting for long period of times?

Do any of the jurors have difficulty understanding English?  Okay.  You want to pass the microphone.

PROSPECTOR JUROR:  My name is Razia Sultana.  I have a speaking problem but I understand.  But sometimes I'm not understand.

THE COURT:  Okay.  Have you understood

A-99

**Jury Selection**

19

everything that has been said so far?

PROSPECTOR JUROR:  Yes.

THE COURT:  Is it more the, I guess, communicating part that's difficult for you.  But you can understand when somebody is speaking to you?

PROSPECTOR JUROR:  Yes.  Little bit of a problem.

THE COURT:  Okay.  What do you do for work.

PROSPECTOR JUROR:  I don't work.

THE COURT:  Okay.  So far everything that has been said, you've had no problem understanding?

PROSPECTIVE JUROR:  Yes, I understand, but sometimes --

THE COURT:  Do you think it would be an issue for you to understand -- I don't anticipate there's going to be anything highly technical in this trial, but I can't control the witnesses.  Some of them might speak softly or quickly, so I don't know.  You tell me, if you think that's going to be a problem for you, or you think you might have difficulty understanding the testimony.

PROSPECTIVE JUROR:  Sometime I understand everything.

THE COURT:  Sometimes, but not all of the time.

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Then you know what?  I'm

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 20 of 90 PageID #: 1361

**Jury Selection**

20

going to excuse you.  You can go back down to the first floor, thanks.  Please replace juror 11.

THE COURTROOM DEPUTY:  Juror number 16:  Barbara Ragona.  And just for all of you when you speak into the microphone, just hold it up close.  Thank you.

THE COURT:  All right.  Ms. Ragona, any unavoidable scheduling conflicts over the next week?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you recognize any of the parties or lawyers?

PROSPECTIVE JUROR:  No, but Ms. Shah -- I know a Dr. Shah with that name, first name.  Is it a younger man? Can you say?

THE COURT:  There's no Dr. Shah involved in this case.

PROSPECTIVE JUROR:  That name, I know a doctor of that name.  So that's not the person.

THE COURT:  The only Shah involved in this case is definitely not a doctor unless something has changed in the last couple of months.  Okay.

PROSPECTIVE JUROR:  So then no.

THE COURT:  All right.

Any physical issues that would prevent you from serving?

PROSPECTIVE JUROR:  No.

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

**Jury Selection**

21

THE COURT:  All right.  This is a question for the whole panel.  Have any of you ever worked in the law office?  Okay.  What did you do?

PROSPECTIVE JUROR:  I was a paralegal.

THE COURT:  What kind of a law firm?

PROSPECTIVE JUROR:  It was litigation.

THE COURT:  Just like general civil litigation?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are you able to put aside anything you might have learned while working at a law firm and consider on the law as the Court instructs you?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  All right.

Have any of you been involved in any civil lawsuits either as plaintiff or defendant?

PROSPECTIVE JUROR:  Class action.  Is that a civil?

THE COURT:  It is.  Were you a named plaintiff?  Meaning, that you actually appeared in the case?

PROSPECTIVE JUROR:  I gave a deposition.

THE COURT:  Okay.  Is there anything about that experience that would make it difficult for you to be fair and impartial in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

A-102

**Jury Selection**

22

Do any of you have friends or family members who are currently involved in a lawsuit against Nassau County or the Nassau County Police Department?

Do any of you or your close work for Nassau County?

PROSPECTIVE JUROR:  Can I say may name?

THE COURT:  Yes.

PROSPECTIVE JUROR:  Naomi Paglia, juror number 14.  My nephew is a detective in Nassau County Police Department, and my good friend is also a detective.  And another friend is a police officer.

THE COURT:  All with Nassau?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And how close are you with your nephew?  Do you see him often?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you ever talk to him about his work?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Would you be able to put aside anything you've learned about policing from your discussions and consider only the evidence that is put before you?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Some of the witnesses in this case

A-103

**Jury Selection**

23

are likely going to be police officers.  Are you able to consider their testimony the same as any other witness?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

Anybody else?  No.  Okay.

Has anyone testified as a witness in another legal proceeding?  No, okay.

Now, the jurors are the judges of the facts.  It is your function to decide the facts and to do it according to legal rules.  You will receive instructions on the law from me and you will be required to follow those legal rules, even if you disagree with them.

Is there anyone that is unable to accept and apply that rule of law?

I'm going to give you a brief description of the case, my description is not evidence.  It's simply provided to help you determine if there is anything about the case that would make it difficult for you to be a fair and impartial juror.  First of all, some of the events that you will hear about took place in the vicinity of Hillside Avenue, New York.  Are any of you familiar with that area?  Okay.

One of the important things that I'm going to instruct you about in greater detail later is that you may consider only the evidence that is presented to you at

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

A-104

**Jury Selection**

24

trial.  So that means no independent research, no Googling things, no looking on social media or anything of that nature.  That also means that if you are personally familiar with certain things, you need to try to put aside what you might know from something outside of this and consider just the evidence that's presented to you.  I don't think there's anything about this case that really depends on the location, so I'm not sure that it really makes a difference.  But to the extent that there is testimony presented about, say, you know, an intersection or, you know, what something looks like, you need to consider only that testimony even if you might think that the testimony is different than something that you remember from your own, okay?  You can only consider the evidence before you.

Would anyone have an issue applying that rule of law?  Okay.

The plaintiff asserts the claims pursuant to 42 United States Code Section 1983.  The statute provides a remedy for individuals that have been deprived of rights that are secured by the United States Constitution.  The defendants are detectives and police officers with the Nassau County Police Department.  The plaintiff, Sunita Shah contends that the defendants violated her constitutional rights on October 4, 2017.  Specifically,

TONIANN LUCATORTC, RMK, CRK, RPR
Official Court Reporter

A-105

**Jury Selection**

25

she alleges that the defendants falsely arrested her without any probable cause, and that defendants maliciously prosecuted her for possession of controlled substances and caused her injuries.  Defendants deny plaintiff's allegations.  They contend that plaintiff was arrested and prosecuted based on probable cause and after defendants completed their investigation.  Plaintiff obviously disagrees with that.

As I said from the beginning, you are the judges of the facts.  So if there are any factual disputes about anything that happened between the parties, it is your job to resolve those factual disputes.

Based on the brief description, is there anyone who thinks they would have a difficulty being fair and impartial in this case based on the nature of case?  No.

Would the fact that this case involves a civil rights case against police officers make it difficult for you to be fair and impartial?

Do any of you have any strong feelings about awarding damages on civil cases that might impact your ability to be fair and impartial?

During the course of this trial, you will be hearing testimony from witnesses from different jobs or backgrounds.  They are all equal before the law and you must judge the credibility of each based on his or her own

**Jury Selection**

26

testimony, not on any assumptions on them based on who they are or what they do.  We used the example of police officers before, but it applies for anything.  You must consider each witness on their own merits, not based on what they do or who they are.

Is there anyone who would have difficulty applying that rule of law?

Have any of you or close members of your family, ever been involved in a case in state or federal court?

PROSPECTIVE JUROR:  Yes.  Currently my nephew -- Naomi Paglia, juror 14.  Yes, I do think there is an issue based on the fact that my nephew, who is a detective, is being sued.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Your nephew is being sued and you think as a result of that, you would find it difficult to be fair and impartial?

PROSPECTIVE JUROR:  I think right now I would, yes.

THE COURT:  All right.  I'm going to excuse you. You can go back down to the first floor.  Can you please replace juror 14?

THE COURTROOM DEPUTY:  Yes.  Myles Murray, please step up and take the empty seat.

TONIANN LUCATORTC, RMK, CRK, RPR
Officiai Couri Reporter

**Jury Selection**

27

THE COURT:  Good morning.  Any unavoidable scheduling conflict over the next week?

PROSPECTIVE JUROR:  No.

THE COURT:  Any issues that have previously been discussed that would make it difficult for you to be fair and impartial?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay, that's what I like to hear.  All right.

Have any of you or close family members been involved in any incidents with the police that might affect your ability to be fair and impartial in this case?

Have you or any close family members ever worked in law enforcement?  Okay.  Who has the microphone?

PROSPECTIVE JUROR:  Alison Incarnato.  I have a brother-in-law who is a New York State cop.

THE COURT:  Do you like your brother-in-law?

PROSPECTIVE JUROR:  Yeah.  He's all right.

THE COURT:  Is there anyone -- can you put aside any relationship you might have to your brother-in-law and consider just the facts and testimony that's presented to you in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Would you be able to treat law enforcement officers the same as any other witness?

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

A-108

**Jury Selection**

28

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Who else has an issue?

PROSPECTIVE JUROR:  Marshall Kapson, juror nine. My entire wife's family is all cops and detectives.

THE COURT:  How do yo u feel about your in laws?

PROSPECTIVE JUROR:  They're all right.

THE COURT:  Are you able to put aside those relationships and consider the evidence and testimony only as it appears in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You're able to consider law enforcement witnesses the same as any other witness?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I have a daughter in law that has a brother-in-law that's Nassau county.  We're very close, but I can still --

THE COURT:  It's like six degrees of separation.

PROSPECTIVE JUROR:  We're actually staying in their condo in Florida so we're very close.  But it wouldn't affect anything.

THE COURT:  And you're able to consider just the testimony that's presented impartially and treat law enforcement witnesses the same as any other witness?

PROSPECTOR JUROR:  I will.

A-109

**Jury Selection**

29

THE COURT:  Okay.

PROSPECTIVE JUROR:  Linda Esposito, juror 12.  I have a niece who is a Suffolk County Police Officer.

THE COURT:  Well Suffolk County is totally different than Nassau County.  I'm just kidding.  Are you able to put aside that relationship and consider only the evidence and testimony in this case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you treat law enforcement witnesses the same as any other witness?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Anybody else?  Okay.

Have you or anyone close to you ever been stopped by the police in an incident that would make it difficult for you to be fair and impartial?  I mean we've all been stopped for traffic tickets, but I mean like something more than that?

Have you, your family or any close friends ever been involved in a criminal case either as a defendant or victim?

Do any of you have any strong feelings about the police or the Nassau County Police Department in particular that would make it difficult for you to be fair and impartial in this case?

Do any of you have any opinions about people who

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 30 of 90 PageID #: 1371

**Jury Selection**

30

have been arrested that would make it hard for you to be fair and impartial in this case?

If the Court instructs you that the plaintiff has the burden of proof in this lawsuit, and if you determine that the plaintiff did not meet that burden, will any of you have an issue with sending the plaintiff away with no money?

On the other side, if you find that the plaintiff does meet that burden, would you have any issue with issuing a judgment against the defendants?

All right.  Having heard any of those all of those preliminary questions which I put to you, is there any other reason that suggests itself to you as to why you could not sit on this jury and render a fair verdict based on the evidence presented to you and consistent with the law as I instruct you?

Okay.  All right.

PROSPECTIVE JUROR:  Is work a reason to be excused when I cannot focus?

THE COURT:  I guess it depends on what you mean by work.

PROSPECTIVE JUROR:  I work in a commission job. So five days out of it is very stressful for me.  I'm a financial advisor.

THE COURT:  So your income is substantially

A-111

**Jury Selection**

31

dependent on you actually making sales?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  How much of your income is based on commissions versus like salary?

PROSPECTIVE JUROR:  Nothing on salary.

THE COURT:  So --

PROSPECTIVE JUROR:  I work as a financial advisor.  So between revenue from fees and commissions, that's how I make my money.

THE COURT:  I see.  So if you don't, I guess work over the next couple of days, you won't get paid.

PROSPECTIVE JUROR:  I will get paid.  Not as much as I would have if I was still working.

THE COURT:  Okay.  You know, if there was a longer trial, I think that that might be a sufficient basis to excuse you.  I think for a couple of days it should be okay.  Again, this is not a situation where, you know, you were not being paid at all.  And I think a few days I would imagine that you probably take days off throughout the year for other reasons.  So I don't think a few days is going to make a huge difference one way or the other.  Okay, anybody else?

PROSPECTIVE JUROR:  It may sound trivial but I bought concert tickets for Wednesday in the city.  It cost me over $300 to attend.

**Jury Selection**

32

THE COURT:  What concert are you going to see?

PROSPECTIVE JUROR:  Andrew Bocelli.

THE COURT:  Nice.  Is it a matinee?

PROSPECTIVE JUROR:  No.  It's at 6 or 7 o'clock or something like that.

THE COURT:  Okay.  What time -- to get to the city takes a while in the afternoon.

PROSPECTIVE JUROR:  If I leave here at five, I'm not going to make it.

THE COURT:  No, that's true.  That's true.  You know what, this is such a sort trial, I would rather not have a whole day that we have to -- why don't you go downstairs to the first floor.  Maybe there will be a trial that starts next week or something that would be better for you.  You can go back down where you came from.

THE COURTROOM DEPUTY:  Shanif Ladha.

THE COURT:  All right.  Any unavoidable scheduling conflicts in the next week?

PROSPECTIVE JUROR:  I just have a court date on the 18th, which is I think is a Monday.

THE COURT:  It's the following Monday.  Okay.  I don't think we're going to last that long.

PROSPECTIVE JUROR:  Fair enough.

THE COURT:  What time is your court?

PROSPECTIVE JUROR:  9:00 a.m.

A-113

**Jury Selection**

33

THE COURT:  Okay.  If we get that far, we may have to start a little bit late that day, but I don't think we're going to get that far.

Okay.  Any other issues that presents itself that would make it difficult for you to be fair and impartial?

PROSPECTIVE JUROR:  No.

THE COURT:  Any law enforcement officers in the family or close friends?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  All right.  Anybody else?

No?  All right.  So let's take a ten-minute break.  And then when we come back, I'm going to ask individual questions to each of you just about some basic background questions, all right?

(Jury exits the courtroom.)

(A recess was taken at this time.)

(Continued on the next page.)

Court's Preliminary Instruction

34

(Trial commences.)

THE COURT:  Remember where you are seated because those will be your seats for the rest of the trial.

A few preliminary notes before I turn it over to the attorneys for their opening statements.  We are going to be starting at 10 o'clock, unless I tell you otherwise, every day.  We will go probably until about 4:30, 4:45 in the afternoon most days.  We may end a little early on a particular day if there is no witness available or to avoid starting a witness that's only going to last for a few minutes and have it be in the middle.

Please try your best to get here no later than 9:30 in the morning so that everybody is ready and we can start on time.  The attorneys are going to be here well before that and we'll make sure that we can start on time and have as few delays as possible.  Every once in a while something may come up where I need to address something with the attorneys separately and we'll have you leave the room.  We'll try to make those breaks as minimal as possible and deal with whatever we need to deal with outside the presence of the jury during breaks and things so that we don't waste any more of your time.

One thing that you need to keep in mind is my

**Court's Preliminary Instruction**

35

role here is very limited.  My main responsibility is to make sure that you can do your jobs.  As the jurors you are the finders of the fact.  You are the final arbiter of all of the facts in this case.  Because of that it's very important that you pay close attention to the evidence and testimony.

The evidence is going to take the form mostly of witness testimony but there will also be exhibits, documents, pictures, we'll put them up on the screen. Some of the stuff might be passed out to you to take a look at but we will endeavor to make sure everything is presented to you in a way that's easy for you to see.  If for whatever reason something comes in that you can't either hear or see, raise your hand and let us know and we'll try to fix whatever the issue is.

I'm going to take breaks throughout the day so that everybody can make sure they have adequate time to use the restroom.  We'll take lunch every day.  If we happen to be going too long and somebody has to use the restroom or some other emergency please just raise your hand.  We'll take a break any time you need it.

One of the most important things that you need to keep in mind is that you must consider only the evidence that you hear during this trial.  So that means only the evidence that's presented to you from the

A-116

**Court's Preliminary Instruction**

36

witnesses, exhibits that are actually introduced to you during the trial.  You can't consider any outside evidence.  That means no independent investigations. Don't go home and start Googling things.  If, for example, it's an accident case don't go to the intersection where the accident happened or anything like that.  You are not independent investigators.  You are to consider only the evidence that's presented to you.

Sometimes there is evidence that's excluded from the trial for a good reason and there is a reason why you are not supposed to consider that evidence.  So it's yet another reason why it's so important for you not to do your own independent research.

Along the same lines, I don't anticipate that there is going to be anything, but if there is anything written about this case in the news, please do not read it.  If you hear anything about the case stop listening and let me know.  I don't anticipate there is going to be anything, but just in case.

Along the same lines, you may not talk to anyone about the case, including your fellow jurors, until the case is concluded and you are directed to go back into the jury room and deliberate.  The reason for that, beyond all the other reasons that we just discussed, is that you need to keep an open mind until you have heard all of the

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-117

**Court's Preliminary Instruction**

37

evidence.  We don't want even the jurors discussing the case while the case is still going on before all of the evidence is presented.

Once all of the evidence is presented and the parties rest you will be able to go back to the jury room and deliberate at which point you should be talking about the case and going through the evidence to reach a verdict.  But prior to that please do not discuss the case with anyone, including your close family members, friends and even your fellow jurors.

You may take notes if you want.  There is nothing wrong with taking notes, but one thing to keep in mind is that your notes are not supposed to be a substitute for your memory of what actually occurred.  If there is ever a dispute between what's in your notes or somebody's memory about what the actual testimony was, please just ask to have the testimony read back or we'll get a transcript to you.  The evidence is the actual testimony and evidence that's presented, not your notes.

At the end of the day one of my law clerks will collect all of your notes and keep them in the room so you can't take them home.  But, again, if there is ever a discrepancy between what somebody remembers and what's written in somebody's notes just go to the actual evidence, which is the transcript, if you are not sure.

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 38 of 90 PageID #: 1379

**Court's Preliminary Instruction**

38

I'm going to instruct you further on this at the end of the day, but before we get to opening statements I'll just advise you that nothing that the attorneys say is evidence. So their opening statements, their closing statements, the questions themselves that they ask the witness, the only evidence is the answers given by the witnesses and any other evidence that's introduced in terms of photographs or documents.

Similarly, nothing I say is evidence in the case. When I instruct you on the law, that's something that you have to follow, but if I make comments or ask questions, I may occasionally question a witness. If I do that you should not take that to mean anything. It's not any indication about how I feel about the case. If I do that it's usually just to clarify a point or to make sure that the evidence comes in a way that I think is easier or more efficient for you. So don't read anything into that.

The plaintiff has the burden of proof in this case, and the plaintiff has to prove her claims by a preponderance of the evidence, which means that it's more likely than not. If we were to look at a balancing scale, preponderance of the evidence means just that slight bit of difference on one side. So 51 percent.

After the attorneys do their opening statements I think we are going to break for the day and we'll start

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 39 of 90 PageID #: 1380

**Court's Preliminary Instruction**

39

with the first witness tomorrow.  Following all of the witnesses the attorneys will get to do their closing arguments or summations to you.

Following that I will instruct you on the law and then you will return to the jury room to begin your deliberations.  As I said before, you are the judges of the facts which means it's incredibly important for you to pay attention and one of the things you are going to have to do is to determine the credibility of witnesses.  You alone are the sole judges of credibility.  You should consider all of the evidence and the witnesses' demeanor when they are testifying.

The last thing is a little bit of a rule, I guess you can say, that's imposed on everyone here, which is, to avoid even the appearance of impropriety, you should not talk to any of the lawyers or the parties involved in the case and they are instructed not to talk to you.  So if you happen to come across one of them in the elevator don't talk to them.  They won't talk to you. It's not in any way a slight.  So don't take it that way, but it's just to avoid even the appearance of impropriety. So if somebody walks past you and doesn't say good morning or anything it's because they have been instructed not to, not because of anything else.

Mr. Harfenist.

A-120

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 40 of 90 PageID #: 1381

**Court's Preliminary Instruction**

40

MR. HARFENIST:  Before we start, Judge, may we have a very brief sidebar?

THE COURT:  Yes.

MR. HARFENIST:  Sorry.

(Continued on next page.)

A-121

Court's Preliminary Instruction

41

(Sidebar.)

MR. HARFENIST:  Judge, because we are retrying this case and there is a record and the evidence from the first trial, at least large chunks of the testimony can either come in as direct evidence under 804(b) --

THE COURT:  You want me to say something?

MR. HARFENIST:  I think we should probably tell them that otherwise they are going to be saying what are they talking about and I think it's better to do it up front instead of after the fact and saying, there was previous testimony in a previous trial.

THE COURT:  I'll just tell them there was a previous trial in this case that did not result in a verdict and, as such, you are going to hear evidence probably of things that occurred in that earlier trial.

MR. HARFENIST:  Testimony, yes.

THE COURT:  Testimony.

MR. HARFENIST:  Otherwise --

MR. REISSMAN:  Otherwise they are going to be confused.

THE COURT:  Fair enough.

MR. HARFENIST:  Thank you, Judge.

THE COURT:  Okay.

(Sidebar concluded.)

(Continued on next page.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-122

Opening - Mr. Harfenist

42

(In open court.)

THE COURT:  Just one last point of information. There has been a prior trial in this case that did not result in a verdict.  As such, you will most likely hear evidence from testimony and things that occurred in that earlier trial.  So to avoid confusion I will let you know that that did occur and so you will probably hear some testimony from that earlier trial.

That being said, Mr. Harfenist, you may begin.

MR. HARFENIST:  Thank you, Judge.

Good afternoon.  This is going -- my name is Steve Harfenist.  This was a quick jury selection.  So you probably remember my name.  I represent Sunita Shah and this is the second trial I represented her in.  This is, as Judge Tiscione told you, a false arrest and malicious prosecution case.

So what happened?  Before I tell you what happened, if I speak a little loud it's because I'm a little hard of hearing and I'm not wearing -- I refuse to wear hearing aids at the age 59.  So I will try my best to keep my tone down.  I tend to speak a little fast.  I know Judge Tiscione and the court reporter will stop me.  They have heard it before.

Okay.  What is this case about?  It's not about me.  It's not about anybody other than what happened to

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-123

Opening - Mr. Harfenist

43

Sunita Shah.  So Sunita Shah is, generally speaking, it's sort of the American story.  Her and her husband came here from India.  They have three children, two of whom graduated from Ivy Leagues.  One went to Penn, the other Cornell.  The other has a degree from St. John's.  All the kids are very successful.  They live in Nassau County. They have lived there for quite some time.  Rajesh owned a store in Manhattan into the early '90s called Accessories By Peak.

It was essentially a novelty shop that sold a variety of items that were culturally traditional to South East Asia, including smoking devices, and other types of novelties.  You will see some pictures of some of that stuff but for this case it's really not relevant because what is relevant is what was Sunita Shah's connection to that business on October 4, 2017, and when you hear all the evidence you are going to see she had no connection to that premises.

So why is that important?  What happened that we are going to be talking about a concept throughout this case and the judge will instruct you on New York law called dominion and control over a premises.

So sometime after they left New York they opened a facility on Hillside Avenue in East Williston.  It's a little strip mall.  Primarily the business is an internet

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 44 of 90 PageID #: 1385

**Opening - Mr. Harfenist**

44

business.  They would occasionally have people come in there.  The space is not large.  It's a basement storage area, small little office.  Sunita's a bank teller by trade.  She wasn't doing that at the time because her daughter was getting married and she was in the process of planning that wedding.

Sometime shortly before that, Rajesh Shah was approached by somebody he -- a friend of his, a loosely connected friend who wanted to rent some space out from him for the basement of that store.  So he agreed to do it.  You are going to see a document that indicates that he rented the basement to an individual named Surender Bhatty.  Surender paid $700 a month to rent the pace and for the most part there was never any issues about it.

Surender told him he was storying some items down there and Rajesh went about his business and there were never issues until on the 4th they got a call from the next door neighbor, the guy that owned the karate studio, saying the fire department was there because they smelled some noxious fumes coming from the building.

Now, Rajesh and Sunita were together at a friend's house discussing plans for their daughter's wedding, actually, and they got in the car and they came over to the building.  When they arrived at the building the only ones there were the fire department.  The police

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 45 of 90 PageID #: 1386

Opening - Mr. Harfenist

45

department were not there at that point.  What they did was they went next door to 122, everything happened here in 120, met with the individual from the fire department and the owner of the karate store and the fire department asked him, can you let us into your building.  Rajesh Shah did that.

By the way, at this point in time Sunita wasn't even with them.  She was sitting in the car, and the evidence is pretty uncontested that she sat in the car up until a point in time that the police arrived.  Rajesh opened the door to the building, let the fire department in, and they went into the basement.  What they ultimately found was that Surender Bhatty was growing synthetic marijuana in the basement of the building.  The police officers arrived.

Now, that's when the story gets really sketchy because your job here is going to be to try to reconcile the stories that you are going to hear from the police officers.  They are not reconcilable.  You are going to have difficulty putting together what they all said happened and when and justify it.  And when the case is all over, and after the judge instructs you on the law, I will tell you why you can't reconcile it and it will all make sense.

So what happens?  The first officer who arrives

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Opening - Mr. Harfenist

46

on the scene is Police Officer Kenney, a relatively young police officer.  He gets on the scene.  He meets with the fire department.  He talks briefly to them and he has a brief conversation with Rajesh Shah at which point he goes into the building with the fire department.  He's the first one to see what's going on out there.  The story kind of gets a little contradictory at this point as to what happens next but we do know that Police Officer Martone then subsequently arrived and he claims that he saw Rajesh open the door to the store but we know that didn't happen because the fire department had already been in there.

Why is it so important as to who opened what and who was there?  Because eventually what happened is they arrested both Rajesh Shah and Sunita for possession of a controlled substance in the basement.  When you hear these inconsistencies in the evidence they are important because what the police are trying to show is that both of them somehow had what's known as dominion and control over what's happening in the basement.  They did not.

Sunita had nothing to do with it.  Occasionally she would help her husband and the business, but she was appointed before that full time as a bank teller.  She would come and help out but she had nothing to do with it. She wasn't an owner.  She wasn't on the lease.  She wasn't

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Opening - Mr. Harfenist

47

on the board of Accessories By Peak.  Yet they eventually arrested her for possessing these approximately 20 pounds of synthetic marijuana that was being grown by Surender Bhatty in the basement.

What happens next?  Now as they start to see what's happening here, the police involvement begins to escalate and Sunita winds up going upstairs in the office and she's sitting in the office with Rajesh as a number of police officers come.  There are a couple of police officers you are not going to hear from who were on the scene.  We don't have any idea what their involvement was. We know they were not the arresting officers.  There were two arrests made, one by Officer Kenney and one by Officer Martone.  They were each arrested, both Rajesh and Sunita. By the way, the charges were dismissed very quickly against both of them.

You are going to hear that the extent of the investigation that happened at the location before they arrested them was essentially nothing.  They really didn't do anything.  The police did nothing despite the fact hearing the story from Rajesh Shah about Surender Bhatty, but I'm going to get to that in a second.  They are both upstairs.  You are going to hear a dispute about where they first saw this lease that was with Surender Bhatty. It's a piece of paper that indicates that he's renting it

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 48 of 90 PageID #: 1389

Opening - Mr. Harfenist

48

out to him for $700 a month.  Is it a professional lease?  No.  But under New York law it's a lease.  The parties have stipulated it was an enforceable agreement.

The officers -- and who asked who first about this is up for dispute -- they are all pointing fingers at each other as to who first started to speak to Rajesh about this lease.  Some of them said they never even saw it.  Then next to arrive on the scene is Detective Twomey and Detective Reed from the narcotics unit.  These are extremely experienced police officers in narcotics investigations.  There is inconsistencies in their stories as well.

The issue that you are going to hear from them is when the decision was made, necessarily, to arrest Sunita and their testimony is going to be she was a, quote-unquote, key holder of the store, therefore they arrested her for what was happening in the basement despite the evidence that shows she didn't work there, she wasn't an owner, she wasn't on the lease.

She was Rajesh Shah's wife.  That's what she was.  She came with him that day.  The most perplexing thing you are going to hear from this case is, and the one thing they are consistent about is, none of the police officers or the detectives can tell you who authorized the arrest of Sunita Shah or Rajesh Shah.  They say they don't

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 49 of 90 PageID #: 1390

**Opening - Mr. Harfenist**

49

know.

Now, it will be up to you to decide whether you believe that or not when you hear the testimony of the evidence, but sometimes cases are about the existence of evidence and sometimes cases are about the lack of evidence.  This case is about both.  You have a lease that says that they submitted the evidence, that they surrendered the possession of this property to this individual.  When they told that to the police officers, one of the police officers asked Rajesh Shah, can you get in touch with Mr. Bhatty.  So he said, yes.  I have his number.  The guy took his cell phone out, called Bhatty up.  He told Bhatty what happened and Bhatty hung up because he knew what he was doing.

Interestingly enough, you are going to hear that Surender Bhatty had done this before in Nassau County in either Plainview or Syosset.  I believe it was Syosset where he had rented out a basement from somebody and he was growing synthetic marijuana and there was actually an explosion there and he was arrested as a result of that. So after he hung up you will hear, Rajesh will tell you, I told the detectives this is what happened and shortly after that, without doing anything else, they arrested both of them.

Now, what happened when they got arrested?  You

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 50 of 90 PageID #: 1391

**Opening - Mr. Harfenist**

50

are going to hear that Sunita throughout the entire thing didn't understand what was going on.  There was some testimony that she was -- looked confused and perplexed as to what was happening.  They were taken down to the precinct.  They were booked and they were transported to the holding cell where they were kept overnight.  She was scared, obviously.  This is a woman who never had any contacts with -- a bank teller.  She had no contact with the criminal justice system.  She certainly wasn't a drug dealer.

The proceedings that happened after the arrest was extraordinarily typical about what happens in these types of cases where the police department has some -- the evidence is going to show you that they wanted to take some credit for this arrest.  What they did was you will hear from Sunita that she was in a cell, her and Rajesh were in a cell with a number of people and one by one these other people left and they were then there alone. They were being taken to court.

When they were taken out to court there was a throng of media out there.  There were multiple television channels and you are going to see it.  We are going to play it for you right on the screen.  You are going to see what the Nassau County Police Department did to Sunita Shah and her life.

A-131

**Opening - Mr. Harfenist**

51

It was on News 12.  It was on Channel 5, it was in Newsday.  It was in all the local papers.  It was in all the Indian community papers, and this family was a very prominent family in the Indian community with a very large wedding about to happen.  You are going to hear about the amount of stress and anguish and ostracizing that they initially felt from their community.

So they get dragged out through the media.  They get taken down to the courthouse.  The courthouse, there's media there.  They get released on their own recognizance and this is where the case gets a little interesting because you are going to hear from Robert Schalk.  Robert Schalk was Sunita's criminal defense lawyer who right when he was initially hired had a conversation and he'll tell you about how Sunita -- what the reaction was and his interplay with her as to how she necessarily was handling what happened to her.

He immediately had conversations with an assistant district attorney named Fexas, and you are going to hear from her as well about this case.  Bob will tell you that he ran into her the next day in county -- he basically said to her, she's not on the lease.  There was a renter there.  She doesn't have ownership interest.  He provided all that information.

The next day -- I think it was either the next

A-132

Opening - Mr. Harfenist

52

day or two days after -- one of the two, he'll tell you he ran into ADA Fexas in the courthouse and said, what are you doing with this thing?  And she said to him, I told them not to arrest her.  Now, ADA Fexas doesn't say -- she doesn't deny that she had that conversation with him.  She claims that she doesn't recall having that conversation with him which is, I don't recall, you will see, is a very convenient way for witnesses to basically avoid actually answering something that they don't want to answer.

The irony of it is, is that ADA Fexas testifies that before the arrest happened, while the investigation was going on, she had multiple telephone conversations with Detective Twomey.  Now, what did they talk about? She's going to say, well, I just was talking about how things were proceeding.  Nothing about any of the substance.  It will be up to you to decide whether you believe that.

So why did they get arrested?  And who authorized them to be arrested?  That's the ultimate question that will result in your verdict because Sunita Shah did not have -- the evidence will show she didn't have control of that basement under New York law.  She shouldn't have been arrested and nobody wants to say who authorized it.  Well, you put two and two together. Nobody wants to say who authorized it and there was a

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 53 of 90 PageID #: 1394

**Opening - Mr. Harfenist**

53

throng of media about having an arrest of all the synthetic marijuana operation.  It's not too hard for you to draw those inferences when your time comes.

But in the end there was never any probable cause to arrest Sunita Shah.  There is testimony from the police officers, they didn't disbelieve them that they leased the place out to Surender Bhatty.  What their testimony was, she was a key holder, this like magic word key holder, that's irrelevant.  When you hear Judge Tiscione's instruction on the law you will never hear the word key holder about anything, one, number two, I'm not sure how they knew she was a key holder because by the time all the police officers arrived at the scene the doors were already opened and she didn't come up for another 15 minutes.

So their stories make no sense and I'll tell you what I think at the end why they make no sense, but this person's life was dragged through the mud.  You go on the -- and I'll show you on the internet during the trial -- you put her name in it's the first thing that comes up.  You are not going to see anything about the fact that they dismissed the case and they didn't care, but they made no effort, the evidence will show that on the day they arrested Sunita and Rajesh Shah, they made no effort to contact Surender Bhatty, who they had

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-134

**Opening - Mr. Harfenist**

54

previously -- it wouldn't have been very hard, the evidence will show, to find out he actually had done this before.  They don't bother.  Because the evidence shows that they had this large amount of drugs and they wanted media attention over it, and they got it, and they didn't care that she still has to live with that when anybody ever looks at the internet.

So when the case is up and you get the entire evidence and we get to make our closing summations I'm going to show you something we used in the last trial which is basically a PowerPoint and I take no credit for creating it, Lori did it, that basically shows how their stories are completely inconsistent, and are not reconcilable.  In the end I think the evidence is going to convince you that there was no probable cause to arrest Sunita Shah, period.

There was even less probable cause to prosecute her the next day when they filed the information.  You are going to hear a bunch of stuff about the paperwork because the paperwork was written by people who didn't necessarily give them the information on it.  They have an explanation as to what was going on.  I'll tell you what I think as to what was really going on.

But I'm going to ask you to find for her and I'm going to ask you to give her substantial amounts of money

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**Opening - Mr. Reissman**

55

because not only can she not get the days back, but she has to live with it every day when you put her name in the internet.

Thank you.

THE COURT:  Mr. Reisman.

MR. REISSMAN:  Thank you, Judge.

Ladies and gentlemen of the jury, my name is Ralph Reissman.  I'm a deputy county attorney with the Nassau County Attorneys Office and along with Deputy County Attorney Victoria LaGreca we represent the defendants in this case who are Detective Liston, he's now a lieutenant but during the time of the incident in 2017 he was a detective.  I also represent Officer Andrew Martone, Officer Michael Kenny and Detective David Twomey who is now retired.

You will hear from all of them and you will also hear from Detective Twomey's partner in the narcotics squad, Detective Kathleen Reed.  You will also hear from the assistant district attorney, Kristen Fexas, who at the time was the head of the street narcotics and gangs unit and subsequently promoted, as we speak today, to the chief of the Nassau County district attorneys public corruption unit.

Now, you heard Mr. Harfenist talk about different ways to look at what you will hear and he said

**Opening - Mr. Reissman**

56

to you that there are -- you will hear inconsistencies from different witnesses, but at the end of the day, after all the witnesses testify and you are shown all the evidence, you will realize that the story does stick together and there is a reason, and there are reasons that everything in this case that happened was justified, including the arrest of Sunita Shah.

Now, this is a very simple case.  There are only two words you have to focus on to reach your decision and the words are probable cause.  What does that mean?  Well, you know what the word probable means.  It means something more likely than not happened, and you know what the word cause means.  It means it's the reason something happened.

But in police work and in case law for centuries, probable cause means if a police officer reasonably believed that a crime had been committed, he is entitled to a defense from a claim for false arrest, and also malicious prosecution and we'll get to that.  What that means is the officer is faced with circumstances when he arrives on the scene.  His job is to assess what he sees and who he talks to and based on his experience and training make a decision whether or not to arrest the person whom he believes committed a crime.

(Continued on next page.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-137

**Opening - Mr. Reissman**

57

(continued.)

MR. REISSMAN:  Now, probable cause to arrest is only based on what the officer knew at the time.  It is not based on 50/50 hindsight, even after, as happened in this case, the arrest charges were dismissed.  To dismiss a criminal charge requires the district attorney -- well, let me take it back.  To prove a criminal charge -- this is a civil trial.  A criminal trial -- what you see on TV is inherently a criminal trial.  Law and Order, all criminal trials.  And what you see in the beginning of the show, first half hour, I love Law and Order.  Is the detectives looking around, talking to people, investigating and at the end of the first half hour they make an arrest.  And that is based on what they saw at the time.  And that is based on the probable cause to believe, reasonable probable cause to believe that a crime had been committed.  Now, after the second half hour of Law and Order and the second half of this case is after the arrest, the case goes to the district attorney's office. Now, the district attorney is responsible for further investigating the case to make a decision whether to continue the criminal charge or dismiss the criminal charge.  And unlike probable cause, which means there was a reason to believe the police reasonably believed a crime had been committed, when the case goes to the district

A-138

Opening - Mr. Reissman

58

attorney, he or she has to prove the case that the defendant was guilty beyond a reasonable doubt.

You may have heard that on TV, you may have seen that in the newspaper. Guilty beyond a reasonable doubt is basically the DA has to prove to the jury, basically 99 percent that this defendant committed a crime. That is not the standard you will hear for probable cause. Because probable cause is determined at the time of arrest based on the circumstances the detectives or the police knew at the time of the arrest.

Now, the judge will instruct you on the law, and I'll get into the facts in a couple of minutes. But the judge will instruct you on the law that if you believe, if you find based on the officers testimony that they reasonably believed that Sunita Shah was responsible for a crime, then that is a defense to a claim of false arrest.

What is a false arrest? Well, usually somebody, an officer, comes to a situation. He decided there is good reason that a crime had been -- to believe a crime had been committed and this person committed it, and that person is arrested. Now, if the charges are later dropped, which they were in this case by the district attorney, because she will tell you after she further investigated the facts of the case, after the police gave the case to her, she decided she cannot prove to a jury

**Opening - Mr. Reissman**

59

beyond a reasonable doubt to prove Sunita Shah was guilty of the charges she was assessed with.  But at the time of arrest, if the officers reasonably believed that is a cause to arrest based on the facts at the time, that is a complete defense to a claim of false arrest.  False arrest, again, is if somebody is arrested and a charges are later dismissed, the person who was arrested certainly has the right in law; either state court or federal court, as Judge Tiscione told you about the constitution, they should not have been arrested.  That's called a false arrest.  And Ms.  Shah also has a second claim for malicious prosecution.  Malicious prosecution is a claim that after the arrest, the prosecutors, the DA should not have continued the case.  But to prove malicious prosecution, hidden in the word malicious prosecution is the word malice.  The plaintiff has to prove that the officers and the district attorney, maliciously, with malice, not to see the ends of justice met, decided to basically harass this plaintiff for no good reason.  But again, the judge will instruct you that probable cause to arrest is also a defense to a claim of malicious prosecution.

Now, Mr. Hartfenist did tell you some of the facts of the case, and I'll tell you a little more.  And I'll tell you that after you hear all of the evidence and

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 60 of 90 PageID #: 1401

**Opening - Mr. Reissman**

60

you hear the testimony of the officers, you hear the testimony of Mr. Shah, her husband, her lawyer; Mr. Shaw, that you will come to the conclusion that the officers had probable cause to arrest her. And therefore, the false arrest claim was to be dismissed as also, the malicious prosecution claim must be dismissed.

So let's get to the facts. On October 4, 2017, Charles Water who owned a karate store, karate studio at 122 Hillside Avenue in Williston Park, and he had students there, this is about 3:00 p.m. He had students in the studio and the students began complaining that they were getting sick and nauseous. And Mr. Water also began getting sick and nauseous. And there was a very bad gaseous, almost poisonous smell. So what did Mr. Water do? He called the Williston Park fire department and the fire department in Nassau -- each town and village may or may not have a fire department. In this case, Williston Park had its own fire department, and the firefighters arrived at the scene. When they got there, they met Mr. Water and asked what is the problem. There is a very noxious odor coming in my store. Now, obviously the firefighters wanted to know what was going on. So they looked around, they looked into Mr. Water's studio and they determined that the smell was coming from next door, 120 Hillside Avenue, which is the store Accessories by

A-141

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 61 of 90 PageID #: 1402

**Opening - Mr. Reissman**

61

Peak, P-E-A-K.  That was a store that Rajesh Shah operated.  There's no dispute he was the sole owner of the store.  And that Sunita -- there's no evidence and we will not claim that she was an employer of the store.  But based on the facts presented to them, when the police arrived, they reasonably believed she had some responsibility for what was found in the basement and what was found in the basement when the firefighters went in and when the police went in, was an illegal drug manufacturing operation.  The drug manufacturing operation which consisted the multiple big green tubs of vegetative substance called potpourri.  Cans of acetone, which are used to spray the leaves and turn them into drug friendly uses.  And they also found upstairs, they found when they walked in the store first floor, you had hear about the layout of the store and you may see photographs.  When the firefighters and the police walked into Accessories by Peak on the first floor, they found drug paraphernalia. Pipes, metal pipes, glass pipes, bongs, blenders, hookah's, all used to smoke or use drugs.

Now, there were also ornaments, maybe a couple of elephant statues.  But the primary focus of the officers and the firefighters was that upstairs, on the first floor, this appeared to be a drug paraphernalia retail operation.  Or as Mr. Rajesh will say; wholesale

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 62 of 90 PageID #: 1403

Opening - Mr. Reissman

62

and retail.  When Officer Kenney arrived on the scene, he was driving in a radio control car.  This is the Third Precinct and Williston Park is in the Third Precinct.  He gets a radio call; respond to 120 Hillside Avenue for a noxious smell.  That's all he knew.  At the same time, Officer Martone driving another car received the same call.  When Officer K got to the store, he was told by the firefighters what happened.  Mr. Water had called the shah's; Mr. And Ms. Shah who Mr.  Hartfenist has correctly described were at a friend's house.  And Mr. Water, based on his own written statement which you will see taken down by Officer Martone said there was a leak, a very nauseous leak, and that he called the fire department.  The fire department asked Mr. Water who owns this store.  He said Mr. Shah.  The fire department said call Mr. Shah and get him over here because we have to open the store.  And the fire department said basically we want the key holder, meaning keys open doors.  Well, 15 or 20 minutes later, Mr. And Ms. Shah did arrive by car.  And you will hear testimony that Sunita was driving the car.  Mr. Rajesh went into the store.  He saw the firefighters, he saw the police.  And he said what is going on and they said are you the owner of the store.  And he said yes.  Then five minutes later Sunita same in and they were both sitting in the upstairs store.  They were both sitting on the first

A-143

**Opening - Mr. Reissman**

63

floor.  You will hear Officer Kenney tell you that the firefighters told him that Rajesh and Sunita were the owners of the store.  Because they had both come in the same car.  They believed and they told Officer Kenney that the Shah's, both of them, were owners of Accessories by Peak.  Officer Kenney had no reason to doubt that.  When Officer Martone arrived on the scene, he was told the same thing.  The Shah's collectively are owners of the store. And in fact, both Shah's were sitting on the first floor. Ms. Shah was sitting at a desk and Mr. Shah was standing up.  Officer Martone tried to go down to the basement, he got halfway down the basement but the smell was so overpowering, he could not breathe.  So he came upstairs. In the meantime, Detective John Liston, who is also a defendant, was called to the scene.  Now, when an officer, patrol officer, responds to a scene, and he believes a crime had been committed or needs to be investigated, he calls his precinct and the precinct calls upstairs to a squad.  What is a squad?  Every precinct has a squad of detectives.  There are eight precincts in Nassau County. This was the third squad.  Now, when a call comes to the squad, it's called catching a call.  Whoever is next up in line is responsible for responding to the call.  So Detective Liston got in his car, drove to the site, saw the fire engines, saw the firefighters, saw Officer

A-144

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 64 of 90 PageID #: 1405

Opening - Mr. Reissman

64

Martone, saw Officer Kenney and they said to him this is what's going on.  There's a narcotics operation going on in the basement.  Now, Detective Liston had no experience. He will tell you he had no experience in narcotics investigations.  So he what he did was he called his precinct officer, and called for the narcotics squad to show up because they're the ones with experience in evaluating narcotics.  Who was on the narcotics squad, Detective Twomey and Detective Reed.  Now, Detective Twomey will testify to you that he has 32 years experience in the police department before he retired.  And actually at the time, he had 32 years experience.  Subsequent to this, he retired.  But you will see in the criminal charging instruments, the complaints, that he stated I have 32 years experience investigating crimes and special narcotics.  You will hear that he was a specialist trained by state and federal authorities in investigating and analyzing drugs and the drug charges that go with that those investigations.  When -- well, let me step back for a second.

When Officer Martone, as I said, he couldn't go all the way down the stairs.  He will tell you he saw Rajesh and Sunita sitting in the first floor.  Sunita was at a desk and Rajesh was standing.  Officer Martone asked them what's going on down there.  And Ms. Shah, Sunita

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 65 of 90 PageID #: 1406

Opening - Mr. Reissman

65

Shah, sitting behind the desk took out a piece of paper and handed it to him.  And he looked at the paper and you will see the paper.  It's a one paragraph type-written paper which says; I Surender Bhatty am renting the basement for $700 a month.  There's no date on it.  It's signed by Surender Bhatty, who we may believe is Surender Bhatty, but there's no date on it.  There's no identification of who owns the basement or the store.  And you will see a copy of the lease that Mr. Shah signed to rent the entire store from a woman who lived in New York City who rented the entire store to Mr. Shah.  And that's a long lease with lots and lots of fine print.  This document which Ms. Shah handed to Officer Martone, again, was one paragraph long.  Was not dated was not signed by rajesh, who you would think as the landlord would sign it. And best of all, you will see that this is not a lease. Now, Mr. Hartfenist is going to tell you that this is a valid lease.  But what Officer Martone saw and later Detective Twomey was this piece of paper said this is not a lease.  And Detective Reed will also testify to that.

They did not believe it was a valid lease.  But it was given to them by Ms. Shah to Officer Martone and then he gave it to Detective Twomey.  In addition when Detective Twomey came to the store, he went downstairs with Detective Reed and his trained narcotics

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

A-146

Opening - Mr. Reissman

66

investigators.  They immediately realized what was going on was a synthetic marijuana drug manufacturing operation. This was based on their observation and you may or may not see the photographs of several big tubs of vegetative material, cans of acetone, and at least a thousand, and you will hear the officer say more like 5,000 tin foil packets closed up with cartoon characters on it. Detective Twomey will testify that based on his experience, these sealed packets with cartoon characters on it were based to the public.  Now, he came upstairs and he said to Officer Martone what's going on here.  And he said these are the owners of the store.  Because that's what Officer Kenney was told and that's what the firefighters told him.  And Detective Twomey said what is going on down there.  And he said who owns this store. Well, I'll tell you what.  Ms. Shah took out of the desk a business card that says Accessories By Peak and you will see a picture of that card, it's in the narcotics file. And she gave it to Detective Twomey.  Based on her giving the lease to Officer Martone and he gave to Detective Twomey.  Based on her giving Detective Twomey the business card, based on her sitting behind the desk, the officers all believed that she had an ownership interest or at least knowledge what was going on in the basement.

          Now, she was charged with three crimes.  One was

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 67 of 90 PageID #: 1408

Opening - Mr. Reissman

67

illegal nitrous oxide, that's laughing gas.  You will hear testimony there was no laughing gas on the premises.  However, Detective Twomey and John Liston, Detective Liston will explain to you that that charge comes from New York State public health law.  And when detectives sat down to type up the arrest report, they had to call -- at the time the computer system was called swift justice.  Which has now been replaced, but at the time, six years ago had certain limitations.  In other words, to process a criminal charge, the police making that statement had to pull up statute because every crime has to be a violation of the law.  And the law is set forth in statutes.  So Detective Liston will testify to you when he put in the charge for nitrous oxide, that came from the public health.  That did not mean that Sunita Shah was using laughing gas.  Did not mean there was nitrous oxide on the premises, which there wasn't.  But that was the charge that had to be included in that particular crime.

Another crime she was charged with is reckless endangerment.  That's just what it.  Means causing a situation which may present a danger to others in a reckless manner.  And all the officers will testify that base on the fact that the noxious odor came up from the basement to the karate studio, and based on the discovery in the basement that there very well could have been an

A-148

Opening - Mr. Reissman

68

explosion based on the acetone.  That was reckless endangerment.  She was charged with reckless endangerment.  Again, because the officers believed she had ownership or dominion and control, as Mr. Hartfenist said, over the contents of the basement.

The third charge was for illegal possession of a precursor to a controlled substance.  That's a fancy word for materials that will aid in the production of illegal substances; such as drugs.  And marijuana was illegal at the time.  Now those charges were written up at the station house and at the time, the system and still pertains, that charging instrument is called the criminal information.  Could be in district court, could be in county court.  Is created by the officers on the computer.  And all the officers will testify that at the time and in this case, they all have a hand in creating the charging document.  Now, most of the basis of the charging document, any charging document is what's called a To Wit, T-O W-I-T.  Above the paragraph is a violation of charging statute and first paragraph sets fort the statute, that's the law.  And the next paragraph says the person who was charged violated the law, how?  And in to wit is written the paragraph or describing how the person who is charged violated that written statute.  In this case, in all 3 instruments, Detective Twomey supplied the information

TONIANN LUCATORTO, RMR, CRR, RPR
Official Court Reporter

A-149

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 69 of 90 PageID #: 1410

**Opening - Mr. Reissman**

69

based on his 32 years experience, his observation in the store, and those form the basis of the 3 charges. However, you will see the 3 charging instruments with some inconsistencies because Officer Kenney's name appears on it as inputting.  Detective Liston signed one of the charging instruments, though he was not -- he did not decide to arrest Sunita Shah because he had no drug experience.  However, as I said, because while he was at the Third Precinct, he caught the call.  Catching calls. It's his turn to take the call and drive to the scene.  So he signed the charging instrument.  He will tell you that even though the form says any false statement is punishable as a misdemeanor, he will say that's not false. I signed it because I was the arresting officer, I caught the call -- not the arresting officer, I'm sorry.  He was first detective on the scene, so he caught the call and he signed it.  Doesn't mean the charging instrument is false.

Officer Martone signed another charging instrument.  And that was based, again, on Detective Twomey's experience.  So Detective Twomey typed up the narrative, and was inserted into all 3 charges.  And Officer Martone signed another one.  These -- the papers themselves were prepared by Detective Reed.  You will see her name on the left side of the charging instrument.  But despite the fact that Officer Kenney's name appears in a

A-150

**Opening - Mr. Reissman**

70

little line, John Liston's name appears on the signature and Detective Reeds's on the left side, these were all facts based on Detective Twomey's observation.

Now, Mr. Hartfenist is exactly right.  You will hear the 4 defendants testify that they do not know who made the decision to arrest Sunita.  But you will also hear the judge instruct you on what is called the collective knowledge doctrine.  That is a legal doctrine found in case law that officers investigating or assisting in arresting someone can share the knowledge of one officer to the other.  And that is base in an investigation, depending on circumstances, not one officer may not have all of the facts.  Collective knowledge doctrine recognizes that in law enforcement, different officers may combine their knowledge to form the basis of an arrest.

Now, that was October 4th.  Mr. And Ms. Shah were arrested, driven to the Third Precinct, fingerprinted, photographed, and then were driven to headquarters in Mineola overnight, to then be taken in the morning to the district court where they were brought before a judge and the judge said okay, you're free to go. Just you will be coming back to court after we inform the district attorney of what happened and what the district attorney wants to do with this case.  District attorney

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 71 of 90 PageID #: 1412

Opening - Mr. Reissman

71

did not oppose the Shah being released that day.  Neither of them had any criminal prior history.  They were tied to their community, they basically were not seasoned criminals.  They then hired an attorney, Mr. Shaw, who will testify that he was retained to represent both defendants because they signed a waiver of conflict that he could represent both at the same time.

So, Mr. Shaw will testify that several days later, he ran into ADA Fexas in court.  He will testify, as Mr. Hartfenist said, that he said to Ms. Fexas, this case should be dismissed.  And Mr. Shaw will say, ADA Fexas said to him, no.  I told the police never to arrest them.  Now, that is false.  ADA Fexas at the first trial said I do not recall that conversation.  But she will tell you now upon reflection that as an assistant district attorney, she would never make that statement to any criminal defense attorney simply because it was not her decision to arrest, it was the officer's decision to arrest.  And her role was to further investigate with district attorney investigators, not police investigators, after the police turned over the case to the DA, whether the prosecution should continue.  She did testify that based on her investigation and other investigations, she learned that the name Surender Bhatty was in the system.  And in fact, he was named in an investigation that also

A-152

Opening - Mr. Reissman

72

involved drugs.  And also ended up blowing up a house.  So based on that, ADA Fexas will tell you and she consulted with her supervisor and the director of the district attorney's office, she made the decision to dismiss the charges against Sunita Shah.  And she will tell you why. She will tell you that she did not believe she could prove beyond a reasonable doubt, which is the 99 percent standard that Sunita Shah had dominion and control of the basement.  So the charges were dismissed.  And then Ms. Shah -- well, I should say Mr. Shah was also charged with the same charges.  He plea bargained to what is called an adjournment of contemplation of dismissal by the DA.  Which basically says stay out of trouble for six months and all of the charges will be dismissed.  That's what he took.  He did not say he was not guilty.  He did not say he was guilty.  That's what a plea is for.  And DA generously offered him an adjournment of contemplation of dismissal.  He has not sued for his false arrest and malicious prosecution.  Ms. Shah has sued for false arrest and malicious prosecution.

So what I tell you now is that the defendants, the officers will prove to you that based on their training and experience at the time they were in the store on October 4, 2017, and based only on those facts alone, they reasonably believed that Sunita Shah was liable for

Case 2:18-cv-04625-ST   Document 131-2   Filed 11/13/24   Page 73 of 90 PageID #: 1414

**Opening - Mr. Reissman**

73

the contents of the basement.  And the three major facts that they will all testify to was; number one, the fire department told them that both Shah's were owners of the store.

Number two, Ms. Shah gave Officer Martone and then Detective Twomey that piece of paper which purported to be a lease.  And Detective Twomey will say that and also Martone that based on their observations of Ms. Shah sitting at the desk handing them the purported lease and handing them, handing Detective Twomey a business card that they believed she had some role in the operation of the store.

Now, you will hear them testify that when they went into the store, they saw all of this drug paraphernalia.  Now, Mr. Shah will testify that at his last trial we just sell costume jewelry.  That's not true. Because all of the detectives will tell you and the officers that they saw dozens and dozens of drug paraphernalia materials.  Again, hookahs, bongs, pipes, scales, grinders, also used to crush drugs to then insert a pipe.  And they reasonably believed that Rajesh was running a drug paraphernalia store.  Nothing wrong with that.  There was nothing illegal about running a drug paraphernalia store.  But the fact that the basement contained an illegal drug manufacturing operation combined

Opening - Mr. Reissman

with their observations of the drug paraphernalia on the first floor, they concluded based on what the fire department told them, that both Shahs were owners of the store, that Sunita Shah knew to give Detective Twomey and Martone the lease, purported lease, and the business card. That formed the basis of their belief that Sunita Shah should be criminally charged.

Now, again, what did the officers see at the time of the arrest that's what they saw. They're not responsible to complete a full blown investigation at the time point of arrest. That's for the DA. Mr. Hartfenist will show you, I think, incorporation document that shows that Mr. Shah was the owner of the company. It says incorporation document Accessories By Peak. Mr. Shah is the owner of the company. No Sunita. He will also show you that long legal lease from the woman in New York to the premises at 120 Hillside Avenue, Mr. Shah signed, no Sunita. But the detectives did not have the benefit of those documents when they made the arrest. The law is that if an officer reasonably believes that probable cause existed to arrest them, he can do that at that point. Down the line, if evidence shows, as it did here, that the DA could not prove beyond a reasonable doubt to support the charges and convince a jury that the defendant is guilty, she, is the interest of justice, decided to

A-155

Opening - Mr. Reissman

75

dismiss the charges.  That is completely different from the standard that the officers need at the point of arrest.  And Judge Tiscione will instruct you that under the law, probable cause to arrest is a complete defense to a claim of false arrest.  It is also a complete to a claim of malicious prosecution.  And again, you will hear no evidence that any of those officers or detectives had any malice against Ms. Shah or that they arrested her other than to serve the ends of justice.  They had no malice. They were just doing their job to protect the public, and that's what they did.

So I submit that after the evidence comes in, we will prove that there was probable cause to arrest, that her claim of false arrest should be dismissed that a claim of malicious prosecution should be dismissed.  And there's one more element.  That is a doctrine called qualified immunity.  The judge will instruct you on this.  I will only tell you now that under the law of qualified immunity, if you find that an officer or detective reasonably believed that probable cause existed to arrest, he is immune from civil liability like in this case. Immune from assessment of money damage.  And further, the doctrine of qualified immunity is further extended to what's called arguable probable cause.  You may dispute or question whether the defendants had probable cause.  But

Opening - Mr. Reissman

76

the law is that if a reasonable officer, reasonably competent officer, could have believed that probable cause existed, arguable probable cause existed and that is also a defense to a claim of civil liability of false arrest and malicious prosecution.

So all said and done, you will hear evidence from Mr. Hartfenist, you will hear evidence from our defendants, and at the end of day, I submit that we will have proved that probable cause existed to arrest at the time of the arrest, not after the investigation concluded. And that you should dismiss all claims against by defendants. Thank you.

THE COURT: All right. Ladies and gentlemen, we are going to break for the day. See you back here 9:30 tomorrow morning. Remember; don't talk about the case, don't read anything about the case, have a good night and I'll see everybody tomorrow.

(Jury exits the courtroom.)

THE COURT: All right. Anybody have anything we need to discuss?

MR. HARTFENIST: Not at this point.

THE COURT: All right. See you tomorrow morning.

(Trial adjourned until Tuesday, December 12, 2023 at 10:00 a.m.)

## $

**$300** [1] - 31:25
**$700** [3] - 44:13, 48:1, 65:5

## '

**'90s** [1] - 43:8

## 1

**1** [2] - 1:19, 12:23
**10** [2] - 13:12, 34:8
**10:00** [3] - 1:8, 16:6, 76:25
**11** [3] - 1:7, 13:13, 20:2
**11042** [1] - 1:17
**11501** [1] - 1:20
**12** [5] - 13:14, 16:25, 29:2, 51:1, 76:24
**120** [6] - 6:13, 8:25, 45:3, 60:25, 62:4, 74:17
**122** [2] - 45:2, 60:9
**123** [1] - 9:1
**13** [1] - 13:15
**14** [8] - 11:14, 12:10, 12:19, 13:16, 18:3, 22:9, 26:11, 26:23
**15** [3] - 18:4, 53:15, 62:18
**15-minute** [1] - 3:12
**16** [1] - 20:3
**18-CV-4625** [1] - 2:8
**18-CV-4625(SLT** [1] - 1:3
**18th** [1] - 32:20
**1983** [1] - 24:19
**1984** [1] - 9:1

## 2

**2** [3] - 9:24, 12:23, 13:3
**20** [2] - 47:2, 62:18
**2017** [7] - 5:15, 6:13, 24:25, 43:16, 55:12, 60:7, 72:24
**2021** [3] - 5:9, 5:12, 6:18
**2022** [1] - 5:10
**2023** [3] - 1:7, 5:10, 76:25
**22** [1] - 4:13
**23rd** [1] - 17:4
**2:00** [2] - 3:10, 3:14

## 3

**3** [6] - 12:23, 13:4, 68:24, 69:2, 69:3, 69:21
**3000** [2] - 1:17, 2:12
**32** [4] - 64:10, 64:12, 64:15, 69:1
**3:00** [1] - 60:10

## 4

**4** [6] - 12:23, 13:5, 43:16, 60:7, 70:5, 72:24
**42** [1] - 24:18

**4:30** [1] - 34:9
**4:45** [1] - 34:9
**4th** [2] - 44:17, 70:17

## 5

**5** [3] - 12:23, 13:6, 51:1
**5,000** [1] - 66:6
**50/50** [1] - 57:4
**51** [1] - 38:23
**59** [1] - 42:20
**5:00** [1] - 16:7

## 6

**6** [3] - 12:23, 13:7, 32:4
**65-1** [1] - 4:10

## 7

**7** [3] - 12:23, 13:8, 32:4
**746** [1] - 8:25

## 8

**8** [2] - 12:24, 13:9
**804(b** [1] - 41:5

## 9

**9** [1] - 13:11
**99** [2] - 58:5, 72:7
**9:00** [1] - 32:25
**9:30** [3] - 16:17, 34:15, 76:14

## A

**A.M** [1] - 1:8
**a.m** [3] - 16:6, 32:25, 76:25
**ability** [2] - 25:21, 27:12
**able** [10] - 15:1, 21:9, 22:20, 23:1, 27:24, 28:7, 28:11, 28:22, 29:6, 37:5
**accept** [1] - 23:13
**accepting** [1] - 10:11
**Accessories** [7] - 43:8, 47:1, 60:25, 61:17, 63:5, 66:17, 74:14
**accident** [2] - 36:5, 36:6
**according** [1] - 23:10
**acetone** [3] - 61:12, 66:5, 68:1
**acknowledged** [1] - 8:8
**action** [1] - 21:16
**actual** [3] - 37:16, 37:18, 37:24
**ADA** [7] - 52:2, 52:4, 52:10, 71:9, 71:11, 71:13, 72:2
**addition** [2] - 6:1, 65:23
**address** [1] - 34:19
**adequate** [1] - 35:17
**adjourned** [1] - 76:24
**adjournment** [2] - 72:12, 72:17
**admissions** [1] - 9:2

**advance** [1] - 14:4
**advise** [1] - 38:3
**advisor** [2] - 30:24, 31:8
**affect** [2] - 27:12, 28:21
**affirmed** [1] - 9:10
**afternoon** [5] - 3:3, 3:5, 32:7, 34:10, 42:11
**age** [1] - 42:20
**ago** [1] - 67:9
**agree** [4] - 6:4, 8:23, 9:21, 11:3
**agreed** [3] - 5:12, 9:3, 44:10
**agreement** [2] - 3:6, 48:3
**aid** [1] - 68:8
**aided** [1] - 1:24
**aids** [1] - 42:20
**al** [1] - 2:8
**Alison** [2] - 13:3, 27:15
**ALL** [1] - 13:23
**allegations** [1] - 25:5
**alleges** [1] - 25:1
**allotted** [1] - 14:11
**almost** [1] - 60:14
**alone** [3] - 39:10, 50:18, 72:24
**American** [1] - 43:2
**amount** [2] - 51:6, 54:4
**amounts** [1] - 54:25
**analyzing** [1] - 64:18
**AND** [1] - 1:14
**andrew** [1] - 32:2
**ANDREW** [1] - 1:9
**Andrew** [3] - 12:5, 15:12, 55:13
**anguish** [1] - 51:6
**animals** [2] - 5:16, 6:2
**Anish** [1] - 13:6
**answer** [1] - 52:9
**answering** [2] - 14:14, 52:9
**answers** [1] - 38:6
**anticipate** [3] - 19:15, 36:14, 36:18
**anyway** [1] - 11:11
**apologize** [3] - 4:17, 13:17, 14:4
**appearance** [4] - 14:21, 14:22, 39:15, 39:21
**appearances** [1] - 2:9
**appeared** [2] - 21:19, 61:24
**applies** [1] - 26:3
**apply** [1] - 23:14
**applying** [2] - 24:16, 26:7
**appointed** [1] - 46:23
**approached** [1] - 44:8
**arbiter** [1] - 35:3
**area** [2] - 23:22, 44:3
**arguable** [2] - 75:24, 76:3
**argue** [2] - 4:20, 8:19
**argument** [4] - 5:11, 6:21, 7:4, 16:3
**arguments** [1] - 39:3
**arise** [1] - 14:22
**arrest** [55] - 7:6, 7:8, 9:16, 42:15, 48:14, 48:25, 50:11, 50:15, 52:4, 52:11, 53:1, 53:5, 54:15, 56:7, 56:17, 56:22, 57:2,

A-158

57:5, 57:14, 57:19, 58:8, 58:10, 58:16, 58:17, 59:3, 59:4, 59:5, 59:6, 59:11, 59:13, 59:21, 60:4, 60:5, 67:6, 69:7, 70:6, 70:16, 71:12, 71:18, 71:19, 72:18, 72:19, 74:9, 74:11, 74:19, 74:21, 75:3, 75:4, 75:5, 75:13, 75:14, 75:20, 76:4, 76:9, 76:10

**arrested** [21] - 25:1, 25:6, 30:1, 46:15, 47:2, 47:14, 47:19, 48:17, 49:20, 49:23, 49:25, 52:18, 52:19, 52:23, 53:24, 58:21, 59:6, 59:7, 59:10, 70:18, 75:8

**arresting** [4] - 47:12, 69:14, 69:15, 70:10

**arrests** [1] - 47:13

**arrive** [3] - 16:16, 48:8, 62:19

**arrived** [9] - 44:24, 45:10, 45:15, 46:9, 53:13, 60:19, 61:6, 62:1, 63:7

**arrives** [2] - 45:25, 56:20

**Asia** [1] - 43:12

**aside** [7] - 9:6, 21:9, 22:20, 24:4, 27:19, 28:7, 29:6

**asserts** [1] - 24:18

**assess** [1] - 56:20

**assessed** [1] - 59:2

**assessment** [1] - 75:22

**assistant** [3] - 51:19, 55:19, 71:15

**assisting** [1] - 70:9

**assumptions** [1] - 26:1

**attend** [1] - 31:25

**attention** [5] - 12:13, 12:17, 35:5, 39:8, 54:5

**attorney** [17] - 2:16, 15:18, 51:19, 55:8, 55:19, 57:6, 57:20, 58:1, 58:23, 59:17, 70:24, 70:25, 71:4, 71:16, 71:17, 71:20

**ATTORNEY** [1] - 1:19

**Attorney** [2] - 2:17, 55:10

**attorney's** [2] - 57:19, 72:4

**Attorneys** [1] - 55:9

**attorneys** [10] - 14:17, 15:24, 18:10, 34:7, 34:16, 34:20, 38:3, 38:24, 39:2, 55:22

**Audio** [1] - 8:25

**authorities** [1] - 64:17

**authorized** [4] - 48:24, 52:19, 52:24, 52:25

**available** [1] - 34:11

**Avenue** [8] - 2:12, 6:14, 23:21, 43:24, 60:9, 60:25, 62:4, 74:17

**AVENUE** [1] - 1:17

**avoid** [5] - 34:12, 39:15, 39:21, 42:6, 52:8

**awarding** [1] - 25:20

### B

**background** [2] - 14:3, 33:15

**backgrounds** [1] - 25:24

**bad** [1] - 60:13

**badly** [1] - 14:20

**balancing** [1] - 38:21

**bank** [3] - 44:3, 46:23, 50:8

**Barbara** [1] - 20:3

**bargained** [1] - 72:11

**base** [2] - 67:23, 70:11

**based** [37] - 5:6, 25:6, 25:13, 25:15, 25:25, 26:1, 26:4, 26:12, 30:14, 31:3, 56:21, 57:3, 57:4, 57:14, 57:15, 58:9, 58:14, 59:4, 61:5, 62:10, 66:3, 66:8, 66:10, 66:19, 66:21, 66:22, 67:24, 68:1, 69:1, 69:19, 70:3, 71:23, 72:2, 72:22, 72:24, 73:8, 74:2

**basement** [29] - 6:13, 6:22, 8:6, 9:20, 44:2, 44:10, 44:12, 45:12, 45:14, 46:16, 46:20, 47:4, 48:17, 49:18, 52:22, 61:7, 61:8, 63:11, 63:12, 64:3, 65:5, 65:8, 66:24, 67:24, 67:25, 68:5, 72:9, 73:1, 73:24

**basic** [1] - 33:14

**basis** [5] - 31:16, 68:17, 69:2, 70:15, 74:6

**bearing** [1] - 10:17

**BEFORE** [1] - 1:14

**began** [2] - 60:11, 60:12

**begin** [4] - 12:7, 16:4, 39:5, 42:9

**beginning** [3] - 2:10, 25:9, 57:10

**begins** [1] - 47:6

**behalf** [1] - 2:19

**behind** [2] - 65:1, 66:22

**belief** [1] - 74:6

**believes** [3] - 56:23, 63:16, 74:20

**bench** [2] - 3:2, 14:16

**benefit** [1] - 74:18

**best** [4] - 3:9, 34:14, 42:20, 65:16

**better** [3] - 18:1, 32:15, 41:9

**between** [4] - 25:11, 31:8, 37:15, 37:23

**beyond** [6] - 36:23, 58:2, 58:4, 59:1, 72:7, 74:23

**Bhatty** [16] - 44:13, 45:13, 47:4, 47:21, 47:24, 49:11, 49:12, 49:13, 49:16, 53:7, 53:25, 65:4, 65:6, 65:7, 71:24

**big** [2] - 61:11, 66:4

**binding** [2] - 9:3, 10:3

**bit** [10] - 3:2, 12:8, 16:2, 16:8, 16:10, 18:1, 19:6, 33:2, 38:22, 39:13

**blenders** [1] - 61:19

**blowing** [1] - 72:1

**blown** [1] - 74:10

**board** [1] - 47:1

**Bob** [1] - 51:20

**Bocelli** [1] - 32:2

**bodhi** [1] - 8:7

**Bonakdarian** [1] - 17:13

**bongs** [2] - 61:19, 73:19

**Bonskdarian** [1] - 13:16

**booked** [1] - 50:5

**bother** [1] - 54:3

**bought** [1] - 31:24

**Boule** [1] - 13:4

**bound** [2] - 4:21, 9:4

**box** [2] - 11:14, 12:12

**break** [7] - 3:9, 16:13, 17:24, 33:13, 35:21, 38:25, 76:14

**breaks** [5] - 3:12, 16:14, 34:21, 34:23, 35:16

**breathe** [1] - 63:13

**brief** [4] - 23:15, 25:13, 40:2, 46:4

**briefly** [1] - 46:3

**bring** [2] - 2:24, 11:12

**brother** [4] - 27:16, 27:17, 27:20, 28:16

**brother-in-law** [4] - 27:16, 27:17, 27:20, 28:16

**brought** [2] - 5:7, 70:21

**building** [7] - 44:20, 44:24, 45:5, 45:11, 45:14, 46:5

**bunch** [1] - 54:19

**burden** [5] - 3:3, 30:4, 30:5, 30:9, 38:18

**business** [10] - 5:15, 43:16, 43:25, 44:1, 44:16, 46:22, 66:17, 66:21, 73:10, 74:5

**BY** [3] - 1:18, 1:20, 1:21

### C

**Calderone** [1] - 13:7

**cannot** [2] - 30:19, 58:25

**cans** [2] - 61:12, 66:5

**car** [9] - 44:23, 45:8, 45:9, 62:2, 62:6, 62:19, 62:20, 63:4, 63:24

**card** [5] - 66:17, 66:18, 66:22, 73:10, 74:5

**Cardinale** [1] - 13:15

**care** [4] - 7:8, 7:9, 53:22, 54:6

**cartoon** [2] - 66:7, 66:9

**case** [92] - 4:5, 7:5, 8:24, 9:17, 9:20, 10:6, 10:18, 11:23, 12:3, 14:2, 14:23, 14:24, 15:1, 15:5, 15:25, 16:1, 16:8, 18:16, 20:15, 20:18, 21:19, 21:23, 22:25, 23:16, 23:18, 24:7, 25:15, 25:16, 25:17, 26:9, 27:12, 27:22, 28:9, 29:7, 29:19, 29:24, 30:2, 35:4, 36:5, 36:16, 36:17, 36:19, 36:21, 36:22, 37:2, 37:7, 37:8, 38:10, 38:14, 38:19, 39:17, 41:3, 41:13, 42:3, 42:16, 42:24, 43:14, 43:21, 45:21, 48:22, 49:6, 51:11, 51:20, 53:22, 54:8, 55:11, 56:6, 56:8, 56:14, 57:5, 57:18, 57:19, 57:21, 57:25, 58:1, 58:22, 58:24, 58:25, 59:14, 59:24, 60:17, 68:16, 68:24, 70:9, 70:25, 71:11, 71:21, 75:21, 76:15, 76:16

**cases** [4] - 25:20, 49:4, 49:5, 50:13

**catching** [2] - 63:22, 69:9

**caught** [3] - 69:9, 69:14, 69:16

**caused** [1] - 25:4

**causing** [1] - 67:20

**cell** [4] - 49:12, 50:6, 50:16, 50:17

**Central** [1] - 1:5

**centuries** [1] - 56:15
**certain** [5] - 4:6, 14:3, 14:11, 24:4, 67:9
**certainly** [3] - 8:7, 50:9, 59:7
**challenge** [2] - 4:8, 4:15
**challenges** [3] - 14:10, 14:12
**chance** [1] - 3:1
**change** [1] - 4:23
**changed** [3] - 4:18, 5:3, 20:19
**Channel** [1] - 51:1
**channels** [1] - 50:22
**characters** [2] - 66:7, 66:9
**charge** [9] - 57:6, 57:7, 57:22, 57:23, 67:4, 67:10, 67:14, 67:17, 68:6
**charged** [7] - 66:25, 67:19, 68:2, 68:22, 68:23, 72:10, 74:7
**charges** [16] - 7:2, 47:15, 57:5, 58:21, 59:2, 59:6, 64:18, 68:10, 69:2, 69:21, 72:5, 72:9, 72:11, 72:14, 74:24, 75:1
**charging** [12] - 64:14, 68:12, 68:16, 68:17, 68:18, 68:19, 69:3, 69:6, 69:11, 69:17, 69:18, 69:24
**Charles** [1] - 60:8
**chief** [1] - 55:21
**children** [1] - 43:3
**choose** [1] - 9:5
**chunks** [1] - 41:4
**Circuit** [3] - 4:25, 8:23, 9:1
**circuit** [1] - 9:10
**circumstances** [4] - 9:7, 56:19, 58:9, 70:12
**city** [2] - 31:24, 32:7
**City** [1] - 65:11
**civil** [9] - 2:7, 21:7, 21:14, 21:17, 25:16, 25:20, 57:8, 75:21, 76:4
**claim** [14] - 56:17, 58:16, 59:5, 59:11, 59:12, 59:21, 60:5, 60:6, 61:4, 75:5, 75:14, 76:4
**claims** [5] - 24:18, 38:19, 46:9, 52:6, 76:11
**clarify** [1] - 38:15
**Clary** [1] - 13:8
**class** [1] - 21:16
**classes** [1] - 17:15
**clear** [1] - 4:20
**clerk** [1] - 3:1
**clerks** [1] - 37:20
**clients** [1] - 15:16
**close** [14] - 12:13, 20:5, 22:4, 22:14, 26:8, 27:10, 27:13, 28:17, 28:20, 29:13, 29:18, 33:9, 35:5, 37:9
**closed** [1] - 66:7
**closing** [3] - 38:4, 39:2, 54:9
**co** [1] - 15:20
**co-counsel** [1] - 15:20
**Code** [1] - 24:19
**collect** [1] - 37:21
**collection** [1] - 5:19
**collective** [2] - 70:8, 70:13
**collectively** [1] - 63:8

**color** [1] - 11:2
**combine** [1] - 70:15
**combined** [1] - 73:25
**coming** [4] - 44:20, 60:21, 60:24, 70:23
**commences** [1] - 34:2
**comments** [1] - 38:11
**commission** [1] - 30:22
**commissions** [2] - 31:4, 31:8
**committed** [8] - 56:16, 56:23, 57:17, 57:25, 58:6, 58:20, 63:17
**communicating** [1] - 19:4
**community** [4] - 51:3, 51:4, 51:7, 71:3
**company** [2] - 74:13, 74:15
**compel** [1] - 9:25
**competent** [1] - 76:2
**complaining** [1] - 60:11
**complaints** [1] - 64:14
**complete** [5] - 3:19, 59:5, 74:10, 75:4, 75:5
**completed** [2] - 16:5, 25:7
**completely** [2] - 54:13, 75:1
**computer** [2] - 67:7, 68:14
**Computer** [1] - 1:24
**Computer-aided** [1] - 1:24
**computerized** [1] - 1:23
**concept** [1] - 43:20
**concert** [2] - 31:24, 32:1
**concession** [1] - 6:18
**concluded** [4] - 36:22, 41:24, 74:2, 76:10
**conclusion** [1] - 60:3
**condition** [1] - 18:15
**condo** [1] - 28:20
**conflict** [4] - 16:20, 17:2, 27:2, 71:6
**conflicts** [4] - 18:7, 18:14, 20:7, 32:18
**confused** [2] - 41:20, 50:3
**confusion** [1] - 42:6
**connected** [1] - 44:9
**connection** [2] - 43:15, 43:17
**consider** [19] - 6:17, 21:11, 22:22, 23:2, 23:25, 24:6, 24:12, 24:14, 26:4, 27:21, 28:8, 28:11, 28:22, 29:6, 35:23, 36:2, 36:7, 36:11, 39:11
**considerations** [1] - 7:17
**consisted** [1] - 61:11
**consistent** [2] - 30:15, 48:23
**constitution** [1] - 59:9
**Constitution** [1] - 24:21
**constitutional** [1] - 24:25
**consulted** [1] - 72:2
**contact** [2] - 50:8, 53:25
**contacts** [1] - 50:8
**contained** [1] - 73:25
**contemplation** [2] - 72:12, 72:17
**contend** [2] - 6:23, 25:5
**contends** [1] - 24:24
**contention** [1] - 8:7
**contents** [2] - 68:5, 73:1
**continue** [3] - 16:5, 57:22, 71:22

**Continued** [4] - 33:18, 40:5, 41:25, 56:24
**continued** [2] - 57:1, 59:14
**contract** [3] - 7:16, 7:18, 7:19
**contradicted** [2] - 5:11, 8:10
**contradictory** [1] - 46:7
**contradicts** [1] - 5:8
**control** [8] - 9:19, 19:17, 43:22, 46:19, 52:22, 62:2, 68:4, 72:8
**controlled** [3] - 25:3, 46:16, 68:7
**convenient** [1] - 52:8
**conversation** [5] - 46:4, 51:14, 52:5, 52:6, 71:14
**conversations** [2] - 51:18, 52:12
**conveyed** [1] - 11:2
**convince** [2] - 54:15, 74:24
**cop** [1] - 27:16
**cops** [1] - 28:4
**copy** [2] - 4:8, 65:9
**Corey** [1] - 13:12
**Cornell** [1] - 43:5
**correct** [1] - 31:2
**correctly** [1] - 62:9
**corruption** [1] - 55:22
**cost** [1] - 31:24
**costume** [3] - 5:15, 6:1, 73:16
**counsel** [4] - 2:9, 15:6, 15:15, 15:20
**county** [5] - 15:18, 28:16, 51:21, 55:8, 68:14
**COUNTY** [2] - 1:11, 1:19
**County** [21] - 2:16, 2:17, 12:6, 15:13, 15:19, 22:2, 22:3, 22:5, 22:9, 24:23, 29:3, 29:4, 29:5, 29:22, 43:6, 49:16, 50:24, 55:9, 55:10, 55:22, 63:20
**couple** [7] - 4:9, 20:20, 31:11, 31:16, 47:9, 58:12, 61:21
**course** [1] - 25:22
**Court** [6] - 1:22, 3:5, 9:4, 9:22, 21:11, 30:3
**COURT** [120] - 1:1, 2:4, 2:14, 2:22, 3:11, 3:16, 3:20, 4:2, 4:11, 4:18, 4:21, 5:2, 5:13, 5:24, 6:6, 6:25, 7:7, 7:16, 7:22, 8:2, 8:12, 8:17, 9:12, 10:5, 10:13, 10:16, 10:24, 11:8, 11:12, 11:18, 11:21, 11:23, 12:1, 13:19, 13:25, 15:11, 15:23, 17:1, 17:5, 17:8, 17:17, 17:21, 18:6, 18:9, 18:12, 18:25, 19:3, 19:8, 19:10, 19:14, 19:23, 19:25, 20:6, 20:9, 20:14, 20:18, 20:22, 21:1, 21:5, 21:7, 21:9, 21:13, 21:18, 21:21, 21:25, 22:7, 22:12, 22:14, 22:17, 22:20, 22:25, 23:4, 26:14, 26:16, 26:21, 27:1, 27:4, 27:8, 27:17, 27:19, 27:24, 28:2, 28:5, 28:7, 28:11, 28:14, 28:18, 28:22, 29:1, 29:4, 29:9, 29:12, 30:20, 30:25, 31:3, 31:6, 31:10, 31:14, 32:1, 32:3, 32:6, 32:10, 32:17, 32:21, 32:24, 33:1, 33:8, 33:11, 34:3, 40:3, 41:6, 41:12, 41:17, 41:21, 41:23, 42:2, 55:5, 76:13, 76:19, 76:22

**court** [17] - 2:1, 2:5, 14:17, 26:9, 32:19, 32:24, 42:1, 42:22, 50:19, 50:20, 59:8, 68:13, 68:14, 70:21, 70:23, 71:9
**courthouse** [5] - 16:17, 16:21, 51:9, 52:2
**Courthouse** [1] - 1:5
**courtroom** [4] - 2:2, 11:25, 33:16, 76:18
**COURTROOM** [9] - 2:3, 2:5, 12:20, 13:21, 13:24, 18:4, 20:3, 26:24, 32:16
**Courts** [1] - 9:3
**cover** [2] - 5:21, 17:15
**create** [1] - 16:18
**created** [1] - 68:14
**creating** [2] - 54:12, 68:16
**credibility** [3] - 25:25, 39:9, 39:10
**credit** [2] - 50:15, 54:11
**crime** [12] - 56:16, 56:23, 57:16, 57:24, 58:6, 58:16, 58:19, 63:17, 67:11, 67:18, 67:19
**crimes** [2] - 64:15, 66:25
**criminal** [16] - 7:2, 29:19, 50:9, 51:13, 57:6, 57:7, 57:8, 57:9, 57:10, 57:22, 64:13, 67:10, 68:12, 71:2, 71:17
**criminally** [1] - 74:7
**criminals** [1] - 71:4
**CRR** [1] - 1:22
**crush** [1] - 73:20
**culturally** [1] - 43:11

**D**

**DA** [7] - 58:5, 59:13, 71:21, 72:13, 72:16, 74:11, 74:23
**damage** [1] - 75:22
**damages** [1] - 25:20
**danger** [1] - 67:21
**date** [4] - 17:19, 32:19, 65:5, 65:7
**dated** [3] - 10:1, 10:4, 65:14
**daughter** [2] - 28:15, 44:5
**daughter's** [1] - 44:22
**DAVID** [1] - 1:11
**David** [3] - 12:4, 15:12, 55:14
**days** [10] - 30:23, 31:11, 31:16, 31:19, 31:21, 34:10, 52:1, 55:1, 71:8
**deal** [2] - 34:22
**dealer** [1] - 50:10
**December** [3] - 1:7, 5:10, 76:24
**decide** [7] - 3:8, 14:18, 14:25, 23:9, 49:2, 52:16, 69:7
**decided** [5] - 9:17, 58:18, 58:25, 59:18, 74:25
**decision** [9] - 9:1, 48:14, 56:9, 56:22, 57:21, 70:6, 71:18, 72:4
**defendant** [6] - 21:15, 29:19, 58:2, 58:6, 63:15, 74:24
**defendants** [24] - 1:12, 2:15, 2:20, 6:16, 6:23, 7:5, 8:8, 15:11, 15:20, 15:25, 24:22, 24:24, 25:1, 25:2, 25:4, 25:7, 30:10, 55:11, 70:5, 71:6, 72:21, 75:25, 76:8, 76:12

**Defendants** [1] - 1:19
**defense** [8] - 51:13, 56:17, 58:16, 59:5, 59:21, 71:17, 75:4, 76:4
**definitely** [1] - 20:19
**degree** [1] - 43:5
**degrees** [1] - 28:18
**delays** [1] - 34:18
**deliberate** [2] - 36:23, 37:6
**deliberations** [2] - 3:24, 39:6
**demeanor** [1] - 39:11
**deny** [2] - 25:4, 52:5
**department** [21] - 44:19, 44:25, 45:1, 45:3, 45:4, 45:11, 46:3, 46:5, 46:11, 50:13, 60:15, 60:16, 60:17, 60:18, 62:13, 62:14, 62:15, 62:17, 64:11, 73:3, 74:3
**Department** [5] - 22:3, 22:10, 24:23, 29:22, 50:24
**dependent** [1] - 31:1
**deposition** [1] - 21:20
**deprived** [1] - 24:20
**Deputy** [2] - 2:16, 55:9
**DEPUTY** [9] - 2:3, 2:5, 12:20, 13:21, 13:24, 18:4, 20:3, 26:24, 32:16
**deputy** [2] - 15:18, 55:8
**described** [1] - 62:10
**describing** [1] - 68:23
**description** [3] - 23:15, 23:16, 25:13
**desk** [6] - 63:10, 64:24, 65:1, 66:16, 66:22, 73:9
**despite** [3] - 47:20, 48:18, 69:25
**detail** [1] - 23:24
**Detective** [38] - 12:4, 48:8, 48:9, 52:13, 55:11, 55:14, 55:17, 55:18, 63:14, 63:24, 64:3, 64:9, 65:19, 65:20, 65:23, 65:24, 65:25, 66:8, 66:14, 66:19, 66:20, 66:21, 67:3, 67:13, 68:25, 69:5, 69:19, 69:20, 69:23, 70:2, 70:3, 73:6, 73:7, 73:10, 74:4
**DETECTIVE** [2] - 1:8, 1:10
**detective** [7] - 15:19, 22:9, 22:10, 26:12, 55:13, 69:16, 75:19
**detectives** [11] - 24:22, 28:4, 48:24, 49:22, 57:12, 58:9, 63:20, 67:5, 73:17, 74:18, 75:7
**Detectives** [1] - 15:11
**determine** [4] - 14:7, 23:17, 30:5, 39:9
**determined** [2] - 58:8, 60:24
**devices** [1] - 43:12
**difference** [3] - 24:9, 31:21, 38:23
**different** [11] - 5:2, 9:25, 15:1, 17:23, 24:13, 25:23, 29:5, 55:25, 56:2, 70:14, 75:1
**difficult** [11] - 16:20, 18:16, 19:4, 21:22, 23:18, 25:17, 26:17, 27:5, 29:15, 29:23, 33:5
**difficulty** [5] - 18:19, 19:20, 25:14, 26:6, 45:20
**direct** [1] - 41:5
**directed** [1] - 36:22

**director** [1] - 72:3
**disagree** [1] - 23:12
**disagrees** [1] - 25:8
**disbelieve** [1] - 53:6
**discovery** [1] - 67:24
**discrepancy** [1] - 37:23
**discuss** [5] - 2:23, 11:6, 14:16, 37:8, 76:20
**discussed** [2] - 27:5, 36:24
**discussing** [2] - 37:1, 44:22
**discussions** [1] - 22:22
**dismiss** [5] - 57:5, 57:22, 72:4, 75:1, 76:11
**dismissal** [2] - 72:12, 72:18
**dismissed** [11] - 47:15, 53:22, 57:5, 59:7, 60:5, 60:6, 71:11, 72:9, 72:14, 75:14, 75:15
**dispute** [5] - 37:15, 47:23, 48:5, 61:2, 75:24
**disputes** [2] - 25:10, 25:12
**district** [17] - 51:19, 55:19, 55:22, 57:6, 57:19, 57:20, 57:25, 58:22, 59:17, 68:13, 70:21, 70:24, 70:25, 71:15, 71:20, 72:3
**DISTRICT** [2] - 1:1, 1:1
**docket** [3] - 2:8, 4:7, 4:10
**doctor** [2] - 20:16, 20:19
**doctrine** [5] - 70:8, 70:14, 75:16, 75:23
**document** [10] - 6:15, 7:23, 8:11, 44:11, 65:13, 68:17, 68:18, 74:12, 74:14
**documents** [3] - 35:9, 38:8, 74:19
**dolphin** [1] - 7:20
**Dominic** [1] - 13:15
**dominion** [4] - 43:22, 46:19, 68:4, 72:8
**done** [4] - 3:23, 49:16, 54:2, 76:6
**door** [5] - 44:18, 45:2, 45:11, 46:10, 60:24
**doors** [2] - 53:14, 62:18
**doubt** [7] - 7:12, 58:2, 58:4, 59:1, 63:6, 72:7, 74:23
**down** [17] - 17:24, 18:1, 20:1, 26:22, 32:15, 42:21, 44:16, 50:4, 51:9, 62:11, 63:11, 63:12, 64:22, 64:25, 66:15, 67:6, 74:22
**downstairs** [3] - 15:2, 32:13, 65:24
**dozens** [2] - 73:18
**Dr** [2] - 20:12, 20:14
**dragged** [2] - 51:8, 53:18
**draw** [1] - 53:3
**drive** [1] - 69:10
**driven** [2] - 70:18, 70:19
**driving** [3] - 62:2, 62:6, 62:20
**dropped** [1] - 58:22
**drove** [1] - 63:24
**drug** [16] - 5:19, 50:9, 61:9, 61:10, 61:13, 61:18, 61:24, 64:18, 66:2, 69:7, 73:14, 73:18, 73:22, 73:23, 73:25, 74:1
**drugs** [6] - 54:4, 61:20, 64:18, 68:9,

72:1, 73:20
**during** [7] - 16:14, 25:22, 34:23, 35:24, 36:2, 53:19, 55:12

## E

**E-mail** [1] - 1:23
**early** [4] - 12:9, 16:8, 34:10, 43:8
**easier** [2] - 4:11, 38:16
**East** [2] - 43:12, 43:24
**EASTERN** [1] - 1:1
**easy** [2] - 5:1, 35:12
**education** [1] - 17:16
**efficient** [2] - 12:18, 38:17
**effort** [2] - 53:23, 53:25
**eight** [5] - 11:17, 11:20, 11:21, 14:2, 63:20
**either** [8] - 16:19, 21:15, 29:19, 35:14, 41:5, 49:17, 51:25, 59:8
**element** [1] - 75:16
**elephant** [1] - 61:22
**elevator** [1] - 39:19
**emergency** [1] - 35:20
**employer** [1] - 61:4
**empty** [1] - 26:25
**enable** [1] - 14:7
**enables** [1] - 14:8
**end** [13] - 3:14, 8:21, 9:12, 16:7, 34:10, 37:20, 38:2, 53:4, 53:17, 54:14, 56:2, 57:13, 76:8
**endangerment** [3] - 67:20, 68:2
**endeavor** [1] - 35:11
**ended** [1] - 72:1
**ending** [1] - 12:8
**ends** [2] - 59:18, 75:9
**enforceable** [1] - 48:3
**enforcement** [7] - 27:14, 27:25, 28:12, 28:24, 29:9, 33:8, 70:14
**engines** [1] - 63:25
**English** [1] - 18:20
**Enterprises** [1] - 8:24
**enters** [2] - 2:2, 11:25
**entire** [5] - 28:4, 50:1, 54:8, 65:10, 65:11
**entitled** [1] - 56:17
**equal** [1] - 25:24
**Erick** [1] - 13:10
**escalate** [1] - 47:7
**especially** [1] - 8:11
**Esposito** [3] - 13:14, 16:25, 29:2
**ESQ** [3] - 1:18, 1:20, 1:21
**essential** [1] - 16:16
**essentially** [2] - 43:10, 47:19
**established** [1] - 5:17
**et** [1] - 2:8
**evaluating** [1] - 64:8
**events** [1] - 23:19
**eventually** [2] - 46:14, 47:1
**evidence** [59] - 8:10, 22:22, 23:16,

23:25, 24:6, 24:15, 28:8, 29:7, 30:15, 35:5, 35:7, 35:24, 35:25, 36:3, 36:8, 36:9, 36:11, 37:1, 37:3, 37:4, 37:7, 37:18, 37:19, 37:25, 38:4, 38:6, 38:7, 38:9, 38:16, 38:20, 38:22, 39:11, 41:3, 41:5, 41:14, 42:5, 43:17, 45:9, 46:17, 48:18, 49:4, 49:5, 49:6, 49:7, 50:14, 52:21, 53:23, 54:2, 54:3, 54:9, 54:14, 56:4, 59:25, 61:3, 74:22, 75:7, 75:12, 76:6, 76:7
**exactly** [2] - 4:24, 70:4
**example** [2] - 26:2, 36:4
**excluded** [1] - 36:9
**excuse** [5] - 14:25, 17:24, 20:1, 26:21, 31:16
**excused** [4] - 11:15, 12:14, 14:7, 30:19
**exercise** [2] - 14:9, 14:12
**exhibits** [2] - 35:8, 36:1
**exist** [1] - 9:11
**existed** [6] - 7:6, 74:21, 75:20, 76:3, 76:9
**existence** [2] - 5:19, 49:4
**exits** [2] - 33:16, 76:18
**expected** [1] - 16:1
**experience** [13] - 21:22, 56:21, 64:3, 64:4, 64:7, 64:10, 64:12, 64:15, 66:9, 69:1, 69:8, 69:20, 72:23
**experienced** [1] - 48:10
**explain** [1] - 67:4
**explanation** [1] - 54:21
**explosion** [2] - 49:20, 68:1
**extended** [1] - 75:23
**extensive** [1] - 5:19
**extent** [2] - 24:9, 47:17
**extraordinarily** [2] - 9:9, 50:12
**extremely** [2] - 9:7, 48:10

## F

**F.2d** [1] - 8:25
**faced** [1] - 56:19
**facility** [1] - 43:24
**fact** [13] - 5:21, 7:14, 25:16, 26:12, 35:3, 41:10, 47:20, 53:22, 63:9, 67:23, 69:25, 71:25, 73:24
**factors** [1] - 9:24
**facts** [22] - 4:6, 5:3, 5:7, 5:22, 9:4, 9:11, 23:8, 23:9, 25:10, 27:21, 35:4, 39:7, 58:12, 58:24, 59:4, 59:24, 60:7, 61:5, 70:3, 70:13, 72:24, 73:1
**factual** [2] - 25:10, 25:12
**fair** [17] - 14:2, 14:5, 21:22, 23:18, 25:14, 25:18, 25:21, 26:18, 27:5, 27:12, 29:15, 29:23, 30:2, 30:14, 32:23, 33:5, 41:21
**false** [17] - 42:15, 56:17, 58:16, 58:17, 59:5, 59:10, 60:4, 69:12, 69:13, 69:17, 71:13, 72:18, 72:19, 75:5, 75:14, 76:4
**falsely** [1] - 25:1
**familiar** [2] - 23:21, 24:4

**family** [10] - 22:1, 26:8, 27:10, 27:13, 28:4, 29:18, 33:9, 37:9, 51:3, 51:4
**fancy** [1] - 68:7
**far** [5] - 5:17, 19:1, 19:10, 33:1, 33:3
**fast** [1] - 42:21
**federal** [3] - 26:9, 59:8, 64:17
**feelings** [2] - 25:19, 29:21
**fees** [1] - 31:8
**fellow** [2] - 36:21, 37:10
**felt** [1] - 51:7
**few** [5] - 31:18, 31:21, 34:6, 34:13, 34:18
**fexas** [1] - 71:10
**Fexas** [9] - 51:19, 52:2, 52:4, 52:10, 55:19, 71:9, 71:12, 71:13, 72:2
**Fidelity** [1] - 8:25
**file** [1] - 66:18
**filed** [2] - 5:9, 54:18
**fill** [1] - 12:15
**final** [1] - 35:3
**financial** [2] - 30:24, 31:7
**finders** [1] - 35:3
**fine** [4] - 3:15, 11:8, 18:3, 65:12
**fingerprinted** [1] - 70:19
**fingers** [1] - 48:5
**fire** [19] - 44:19, 44:25, 45:3, 45:4, 45:11, 46:3, 46:5, 46:11, 60:15, 60:16, 60:17, 60:18, 62:13, 62:15, 62:17, 63:25, 73:2, 74:2
**firefighters** [10] - 60:18, 60:22, 61:8, 61:17, 61:23, 62:8, 62:21, 63:2, 63:25, 66:14
**firm** [3] - 15:9, 21:5, 21:10
**first** [30] - 11:17, 12:19, 12:24, 15:2, 17:25, 20:1, 20:12, 23:19, 26:22, 32:13, 39:1, 41:4, 45:25, 46:6, 47:24, 48:4, 48:6, 53:20, 57:11, 57:13, 61:15, 61:18, 61:24, 62:25, 63:9, 64:23, 68:20, 69:16, 71:13, 74:2
**fish** [1] - 7:20
**five** [5] - 6:12, 16:11, 30:23, 32:8, 62:23
**fix** [1] - 35:15
**floor** [12] - 15:2, 17:25, 20:2, 26:22, 32:13, 61:15, 61:18, 61:24, 63:1, 63:9, 64:23, 74:2
**Florida** [1] - 28:20
**focus** [3] - 30:19, 56:9, 61:22
**foil** [1] - 66:6
**follow** [2] - 23:11, 38:11
**following** [3] - 32:21, 39:1, 39:4
**form** [4] - 35:7, 69:2, 69:12, 70:15
**formed** [1] - 74:6
**fort** [1] - 68:20
**forth** [1] - 67:12
**forward** [1] - 12:18
**frankly** [1] - 9:13
**free** [4] - 4:20, 9:5, 14:12, 70:22
**Friday** [1] - 4:5
**friend** [4] - 22:10, 22:11, 44:8, 44:9

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 82 of 90 PageID #: 1423

**friend's** [2] - 44:22, 62:10
**friendly** [1] - 61:13
**friends** [4] - 22:1, 29:18, 33:9, 37:9
**front** [2] - 14:14, 41:10
**full** [2] - 46:23, 74:10
**fumes** [1] - 44:20
**function** [1] - 23:9
**funeral** [1] - 3:4

## G

**gangs** [1] - 55:20
**gas** [3] - 67:1, 67:2, 67:16
**gaseous** [1] - 60:14
**general** [1] - 21:7
**generally** [2] - 16:6, 43:1
**generously** [1] - 72:17
**gentlemen** [4] - 12:1, 13:25, 55:7, 76:13
**given** [3] - 14:11, 38:6, 65:22
**glass** [1] - 61:19
**Googling** [2] - 24:1, 36:4
**graduated** [1] - 43:4
**greater** [1] - 23:24
**green** [1] - 61:11
**grinders** [1] - 73:20
**growing** [2] - 45:13, 49:19
**grown** [1] - 47:3
**guarantee** [1] - 17:9
**guess** [4] - 19:3, 30:20, 31:10, 39:14
**guilty** [6] - 58:2, 58:4, 59:1, 72:15, 72:16, 74:25
**guy** [2] - 44:18, 49:12

## H

**half** [4] - 57:11, 57:13, 57:17, 57:18
**halfway** [1] - 63:12
**hand** [5] - 4:11, 18:2, 35:14, 35:21, 68:16
**handed** [2] - 65:2, 65:13
**handing** [3] - 73:9, 73:10
**handling** [1] - 51:16
**harass** [1] - 59:19
**hard** [4] - 30:1, 42:19, 53:2, 54:1
**Harfenist** [4] - 39:25, 42:9, 42:12, 55:24
**HARFENIST** [10] - 1:16, 1:18, 40:1, 40:4, 41:2, 41:7, 41:16, 41:18, 41:22, 42:10
**HARTFENIST** [21] - 2:11, 2:25, 3:15, 3:18, 3:22, 4:3, 4:12, 4:17, 4:19, 4:24, 6:4, 7:12, 7:20, 7:25, 8:13, 8:23, 9:17, 10:8, 11:10, 15:8, 76:21
**hartfenist** [10] - 6:24, 11:2, 59:23, 62:9, 65:17, 68:4, 70:4, 71:10, 74:11, 76:7
**Hartfenist** [5] - 2:11, 15:6, 15:9
**head** [1] - 55:20
**headquarters** [1] - 70:20
**health** [2] - 67:5, 67:15
**hear** [50] - 6:24, 8:9, 23:20, 27:8, 35:14, 35:24, 36:17, 41:14, 42:5, 42:8, 43:16,
45:18, 46:16, 47:10, 47:17, 47:23, 48:13, 48:22, 49:3, 49:15, 49:21, 50:1, 50:16, 51:5, 51:12, 51:20, 53:9, 53:11, 54:19, 55:16, 55:17, 55:18, 55:25, 56:1, 58:7, 59:25, 60:1, 61:15, 62:19, 63:1, 64:16, 66:6, 67:1, 70:5, 70:7, 73:13, 75:6, 76:6, 76:7
**heard** [5] - 30:11, 36:25, 42:23, 55:24, 58:3
**hearing** [5] - 18:17, 25:23, 42:19, 42:20, 47:21
**help** [3] - 23:17, 46:22, 46:24
**hidden** [1] - 59:15
**high** [1] - 9:9
**highly** [1] - 19:16
**Hillside** [7] - 6:14, 23:21, 43:24, 60:9, 60:25, 62:4, 74:17
**hindsight** [1] - 57:4
**hired** [2] - 51:14, 71:4
**history** [1] - 71:2
**hold** [1] - 20:5
**holder** [6] - 48:16, 53:8, 53:9, 53:11, 53:12, 62:17
**holding** [1] - 50:6
**home** [2] - 36:4, 37:22
**Honor** [12] - 2:13, 2:18, 2:20, 6:10, 6:24, 7:4, 8:7, 10:22, 11:1, 11:5, 11:16, 11:22
**Honorable** [1] - 2:6
**HONORABLE** [1] - 1:14
**hookah's** [1] - 61:20
**hookahs** [1] - 73:19
**hookas** [2] - 5:16, 6:1
**hour** [3] - 57:11, 57:13, 57:17
**house** [4] - 44:22, 62:10, 68:11, 72:1
**huge** [1] - 31:21
**hung** [2] - 49:13, 49:21
**husband** [3] - 43:2, 46:22, 60:2

## I

**idea** [1] - 47:11
**identification** [1] - 65:8
**illegal** [7] - 61:9, 67:1, 68:6, 68:8, 68:9, 73:23, 73:25
**imagine** [1] - 31:19
**immediate** [1] - 9:19
**immediately** [2] - 51:18, 66:1
**immune** [2] - 75:21, 75:22
**immunity** [3] - 75:17, 75:19, 75:23
**impact** [1] - 25:20
**impartial** [15] - 14:2, 14:6, 14:21, 21:23, 23:19, 25:15, 25:18, 25:21, 26:18, 27:6, 27:12, 29:15, 29:24, 30:2, 33:6
**impartially** [1] - 28:23
**importance** [1] - 5:18
**important** [9] - 12:21, 23:23, 35:5, 35:22, 36:12, 39:7, 43:19, 46:13, 46:17
**importing** [2] - 5:15, 6:1

**imposed** [1] - 39:14
**impropriety** [2] - 39:15, 39:21
**Inc** [1] - 8:25
**Incarnato** [2] - 13:3, 27:15
**incident** [2] - 29:14, 55:12
**incidents** [1] - 27:11
**included** [1] - 67:18
**including** [4] - 36:21, 37:9, 43:12, 56:7
**income** [2] - 30:25, 31:3
**inconsistencies** [4] - 46:17, 48:11, 56:1, 69:4
**inconsistent** [2] - 6:7, 54:13
**incorporation** [2] - 74:12, 74:14
**incorrect** [4] - 5:4, 5:25, 6:7, 6:22
**incredibly** [1] - 39:7
**independent** [4] - 24:1, 36:3, 36:7, 36:13
**India** [3] - 5:16, 6:2, 43:3
**Indian** [2] - 51:3, 51:4
**indicates** [2] - 44:11, 47:25
**indication** [1] - 38:14
**individual** [5] - 4:13, 33:14, 44:12, 45:3, 49:9
**Individually** [1] - 1:8
**individually** [3] - 1:9, 1:10, 1:11
**individuals** [1] - 24:20
**inferences** [1] - 53:3
**inform** [1] - 70:23
**information** [6] - 42:2, 51:24, 54:18, 54:21, 68:13, 68:25
**inherently** [1] - 57:9
**injuries** [1] - 25:4
**inputting** [1] - 69:5
**insert** [1] - 73:20
**inserted** [1] - 69:21
**instead** [2] - 3:13, 41:10
**instruct** [12] - 23:24, 30:16, 38:1, 38:10, 39:4, 43:21, 58:11, 58:13, 59:20, 70:7, 75:3, 75:17
**instructed** [2] - 39:17, 39:23
**instruction** [1] - 53:10
**instructions** [1] - 23:10
**instructs** [3] - 21:11, 30:3, 45:22
**instrument** [5] - 68:12, 69:11, 69:17, 69:19, 69:24
**instruments** [4] - 64:14, 68:25, 69:3, 69:6
**interest** [4] - 10:12, 51:23, 66:23, 74:25
**interesting** [1] - 51:11
**interestingly** [1] - 49:15
**internet** [4] - 43:25, 53:19, 54:7, 55:3
**interplay** [1] - 51:16
**interpretation** [1] - 9:25
**intersection** [2] - 24:10, 36:5
**introduce** [3] - 15:4, 15:7, 15:15
**introduced** [2] - 36:1, 38:7
**introducing** [1] - 11:9
**investigate** [1] - 71:19
**investigated** [2] - 58:24, 63:17

**investigating** [5] - 57:13, 57:21, 64:15, 64:17, 70:9
**investigation** [8] - 25:7, 47:18, 52:11, 70:12, 71:23, 71:25, 74:10, 76:10
**investigations** [5] - 36:3, 48:11, 64:5, 64:19, 71:23
**investigators** [4] - 36:7, 66:1, 71:20
**involve** [2] - 5:23, 6:12
**involved** [9] - 20:14, 20:18, 21:14, 22:2, 26:9, 27:11, 29:19, 39:17, 72:1
**involvement** [2] - 47:6, 47:11
**involves** [1] - 25:16
**irony** [1] - 52:10
**irrelevant** [3] - 7:15, 8:15, 53:9
**Islip** [1] - 1:5
**issue** [15] - 2:25, 3:2, 4:3, 4:12, 6:24, 7:8, 10:12, 19:14, 24:16, 26:11, 28:2, 30:6, 30:9, 35:15, 48:13
**issues** [6] - 10:18, 20:23, 27:4, 33:4, 44:14, 44:17
**issuing** [1] - 30:10
**items** [3] - 5:18, 43:11, 44:15
**itself** [3] - 6:15, 30:13, 33:4
**Ivy** [1] - 43:4

## J

**jewelry** [3] - 5:16, 6:1, 73:16
**Jiminez** [1] - 13:10
**job** [5] - 25:11, 30:22, 45:17, 56:20, 75:10
**jobs** [2] - 25:23, 35:2
**John** [5] - 12:4, 15:11, 63:14, 67:3, 70:1
**JOHN** [1] - 1:8
**John's** [1] - 43:5
**joint** [2] - 4:6, 5:9
**judge** [11] - 25:25, 41:2, 43:21, 45:22, 58:11, 58:13, 59:20, 70:7, 70:22, 75:17
**Judge** [17] - 2:25, 4:12, 5:5, 8:15, 9:24, 10:8, 10:14, 12:2, 40:1, 41:22, 42:10, 42:15, 42:22, 53:10, 55:6, 59:9, 75:3
**JUDGE** [2] - 1:14, 2:2
**judges** [4] - 23:8, 25:9, 39:6, 39:10
**judgment** [2] - 14:9, 30:10
**June** [1] - 17:19
**juror** [31] - 11:23, 12:23, 13:1, 13:3, 13:4, 13:5, 13:6, 13:7, 13:8, 13:9, 13:11, 13:12, 13:13, 13:14, 13:15, 13:16, 14:19, 15:1, 16:23, 16:25, 18:3, 18:4, 18:16, 20:2, 20:3, 22:8, 23:19, 26:11, 26:23, 28:3, 29:2
**JUROR** [67] - 16:25, 17:3, 17:7, 17:13, 17:18, 18:8, 18:11, 18:22, 19:2, 19:6, 19:9, 19:12, 19:21, 19:24, 20:8, 20:11, 20:16, 20:21, 20:25, 21:4, 21:6, 21:8, 21:12, 21:16, 21:20, 21:24, 22:6, 22:8, 22:13, 22:16, 22:19, 22:24, 23:3, 26:10, 26:15, 26:19, 27:3, 27:7, 27:15, 27:18, 27:23, 28:1, 28:3, 28:6, 28:10,

28:13, 28:15, 28:19, 28:25, 29:2, 29:8, 29:11, 30:18, 30:22, 31:2, 31:5, 31:7, 31:12, 31:23, 32:2, 32:4, 32:8, 32:19, 32:23, 32:25, 33:7, 33:10
**juror's** [1] - 14:23
**Jurors** [1] - 13:22
**jurors** [15] - 12:11, 12:14, 13:20, 14:2, 14:7, 14:15, 14:20, 15:17, 15:23, 18:19, 23:8, 35:2, 36:21, 37:1, 37:10
**JURORS** [1] - 13:23
**jury** [28] - 2:7, 2:24, 3:7, 3:12, 3:17, 3:20, 6:21, 8:9, 11:6, 11:12, 12:3, 12:6, 12:8, 12:12, 14:6, 15:3, 15:7, 16:4, 30:14, 34:23, 36:23, 37:5, 39:5, 42:12, 55:7, 58:5, 58:25, 74:24
**JURY** [1] - 1:14
**Jury** [3] - 11:25, 33:16, 76:18
**justice** [5] - 50:9, 59:18, 67:7, 74:25, 75:9
**justified** [1] - 56:6
**justify** [1] - 45:21

## K

**Kapson** [2] - 13:11, 28:3
**karate** [5] - 44:18, 45:4, 60:8, 67:24
**Kathleen** [1] - 55:18
**keep** [7] - 16:15, 34:25, 35:23, 36:25, 37:12, 37:21, 42:21
**KENNEY** [1] - 1:10
**Kenney** [10] - 12:5, 15:13, 46:1, 47:13, 62:1, 63:1, 63:4, 63:6, 64:1, 66:13
**Kenney's** [2] - 69:4, 69:25
**Kenny** [1] - 55:14
**kept** [1] - 50:6
**key** [8] - 5:18, 7:5, 48:16, 53:8, 53:9, 53:11, 53:12, 62:17
**keys** [1] - 62:18
**kidding** [1] - 29:5
**kids** [1] - 43:6
**kind** [3] - 8:4, 21:5, 46:7
**knowledge** [5] - 66:24, 70:8, 70:10, 70:13, 70:15
**known** [1] - 46:19
**Kraut** [2] - 2:12, 15:10
**KRAUT** [1] - 1:16
**Kristen** [1] - 55:19

## L

**lack** [2] - 14:21, 49:5
**Ladha** [1] - 32:16
**ladies** [4] - 12:1, 13:25, 55:7, 76:13
**LAGRECA** [2] - 2:19, 15:21
**LaGreca** [3] - 2:19, 15:22, 55:10
**LAGRECO** [1] - 1:21
**LAKE** [1] - 1:17
**Lake** [1] - 2:12
**landlord** [3] - 10:3, 10:4, 65:15
**large** [4] - 41:4, 44:2, 51:5, 54:4

**last** [15] - 3:24, 5:7, 11:1, 11:13, 13:17, 16:2, 17:10, 17:14, 20:20, 32:22, 34:12, 39:13, 42:2, 54:10, 73:16
**lasting** [2] - 17:6, 17:9
**late** [1] - 33:2
**laughing** [3] - 67:1, 67:2, 67:16
**law** [50] - 4:19, 5:6, 7:14, 7:15, 10:9, 21:2, 21:5, 21:10, 21:11, 23:11, 23:14, 24:17, 25:24, 26:7, 27:14, 27:16, 27:17, 27:20, 27:24, 28:11, 28:15, 28:16, 28:23, 29:9, 30:16, 33:8, 37:20, 38:10, 39:4, 43:21, 45:22, 48:2, 52:22, 53:10, 56:14, 57:9, 58:11, 58:13, 59:8, 67:5, 67:12, 68:21, 68:22, 70:9, 70:14, 74:19, 75:4, 75:18, 76:1
**Law** [2] - 57:11, 57:17
**laws** [1] - 28:5
**lawsuit** [2] - 22:2, 30:4
**lawsuits** [1] - 21:15
**lawyer** [2] - 51:13, 60:2
**lawyers** [3] - 2:15, 20:10, 39:16
**layout** [1] - 61:16
**Leagues** [1] - 43:4
**leak** [2] - 62:12, 62:13
**learned** [3] - 21:10, 22:21, 71:24
**lease** [52] - 5:23, 6:16, 6:17, 6:18, 6:20, 6:23, 7:1, 7:9, 7:10, 7:11, 7:14, 7:15, 7:24, 8:3, 8:9, 8:10, 8:11, 8:14, 8:16, 8:19, 8:21, 8:22, 9:14, 9:21, 9:25, 10:1, 10:3, 10:11, 10:17, 10:19, 46:25, 47:24, 48:1, 48:2, 48:7, 48:19, 49:6, 51:22, 65:9, 65:12, 65:16, 65:18, 65:20, 65:21, 66:20, 73:7, 73:9, 74:5, 74:16
**leased** [2] - 8:6, 53:7
**leasing** [2] - 6:13, 6:22
**least** [4] - 5:8, 41:4, 66:5, 66:24
**leather** [2] - 5:16, 6:2
**leave** [4] - 3:19, 16:10, 32:8, 34:20
**leaves** [1] - 61:13
**left** [4] - 43:23, 50:18, 69:24, 70:2
**legal** [7] - 7:18, 9:14, 23:7, 23:10, 23:12, 70:8, 74:16
**legally** [2] - 8:15, 9:22
**legitimate** [1] - 7:3
**less** [2] - 16:2, 54:17
**letting** [1] - 3:13
**Lev** [1] - 13:12
**liability** [2] - 75:21, 76:4
**liable** [1] - 72:25
**lieutenant** [1] - 55:12
**life** [2] - 50:25, 53:18
**likely** [4] - 23:1, 38:21, 42:5, 56:12
**limitations** [1] - 67:9
**limited** [2] - 9:7, 35:1
**Linda** [3] - 13:14, 16:25, 29:2
**line** [3] - 63:23, 70:1, 74:22
**lines** [2] - 36:14, 36:20
**listening** [1] - 36:17

**Liston** [11] - 2:8, 12:4, 15:12, 55:11, 63:14, 63:24, 64:3, 67:3, 67:4, 67:13, 69:5
**LISTON** [1] - 1:8
**Liston's** [1] - 70:1
**litigation** [2] - 21:6, 21:7
**live** [3] - 43:6, 54:6, 55:2
**lived** [2] - 43:7, 65:10
**LLP** [1] - 1:16
**local** [1] - 51:2
**location** [2] - 24:8, 47:18
**look** [5] - 7:12, 9:12, 35:11, 38:21, 55:25
**looked** [5] - 4:25, 50:3, 60:23, 65:2
**looking** [2] - 24:2, 57:12
**looks** [3] - 3:23, 24:11, 54:7
**loosely** [1] - 44:8
**Loper** [1] - 13:2
**Lori** [1] - 54:12
**lose** [1] - 11:23
**loss** [1] - 18:17
**loud** [1] - 42:18
**love** [1] - 57:11
**Lucatorto** [1] - 1:22
**lunch** [3] - 3:13, 16:13, 35:18

### M

**magic** [1] - 53:8
**Magistrate** [1] - 12:2
**mail** [1] - 1:23
**main** [1] - 35:1
**major** [1] - 73:1
**malice** [4] - 59:16, 59:18, 75:8, 75:9
**malicious** [13] - 42:15, 56:18, 59:12, 59:14, 59:15, 59:21, 60:5, 72:19, 72:20, 75:6, 75:15, 76:5
**maliciously** [2] - 25:3, 59:17
**mall** [1] - 43:25
**mammal** [1] - 7:21
**man** [2] - 6:14, 20:12
**Manhattan** [1] - 43:8
**manifested** [1] - 9:9
**manner** [1] - 67:22
**Mansour** [2] - 13:16, 17:13
**manufacturing** [4] - 61:10, 66:2, 73:25
**Marcus** [1] - 2:12
**MARCUS** [1] - 1:17
**marijuana** [6] - 45:14, 47:3, 49:19, 53:2, 66:2, 68:9
**marketed** [1] - 6:2
**married** [1] - 44:5
**Marshall** [2] - 13:11, 28:3
**Martone** [22] - 12:5, 15:12, 46:9, 47:14, 55:14, 62:6, 62:12, 63:7, 63:11, 64:1, 64:21, 64:24, 65:13, 65:18, 65:22, 66:11, 66:20, 69:18, 69:22, 73:5, 73:8, 74:5
**MARTONE** [1] - 1:9
**material** [1] - 66:5

**materials** [2] - 68:8, 73:19
**matinee** [1] - 32:3
**matter** [4] - 6:25, 9:14, 10:21, 14:24
**matters** [5] - 2:23, 9:13, 9:15, 10:13, 10:16
**Maureen** [1] - 13:1
**Mauro** [1] - 13:7
**mean** [11] - 3:22, 4:20, 7:1, 29:15, 29:16, 30:20, 38:13, 56:10, 67:15, 67:16, 69:17
**meaning** [2] - 21:19, 62:18
**means** [15] - 24:1, 24:3, 35:24, 36:3, 38:20, 38:22, 39:7, 56:11, 56:13, 56:15, 56:19, 57:23, 67:20
**meantime** [1] - 63:14
**media** [6] - 24:2, 50:21, 51:8, 51:10, 53:1, 54:5
**meet** [2] - 30:5, 30:9
**meets** [1] - 46:2
**members** [5] - 22:1, 26:8, 27:10, 27:13, 37:9
**memory** [2] - 37:14, 37:16
**merits** [1] - 26:4
**met** [3] - 45:3, 59:18, 60:19
**metal** [1] - 61:19
**MICHAEL** [1] - 1:10
**Michael** [3] - 12:5, 15:13, 55:14
**microphone** [5] - 16:22, 17:10, 18:21, 20:5, 27:14
**middle** [1] - 34:13
**might** [13] - 3:11, 3:20, 16:2, 19:17, 19:20, 21:10, 24:5, 24:12, 25:20, 27:11, 27:20, 31:15, 35:10
**mind** [4] - 34:25, 35:23, 36:25, 37:13
**Mineola** [3] - 1:20, 2:17, 70:20
**minimal** [1] - 34:21
**minute** [1] - 33:12
**minutes** [5] - 34:13, 53:15, 58:12, 62:18, 62:24
**misdemeanor** [1] - 69:13
**mispronounced** [1] - 13:17
**mistake** [2] - 10:7, 10:8
**Monday** [3] - 1:7, 32:20, 32:21
**money** [4] - 30:7, 31:9, 54:25, 75:22
**month** [7] - 10:9, 10:10, 44:13, 48:1, 65:5
**month-to-month** [2] - 10:9, 10:10
**months** [2] - 20:20, 72:14
**morning** [19] - 2:13, 2:14, 2:18, 2:20, 2:21, 2:22, 11:5, 11:7, 12:1, 15:8, 15:17, 15:21, 16:17, 27:1, 34:15, 39:22, 70:21, 76:15, 76:23
**most** [6] - 34:10, 35:22, 42:4, 44:14, 48:21, 68:17
**mostly** [1] - 35:7
**move** [1] - 3:25
**moving** [1] - 12:18
**MR** [48] - 2:11, 2:15, 2:25, 3:15, 3:18, 3:22, 4:3, 4:10, 4:12, 4:16, 4:17, 4:19,

4:24, 5:5, 5:14, 6:4, 6:10, 7:4, 7:12, 7:20, 7:25, 8:5, 8:13, 8:23, 9:17, 9:24, 10:8, 10:14, 10:22, 11:1, 11:10, 11:16, 11:19, 11:22, 15:8, 15:17, 40:1, 40:4, 41:2, 41:7, 41:16, 41:18, 41:19, 41:22, 42:10, 55:6, 57:2, 76:21
**MS** [2] - 2:19, 15:21
**mud** [1] - 53:18
**multiple** [3] - 50:21, 52:12, 61:11
**Murray** [1] - 26:24
**must** [5] - 14:5, 25:25, 26:3, 35:23, 60:6
**Myles** [1] - 26:24

### N

**name** [24] - 12:2, 12:11, 12:20, 15:8, 15:17, 15:21, 16:23, 17:12, 18:22, 20:12, 20:16, 20:17, 22:6, 42:11, 42:13, 53:20, 55:2, 55:7, 69:4, 69:24, 69:25, 70:1, 71:24
**named** [5] - 6:14, 21:18, 44:12, 51:19, 71:25
**names** [4] - 12:10, 12:15, 12:19, 13:18
**Naomi** [3] - 18:4, 22:8, 26:11
**narcotics** [12] - 48:9, 48:10, 55:17, 55:20, 64:2, 64:4, 64:6, 64:8, 64:16, 65:25, 66:18
**narrative** [1] - 69:21
**NASSAU** [2] - 1:11, 1:19
**Nassau** [20] - 2:16, 12:6, 15:13, 15:19, 22:2, 22:3, 22:4, 22:9, 22:12, 24:23, 28:16, 29:5, 29:22, 43:6, 49:16, 50:24, 55:9, 55:22, 60:16, 63:20
**nature** [2] - 24:3, 25:15
**nauseous** [3] - 60:12, 60:13, 62:12
**necessarily** [3] - 48:14, 51:16, 54:20
**necessary** [1] - 16:14
**need** [12] - 2:23, 14:20, 24:4, 24:11, 34:19, 34:22, 34:25, 35:21, 35:22, 36:24, 75:2, 76:20
**needs** [2] - 16:8, 63:17
**neighbor** [1] - 44:18
**nephew** [5] - 22:9, 22:15, 26:10, 26:12, 26:16
**never** [9] - 9:10, 44:14, 44:17, 48:7, 50:7, 53:4, 53:10, 71:12, 71:16
**NEW** [2] - 1:1, 1:17
**New** [15] - 1:5, 1:20, 2:12, 2:17, 7:15, 10:9, 23:21, 27:16, 43:21, 43:23, 48:2, 52:22, 65:10, 67:4, 74:16
**news** [1] - 36:16
**News** [1] - 51:1
**Newsday** [1] - 51:2
**newspaper** [1] - 58:4
**next** [24] - 13:9, 18:2, 18:7, 20:7, 27:2, 31:11, 32:14, 32:18, 33:18, 40:5, 41:25, 44:18, 45:2, 46:8, 47:5, 48:8, 51:21, 51:25, 54:18, 56:24, 60:24, 63:22, 68:21
**nice** [1] - 32:3

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 85 of 90 PageID #: 1426

niece [1] - 29:3
night [1] - 76:16
nine [1] - 28:3
nitrous [3] - 67:1, 67:14, 67:16
nobody [2] - 52:23, 52:25
non [2] - 7:10, 10:12
non-issue [1] - 10:12
none [1] - 48:23
notes [8] - 34:6, 37:11, 37:12, 37:13, 37:15, 37:19, 37:21, 37:24
nothing [13] - 4:19, 9:20, 31:5, 37:12, 38:3, 38:9, 46:21, 46:24, 47:19, 47:20, 52:15, 73:22, 73:23
novelties [1] - 43:13
novelty [1] - 43:10
November [1] - 5:10
noxious [4] - 44:20, 60:21, 62:5, 67:23
number [32] - 2:8, 4:13, 5:14, 6:12, 12:22, 12:24, 13:1, 13:3, 13:4, 13:5, 13:6, 13:7, 13:8, 13:9, 13:11, 13:12, 13:13, 13:14, 13:15, 13:16, 14:11, 16:23, 18:3, 18:4, 20:3, 22:8, 47:8, 49:12, 50:17, 53:11, 73:2, 73:5
NYU [1] - 17:18

**O**

o'clock [2] - 32:4, 34:8
objection [2] - 6:13, 8:2
observation [3] - 66:3, 69:1, 70:3
observations [2] - 73:8, 74:1
obviously [4] - 4:5, 25:8, 50:7, 60:21
occasionally [3] - 38:12, 44:1, 46:21
occur [1] - 42:7
occurred [3] - 37:14, 41:15, 42:6
October [6] - 5:15, 6:13, 43:16, 60:7, 70:17, 72:24
October4 [1] - 24:25
odor [2] - 60:21, 67:23
OF [4] - 1:1, 1:11, 1:14, 1:19
offered [1] - 72:17
office [7] - 2:16, 21:3, 44:3, 47:7, 47:8, 57:19, 72:4
OFFICE [1] - 1:19
Office [1] - 55:9
OFFICER [2] - 1:8, 1:9
Officer [29] - 29:3, 46:1, 46:8, 47:13, 55:13, 55:14, 62:1, 62:6, 62:7, 62:12, 63:1, 63:4, 63:7, 63:25, 64:1, 64:21, 64:24, 65:13, 65:18, 65:22, 66:11, 66:13, 66:20, 69:4, 69:18, 69:22, 69:25, 73:5
officer [22] - 15:19, 22:11, 45:25, 46:2, 56:15, 56:19, 57:3, 58:18, 63:6, 63:11, 63:15, 63:16, 64:6, 66:6, 69:14, 69:15, 70:11, 70:12, 74:20, 75:19, 76:1, 76:2
officer's [1] - 71:18
Officers [2] - 12:5, 15:12
officers [40] - 8:20, 9:15, 9:22, 10:19, 23:1, 24:22, 25:17, 26:3, 27:25, 33:8,

45:15, 45:19, 47:9, 47:10, 47:12, 48:4, 48:10, 48:24, 49:9, 49:10, 53:6, 53:13, 58:14, 59:3, 59:17, 60:1, 60:3, 61:23, 66:22, 67:22, 68:3, 68:14, 68:15, 70:9, 70:15, 72:22, 73:18, 74:8, 75:2, 75:7
Official [1] - 1:22
often [1] - 22:15
once [2] - 34:18, 37:4
one [39] - 2:17, 3:8, 4:3, 5:2, 9:5, 9:18, 10:24, 10:25, 12:22, 13:1, 23:23, 31:21, 34:25, 35:22, 37:12, 37:20, 38:23, 39:8, 39:18, 42:2, 43:4, 46:6, 47:13, 48:22, 49:10, 50:17, 52:1, 53:11, 65:3, 65:14, 66:25, 69:5, 69:22, 70:10, 70:12, 73:2, 75:16
ones [2] - 44:25, 64:7
open [8] - 2:1, 3:7, 3:21, 36:25, 42:1, 46:10, 62:16, 62:18
opened [4] - 43:23, 45:11, 46:13, 53:14
opening [4] - 34:7, 38:2, 38:4, 38:24
operated [1] - 61:2
operation [8] - 53:2, 61:10, 61:25, 64:2, 66:2, 73:11, 73:25
opinions [1] - 29:25
opportunity [1] - 11:4
oppose [1] - 71:1
Order [3] - 57:9, 57:11, 57:18
order [4] - 4:6, 5:9, 12:21, 16:11
ornaments [1] - 61:21
ostracizing [1] - 51:6
otherwise [4] - 34:8, 41:8, 41:18, 41:19
outside [3] - 24:5, 34:23, 36:2
overnight [2] - 50:6, 70:20
overpowering [1] - 63:13
own [7] - 24:14, 25:25, 26:4, 36:13, 51:10, 60:18, 62:11
owned [3] - 43:7, 44:18, 60:8
owner [7] - 45:4, 46:25, 48:19, 61:2, 62:23, 74:13, 74:15
owners [6] - 63:3, 63:5, 63:8, 66:12, 73:3, 74:3
ownership [3] - 51:23, 66:23, 68:3
owns [3] - 62:14, 65:8, 66:15
oxide [3] - 67:1, 67:14, 67:16

**P**

P-E-A-K [1] - 61:1
p.m [2] - 16:7, 60:10
pace [1] - 44:13
packets [2] - 66:7, 66:9
page [5] - 9:1, 33:18, 40:5, 41:25, 56:24
Paglia [3] - 18:5, 22:8, 26:11
paglia [1] - 18:6
paid [4] - 31:11, 31:12, 31:18, 44:13
panel [6] - 12:13, 12:14, 14:1, 14:6, 15:24, 21:2
paper [9] - 7:13, 10:1, 47:25, 65:1, 65:2, 65:3, 65:4, 65:19, 73:6
papers [3] - 51:2, 51:3, 69:22

paperwork [2] - 54:19, 54:20
paragraph [6] - 65:3, 65:14, 68:19, 68:20, 68:21, 68:23
paragraphs [1] - 4:14
paralegal [1] - 21:4
paraphernalia [8] - 5:20, 61:18, 61:24, 73:15, 73:19, 73:22, 73:24, 74:1
Park [4] - 60:9, 60:15, 60:18, 62:3
part [2] - 19:4, 44:14
partial [1] - 14:22
participants [1] - 15:4
particular [3] - 29:23, 34:11, 67:18
parties [11] - 2:23, 9:3, 9:4, 14:8, 14:23, 18:10, 20:9, 25:11, 37:5, 39:16, 48:2
partner [1] - 55:17
party [1] - 10:11
pass [3] - 16:21, 17:10, 18:20
passed [1] - 35:10
past [1] - 39:22
Patel [1] - 13:6
patrol [1] - 63:16
pay [4] - 12:13, 12:17, 35:5, 39:8
Peak [7] - 43:9, 47:1, 61:1, 61:18, 63:6, 66:17, 74:14
Penn [1] - 43:4
people [9] - 8:20, 11:14, 16:11, 29:25, 44:1, 50:17, 50:18, 54:20, 57:12
percent [3] - 38:23, 58:6, 72:7
perhaps [1] - 17:25
period [3] - 9:20, 18:18, 54:16
Perlstein [2] - 2:12, 15:10
PERLSTEIN [1] - 1:16
perplexed [1] - 50:3
perplexing [1] - 48:21
person [9] - 17:10, 18:2, 20:17, 56:23, 58:20, 58:21, 59:7, 68:21, 68:23
person's [1] - 53:18
personal [1] - 14:4
personally [1] - 24:3
perspective [1] - 3:22
pertains [1] - 68:12
phone [1] - 49:12
photographed [1] - 70:19
photographs [6] - 11:2, 11:3, 11:9, 38:8, 61:16, 66:4
physical [2] - 18:15, 20:23
pick [5] - 3:7, 3:16, 3:20, 9:5, 11:16
picture [1] - 66:18
pictures [2] - 35:9, 43:13
piece [6] - 7:13, 10:1, 47:25, 65:1, 65:19, 73:6
pipe [1] - 73:21
pipes [4] - 61:19, 73:19
place [2] - 23:20, 53:7
plaintiff [17] - 2:10, 2:13, 15:5, 21:15, 21:18, 24:18, 24:23, 25:5, 25:7, 30:3, 30:5, 30:6, 30:9, 38:18, 38:19, 59:16, 59:19
Plaintiff [2] - 1:4, 1:16

**plaintiff's** [1] - 25:5
**plaintiffs** [2] - 8:5, 15:24
**Plainview** [1] - 49:17
**planning** [1] - 44:6
**plans** [1] - 44:22
**play** [1] - 50:23
**plea** [2] - 72:11, 72:16
**pleadings** [1] - 9:2
**point** [16] - 3:8, 3:17, 4:15, 15:4, 37:6, 38:15, 42:2, 45:1, 45:7, 45:10, 46:4, 46:7, 74:11, 74:21, 75:2, 76:21
**pointing** [2] - 12:22, 48:5
**poisonous** [1] - 60:14
**POLICE** [2] - 1:8, 1:9
**police** [43] - 7:10, 9:22, 15:12, 15:19, 22:11, 23:1, 24:22, 25:17, 26:2, 27:11, 29:14, 29:22, 44:25, 45:10, 45:14, 45:18, 46:2, 46:18, 47:6, 47:9, 47:20, 48:10, 48:23, 49:9, 49:10, 50:13, 53:6, 53:13, 56:14, 56:15, 57:24, 58:9, 58:24, 61:5, 61:9, 61:17, 62:22, 64:11, 67:10, 71:12, 71:20, 71:21
**Police** [9] - 12:5, 22:3, 22:9, 24:23, 29:3, 29:22, 46:1, 46:8, 50:24
**policing** [1] - 22:21
**possessing** [1] - 47:2
**possession** [4] - 25:3, 46:15, 49:8, 68:6
**possible** [2] - 34:18, 34:22
**possibly** [1] - 11:3
**postponement** [1] - 17:19
**potential** [1] - 12:10
**potpourri** [1] - 61:12
**pounds** [1] - 47:2
**PowerPoint** [1] - 54:11
**PPX** [1] - 8:24
**precinct** [5] - 50:5, 63:18, 63:19, 64:6
**Precinct** [4] - 62:3, 69:9, 70:18
**precincts** [1] - 63:20
**precursor** [1] - 68:7
**preemptories** [1] - 11:13
**preemptory** [1] - 14:9
**preliminary** [3] - 2:23, 30:12, 34:6
**premises** [5] - 43:18, 43:22, 67:2, 67:17, 74:17
**prepared** [1] - 69:23
**preponderance** [2] - 38:20, 38:22
**presence** [2] - 14:16, 34:23
**present** [2] - 9:8, 67:21
**presented** [13] - 23:25, 24:6, 24:10, 27:21, 28:23, 30:15, 35:12, 35:25, 36:8, 37:3, 37:4, 37:19, 61:5
**presents** [1] - 33:4
**presiding** [2] - 2:6, 12:6
**pretrial** [2] - 4:6, 5:9
**pretty** [4] - 3:25, 4:19, 4:21, 45:9
**prevent** [2] - 18:18, 20:23
**previous** [3] - 41:11, 41:13
**previously** [3] - 4:22, 27:4, 54:1
**primarily** [1] - 43:25

**primary** [1] - 61:22
**print** [1] - 65:12
**probable** [27] - 7:6, 9:18, 25:2, 25:6, 53:4, 54:15, 54:17, 56:10, 56:11, 56:15, 57:2, 57:15, 57:16, 57:23, 58:7, 58:8, 59:20, 60:4, 74:20, 75:4, 75:13, 75:20, 75:24, 75:25, 76:2, 76:3, 76:9
**problem** [8] - 8:13, 16:19, 18:17, 18:23, 19:7, 19:11, 19:19, 60:20
**procedure** [1] - 14:1
**proceeding** [2] - 23:7, 52:15
**proceedings** [1] - 50:11
**Proceedings** [1] - 1:23
**process** [3] - 9:23, 44:5, 67:9
**produced** [1] - 1:24
**production** [1] - 68:8
**professional** [1] - 48:1
**prominent** [1] - 51:4
**promoted** [1] - 55:21
**proof** [2] - 30:4, 38:18
**property** [2] - 10:12, 49:8
**prosecute** [1] - 54:17
**prosecuted** [2] - 25:3, 25:6
**prosecution** [14] - 42:16, 56:18, 59:12, 59:15, 59:22, 60:6, 71:22, 72:19, 72:20, 75:6, 75:15, 76:5
**prosecutors** [1] - 59:13
**PROSPECTIVE** [57] - 17:18, 18:8, 19:12, 19:21, 19:24, 20:8, 20:11, 20:16, 20:21, 20:25, 21:4, 21:6, 21:8, 21:12, 21:16, 21:20, 21:24, 22:6, 22:8, 22:13, 22:16, 22:19, 22:24, 23:3, 26:10, 26:15, 26:19, 27:3, 27:7, 27:15, 27:18, 27:23, 28:1, 28:3, 28:6, 28:10, 28:13, 28:15, 28:19, 29:2, 29:8, 29:11, 30:18, 30:22, 31:2, 31:5, 31:7, 31:12, 31:23, 32:2, 32:4, 32:8, 32:19, 32:23, 32:25, 33:7, 33:10
**prospective** [2] - 13:20, 14:23
**PROSPECTOR** [10] - 16:25, 17:3, 17:7, 17:13, 18:11, 18:22, 19:2, 19:6, 19:9, 28:25
**protect** [1] - 75:10
**prove** [12] - 38:19, 57:7, 58:1, 58:5, 58:25, 59:1, 59:14, 59:16, 72:6, 72:22, 74:23, 75:13
**proved** [1] - 76:9
**provided** [2] - 23:17, 51:24
**provides** [1] - 24:19
**public** [7] - 16:9, 16:12, 55:22, 66:10, 67:5, 67:14, 75:10
**pull** [1] - 67:11
**punishable** [1] - 69:13
**purported** [3] - 73:6, 73:9, 74:5
**purpose** [2] - 14:1, 14:5
**pursuant** [1] - 24:18
**put** [13] - 21:9, 22:20, 22:22, 24:4, 27:19, 28:7, 29:6, 30:12, 35:9, 52:24, 53:20, 55:2, 67:13
**putting** [1] - 45:20

**Q**                                        1

**qualified** [3] - 75:16, 75:18, 75:23
**questioning** [1] - 14:8
**questions** [10] - 6:12, 12:16, 14:3, 14:4, 14:6, 30:12, 33:14, 33:15, 38:5, 38:12
**quick** [1] - 42:12
**quickly** [4] - 4:1, 5:22, 19:18, 47:15
**quite** [1] - 43:7
**quote** [1] - 48:16
**quote-unquote** [1] - 48:16

**R**

**radio** [2] - 62:2, 62:4
**Ragona** [1] - 20:4
**ragona** [1] - 20:6
**raise** [2] - 35:14, 35:20
**raised** [1] - 4:4
**Rajesh** [24] - 43:7, 44:7, 44:16, 44:21, 45:5, 45:10, 46:4, 46:10, 46:15, 47:8, 47:14, 47:21, 48:6, 48:20, 48:25, 49:10, 49:21, 50:16, 53:24, 61:1, 63:2, 64:23, 64:24, 73:21
**rajesh** [3] - 61:25, 62:20, 65:15
**Ralph** [4] - 2:16, 15:14, 15:18, 55:8
**RALPH** [1] - 1:20
**ran** [3] - 51:21, 52:2, 71:9
**rather** [1] - 32:11
**Razia** [2] - 13:13, 18:22
**reach** [2] - 37:7, 56:9
**reaction** [1] - 51:15
**read** [5] - 5:20, 36:16, 37:17, 38:17, 76:16
**reading** [2] - 6:21, 8:25
**ready** [1] - 34:15
**realize** [1] - 56:4
**realized** [1] - 66:1
**really** [10] - 9:14, 9:17, 10:17, 10:21, 24:7, 24:8, 43:14, 45:16, 47:19, 54:23
**reason** [19] - 7:22, 8:17, 9:6, 14:10, 14:14, 14:25, 30:13, 30:18, 35:13, 36:10, 36:12, 36:23, 56:5, 56:13, 57:24, 58:19, 59:19, 63:6
**reasonable** [7] - 57:16, 58:2, 58:4, 59:1, 72:7, 74:23, 76:1
**reasonably** [10] - 56:16, 57:24, 58:15, 59:3, 61:6, 72:25, 73:21, 74:20, 75:20, 76:1
**reasoning** [1] - 5:5
**reasons** [3] - 31:20, 36:24, 56:5
**receive** [1] - 23:10
**received** [1] - 62:6
**recess** [1] - 33:17
**reckless** [4] - 67:19, 67:22, 68:1, 68:2
**recognizance** [1] - 51:10
**recognize** [3] - 15:24, 18:9, 20:9
**recognizes** [1] - 70:14
**reconcilable** [2] - 45:19, 54:14

Case 2:18-cv-04625-ST     Document 131-2     Filed 11/13/24     Page 87 of 90 PageID #: 1428

reconcile [2] - 45:17, 45:23
record [5] - 2:10, 3:3, 5:21, 8:24, 41:3
recorded [1] - 1:23
Reed [6] - 48:9, 55:18, 64:9, 65:20, 65:25, 69:23
Reeds's [1] - 70:2
reelect [1] - 14:20
refers [1] - 6:19
reflection [1] - 71:15
refuse [1] - 42:19
refused [1] - 17:20
regardless [2] - 7:23, 8:18
Reisman [1] - 55:5
REISSMAN [20] - 1:20, 2:15, 4:10, 4:16, 5:5, 5:14, 6:10, 7:4, 8:5, 9:24, 10:14, 10:22, 11:1, 11:16, 11:19, 11:22, 15:17, 41:19, 55:6, 57:2
Reissman [4] - 2:16, 15:14, 15:18, 55:8
reissman [2] - 3:6, 4:4
relationship [3] - 14:23, 27:20, 29:6
relationships [1] - 28:8
relatively [1] - 46:1
released [2] - 51:10, 71:1
relevant [2] - 43:14, 43:15
rely [1] - 11:19
remedy [1] - 24:20
remember [6] - 11:1, 16:23, 24:14, 34:3, 42:13, 76:15
remembers [1] - 37:23
render [1] - 30:14
rent [3] - 44:9, 44:13, 65:10
rented [3] - 44:12, 49:18, 65:11
renter [1] - 51:23
renting [2] - 47:25, 65:4
replace [4] - 11:15, 18:3, 20:2, 26:23
replaced [1] - 67:8
report [1] - 67:6
Reporter [1] - 1:22
reporter [2] - 14:17, 42:22
represent [5] - 42:13, 55:10, 55:13, 71:5, 71:7
represented [3] - 15:5, 15:13, 42:14
required [1] - 23:11
requires [1] - 57:6
research [2] - 24:1, 36:13
resolve [1] - 25:12
respect [1] - 14:9
respond [1] - 62:4
responding [1] - 63:23
responds [1] - 63:16
responses [1] - 14:6
responsibility [2] - 35:1, 61:7
responsible [4] - 57:20, 58:15, 63:23, 74:10
rest [2] - 34:4, 37:5
restroom [2] - 35:18, 35:20
result [5] - 26:17, 41:13, 42:4, 49:20, 52:20
retail [2] - 61:25, 62:1

retained [1] - 71:5
retired [3] - 55:15, 64:11, 64:13
retrying [1] - 41:2
return [1] - 39:5
revenue [1] - 31:8
review [1] - 11:3
rights [3] - 24:20, 24:25, 25:17
rise [3] - 2:3, 15:6, 15:15
rissman [2] - 4:8, 4:15
RMR [1] - 1:22
Robert [2] - 51:12
role [3] - 35:1, 71:19, 73:11
room [7] - 12:15, 15:3, 34:21, 36:23, 37:5, 37:21, 39:5
row [4] - 12:23, 12:25, 13:10, 17:11
Roxann [1] - 13:5
RPR [1] - 1:22
rule [4] - 23:14, 24:16, 26:7, 39:13
rules [2] - 23:10, 23:12
ruling [1] - 10:15
running [2] - 73:22, 73:23

## S

safety [1] - 16:3
salary [2] - 31:4, 31:5
sales [1] - 31:1
sat [2] - 45:9, 67:5
saw [17] - 6:5, 7:12, 46:10, 47:24, 48:7, 57:14, 62:21, 63:24, 63:25, 64:1, 64:22, 65:18, 73:14, 73:18, 74:9
scale [1] - 38:21
scales [1] - 73:20
scared [1] - 50:7
scene [13] - 46:1, 46:2, 47:11, 48:8, 53:13, 56:20, 60:19, 62:1, 63:7, 63:15, 63:16, 69:10, 69:16
Schalk [2] - 51:12, 51:13
schedule [2] - 16:9, 18:1
scheduling [9] - 2:25, 3:2, 16:20, 17:1, 18:7, 18:13, 20:7, 27:2, 32:18
screen [2] - 35:9, 50:23
sealed [1] - 66:9
seasoned [1] - 71:3
seat [5] - 11:14, 12:21, 12:22, 12:24, 26:25
seated [3] - 2:4, 12:21, 34:3
seats [1] - 34:4
Second [3] - 4:25, 8:23, 9:1
second [6] - 42:14, 47:22, 57:17, 57:18, 59:11, 64:20
secondly [1] - 10:2
Section [1] - 24:19
secured [1] - 24:21
see [34] - 3:7, 3:16, 3:17, 22:15, 31:10, 32:1, 35:12, 35:14, 43:13, 43:17, 44:11, 46:6, 47:5, 50:22, 50:23, 52:7, 53:21, 57:8, 57:10, 59:18, 61:16, 62:11, 64:13, 65:3, 65:9, 65:16, 66:4,

66:18, 69:3, 69:23, 74:8, 76:14, 76:17, 76:22
sees [1] - 56:21
select [3] - 3:12, 12:3, 14:1
selecting [1] - 14:5
SELECTION [1] - 1:14
selection [5] - 2:7, 12:7, 12:8, 16:4, 42:12
sell [1] - 73:16
semester [1] - 17:14
sending [1] - 30:6
sense [3] - 45:24, 53:16, 53:17
separately [1] - 34:20
separation [1] - 28:18
September [1] - 17:19
serious [1] - 16:19
serve [2] - 15:1, 75:9
serving [1] - 20:24
session [2] - 2:6, 16:6
set [3] - 9:4, 9:6, 67:12
sets [1] - 68:20
several [2] - 66:4, 71:8
SHAH [1] - 1:3
Shah [62] - 2:7, 8:5, 8:6, 9:19, 12:4, 15:5, 20:11, 20:12, 20:14, 20:18, 24:24, 42:13, 43:1, 44:7, 45:5, 46:4, 46:15, 47:21, 48:25, 49:10, 50:25, 52:21, 53:5, 53:24, 54:16, 56:7, 58:15, 59:1, 59:11, 60:2, 61:1, 62:9, 62:19, 63:10, 64:25, 65:1, 65:9, 65:13, 65:22, 66:16, 67:15, 69:7, 70:17, 71:1, 72:5, 72:8, 72:10, 72:19, 72:25, 73:5, 73:8, 73:15, 74:4, 74:6, 74:13, 74:14, 74:17, 75:8
shah [5] - 10:3, 62:15, 65:11, 72:10
Shah's [6] - 43:15, 48:20, 63:5, 63:8, 63:9, 73:3
shah's [1] - 62:9
Shahs [1] - 74:3
Shanif [1] - 32:16
Shannon [1] - 13:8
share [1] - 70:10
shaw [4] - 60:2, 71:4, 71:8, 71:11
shop [1] - 43:10
short [1] - 16:14
shortly [2] - 44:7, 49:22
show [12] - 9:8, 46:18, 50:14, 52:21, 53:19, 53:23, 54:2, 54:10, 57:11, 64:7, 74:12, 74:15
shown [1] - 56:3
shows [5] - 48:18, 54:3, 54:12, 74:12, 74:22
sick [2] - 60:12, 60:13
side [5] - 14:11, 30:8, 38:23, 69:24, 70:2
sidebar [1] - 40:2
Sidebar [2] - 41:1, 41:24
sign [1] - 65:15
signature [1] - 70:1
signed [14] - 10:2, 10:4, 10:11, 65:6,

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 88 of 90 PageID #: 1429

65:9, 65:14, 69:5, 69:11, 69:14, 69:17, 69:18, 69:22, 71:6, 74:17
**significance** [1] - 7:18
**similarly** [1] - 38:9
**simple** [1] - 56:8
**simply** [2] - 23:16, 71:17
**sit** [4] - 12:11, 14:18, 18:16, 30:14
**site** [1] - 63:24
**sitting** [11] - 18:18, 45:8, 47:8, 62:24, 62:25, 63:9, 63:10, 64:23, 65:1, 66:22, 73:9
**situation** [3] - 31:17, 58:18, 67:21
**six** [4] - 11:19, 28:18, 67:8, 72:13
**sketchy** [1] - 45:16
**slight** [2] - 38:22, 39:20
**small** [1] - 44:3
**smell** [4] - 60:14, 60:24, 62:5, 63:12
**smelled** [1] - 44:20
**smoke** [1] - 61:20
**smoking** [1] - 43:12
**social** [1] - 24:2
**softly** [1] - 19:17
**sold** [2] - 6:9, 43:10
**sole** [2] - 39:10, 61:2
**someone** [1] - 70:10
**sometime** [4] - 3:10, 19:21, 43:23, 44:7
**sometimes** [6] - 18:23, 19:13, 19:23, 36:9, 49:4, 49:5
**soon** [1] - 12:7
**sorry** [2] - 40:4, 69:15
**sort** [2] - 32:11, 43:2
**sound** [1] - 31:23
**South** [1] - 43:11
**space** [2] - 44:2, 44:9
**speaking** [3] - 18:23, 19:5, 43:1
**special** [1] - 64:15
**specialist** [1] - 64:16
**specifically** [1] - 24:25
**spells** [1] - 7:16
**spots** [1] - 12:16
**spray** [1] - 61:13
**squad** [8] - 55:18, 63:19, 63:21, 63:22, 64:6, 64:8
**St** [1] - 43:5
**stairs** [1] - 64:22
**standard** [4] - 9:10, 58:7, 72:8, 75:2
**standing** [2] - 63:10, 64:24
**start** [11] - 3:18, 11:13, 12:24, 16:16, 33:2, 34:16, 34:17, 36:4, 38:25, 40:1, 47:5
**started** [2] - 10:6, 48:6
**starting** [3] - 13:9, 34:8, 34:12
**starts** [1] - 32:14
**State** [2] - 27:16, 67:5
**state** [5] - 2:9, 16:23, 26:9, 59:8, 64:17
**statement** [8] - 5:20, 5:24, 6:17, 6:19, 62:11, 67:10, 69:12, 71:16
**statements** [8] - 5:8, 5:12, 5:13, 34:7, 38:2, 38:4, 38:5, 38:24

**STATES** [1] - 1:1
**States** [3] - 1:5, 24:19, 24:21
**station** [1] - 68:11
**statues** [1] - 61:22
**statute** [5] - 24:19, 67:11, 68:20, 68:24
**statutes** [1] - 67:12
**stay** [1] - 72:13
**staying** [1] - 28:19
**stenography** [1] - 1:23
**step** [2] - 26:25, 64:19
**Steve** [2] - 12:2, 42:12
**Steven** [4] - 2:6, 2:11, 15:6, 15:9
**STEVEN** [3] - 1:14, 1:18, 2:2
**stick** [1] - 56:4
**still** [8] - 7:21, 7:24, 15:1, 28:17, 31:13, 37:2, 54:6, 68:11
**stipulated** [6] - 4:6, 4:22, 5:21, 7:23, 8:18, 48:3
**stipulation** [8] - 4:13, 5:3, 6:7, 6:22, 8:1, 9:7, 9:18, 10:7
**stipulations** [2] - 4:7, 9:2
**stop** [2] - 36:17, 42:22
**stopped** [2] - 29:14, 29:16
**storage** [1] - 44:2
**store** [38] - 5:18, 6:2, 6:8, 43:8, 44:10, 45:4, 46:10, 48:16, 60:8, 60:21, 60:25, 61:1, 61:3, 61:4, 61:15, 61:16, 62:7, 62:14, 62:16, 62:21, 62:23, 62:25, 63:3, 63:8, 65:8, 65:10, 65:11, 65:24, 66:12, 66:15, 69:2, 72:23, 73:4, 73:12, 73:14, 73:22, 73:24, 74:4
**stories** [4] - 45:18, 48:11, 53:16, 54:13
**story** [6] - 17:23, 43:2, 45:16, 46:6, 47:21, 56:4
**storying** [1] - 44:15
**street** [1] - 55:20
**Street** [2] - 1:19, 2:17
**stress** [1] - 51:6
**stressful** [1] - 30:23
**strip** [1] - 43:25
**strong** [2] - 25:19, 29:21
**students** [4] - 17:15, 60:9, 60:10, 60:11
**studio** [5] - 44:19, 60:8, 60:11, 60:23, 67:24
**stuff** [4] - 6:8, 35:10, 43:14, 54:19
**subject** [1] - 14:24
**submit** [2] - 75:12, 76:8
**submitted** [1] - 49:7
**subsequent** [1] - 64:12
**subsequently** [2] - 46:9, 55:21
**substance** [4] - 46:16, 52:16, 61:12, 68:7
**substances** [2] - 25:4, 68:9
**substantial** [1] - 54:25
**substantially** [1] - 30:25
**substitute** [1] - 37:14
**SUCCESS** [1] - 1:17
**Success** [1] - 2:12
**successful** [1] - 43:6

**sued** [4] - 26:13, 26:16, 72:18, 72:19    12
**sufficient** [1] - 31:15
**Suffolk** [2] - 29:3, 29:4
**suggests** [1] - 30:13
**Sultana** [2] - 13:13, 18:22
**summations** [2] - 39:3, 54:9
**sun** [1] - 9:19
**SUNITA** [1] - 1:3
**Sunita** [44] - 9:19, 12:3, 15:5, 24:23, 42:13, 43:1, 43:15, 44:21, 45:7, 46:15, 46:21, 47:7, 47:14, 48:15, 48:25, 50:1, 50:16, 50:24, 51:15, 52:20, 53:5, 53:24, 54:16, 56:7, 58:15, 59:1, 61:3, 62:20, 62:24, 63:2, 64:23, 64:25, 67:15, 69:7, 70:6, 72:5, 72:8, 72:25, 74:4, 74:6, 74:15, 74:18
**Sunita's** [2] - 44:3, 51:13
**supervisor** [1] - 72:3
**supplement** [1] - 5:25
**supplied** [1] - 68:25
**support** [1] - 74:23
**supports** [1] - 7:14
**supposed** [2] - 36:11, 37:13
**Surender** [14] - 44:12, 44:13, 44:15, 45:13, 47:4, 47:21, 47:24, 49:16, 53:7, 53:25, 65:4, 65:6, 71:24
**surrendered** [1] - 49:8
**swear** [1] - 13:19
**swift** [1] - 67:7
**Sworn** [1] - 13:22
**Sydnie** [1] - 13:4
**synthetic** [5] - 45:13, 47:3, 49:19, 53:2, 66:2
**Syosset** [2] - 49:17
**system** [4] - 50:9, 67:7, 68:11, 71:24

## T

**talks** [2] - 46:3, 56:21
**teach** [2] - 17:17, 17:18
**team** [2] - 15:7, 15:16
**technical** [1] - 19:16
**technically** [1] - 7:24
**telephone** [1] - 52:12
**television** [1] - 50:21
**teller** [3] - 44:3, 46:23, 50:8
**ten** [1] - 33:12
**ten-minute** [1] - 33:12
**tenancy** [2] - 10:9, 10:10
**tend** [3] - 16:7, 16:10, 42:21
**term** [1] - 10:10
**terms** [4] - 7:17, 7:25, 10:2, 38:8
**testified** [3] - 6:16, 8:6, 23:6
**testifies** [1] - 52:10
**testify** [18] - 6:5, 6:8, 10:19, 56:3, 64:10, 65:20, 66:8, 67:13, 67:22, 68:15, 70:5, 71:5, 71:8, 71:9, 71:22, 73:2, 73:13, 73:15
**testifying** [1] - 39:12

A-169

testimony [38] - 5:6, 5:11, 5:17, 5:21, 5:25, 6:14, 19:20, 23:2, 24:10, 24:12, 24:13, 25:23, 26:1, 27:21, 28:8, 28:23, 29:7, 35:6, 35:8, 37:16, 37:17, 37:19, 41:4, 41:11, 41:16, 41:17, 42:5, 42:8, 48:15, 49:3, 50:3, 53:5, 53:8, 58:14, 60:1, 60:2, 62:20, 67:2

THE [130] - 1:11, 1:14, 1:19, 2:4, 2:5, 2:14, 2:22, 3:11, 3:16, 3:20, 4:2, 4:11, 4:18, 4:21, 5:2, 5:13, 5:24, 6:6, 6:25, 7:7, 7:16, 7:22, 8:2, 8:12, 8:17, 9:12, 10:5, 10:13, 10:16, 10:24, 11:8, 11:12, 11:18, 11:21, 11:23, 12:1, 12:20, 13:19, 13:21, 13:24, 13:25, 15:11, 15:23, 17:1, 17:5, 17:8, 17:17, 17:21, 18:4, 18:6, 18:9, 18:12, 18:25, 19:3, 19:8, 19:10, 19:14, 19:23, 19:25, 20:3, 20:6, 20:9, 20:14, 20:18, 20:22, 21:1, 21:5, 21:7, 21:9, 21:13, 21:18, 21:21, 21:25, 22:7, 22:12, 22:14, 22:17, 22:20, 22:25, 23:4, 26:14, 26:16, 26:21, 26:24, 27:1, 27:4, 27:8, 27:17, 27:19, 27:24, 28:2, 28:5, 28:7, 28:11, 28:14, 28:18, 28:22, 29:1, 29:4, 29:9, 29:12, 30:20, 30:25, 31:3, 31:6, 31:10, 31:14, 32:1, 32:3, 32:6, 32:10, 32:16, 32:17, 32:21, 32:24, 33:1, 33:8, 33:11, 34:3, 40:3, 41:6, 41:12, 41:17, 41:21, 41:23, 42:2, 55:5, 76:13, 76:19, 76:22

themselves [2] - 38:5, 69:23

therefore [4] - 5:3, 16:16, 48:16, 60:4

thinks [1] - 25:14

Third [4] - 62:2, 62:3, 69:9, 70:18

third [4] - 10:24, 10:25, 63:21, 68:6

thousand [1] - 66:5

three [10] - 4:16, 5:8, 5:11, 5:13, 5:14, 5:18, 11:13, 43:3, 66:25, 73:1

throng [2] - 50:21, 53:1

throughout [4] - 31:20, 35:16, 43:20, 50:1

tickets [2] - 29:16, 31:24

tied [1] - 71:2

timing [1] - 17:21

tin [1] - 66:6

Tiscione [6] - 2:6, 12:2, 42:15, 42:22, 59:9, 75:3

TISCIONE [2] - 1:14, 2:2

Tiscione's [1] - 53:10

TO [1] - 68:19

today [5] - 11:9, 12:3, 12:9, 16:4, 55:21

together [4] - 44:21, 45:20, 52:24, 56:5

tomorrow [5] - 11:6, 39:1, 76:15, 76:17, 76:22

tone [1] - 42:21

ToniAnn [1] - 1:22

ToniAnnLucatorto@gmail.com [1] - 1:23

took [5] - 23:20, 49:12, 65:1, 66:16, 72:15

totally [2] - 14:21, 29:4

touch [1] - 49:11

town [1] - 60:16

trade [1] - 44:4

traditional [2] - 5:15, 43:11

traffic [1] - 29:16

train [2] - 16:9, 16:11

trained [2] - 64:16, 65:25

training [2] - 56:22, 72:23

TRANSCRIPT [1] - 1:14

Transcript [1] - 1:24

transcript [2] - 37:18, 37:25

Transcription [1] - 1:24

transportation [2] - 16:9, 16:12

transported [1] - 50:5

treat [3] - 27:24, 28:23, 29:9

TRIAL [1] - 1:14

trial [45] - 2:7, 3:23, 3:25, 5:6, 5:7, 5:10, 5:16, 5:22, 6:15, 12:3, 12:7, 16:1, 16:5, 16:6, 16:7, 16:15, 17:5, 17:9, 19:16, 24:1, 25:22, 31:15, 32:11, 32:14, 34:2, 34:5, 35:24, 36:2, 36:10, 41:4, 41:11, 41:13, 41:15, 42:3, 42:6, 42:8, 42:14, 53:20, 54:10, 57:8, 57:9, 71:13, 73:16

Trial [1] - 76:24

trials [1] - 57:10

tried [1] - 63:11

trivial [1] - 31:23

trouble [1] - 72:13

true [3] - 32:10, 73:16

try [8] - 14:2, 16:7, 24:4, 34:14, 34:21, 35:15, 42:20, 45:17

trying [1] - 46:18

tubs [2] - 61:11, 66:4

Tuesday [1] - 76:24

turn [3] - 34:6, 61:13, 69:10

turned [1] - 71:21

TV [2] - 57:8, 58:3

two [19] - 2:15, 4:14, 5:23, 6:12, 11:24, 17:3, 17:6, 17:9, 17:14, 17:22, 43:3, 47:13, 52:1, 52:24, 53:11, 56:9, 73:5

Twomey [22] - 12:4, 15:12, 48:8, 52:13, 55:14, 64:9, 64:10, 65:19, 65:23, 65:24, 66:8, 66:14, 66:19, 66:21, 67:3, 68:25, 69:20, 73:6, 73:7, 73:10, 74:4

TWOMEY [1] - 1:11

Twomey's [3] - 55:17, 69:20, 70:3

type [2] - 65:3, 67:6

type-written [1] - 65:3

typed [1] - 69:20

types [2] - 43:12, 50:13

typical [1] - 50:12

**U**

ultimate [2] - 11:19, 52:19

ultimately [2] - 7:2, 45:12

unable [1] - 23:13

unanimous [1] - 11:20

unavoidable [6] - 16:19, 18:7, 18:13, 20:7, 27:1, 32:17

uncomfortable [1] - 14:13

uncontested [1] - 45:9

under [8] - 7:15, 9:7, 10:9, 41:5, 48:2, 52:22, 75:3, 75:18

understood [1] - 18:25

unfortunately [1] - 17:21

unit [3] - 48:9, 55:20, 55:23

UNITED [1] - 1:1

United [3] - 1:5, 24:19, 24:21

unjust [1] - 9:9

unless [2] - 20:19, 34:8

unlike [1] - 57:23

unquote [1] - 48:16

up [31] - 4:11, 7:16, 14:15, 20:5, 26:25, 34:19, 35:9, 41:9, 45:9, 47:7, 48:5, 49:2, 49:13, 49:21, 52:16, 53:14, 53:21, 54:8, 63:11, 63:22, 64:7, 66:7, 67:6, 67:11, 67:23, 68:10, 69:20, 72:1

upstairs [8] - 47:7, 47:23, 61:14, 61:23, 62:25, 63:13, 63:18, 66:10

uses [1] - 61:14

**V**

valid [14] - 6:17, 6:18, 6:23, 7:1, 7:9, 8:3, 8:9, 8:10, 8:21, 10:17, 10:18, 10:20, 65:18, 65:21

variety [1] - 43:11

vegetative [2] - 61:11, 66:4

verdict [6] - 11:20, 30:14, 37:8, 41:14, 42:4, 52:20

versus [2] - 8:25, 31:4

vicinity [1] - 23:20

victim [1] - 29:20

VICTORIA [1] - 1:21

Victoria [3] - 2:19, 15:22, 55:10

view [1] - 7:13

village [1] - 60:16

violated [3] - 24:24, 68:22, 68:24

violation [2] - 67:11, 68:19

vision [1] - 18:17

**W**

W-I-T [1] - 68:19

waiting [1] - 16:15

waiver [1] - 71:6

walked [2] - 61:15, 61:17

walks [1] - 39:22

wants [6] - 4:8, 4:15, 11:5, 52:23, 52:25, 70:25

waste [1] - 34:24

Water [1] - 60:8

water [6] - 60:12, 60:14, 60:20, 62:8, 62:10, 62:14

water's [1] - 60:23

ways [1] - 55:25

wear [1] - 42:20

A-170

Case 2:18-cv-04625-ST    Document 131-2    Filed 11/13/24    Page 90 of 90 PageID #: 1431

14

**wearing** [1] - 42:19
**wedding** [3] - 44:6, 44:23, 51:5
**Wednesday** [1] - 31:24
**week** [8] - 11:2, 16:2, 16:3, 18:7, 20:7, 27:2, 32:14, 32:18
**weekday** [1] - 16:5
**weekend** [1] - 4:4
**weeks** [5] - 17:3, 17:6, 17:10, 17:14, 17:22
**Weinstein** [1] - 13:5
**West** [2] - 1:19, 2:17
**whole** [4] - 8:17, 9:20, 21:2, 32:12
**wholesale** [1] - 61:25
**wife** [1] - 48:20
**wife's** [1] - 28:4
**willing** [1] - 6:24
**Williston** [5] - 43:24, 60:9, 60:15, 60:17, 62:3
**winds** [1] - 47:7
**winter** [1] - 17:23
**Wit** [1] - 68:18
**wit** [1] - 68:22
**witness** [15] - 3:9, 3:19, 23:2, 23:6, 26:4, 27:25, 28:12, 28:24, 29:10, 34:11, 34:12, 35:8, 38:6, 38:12, 39:1
**witnesses** [15] - 6:4, 6:8, 19:17, 22:25, 25:23, 28:12, 28:24, 29:10, 36:1, 38:7, 39:2, 39:9, 52:8, 56:2, 56:3
**witnesses'** [1] - 39:11
**woman** [3] - 50:7, 65:10, 74:16
**wonky** [1] - 16:10
**word** [8] - 5:23, 53:8, 53:11, 56:11, 56:12, 59:15, 59:16, 68:7
**words** [3] - 56:9, 56:10, 67:9
**works** [2] - 3:5, 18:1
**write** [1] - 7:16
**written** [8] - 36:16, 37:24, 54:20, 62:11, 65:3, 68:10, 68:22, 68:24

### Y

**year** [1] - 31:20
**years** [5] - 64:10, 64:12, 64:15, 67:8, 69:1
**yesterday** [1] - 4:25
**yo** [1] - 28:5
**YORK** [2] - 1:1, 1:17
**York** [15] - 1:5, 1:20, 2:13, 2:17, 7:15, 10:9, 23:21, 27:16, 43:21, 43:23, 48:2, 52:22, 65:10, 67:5, 74:16
**young** [1] - 46:1
**younger** [1] - 20:12
**yourself** [2] - 15:7, 15:15

A-171

45

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
SUNITA SHAH,

                              :  18-cv-4625
                                (ST)
      Plaintiff,

                              :  United States Courthouse
  -against-                    Central Islip, New York

DETECTIVE JOHN LISTON,
individually, POLICE OFFICER
ANDREW MARTONE, individually,
POLICE OFFICER MICHAEL KENNEY,
individually, DETECTIVE DAVID
TWOMEY, individually, and
THE COUNTY OF NASSAU,

                              :  December 12, 2023
          Defendants.      10 a.m.
-------------------------------X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE, and a jury.


APPEARANCES:

For the Plaintiff:       STEVEN J. HARFENIST, ESQ.
                       Harfenist Kraut & Perlstein
                       3000 Marcus Avenue
                       Lake Success, New York 11042


For the Defendants:      RALPH REISSMAN, ESQ.
                       VICTORIA LAGRECA, ESQ.
                       Nassau County Attorney Office
                       1 West Street
                       Mineola, New York 11501


Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
Ph. (631) 712-6106       100 Federal Plaza - Suite 1180
Fax (631) 712-6122       Central Islip, New York 11722
        Proceedings recorded by mechanical stenography.
          Transcript produced by CAT.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

A-172

46

(Trial continues.)

THE COURT:  Good morning.

COURTROOM DEPUTY:  The Court is now in session. The Honorable Steven Tiscione presiding.  Civil cause for jury trial, Shah v. Liston, et al., Docket No. 18-CV-4625.

Counsel, please state your appearances for the record, beginning with the plaintiff.

MR. HARFENIST:  Steven Harfenist for the plaintiff.  Good morning, Judge.

THE COURT:  Good morning.

MR. REISSMAN:  Ralph Reissman for defendants, your Honor.

MS. LaGRECA:  Deputy County Attorney Victoria LaGreca also on behalf of the defendants.

Good morning.

THE COURT:  Good morning, everyone.

Some housekeeping matters.  We got a phone call from one of the jurors this morning, and it's Juror Number 3, I believe.

COURTROOM DEPUTY:  Yes.

THE COURT:  She's apparently too sick to come in today.  Given how short this trial is and the fact that we have two extra jurors, my inclination is to just excuse her and move forward, but if anybody has any strong objection to that.

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 3 of 274 PageID #: 1434

47

No?

MR. REISSMAN:  No objection from defendant, your Honor.

MR. HARFENIST:  If the case was going to be longer, I would think we'd have to consider it.

THE COURT:  Well, if the case was going to be longer, I would have picked more alternates, I guess.

Not really alternates, but just extra jurors.

MR. HARFENIST:  Right, exactly.

THE COURT:  So we'll excuse Juror Number 3 and move forward with the remaining seven.

I see that plaintiff filed a motion in limine regarding some statements that were made in the opening of defense about, I guess this would have been statements made by fire department personnel to one or more of the police officers.

Mr. Reissman, what's the basis for that?

MR. REISSMAN:  That was Mr. Harfenist's motion.

THE COURT:  Yes, but you were the one that made the statements in your opening.

MR. REISSMAN:  Yes.

THE COURT:  So what's the expected testimony regarding this?  Because I've never heard it before.

MR. REISSMAN:  Well, Judge, you mean, you're talking about the last trial?

A-174

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 4 of 274 PageID #: 1435

48

THE COURT:  I'm talking about the last trial, the depositions, the interrogatory responses.

MR. REISSMAN:  Yes.  Well, you know, basically under the collective knowledge doctrine, officers can share information with each other and come to a conclusion as to the next step or steps in the case.

THE COURT:  Okay.

MR. REISSMAN:  All the officers testified that they relied on one another in sharing information which led to the ultimate decision to arrest Ms. Shah.

In my opening in the first trial at page 21, I said the following:  In addition to the defense of probable cause, I will ask you to find that the defendants are entitled to something called qualified immunity. Qualified immunity is a legal doctrine that protects officers from civil liabilities in the case where there was a reasonable cause to believe that a crime had been committed.  However, even if you find that probable cause did not exist on October 4th, 2017, the law is that if you find a reasonably competent officer that he reasonably believed a crime was qualified, qualified immunity applies.  Further, under probable cause you can find that officers of reasonable competence could disagree about whether probable cause existed, qualified immunity must apply.

Marie Foley, RMR, CRR
Official Court Reporter

A-175

49

And then I said:  Now, you will see the charging instruments.  That's a fancy word for the three typewritten complaints.  These were created by Detective Kathleen Reed, and she will testify that she created them based on the collective knowledge of the defendant officers.

And then in my closing at page 454, line 13, and I have it right here -- I'm sorry.  I will get it in two seconds.

(Pause.)

MR. REISSMAN:  454, that was my closing argument:  Officer Kenney, and indeed, all the defendants, testified that they did not know who made the decision to arrest plaintiff, but the Judge will instruct you that due to the complex nature of modern police work, the knowledge of one officer can be imputed or shared with the other officers.  This is called the collective knowledge doctrine.  The Judge will instruct that you Officers Kenney, Martone, Detective Liston and Detective Twomey shared their knowledge.

So, plaintiff is fully aware that in the first trial I relied on the defense, or the concept of collective knowledge doctrine, and that's why I stated it in my opening yesterday.

THE COURT:  I have no problem with the

50

collective knowledge doctrine.  But what's missing from that description is any suggestion that there was going to be testimony that the officers heard from fire department personnel that the plaintiff was the owner of the store. That's a huge difference from the testimony that happened at the first trial.

MR. REISSMAN:  Well, the officers -- I can't remember specifically.  I know that Officers Kenney, Martone arrived on the scene first.  I believe they testified that members of the fire department told Officer Kenney and Martone that the Shahs were the key holders. And I think they will testify, and you could ask them now if you want out of the hearing of the jury, whether either Officer Kenney or Martone, was told by any member of the fire department that the Shahs were the owners.  But they were told that the Shahs were the key holder.  That is for certain.  And Mr. Harfenist was very interested in the word "key holders," and that came up many times in the first trial.

So I'm not saying fire department officials or firemen are part of the police department, and that the collective knowledge doctrine encompasses conversations between the fire department and the officers.  That's not the case.  Collective knowledge doctrine holds that officers can share information.

Marie Foley, RMR, CRR
Official Court Reporter

A-177

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 7 of 274 PageID #: 1438

51

In this case, either Kenney, Martone, or both, will testify that they were told by members of the fire department that the Shahs were owners and key holder, and Officer Martone and Kenney shared that knowledge with Detective Liston, Detective Reed, and Detective Twomey.

And that's defendants' position.

THE COURT:  Okay.

Mr. Harfenist?

MR. HARFENIST:  Yes, Judge.  I think the Court put its finger on this is a very narrow issue with regard to one particular point.  In Mr. Reissman's opening statement, he indicated there were three bases for why there was probable cause.  I'll work backwards: that Sunita Shah handed a business card; that she handed the Surender Bhatty lease; and that they were told, that the police officers were told that she was an owner.  That's what he said.  I can read from the opening statement, if you like.

The problem with that is not only is there -- you're a hundred percent right.  There's no evidence presented ever in this case that the fire department had ever told anybody that they were an owner.  And I'm going to talk about the deposition of Chief Schnall in a second. It's three sentences I'm going to pull it up there because it really should end all of this.  But it's a huge quantum

52

leap to go from the whole key holder discussion to now say that well, we were told that she was an owner. That is coming out of the blue. It was never -- the Court's right, it was never raised at the prior trial. But let's talk about what makes it even worse.

In the summary of Officer Kenney's testimony in the pretrial order, and I'm reading from pretrial order that was filed on May 3rd, 2021. It's Docket No. --

THE COURT: Let me just stop you there. I'm not really concerned about the pretrial order. I'll tell you why.

The pretrial order is a very, very basic summary of testimony.

MR. HARFENIST: I'm with you.

THE COURT: I don't expect every single detail of someone's testimony to be included in the description in the pretrial order. So if the officer testifies about a specific statement, the absence of that in the pretrial order doesn't really concern me. It does concern me a little bit that it's never been mentioned at any other point in the discovery process.

MR. HARFENIST: In fact --

THE COURT: But the question I have is is that really a reason to preclude the testimony? If the officer wants to get on the stand and testify to a statement that

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 9 of 274 PageID #: 1440

53

he's never mentioned in any of the discovery responses, his prior deposition, or his prior testimony, and is contradicted by the deposition of the fire department who I assume you could call if necessary, I mean, shouldn't we let him do that?

MR. HARFENIST:  Well, I knew I was going to get that question yesterday because -- last night as I was filing the application because I think there is a distinctive line between whether or not it's something is subject to impeachment, which is what the Court's talking about, and whether it should necessarily be precluded.

First off, I agree with the Court that it's -- that most instances, this would just be fodder for impeachment.  I mean, the interrogatory response is fine. Yes, is it cumbersome having to go through depositions and a prior trial testimony necessarily to find it?  We had a conference earlier last week when we -- under 804(b)(1) I can simply just read the -- his prior testimony and not -- and avoid the cumbersomeness of the impeachment.

Here's the problem though, and I think the Court put its finger on it.  I don't think I can -- I'd like to show you what -- what the fire department Chief Schnall testified about his conversations with the police department.  It's two sentences and it will really just take a second.  Let me just pull it up here so everybody

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 10 of 274 PageID #: 1441

54

can see it.

THE COURT:  Sure.

MR. HARFENIST:  I don't think I can get chief -- he's not a -- Williston Park Fire Department, they're not employed by the County of Nassau.  They're non-parties.  I don't know if I can get him.

THE COURT:  You can't subpoena him?

MR. HARFENIST:  I'm trying to do it right now because I had a feeling this was what you were going to say.  I don't know if I can get him, and if we can't get him, we cross the line from impeachment to prejudice because if I would have known about this at the last trial or the -- or even in the interim, I would have to speak to the guy.  Because the testimony's great for me.  Wait until you see what he says.  He says he never spoke to anybody about it, telling anyone who the key holder was.

And quite frankly, I didn't have him listed on the pretrial order because when I saw what the County was putting in, in my view, it was a non-issue, especially in light of the stipulation.

So, this was from the deposition, Laurie, what date was this deposition taken?

MS. MOLLER:  June 12th, 2019.

MR. HARFENIST:  And this is what he said:

Have you ever heard the term:  Key person?

A-181

55

ANSWER:  Key holder.

Have you ever used that term:  Key holder?

ANSWER:  On homes, yes.

What does key holder mean to you?

ANSWER:  Someone available that has a key to enter the house or business.

QUESTION:  Did you ask for a key holder?  No.

To your knowledge, did anyone in the Williston Park Fire Department ask for a key holder?

No.

The next door neighbor called someone, and that person showed up, and we don't know if that person is a male or female, and that person opened the door?

ANSWER:  Yes.

That's the problem, Judge.  This is great testimony for me.  It contradicts everything the police officers have been saying from day one.  They never even asked for the key holder to come here.  So how can they be permitted to testify that not only did someone from the fire department tell them that they were an owner when the direct testimony from the witness says they never even told them that they had access to the building?  They never called them?  And that's consistent if you went back in the testimony as to how Rajesh Shah said he arrived. He said he got a call from Mr. Waters.

Marie Foley, RMR, CRR
Official Court Reporter

A-182

56

So yes, if I could get him in to testify, then I think the prejudice would necessarily be ameliorated.

THE COURT: Frankly, I'm surprised you didn't in the last trial, because while they didn't say anything about the owner last time, I do think there was some testimony about them being key holders.

MR. HARFENIST: They did, but I -- I chose not to call them the last time, having looked at the -- let's put it this way. There's inconsistency about who is a key holder and what a key holder was, I didn't feel like I needed to muddle the water anymore. I felt it was pretty clear that merely being a key holder doesn't mean you have dominion and control. Two of the officers testified to that. So in my view, sometimes you choose to make it -- sometimes less is more.

MR. REISSMAN: Well, Judge, I think it --

THE COURT: Did you ask any questions of this witness about what, if anything, was told to the police officers when they arrived?

MR. HARFENIST: According to him, he says nobody -- well, he says nobody spoke to the police officers about who was the, quote/unquote, key holder to the property. I do know that there were conversations between Chief Schnall and some of the police officers after they got there about going into the basement and

Marie Foley, RMR, CRR
Official Court Reporter

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 13 of 274 PageID #: 1444

57

subsequently what they found.

Now, you have to remember, Judge, that from the -- the way the testimony plays out is that the fire department and Rajesh Shah went into the basement before the police ever even arrived. So they obviously would -- there's testimony there was communication between Schnall and the police officers as to what they say, which would be perfectly logical to have had that conversation. I would be more concerned if there wasn't that conversation because then you got to worry about what he's doing.

But this is my problem. And if I could get him here, yeah, I mean, but I don't know if I can.

MR. REISSMAN: Judge, may I respond?

THE COURT: Sure.

MR. REISSMAN: Okay.

Well, first of all, I think everybody will agree, and the officers will testify if necessary, that there was more than one member of the Williston Park Fire Department at that scene. Detective Schnall was not the only fire department employee at the scene. And the officers are free to testify that they either spoke to Chief Schnall or another member of the fire department. So the fact that Mr. Harfenist has chosen to depose only Chief Schnall from the Williston Park Fire Department and did not call him at the first trial as a witness does not

*Marie Foley, RMR, CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 14 of 274 PageID #: 1445

58

prejudice or contradict the fact that these officers are going to testify that they spoke to one or more members, if not Chief Schnall, other members of the Williston Park Fire Department.  And the officers will testify that they were told by unidentified members of the Williston Park Fire Department that the Shahs were the owners.

THE COURT:  And that's my problem right there.

MR. HARFENIST:  Me too.

THE COURT:  Unidentified members of the fire department that have never previously been mentioned, how is plaintiff's counsel supposed to rebut that?

MR. REISSMAN:  He's supposed to rebut it by doing his work before trial.

THE COURT:  Yeah, but he can't do the work before trial because this was never mentioned before trial.  If your officers had testified in a deposition that they spoke to members of the fire department and were told that Ms. Shah was an owner, I guarantee you he would have called other people from the fire department for deposition.  But they didn't.

MR. REISSMAN:  Okay.

THE COURT:  And you can't come up now on the eve of trial and say Oh, they're going to come up with a completely new line of testimony that was never revealed in any discovery, that plaintiff counsel will have no

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 15 of 274 PageID #: 1446

59

opportunity to rebut because he wasn't prepared for it because it's never been mentioned before.

MR. REISSMAN:  Well, Judge, the only thing I can say to that is that, number one, another member of Mr. Harfenist's office took the depositions of the officers. If he wanted to ask the officers those questions, he was certainly free to do so.

Number two --

THE COURT:  You had a summary judgment motion in this case, did you not?

MR. HARFENIST:  Correct.

MR. REISSMAN:  Correct.

THE COURT:  One of the key issues in that summary judgment motion was whether or not Ms. Shah was an owner of the business.

Did you mention any evidence whatsoever about a conversation between the fire department and the officers in which she was identified as an owner?

MR. REISSMAN:  I don't recall what I argued in the motion.

THE COURT:  No.  The answer is no.  I reviewed it.

MR. REISSMAN:  But I can say this, and I will ask for your Honor's ruling.  Whatever happened at the last trial, the officers testified, and Mr. Harfenist did

A-186

60

not call Chief Schnall.  We are now at a new trial.  If your Honor or Mr. Harfenist believes the officers testify now inconsistently with either their deposition testimony or their prior testimony at trial, he can question them and he can impeach them.  This is a new trial with new evidence before a new jury.  Let the officers say what they want.  Mr. Harfenist is free to say:  Well, Officer X, did you ever say in deposition that you were told they were owners?  I don't know, maybe yes, maybe no.  At the prior trial, were you ever asked or did you ever say the fire department told you they were the owners?  Well, we'll see what the officers say.

This is a new trial with a new jury.  Mr. Harfenist is free to impeach them with their prior testimony at deposition or their prior testimony at trial.  But this is a new trial where the officers are testifying before a new jury, and as in any case, Mr. Harfenist is free to impeach them with their prior testimony in deposition or trial.

MR. HARFENIST:  Judge, two more quick things, because -- can we pull up another page in here?  Because this sort of really focuses -- look at line 25:  As we sit here today -- and this was a deposition that was conducted by my colleague.

(Reading) As we sit here today, do you have any

*Marie Foley, RMR, CRR*
*Official Court Reporter*

A-187

61

recollection of conversations with Officer Kenney at the scene?

ANSWER:  No.

I mean, what am I supposed to do with that at this point?

MR. REISSMAN:  What you're supposed to do is call the other members of the fire department.

MR. HARFENIST:  You don't even know who they were.

MR. REISSMAN:  Well, that's your problem.

MR. HARFENIST:  Well, how about identifying them somewhere.

MR. REISSMAN:  How about you call your witnesses and say oh, we have members of the fire department who did or did not talk to the officers.  That was your job in discovery.  And it's your job now to subpoena anybody you want to come to trial, including Chief Schnall or any other members of the fire department.

I doubt whether the officers, and you're free to ask them, Do you know who Chief Schnall is?  I don't know.  Did you talk to Chief Schnall?  I don't know.  Did you talk to any members of the fire department?  Yes, I did.

MR. HARFENIST:  How am I supposed to do that now?

MR. REISSMAN:  You're supposed to be prepared.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 18 of 274 PageID #: 1449

62

MR. HARFENIST:  I'm quite prepared, Ralph.

Let's look at interrogatory response number 3: State whether any Nassau County Police Department member had any conversation on October 4th, 2017 without any member -- with any member of the Williston Park Fire Department in reference to the property and its contents. If the answer is in the affirmative, identify the member of the Nassau County Police Department who had the conversation, and, B, the member of the Williston Park Fire Department who had the conversation and provide the sum and substance of the conversation.

Response:  When Officers Kenney and Martone responded to the location, Fire Chief Schnall requested a key holder to respond to the location.  A short time later, Rajesh and Sunita Shah arrived at 120 Hillside Avenue.

There's no mention about a discussion about an owner.  There's no mention about that they even talked to any other members of the fire department.  How are we supposed to depose all these people?  If someone had said, and quite frankly, when you took Schnall's deposition, he's basically saying I'm the only one who spoke to them, why would you think to go any further?

What they're basically trying to do, Judge, is push their obligation on us.  And you said it before, and

A-189

63

I'm going to say it more bluntly, they're changing their story now.  That's what they're doing.  They're changing the story because they know how it went the last time.

MR. REISSMAN:  This is a new trial, Judge.  I'm allowed to present any evidence I want --

THE COURT:  Stop.

MR. REISSMAN:  -- and he's allowed to impeach any witness he wants.

THE COURT:  Stop.

Look, fundamentally, that's really the question is, I mean, I can't preclude them from changing their testimony.  If they want to change their testimony --

MR. HARFENIST:  They do that at their own peril.

THE COURT:  Yeah, they do that at their own peril.

So the question here is if they do testify in a way that is inconsistent with all of the previous responses, both in discovery and deposition as for the prior trial testimony, how can you impeach them?  And obviously if you could call the fire department chief, that would probably be the best rebuttal to that.

MR. HARFENIST:  As soon as I heard that yesterday, that's the first thing I did.

THE COURT:  However, if you cannot get him for trial, what about introducing his deposition testimony as

A-190

64

a substitute in addition to whatever other supplemental questions you plan to impeach the officers with?

MR. HARFENIST: I mean, I could do that. It's technically not admissible because he's a non-party.

I mean, I guess the Court could fashion some form of compromise under Rule 37 and Rule 26.

THE COURT: Well, it's not admissible unless the other side consents.

MR. HARFENIST: Correct.

MR. REISSMAN: I do not consent, your Honor. He should have done his homework. He should have called Schnall at the first trial. He should have called Schnall at the second trial.

My officers will testify that they spoke to members of the fire department, they don't know them by name. But they're allowed to testify now. And he's allowed to say, "Are you sure? You didn't mention that in your deposition. You didn't mention that in the other trial." And leave it to the jury who's telling the truth. That's why the jury is here, to determine credibility.

MR. HARFENIST: Civil trials are not trial by surprise. You said it when you first walked in and took the bench, Judge, this theory is nowhere until yesterday.

MR. REISSMAN: I spoke about it in my opening and my closing in the prior trial.

A-191

65

MR. HARFENIST:  There was no evidence that was produced during the prior trial about conversations, Ralph, with any of the members of the fire department.  I read the transcript.  It didn't say it.  They all testified they didn't know who told them.

MR. REISSMAN:  Then ask them now.

MR. HARFENIST:  But I shouldn't have to.

MR. REISSMAN:  Yes, you have.  It's your trial.  It's a new trial.  You chose to retry this case.  I didn't.  You have an obligation to prove by a preponderance of the evidence that your client was not arrested with probable cause.

MR. HARFENIST:  I agree.

MR. REISSMAN:  And part of our argument, which I made in the prior trial, was that the collective knowledge doctrine among police officers applies.  And you can ask them whether they spoke to any members of the fire department, not just Chief Schnall.

And if you want to call Chief Schnall, that's your problem.  I'm not consenting.

MR. HARFENIST:  Judge, I stand by the argument and the Court's initial inclination on this.  This is trial by ambush.

MR. REISSMAN:  This is a new trial.  You had a year to prepare for this new trial.  If you wanted to get

*Marie Foley, RMR, CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 22 of 274 PageID #: 1453

66

Chief Schnall in, you should have moved a year ago to add to your witness list or your deposition testimony.  You can't do that now.  That was your choice a year ago.  We had this trial in November 2022.  This is a year later.  You could have fashioned your defense by calling Chief Schnall.

MR. HARFENIST:  You're right.

MR. REISSMAN:  And you could even have had a deposition, another deposition with Chief Schnall.

THE COURT:  The point that you're missing though is that there was no reason to call Chief Schnall at the last trial because his testimony didn't exist.  You're now introducing new testimony that plaintiff has a necessity to rebut and impeach using Detective Schnall, which didn't exist in the last trial because that testimony was never introduced.  So it's different.  It's not -- you can't just say oh, it's been a year since the last trial, because this is new.  This is not something that was brought up in the last trial.

MR. HARFENIST:  And, you know, on the other side of the coin, if they knew they were going to do this within the last year, they should have amended their discovery responses and told them, By the way, let me tell you what's going to happen.

But I found out about this yesterday and I did

67

something about it I as soon as I heard.  I moved to subpoena Schnall and I raised the issue with the Court.

It's trial by ambush.  That's it.

MR. REISSMAN:  That's baloney.

MR. HARFENIST:  There's no other way, necessarily, to describe it.

MR. REISSMAN:  Yes, there is.

MR. HARFENIST:  And if you go back and you look, and I did last night, to go back and look at how the testimony would have came out from these officers, the way they answered it, there wouldn't have even been a reason to ask them, Well, who else from the fire department did you talk to, because once they said they didn't speak to anybody, I mean, cardinal rule, get a good answer, leave it alone.  So this testimony needs to be precluded, or, I mean, and I dread to say this 'cause I think is that we get a mistrial and they can amend whatever they want and I'll start taking discovery on this issue.  I mean, because those are the, in my view, the only two alternatives that are not prejudicial to the plaintiff.

MR. REISSMAN:  What's prejudicial to the plaintiff is your lack of preparation.  You could have called Officer Schnall at any time during the year if you had any qualms about my statements at the last statement about the collective knowledge doctrine.

Marie Foley, RMR, CRR
Official Court Reporter

68

THE COURT:  That's not -- the problem is not -- your statements about collective knowledge have nothing to do with this.  Nobody's disputing the collective knowledge doctrine.  Nobody's saying that the officers can't share information.

The problem is they're sharing information with a fire department personnel who was never identified, and this is the first time that anyone's hearing that they got this information from a fire department personnel who's not identified.  So it's not even like plaintiff can go out and subpoena the person that they allege made the statement.

MR. REISSMAN:  If he wanted to ask the officers at the deposition.

THE COURT:  There's no reason to ask them because they'd never mentioned it before.  You can't sandbag him with this.

MR. REISSMAN:  He had opportunities to depose these officers again and again and again.

THE COURT:  They've also testified.  Why did nobody ever mention this before?  This was a key issue in the trial and nobody's ever thought to mention this before?  Why didn't you ask them the question during their direct testimony in the last trial?

MR. REISSMAN:  I believe --

Marie Foley, RMR, CRR
Official Court Reporter

69

THE COURT: Is this not a key issue in the trial?

MR. REISSMAN: Absolutely.

MR. HARFENIST: It's the whole case.

THE COURT: So how did you not ask the question the last time?

MR. REISSMAN: Because I asked the officers what did you do, what did you see, who did you talk to.

THE COURT: And how many years after the fact they suddenly remember that they talked to somebody from the fire department?

MR. REISSMAN: Well, why didn't Mr. Harfenist ask them on the stand and then say --

THE COURT: Why did they suddenly remember this five years later after a first trial that they lost, or almost lost?

MR. REISSMAN: He's free to ask them that, your Honor, and he can say --

THE COURT: I'm not putting them on the stand if I think they're going to perjure themselves.

MR. REISSMAN: They're not going to perjure themselves. Put them on the stand right now.

THE COURT: I'd like to. Put them on the stand. I'd like to hear them outside the presence of the jury.

MR. REISSMAN: Okay.

Marie Foley, RMR, CRR
Official Court Reporter

A-196

70

Officer Kenney, come to the stand.

Would you like to question him on your own, your Honor?

THE COURT:  No.

MR. REISSMAN:  Would you like me to question him?

THE COURT:  I'd like you to elicit direct testimony about this statement.

Is this the only witness who's going to make it?

MR. REISSMAN:  No, Officer Martone is also going to make it.

THE COURT:  So you have two officers who are suddenly remembering something, okay.

MR. REISSMAN:  How would you like me to proceed, your Honor?  Would you like me to question the witness?

THE COURT:  Yes.

MR. REISSMAN:  Okay.

(Witness takes the witness stand.)

COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Michael Kenney, M-I-C-H-A-E-L K-E-N-N-E-Y.

COURTROOM DEPUTY:  Please stand and raise your right hand.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

A-197

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 27 of 274 PageID #: 1458

*Kenney - Direct/Reissman*

71

MICHAEL KENNEY,

     called by the Defense, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. REISSMAN:

Q.   Officer Kenney, on October 4th, 2017, were you employed by the Nassau County Police Department?

A.   Yes.

Q.   And did there come a time you responded to the location known as 120 Hillside Avenue in Williston Park?

A.   122, yes.

Q.   122.

     And that was the karate store?

A.   Yes.

Q.   And why was the reason you responded?  What were you told?

A.   We responded for a radio assignment for an odor of gas emanating from that location.

Q.   And when you arrived, what did you see, and what did you do?

A.   We arrived to the karate studio and we were met by multiple members of the fire department and we entered the karate studio along with the owner of that location.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

A-198

*Kenney - Direct/Reissman*

72

Q.   Do you remember specifically any names -- well, let me ask you this.

Approximately how many members of the fire department did you observe there?

A.   There were several members, at least one or two trucks.  I don't know if the fire marshals were there at that point either, but I know that there were fire marshals there too.

Q.   Can you explain to the Judge the difference between a village or town fire department and the Nassau County Fire Marshal?

A.   So, the village or town fire department are generally volunteer firefighters who live and are employed through their local municipality.  The Nassau County fire marshals are employed through Nassau County and they enforce different code violations and assist with investigations related to odors of gas or fires or anything along those lines.

Q.   Thank you.

Is it the practice that -- it's your understanding when a local village fire department composed of volunteer firefighters report a fire either to the police or to the fire marshals that the Nassau County Fire Marshals Office shows up at the scene?

A.   It depends on the scene.  It's very fluid.

*Kenney - Direct/Reissman*

73

For, I guess, an odor of gas, the fire marshals, from my understanding, and I don't want to speak to their scope of employment, but they do listen to their radio. If they feel it's something necessary to respond to, they will respond to that location.

Q.   Do you recall members of the Nassau County Fire Marshals Department being there at that time and date?

A.   At that point, I don't recall if they were there yet. But they were at that scene as well.

Q.   When you arrived at the scene, you saw multiple members of the volunteer fire department and at least two fire trucks, did there come a time you spoke to any members of the Williston Park Fire Department?

A.   Yeah, there were several members there.  I would have spoken to at least one of them.

Q.   And can you tell the Judge what they told you and what you told them?

A.   They told me that there was some type of odor emanating from the adjoining business at 120 Mineola Boulevard and they would need access to that location.

Q.   Did there come a time when any member of the Williston Park Fire Department advised you that the -- well, at that point, when you -- when you arrived, was Mr. or Mrs. Shah there?

A.   No.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 30 of 274 PageID #: 1461

*Kenney - Direct/Reissman*

74

Q.   And when was the first time you saw Mr. and Mrs. Shah?

A.   After I had already entered their business, gotten through the business to the basement, observed what was found in the basement, and then came back upstairs to the front of the store.

Q.   And at what time did you leave the scene?  How long were you there?

A.   From the time that I arrived on the scene until we left for the Third Precinct, I would say almost exactly three hours.

Q.   And at any time during those three hours, did any member of the Williston Park Fire Department advise you that the Shahs were the owners of the premises of --

THE COURT:  Don't lead the witness.  Ask the question.

MR. REISSMAN:  Excuse me?

THE COURT:  Don't testify.

MR. REISSMAN:  Okay.

BY MR. REISSMAN:

Q.   And what, if anything, did the -- in those three hours, what, if anything, did the members of the Williston Park Fire Department tell you about who owned the store?

A.   Told me specifically?  They did not advise me who owned that specifically.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 31 of 274 PageID #: 1462

*Kenney - Direct/Reissman*

75

I had asked one, at one point, one of the members of the fire department to contact either a business owner or a key holder or someone responsible for their business to respond because we did need access to that building and we did not have that at that time.  Fire department did ultimately gain access into the building, which is when we went through the -- the space into the basement and then at that point had a -- after I had came back up to the front of the store, that's when I observed the Shahs.

Q.   And based on your conversations with members of the fire department, did you come to a conclusion as to who owned the store at that time?

MR. HARFENIST:  Objection.

MR. REISSMAN:  Well, it's a fair question.

THE COURT:  No, it's not.  Sustained.

MR. REISSMAN:  Okay.

BY MR. REISSMAN:

Q.   Based on your --

MR. REISSMAN:  Well, we're talking about the fire department.  I rest my questioning of Officer Kenney and yield the stand to Mr. Harfenist, if you like to cross him.

MR. HARFENIST:  May I, Judge?

THE COURT:  Yeah.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

A-202

*Kenney - Direct/Reissman*

76

MR. HARFENIST:  Can we have a couple minutes though?  I mean, just a couple.  I want to pull out something from the testimony from the prior trial?  Or do you not need it?

THE COURT:  I'm not sure that I need it because I don't think he testified to what counsel said in his opening statement.

MR. HARFENIST:  That's what I was about to look for.

If I understand correctly what -- and I think Officer Kenney's testimony now is consistent with what he said at the first trial.

THE COURT:  I agree.

MR. HARFENIST:  In that he spoke to somebody and they asked him did an owner or a key holder come, and then at some point, there's a dispute as to when, he eventually met Mr. Shah and they -- access was provided to the -- was provided to the store.  That was consistent with what he said during the first trial, if I remember correctly. That has nothing to do with anybody from the fire department telling him that the Shahs are an owner, that Sunita Shah was an owner.

THE COURT:  Or more specifically, that plaintiff is an owner.

MR. HARFENIST:  That's what I was saying, Sunita

*Marie Foley, RMR CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 33 of 274 PageID #: 1464

*Kenney - Cross/Harfenist*

77

Shah.  Sometimes I use the name interchangeable.

I mean, listen, it's easy to say that Rajesh Shah was an owner, but that's a different story.  But there's nothing in that statement that indicates that Sunita Shah was an owner.

There's also one other -- there's one or two things I'd like to clarify real quick, if I could.

May I?

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. HARFENIST:

Q.   So, Officer Kenney, when you arrived at the location at 120, the fire department was already there, correct?

A.   122 or 120?  They're next to each other.

Q.   So we can use them interchangeable because they're literally, what, feet apart?

A.   Right.

Q.   So when you got there, you first went into 122, correct?

A.   Correct.

Q.   And the fire department was there at the time?

A.   Yes.

Q.   Now, at that time, the fire department had already been in 120, correct?

A.   Yes -- that -- no.  Already in 122.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 34 of 274 PageID #: 1465

*Kenney - Cross/Harfenist*

78

Q. They're in 122. They then went into 120?

A. Correct.

Q. Did they go into 120 with you, or did they go into 120 alone?

A. Well, they ultimately had to take the door -- or, I'm sorry, pop the lock because they had no other access at that time.

Q. Okay. So is it your testimony that Rajesh Shah didn't open the door for them?

A. No.

MR. HARFENIST: That's new too. So that's not -- that's fine.

Q. So it's your testimony, so as I understand, that the fire department had to use forcible entry to get into 120?

A. As far as I can remember, yes.

MR. HARFENIST: Okay.

I have nothing further, Judge.

THE COURT: Look, I don't think that's inconsistent with the prior evidence, but I also don't think it matters.

MR. HARFENIST: I know. I know it doesn't matter.

And by the way, it may not be inconsistent. There may have just been some confusion between the questioning because I know looking back now -- listen, I'm

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 35 of 274 PageID #: 1466

*Kenney - Cross/Harfenist*

79

not saying that Officer Kenney's not testifying truthfully.  I know he's testifying truthfully right now. His testimony now is inconsistent between what he said at his deposition and in the prior trial.  The problem is it doesn't help them with what they want to argue.

THE COURT:  Well, look, he can make whatever arguments he wants to make in his opening and closing statements.

MR. HARFENIST:  Sure.

THE COURT:  If the evidence doesn't bear it out, the evidence doesn't bear it out.

My only issue is the testimony.  If that's the testimony, then I don't see any problem with it.

MR. HARFENIST:  I agree.  That's not what I thought was going to be coming out.  That's why I raised this issue.

THE COURT:  Okay.

MR. HARFENIST:  I mean, if the testimony's going to be that they asked for a key holder or an owner, I can live with that.

And in Mr. Reissman's opening statement, he said something that they were told that the owners were -- who the owners were.  That's what he said.

THE COURT:  I mean, look, if he wants to make an argument that based on what they were told they inferred

A-206

*Kenney - Cross/Harfenist*

80

that they were the owners, that's perfectly fine.

MR. HARFENIST:  That's fair game.  Yeah, I mean, if they want to make the leap that somebody is a key holder means that they're an owner, that's a perfectly reasonable argument.  Let the jury decide whether under New York law key holder necessarily is an owner.  That's fine.  I mean, I don't have a problem with it.  What my concern was that's not what was said in the opening statement.  The opening statement was much more definitive.

THE COURT:  I mean, at the end of the day, it doesn't really matter what was said in opening statement 'cause it's argument.

MR. HARFENIST:  Well, true, but --

THE COURT:  All that matters is the testimony. If that's going to be his testimony, I don't have a problem with it.

MR. HARFENIST:  I won't either if that's his testimony.  That's not what I thought was necessarily going to happen.  I don't think the Court thought that's what was coming either.

THE COURT:  No.

MR. HARFENIST:  So I don't think I'm crazy.

THE COURT:  No.

MR. HARFENIST:  Okay.

A-207

81

MR. REISSMAN:  Judge, would you like me to call Officer Martone to the stand?

THE COURT:  Is his testimony going to be similar, or is he going to make statements --

MR. REISSMAN:  It's quite similar.

MR. HARFENIST:  I'll take Mr. Reissman's representation as an officer of the court that the testimony's going to be consistent.  We don't need to waste any more time.

THE COURT:  That's fine.  If that's the testimony, that's fine.

MR. HARFENIST:  I agree.

THE COURT:  Then there's no issue.

MR. REISSMAN:  Thank you, your Honor.

THE COURT:  You can step down.  Thank you.

(The witness leaves the witness stand.)

MR. HARFENIST:  I guess we just had a whole much to do about nothing.

THE COURT:  Pretty much.

MR. REISSMAN:  Judge, I think my colleague, Ms. LaGreca, would like the opportunity to address the issue of the photos before the jury comes in.

THE COURT:  Sure.

MR. REISSMAN:  Thank you.  Ms. LaGreca, please take the lectern.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 38 of 274 PageID #: 1469

82

MS. LaGRECA:  Your Honor, it was brought to our attention yesterday by opposing counsel that despite previously claiming otherwise, he is now not consenting to any of the crime scene photographs going into evidence. So at this time, we respectfully request the Court hear our argument for the admission of the photographs.

THE COURT:  Go ahead.

MS. LaGRECA:  Your Honor, Federal Rule of Civil Procedure 37 regarding failure to make disclosures or cooperate in discovery, specifically subsection (c) states:  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion at a hearing or at a trial unless the failure was substantially justified or is harmless.  In addition to or instead of the sanction, the court, on motion and after giving an opportunity to be heard, may order payment of the reasonable expenses, including attorney's fees, caused by the failure, may inform the jury of the party's failure, and may impose other appropriate sanctions, including any of the orders listed in Rule 37(b).

First, we respectfully request the Court allow the photographs into evidence because the failure to disclose said photographs was harmless to the plaintiff.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 39 of 274 PageID #: 1470

83

The plaintiff is not at all prejudiced by the admission of the photographs.  Especially the photos simply showing the upstairs of the location does not prejudice the plaintiff in any way.  It simply shows the layout of the store, how the front portion of the store with the desk was arranged, what the room behind that looked like, and the stairs to the basement area.

The plaintiff knew what this area looked like on that day and on the days she was at the store previously.  It is not in any way new evidence or a surprise to the plaintiff.  There's no debate at the trial that the store looked as it does in the photos.  There's no debate about what the outside of the store looked like, and there's no debate about what was inside of the store that day.  All the officers will testify consistently.

And additionally, Defendant's Exhibit H depicts the store's business card that states that they sell smoking paraphernalia as well.

Adding photos for the jury to see what is already being testified to would not prejudice plaintiff at all.  Especially if your Honor allows solely photographs of the upstairs layout to provide a visual aid, it provides no prejudice to plaintiff and benefits both parties because the jury will be a lot less confused.  It is our position the photos of the basement would not be

84

prejudicial either as plaintiff claims to not know anything about what was in that basement.  So if plaintiff claims she has no ties to what was in the basement, had no knowledge of what was there, she cannot also turn around and claim that what was contained in the basement is prejudicial to her if it has nothing to do with her.  This is not a criminal trial, and showing photos of precursors to synthetic marijuana would not prejudice the jury into thinking she's guilty of any crime.  It would be of great probative value to the jury as I will now discuss.

Your Honor, when I joined this case, obviously I had a lot of testimony between the depositions and the previous trial to catch up on, and as I was reading those descriptions in the testimony of the layout of the store, I honestly was quite confused.  And before Mr. Reissman had even gotten his hands on the photos, I was thinking to myself it would be so beneficial and helpful if I had photos to look at because, no offense to my officers, but the testimony alone was very confusing about what this place looked like and where they were sitting and where the basement door was or the door to the outside.  It just was very confusing.  So as a lawyer, I thought just testimony alone was not enough.

And I think that giving these photos to the jury so that they could visualize the store in their head is

A-211

85

extremely probative and greatly outweighs any potential prejudice to the plaintiff.

Additionally, your Honor, I have copies of case law for your review.  I do apologize that I'm bringing case law in at this late stage in the game.  However, we did not really have any choice after Mr. Harfenist decided not to consent on any of the photos anymore.

If your Honor permits, I can briefly summarize the case law, and I can hand up a copy to your Honor as well.

In *Outley v. New York*, the court held that before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes and must consider less drastic responses.  Considerations of fair play may dictate that courts eschew the harshest sanctions where failure to comply is due to a mere oversight of counsel to no more than simple negligence.

*Papiez v. Home Depot U.S.A.* also quoted from *Outley*, and *Papiez* also quoted from another case, *Richie Risk-Linked Strategies Trading,* stating that courts have broad discretion to determine the nature of any sanction that should be imposed under Rule 37 based on all facts of the case.

*Schrom* is another case that is quoted from

A-212

86

*Outley* emphasizing how extreme the remedy of preclusion is.

In another case named *Meyers*, the Court held: We have recently held that the exclusion of critical evidence is an extreme sanction - that was quoting from *Dudley* - not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence.

Other cases that cite to Meyers also stress the importance of considering the willfulness or bad faith of a party's failure to comply with discovery.  That is clearly not the case here, as defendants in this matter have turned over complete police files in addition to other documents and evidence over the course of years.  We do not have any flagrant -- did not have any flagrant disregard of a court order or any vocal deception.

We respectfully consider that the Court allow the photographs with the sanction against the defendants in the form of an adverse jury instruction informing the jury of our failure to turn over the photographs in a timely manner.

In the alternative, we request that only the photographs showing the upstairs layout be allowed into evidence.

Thank you for your consideration.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

**A-213**

87

I will hand opposing counsel and the Court a copy of the case law.

THE COURT:  Does anyone have a copy of the photos?

MS. LaGRECA:  I do.

MR. HARFENIST:  May I, Judge?

THE COURT:  Yes.

MR. HARFENIST:  So, we're now relitigating an issue that the Court's already previously decided.  What was the docket entry number?

MS. MOLLER:  110.

MR. HARFENIST:  On docket entry 110 the issue with regard to these photos was addressed through the telephone conference.  The Court denied the County's application to admit the photos unless the plaintiffs consented.  And I'll talk about what happened yesterday with regard to the consent in a moment.  But as the Court correctly noted when it precluded the use of the photographs, they were not produced with regard to any Rule 34 discovery.  They were not produced pursuant to Rule 26.  Nor were they identified in the pretrial order. Nor were they identified in the prior trial.  They were claimed to be newly discovered evidence.  They are not newly discovered evidence.  If they weren't produced, it was as a result of the negligence of the defendants, which

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 44 of 274 PageID #: 1475

88

is not a standard to modify the pretrial order or excuse them from their failure to comply with Rule 26 or Rule 34.

While the Court has discretion to alleviate the preclusion for failure to produce, the Court chose not to, and correctly didn't, alleviate the defendants from their failure to produce them before.  There is a number of reasons why they shouldn't -- putting aside the inordinate delay, I mean, you couldn't -- I looked last night.  I couldn't find a case in which at such a late date photographs of -- of a scene that was -- wherein which an arrest necessarily occurred were produced that were ultimately allowed into evidence.  We did not have a chance to examine any of the witnesses with regard to the photographs.  They were not addressed at deposition.

And then we get -- I think we get to the real -- the real fundamental issue as to why the County cannot overcome a presumption at this juncture if the Court correctly precluded them.  What's the purpose of those photographs, Judge?  I ask that question rhetorically because they have nothing to do with the issue that this jury needs to decide.

Now, if Rajesh Shah was the plaintiff, I think the County might have an argument that they have some probative value.  They have no probative value based on the issue -- it's a -- the narrow issue that this jury has

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 45 of 274 PageID #: 1476

89

to decide: whether or not Sunita Shah knew -- not knew. Knew and/or had dominion and control over what was in the basement.

So why are they trying to offer that evidence? They want to try to have this jury reach an insinuation that because some of the products that were sold in this, which by the way they had a license to sell and are completely legal, had to do with the use or potential use of marijuana.  Therefore, they knew -- the -- someone who had access to that property had to know what was necessarily going on.  That's what they're trying to use them for.  They could say -- it's not about layout.  This isn't a case where -- where it's relevant where Ms. Shah was sitting or Mr. Shah was sitting or where the police officers were.  It has nothing to do with the issue in the case.  The issue in the case is extraordinarily limited: Did Ms. Shah have dominion and control over the basement? That's it.

What do those photographs add to a jury's ability to make that determination?  Nothing.

What do they do?  They attempt to poison the jury, to allow the jury to reach a conclusion that because this was a, quote/unquote, smoke shop, they had to know that Surender Bhatty was growing marijuana in the basement.

A-216

90

(Continued on following page.)

A-217

91

MR. HARFENIST (Cont'd):  How does that show that Sunita Shah, who's not on the lease, not an owner, she potentially knew?

I could not think of a more clear circumstance in which the prejudicial value of those photographs grossly outweighs the probative value.  In fact, they have zero probative value.  The fact that the officers' testimony with regard to the location and where they were and how they were moving, I would say there was -- I wouldn't disagree with counsel that it might have been a little on the confusing side, but it's meaningless to the issue in the case.  It has nothing to do with it.  They have not done anything now to show this court that you either misunderstood the facts or misunderstood the law when you precluded those photographs, because this is what this is, it's a motion to reargue.

Now, what happened yesterday with regard to the photographs?  I agreed to look at the photographs and I did, on the telephone, call and yesterday which -- to identify those in which I would have no problem offering. I did agree to offer some of them, at which point the defendants essentially said, well, if you are going to offer that one you need to offer this one too because you are misleading the jury.

That's not the case and that's not what the

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

92

court's order said.  For better or worse they were stuck with what I was willing to consent to, and I was not willing to consent to a number of the photographs because I didn't have to.  I don't think they have any probative value and for better or worse, in light of the court's order, my judgment ruled with regard to the photos.

Now, they may convince the court otherwise, but I don't see it and I don't think that my -- after we were unable to agree on the limitation on the photographs that I took the position that none of them should come in was unreasonable.  Putting aside the fact that they never produced it and, in my view, it's a complete death knell and they haven't shown that the court made a mistake, where is the probative value such that it outweighs the prejudicial effect as to the issue?

It's not there.

MR. REISSMAN:  May I respond, your Honor?

THE COURT:  Yes.

MR. REISSMAN:  Thank you.

Now, before I get to the main argument I want to refresh the court's memory from my letter of last week that the circumstances of defendants discovering these photos at this late date, I think it's clear that the failure to turn them over years ago in discovery was not willful.  It was not due to any desire to prejudice the

93

plaintiff.

It was due to basically a bureaucratic situation where I had different units of the police department responsible for different aspects of the investigation and arrest and the district attorney's office determination to dismiss the charges and, in a nutshell, I was given from the police department's legal bureau the arrest documents. I was given the narcotics -- the narcotics squad is a different -- let me put it this way. The documents that the police legal bureau gave me when I received the complaint were in the precinct's files. That's the police department. That's the police officers. Those are the criminal charging instruments that these defendants will testify they created in order to process the arrest of Ms. Shah.

Second, and I did receive and I did turn over the entire file of the narcotics squad which is not the same as the documents from the police legal bureau. Last week or ten days ago I met with Detective Reed to prepare for trial and for the first time in five years since this case has been prosecuted she said, well, where are the crime scene unit photographs? I said, what are you talking about?

And she said, the crime scene unit had to have showed up and they would have taken photographs. I said,

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

94

that's great.  Let's get them.  As a matter of fact, that day I contacted the legal bureau and I said, can you ask the crime scene unit for their photographs and they said we'll get back to you and the next day at 2 o'clock they emailed me the photographs and I immediately emailed them to Mr. Harfenist.

So there was no willful desire to hide these photographs or not produce them.  It was a pure bureaucratic situation.  Now, as much as I respect Mr. Harfenist and he is one of the greatest lawyers I ever encountered, however, he mischaracterized the purpose of this case.  As I said in my opening, this is not a case whether Ms. Shah owned or operated or had dominion and control over the store or the contents.

That's not what defendants are proving in this case.  We concede she -- ultimately we learned that she had no ownership in the business or the contents of the basement.  She may have knowledge.  She may testify that she had knowledge of what was in the store in the basement.  And the fact that she testified at the last trial that she did visit the store with her husband at least six or seven times.  So it's fair to conclude that she went into the store and she at least saw the contents of the first floor.

The issue in this case is not whether Ms. Shah

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 51 of 274 PageID #: 1482

95

owned the basement or the first floor.  The issue in this case for the jury, as I said in my first sentence, is whether the officers had probable cause to arrest her and the officers and detectives all testified that what they saw when they went into the store and went into the basement was a large collection of drug paraphernalia and they also proceeded to the basement where they saw -- some of them did, others couldn't get there -- but the others did see what was in the basement.

The issue in this case is not whether Ms. Shah owned the store.  The issue is whether the officers had probable cause to believe she had an ownership interest in the store or of the basement.  They will testify that the basis of their conclusion that probable cause existed was that they saw a huge collection of drug paraphernalia on the first floor and drugs in the basement.

Now, as Mr. Harfenist said, the officers' description of what they saw six years ago now was confusing a year ago and just a verbal description will undoubtedly be confusing to the jury again.  But showing the jurors these pictures will clearly show what the officers saw, and I'll give you a heads up.  When I met with the officers last week I showed them the photographs, and the officers all said, well, that really helps me recall what I saw six years ago.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

96

So that is the case.  The whole case depends on what the officers saw, what they believed provided probable cause, and, at a minimum, the existence of a huge amount of drug paraphernalia will convince you that the officers saw what they saw was drug paraphernalia, that drug paraphernalia existed on the first floor and that was one of the large reasons they concluded that Ms. Shah should be arrested on three drug charges.

And, I submit, as Ms. LaGreca correctly stated, the photos will be of great probative value to the jury. They are color photographs.  They are quite extensive in terms of showing what was there on the first floor and the basement and it will assist the jury come to a real understanding of what the officers saw, which is the whole reason for this case, not whether Ms. Shah owned the business or the basement.  It's what the officers saw six years ago.  And the photographs will assist the officers in refreshing their recollection.

Mr. Harfenist can certainly ask them about the prior deposition testimony and prior trial and why didn't you say this or didn't say that?  And they are free to say, well, I didn't say that a year ago because I didn't have the photographs.  They can now say, having seen the photographs last week my recollection has been refreshed. It in no way prejudices the plaintiffs.  As Mr. Harfenist

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 53 of 274 PageID #: 1484

97

conceded, Ms. Shah visited the store six or seven times in Williston Park, obviously knew what was in the first floor and she saw them and I will ask her about them.

And there is no prejudice to the plaintiff. It's greatly probative to the jury. The omission to turn them over earlier was not willful and I, therefore, ask Ms. LaGreca's request all the photographs come in or, in the alternative, only the first four photographs come in.

Thank you, Judge.

THE COURT: Given the late disclosure here I'm going to stand by my original ruling and exclude the photographs.

The officers can use them to refresh their recollection if they need to, which it sounds like they have already done. But in terms of showing them to the jury I think it's too little too late. I'm not sure that you really need the layout photographs, but to the extent that there's one or two of these photographs that kind of show the outside and where the basement door is --

MR. HARFENIST: Judge, I don't have a problem with those photos.

They want to show the front door and where the basement door is, I don't have a problem with that. I have never had a problem with that. But, again, I don't really think it adds a whole lot to the issue. You know,

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 54 of 274 PageID #: 1485

98

I agree with Mr. Reissman on the issue when we talk about probable cause is what the police officers knew.

I disagree with him on how you frame that issue. But the issue is what did the police officers know about Sunita Shah's dominion and control over the store, not what was necessarily -- what they saw in the store. That's the issue in the case.  That's it.

MR. REISSMAN:  Judge, I think I heard you rule that defendants and plaintiff may show the photographs to the witnesses to refresh their recollection without showing them to the jury obviously.

Is it also your Honor's ruling that I may show the photographs to Mr. and Mrs. Shah on their direct testimony when I cross them?

THE COURT:  Only if they need to have their recollection refreshed.

MR. REISSMAN:  Okay.

And I'm anticipating the following issue.  If I ask Mr. and Mrs. Shah what was on the first floor and they say A, B, C, and I look at the photograph and I see D, E, F, is it fair to show them the photograph and say, well, in addition to what you testified as to A, B, C, does this refresh your recollection as to what else was in this space?  Is that a fair question?

MR. HARFENIST:  I have a problem with that

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-225

99

because now they are using it substantively.

You can -- if they ask -- if the county asks either one of the Shah witnesses what do you understand to be in the store and they gave you a list, you then can't say, well, I told you there were other things in there.  I showed you the photograph that showed you there were other things in there, will that refresh your recollection?  No.  You just asked them what they knew, not whether or not they didn't know.  They are not answering, I don't know what was in the store.  I don't remember what was in the store.  They are stuck with what their memory was, otherwise they are using it substantively.

To make matters worse, if we start playing with those photographs in front of these witnesses to refresh their recollection, this jury is going to want to know where the photographs are.  The first note we are going to get from them is can we see the photographs.  I'm willing to bet everybody lunch that's the case and I think that's going to create -- it's going to be more of a problem from an adjudication of an issue standpoint than the validity or the value of refreshing their recollection with the photographs.

THE COURT:  I don't know why you would need to refresh the recollection about it anyway if you are --

MR. HARFENIST:  I don't think you need to

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-226

100

either --

THE COURT:  -- if you have shown them the photographs prior to today.

MR. HARFENIST:  Go outside and show it to them now and let their recollection be refreshed and then let's go.

THE COURT:  It's hard to say.

I would have to hear what the testimony is to see whether or not it would be admissible -- not if they are not admissible, it would just be whether or not they could be shown anything to refresh recollection.

MR. HARFENIST:  We are going to get a note when they see the photographs.

I know we are going to get that note.

THE COURT:  If we are showing the witness to refresh their recollection you are not going to tell the jury what it is you are showing them.

You are just going to show them what you want to show them.

MR. REISSMAN:  On that note, your Honor, is it proper or not to ask the witness the questions what do you see in the photograph?

MR. HARFENIST:  He can't say that.

THE COURT:  You can't do that.  That's not refreshing recollection.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

101

That's using it as evidence.

MR. REISSMAN:  I understand, your Honor.

I will not ask that question.

MR. HARFENIST:  I think we are opening up Pandora's box.

To me the better course is they have the photographs.  Let them go outside and look at them now again.  They have looked at them already.  This is not complicated.  What did you see in there?  We are not going to go through a litany list of every single item that was in the store.  They saw some drug paraphernalia.  There is nothing illegal about selling the drug paraphernalia.

Rajesh Shah is going to say he had a permit from Nassau County to do it and, quite frankly, if this case was happening now we wouldn't even be having this conversation.

THE COURT:  This is true.

I don't know how much these photographs really add anything because there is no dispute about what was there.  Everybody's already testified about what was there.

MR. REISSMAN:  Well, just to that point, your Honor, Mr. Shah testified that he sold and had in his store elephants, costume jewelry and some hookahs.

That's not all that was in the store.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-228

102

THE COURT:  So ask him the question.

MR. REISSMAN:  Excuse me?

THE COURT:  So ask him the question, did you have bongs in the store, yes or no?

MR. REISSMAN:  Okay.

THE COURT:  And if he says no then you can show him the photograph to refresh his recollection about the 50 boxes of bongs that were in the store.

This is not rocket science.

MR. REISSMAN:  I understand your Honor.

I understand your Honor's ruling and I will abide it.  Thank you.

MS. LAGRECA:  Just to clarify, I'm sorry, the picture of the front of the store and the basement door are being allowed in?

THE COURT:  Yes.

Just confirm with plaintiff's counsel which photos that he's okay with.

MR. HARFENIST:  Right.

THE COURT:  I don't see any problem with putting those photos in.

MR. HARFENIST:  I don't either.

MS. LAGRECA:  If we can maybe premark them.

THE COURT:  That's fine.

MR. HARFENIST:  Judge, the last thing we have to

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 59 of 274 PageID #: 1490

103

do before the jury comes in and we forgot to do it during the last trial, we stipulated to the admissibility of all the evidence.  So we have to read it into the record.

I think Mr. Reissman and I wound up doing it on day two.

THE COURT:  It doesn't actually matter as long as you stipulate before the evidence closes.

MR. HARFENIST:  I'd like to get it out of way, one less thing we have to do and we can deal with these couple of photos.

MR. REISSMAN:  I have 15 is the furnace door, you have plaintiff's 16 --

MR. HARFENIST:  Hold on.

You are ahead of me.

MR. REISSMAN:  I think Plaintiff Exhibit 16 may be a little different from the photos before your Honor --

MR. HARFENIST:  Show me which one you want to use and I'll make sure it's the front of the store.

If it's the front of the store it's the front of the store.

THE COURT:  Show them the photos here.

MS. LAGRECA:  Thank you.

MR. HARFENIST:  Maybe this one doesn't have the foot massage place next to it.

We can do this one of two ways.  We both have

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-230

104

exhibit lists.  We can mark the exhibit list and say everything on the exhibit list is in evidence.  That's probably the easiest way to do it.

(There was a pause in the proceedings.)

MR. HARFENIST:  Judge, should we do that now?

Give us a few minutes.  We'll deal with the exhibit list.

THE COURT:  Is there any dispute over them?

Why don't we start and you can do that during lunch.

MR. REISSMAN:  Okay.

MR. HARFENIST:  Whatever you want, Judge.

MR. REISSMAN:  Thank you.

THE COURT:  Go get the jury.

MR. HARFENIST:  They have been waiting a while.

THE COURT:  Yes.

MR. HARFENIST:  And you have to tell them -- well, they know one's missing now.

THE COURT:  I'm going to just inform them that we have a missing juror and we are going to excuse that juror and move forward.

MR. HARFENIST:  Judge, I'm going to start with the stipulation and I'm going to read one of the interrogatory responses and then I'm going to start with Officer Kenney.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-231

105

THE COURT:  Sounds good.

MR. REISSMAN:  Judge, can we take a five-minute break before the jury comes in?

THE COURT:  Go ahead.

(Recess.)

(Continued on the next page.)

A-232

106

(Following a recess.)

(Jury enters the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.

I'm sorry for the delay this morning.  As you noticed, we have a missing juror this morning.  We have decided to go forward and I'm going to excuse juror number three, and we are just going to move forward with everybody who is here rather than delay things any further.

At this point I'm going to turn things over to plaintiff's counsel and you can begin the evidence portion of the trial.

MR. HARFENIST:  Your Honor, we are going to start the plaintiff's presentation of proof with a stipulation that was entered into by the parties that was filed on the docket on November 10, 2022, when we were last here on this case.  The jury can have a copy of it at some point but I'm going the read it to them.

The court can explain to the jury what a stipulation is.

THE COURT:  A stipulation means that the parties have agreed that a particular fact is true and so the stipulation is a piece of evidence that can be admitted and the jury has to accept that stipulation.

It's a factual issue that you do not need to

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

107

decide because the parties already agreed to it.

MR. HARFENIST:  May I read it, Judge?

THE COURT:  Go ahead.

MR. HARFENIST:  I'm going to read each paragraph individually:

1.  Sunita Shah is a 59 year old female American citizen.

2.  Sunita Shah is married to Rajesh Shah.

3.  In October of 2017 Rajesh Shah owned a business importing custom jewelry, hookahs and leather animals from India.

4.  The name of Rajesh Shah's business was Accessories By Peak located at 120 Hillside Avenue, Williston Park, New York.

5.  In October 2017, Rajesh Shah was leasing the basement at 120 Hillside Avenue to a man named Surender Bhatty.

6.  On the afternoon of October 4, 2017, Sunita and Rajesh Shah were at a friend's house when either the police or a neighbor of 120 Hillside Avenue telephoned Rajesh and advised him that there was smoke or a smell coming from the store at 120 Hillside Avenue.

7.  Sunita and Rajesh drove to the store. Rajesh went into the store while Sunita parked the car. After 15 to 20 minutes, when Rajesh did not come out,

108

Sunita left the car and went into the store.

8.   Rajesh told the police that he rented the basement to Surender Bhatty and showed the police the lease, which was printed on a peace of paper.

9.   Rajesh and Sunita sat in the store for three to four hours and then, at about 5:30 or 6, they were arrested.

10.   A female police officer put handcuffs on Sunita and then she was driven to a police station and put into a detention cell.

11.   Rajesh was also placed in handcuffs upon being arrested.

12.   Sunita was in the detention cell overnight, then she was transferred to two places, in the second cell she was in for three hours.

13.   Sunita was then transferred to a third cell in Mineola, then went to court the next morning and was released.

14.   Sunita went back to court two or three times and then learned that the charges against her were dismissed after about one month.

15.   Sunita did not sustain any physical injury between the time that she was arrested and the time the charges were dismissed.

16.   As a result of the arrest of Sunita, the

109

Nassau County Police Department filed district court information 217AR0051949 against Sunita for violation of 3380.5(A) nitrous oxide-illegal use, a misdemeanor.  This information was executed by Defendant Liston.

17.  As a result of the arrest of Sunita, the Nassau County Police Department filed district court information 217AR0051949 against Sunita for violation of reckless endangerment in the second degree, penal law Section 120.20, a misdemeanor.  This information was executed by Defendant Martone.

18.  As a result of the arrest of Sunita, the Nassau County Police Department filed felony complaint 2170051949 against Sunita for criminal possession of a controlled substance, Penal Law Section 220.60, Class E felony, the felony complaint was executed by Defendant Twomey.

19.  As a result of the arrest of Sunita, the Nassau County Police Department filed arrest report 217AR0014749.

20.  As a result of the arrest of Sunita, the Nassau County Police Department filed crime report PDCN 85 SJ-217CR0051949.  The crime report listed Kenny and Martone as arresting officers, Liston as the carrying detective, and Twomey at the assisting detective.

21.  As a result of the arrest of Sunita, the

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 66 of 274 PageID #: 1497

110

Nassau County Police Department filed case report PDCN 32 SJ-217CR0041949.

22.  On November 22, 2017, the criminal charges against Sunita were dismissed on motion of the Nassau County District Attorney's Office pursuant to New York Criminal Procedure Law Section 170.30(1)(f).

That's the entirety of the stipulation, Judge, and I want to read one other piece of evidence before we start the examinations.  I'm reading from the defendant's response to the plaintiff's interrogatories, Judge, and if you could explain to the jury what interrogatories are.

THE COURT:  So an interrogatory is a mechanism of discovery in civil cases where one side will ask questions that the other side has to answer and swear to the truth of the answers.

So it's under oath the same way technically like trial testimony or a deposition testimony would be.  They are written questions and written responses that would be the official answer of whichever party is asked the interrogatory.

MR. HARFENIST:  May I, Judge?

THE COURT:  Go ahead.

MR. HARFENIST:  I'm going to read from interrogatory number 3 and I'll read the question and the response:

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 67 of 274 PageID #: 1498

111

Question:  State whether any member of the Nassau County Police Department had any conversation on October 4, 2017 with any member of the WFPD -- it's supposed to be WPFPD -- Williston Park Fire Department in reference to the property and its contents.  If the answer is in the affirmative identify, A, the member of the Nassau County Police Department who had the conversation, B, the member of the Williston Park Fire Department who had the conversation and, C, provide the sum and substance of the conversation.

Here is the county's response:

When Officers Kenney and Martone responded to the location, Fire Chief Schnall requested a key holder to respond to the location.  A short time later Rajesh and Sunita Shah arrived at 120 Hillside Avenue and opened the door.

Look at interrogatory number 8.

Question:  State whether any of the Nassau County Police Department made -- excuse me -- state whether any member of the Nassau County Police Department made any attempts to contact on October 4, 2017 -- excuse me.  I'm doing a poor job reading this one.

State whether any member of the Nassau County Police Department made any attempts to contact Bhatty on October 4, 2017.  If the answer is in the affirmative

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-238

112

identify, A, the time and method of each attempt to contact Bhatty, B, the member of Nassau County Police Department who attempted to contact him and if successful in contacting Bhatty, and, C, provide the sum and substance of any conversations with him.

Answer:  No.

Question 15.  State who arrested Sunita on October 4, 2017 and provide the specific facts which created probable cause to make the arrest.

Response:  Officer Michael Kenney and Officer Martone arrested Sunita Shah.  The probable cause to arrest was the fact that she and her husband owned the business located at 120 Hillside Avenue in Williston Park in the basement of which was found bottles of acetone along with other paraphernalia.

That's all I'm going to read from the interrogatories.

THE COURT:  Okay.

MR. HARFENIST:  I'm ready to call the first witness.

We call Police Officer Kenney.

LAW CLERK:  Please state and spell your name again for the record.

THE WITNESS:  Michael Kenney, M-I-C-H-A-E-L, K-E-N-N-E-Y.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 69 of 274 PageID #: 1500

Kenney - Direct/Harfenist

113

LAW CLERK:  Please raise your right hand.

**MICHAEL KENNEY**,

      having been duly sworn, testified as follows:

           MR. HARFENIST:  May I, your Honor?

           THE COURT:  You may.

DIRECT EXAMINATION

BY MR. HARFENIST:

Q.    Good morning, Officer Kenney.

A.    Good morning.

Q.    This isn't the first time we have done this, is it?

A.    No.

Q.    We did this once before about a year ago, correct?

A.    Correct.

Q.    You also testified previously in this case in a deposition, correct?

A.    Correct.

Q.    So this will essentially be the third time you are testifying in this case, correct?

A.    Yes.

Q.    On October 4, 2017, what was your job?

A.    I was assigned to radio patrol within the 3rd Precinct.

Q.    You were a police officer in Nassau County?

A.    I was a police officer.

Q.    And how long had you been a police officer at that

A-240

Kenney - Direct/Harfenist

114

point?

A.   About two and a half years.

Q.   You were in a -- you were a patrolman?

A.   Correct.

Q.   And you were working out of the 3rd Precinct?

A.   3rd Precinct.

Q.   Does the precinct have squads?

A.   Yes.

Q.   Were you working in a specific squad?

A.   I was in squad two at that time.

Q.   Did you have a partner?

A.   Yes.

Q.   Who was your partner?

A.   Officer Martone.

Q.   In terms of your partners, on October 4, 2017, you don't travel around together in the same car, correct?

A.   No.

We do routine solo patrol and each radio assignment is responded to by two officers.

Q.   So you guys are both independent and if there is a response to a call you both go?

A.   Yes.

Q.   Okay.

Now, you got a call approximately around -- a little after 2 o'clock on October 4, 2017, correct?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-241

Kenney - Direct/Harfenist

115

A.   Correct.

Q.   You responded to, I believe it was 122 Hillside Avenue in Williston, correct?

A.   Correct.

Q.   And the response was a peculiar odor coming from the building, correct?

A.   Yes.

There was an overwhelming odor of gas or a chemical emanating from the facility.

Q.   And when you arrived at 122, you were the first police officer on the scene, correct?

A.   Correct.

Q.   And at the time that you got there the fire department was already there, correct?

A.   Yes.

There were multiple members of the fire department there as well as at least one or two of their fire trucks.

Q.   When you say multiple members, there was also a supervisor there as well, right?

A.   Would that be a chief?

Q.   Chief Schnall was there, right?

A.   Could have been multiple, but, yes, that was one of the chiefs.

Q.   And when you first got there you went into 122 to

A-242

Kenney - Direct/Harfenist

116

find out what was going on, correct?

A.   Yes, spoke to the business of a karate studio, a large open space, and he advised us there was some sort of odor or overwhelming smell of gas or chemical coming from his building.

Q.   And at that time that you spoke to Mr. Waters -- that was the name of the owner, correct?

A.   Sounds correct.

Q.   And at the time you spoke to him, had you already spoken to members of the fire department?

A.   I'm sure I would have.

Q.   Do you know at that point in time if the fire department had already gone into 120?

A.   No.

Q.   You don't know, do you?

A.   No, they did not enter 120.

Q.   They did not enter 120 at that point?

A.   No.

Q.   There came a point in time where the fire department decided to enter into 120, correct?

A.   So after they used their whatever -- they used to take the measurements and readings from the karate studio it was determined it was coming from an adjacent wall that shared the space with 120.

Q.   So we understand, it's like a strip mall and the

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Kenney - Direct/Harfenist

117

stores are right next to each other.

Correct?

A.   Yes.

Q.   They used something called a sniffer, right, to determine the --

A.   I don't know what it's called.

Q.   And they determined it was coming from the adjacent wall.

So there was a decision to go into 120, correct?

A.   Yes.

Q.   Did you go with the fire department when they first entered into 120?

A.   Yes.

Q.   Do you know who opened the door to 120?

A.   I believe it was the fire department because we didn't have access to the building at that point in time.

Q.   So they broke the door open?

A.   They would have, yes.

Q.   And at that point in time you went into the property on -- into the store at 120, correct?

A.   Yes.

Q.   When you went in you went in with multiple members of the fire department?

A.   Correct.

Q.   The first place you went was to the basement -- well,

Kenney - Direct/Harfenist

118

you walked through the initial entranceway to the store, correct?

A.   Well, the first place we entered was a small office in the front of the building.

There was a small desk on the right.  I believe there was another seating area too and there was another large wall or petition that divided that office space to another space beyond that with a door leading to that.

And in that other office there was a couple of pieces of smoking paraphernalia and there was a trinket of elephants or something along those lines.  There was decorations in that room.

Q.   And eventually you cleared through the office and went to the basement, right?

A.   After you go through that first door you go through a large storage area.  There were multiple shelves.

It was almost like a warehouse of boxes, again of different forms of glass and smoking paraphernalia and bongs and things of that nature, but it was a very large room beyond that.  There would have been another room or two after walking into that large space and then again that led to a basement door.

Q.   There was a door to the basement, correct?

A.   Yes.

Q.   Was that door open when you got there?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-245

Kenney - Direct/Harfenist

119

A.    I don't recall if it was open.

I believe it was open by the fire department at that point.

Q.    As you sit here today you don't remember how that door got open, right?

A.    No.

Q.    You subsequently went into the basement, correct?

A.    Yes.

Q.    You went to the basement and when you got there the noxious odor got stronger, right?

A.    Yeah, it was very intense.

Q.    And at that point you saw what looked like to be a green leafy substance that you suspected to be marijuana, correct?

A.    When you went into the basement and it was an unfinished basement -- I believe there were two rooms -- one of the rooms had large rectangular plastic bins with the green leafy substance and, again, at that point it was very overpowering with the smell.  It was hard to stay down there that long.

But we did also observe large clear plastic containers with some other type of unknown chemical or substance in there and empty bottles of acetone.

We also observed thousands of prepackaging and packaged material of some sort of substance I believe

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-246

Kenney - Direct/Harfenist

120

cartoon characters on the front.  But, again, there were thousands of those packaging materials as well.

Q.   At that point you then subsequently walked up the stairs, correct?

A.   Yes.

Q.   And when you arrived up the stairs, did you see anybody in the office area?

A.   I walked up the stairs -- from the stairs I would have walked back to the front of the building, wanting to get away from the odor to go back towards the front.

And then after I walked up the stairs I saw Officer Martone, along with whoever was there that was notified for business contact.

Q.   There was a gentleman sitting there, correct?

A.   Yes.

Q.   You subsequently learned that to be Rajesh Shah, correct?

A.   Correct.

Q.   When you walk up there was Officer Martone having conversations with Mr. Shah?

A.   He could have, yes.

Q.   As we sit here today you don't remember what if anything Officer Martone was saying to Mr. Shah, correct?

A.   Not directly, no.

Q.   There came a point in time in which when you first

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-247

Kenney - Direct/Harfenist

121

got up into the store you didn't see Sunita Shah sitting there, did you?

A.    Not eventually.

Q.    She arrived later, correct?

A.    Shortly after.

Q.    But it was later?

A.    Correct.

Q.    At that point you stopped to have a conversation with Officer Martone and Mr. Shah, correct?

A.    Yes.

Q.    And you asked -- at that point he advised you he was the business owner, correct?

A.    I believe so, yes.

Q.    And he told you at that point that he had leased out the basement to an individual named Surender Bhatty, correct?

A.    Eventually.

But initially at that point, just from what I observed in the basement, I knew this was going to be part of a large investigation and I knew that my part in that investigation was just to be collecting basic pedigree information, contact information from the Shahs because at that point I would have requested a supervisor.

Q.    And you did?

A.    I did, and the detectives as well.

A-248

**Kenney - Direct/Harfenist**

122

It was important for me to gather as much information for the detectives and supervisors I could prior to observing any other sort of documents.

Q.   At any point in time when you first spoke to Rajesh Shah, before the supervisors arrived, did he tell you that he leased the basement to Surender Bhatty?

A.   He told me there was some sort of document.

Q.   So he told you that somebody else was in possession of the basement, correct?

A.   He produced a document that said this is not a lease on the document --

Q.   We'll get to that.

A.   I'd like to explain what I saw.

He did show us a document that was not dated, that did not have a signature, that stated this is not a lease, was not notarized.

So that, yes, he did show us that document.

Q.   We'll talk about that in a few minutes.

But at that point in time you had already called for the detectives and the supervisors, correct?

A.   Immediately coming up from the basement I asked for the supervisor, yes.

Q.   How many supervisors arrived?

A.   I wouldn't say several, but more than one.

Q.   Do you know who they were?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-249

Kenney - Direct/Harfenist

123

A.   One was Sergeant Harverson.  I don't recall the other.

There were a number of detectives and units that were notified and on scene throughout that day.

Q.   Who was the first detective you recall arriving on the scene?

A.   Detective Liston.

Q.   When Detective Liston arrives you told him what you saw, correct?

A.   Yes.

Q.   You told him what Mr. Shah had told you, correct?

A.   I would have.

Q.   At the time Detective Liston arrived on the scene, Sunita Shah was there -- withdrawn.

At the time Detective Liston arrived, was Sunita Shah in the office?

A.   I believe she was.

Q.   As we sit here today are you sure she was?

A.   I wouldn't say for sure.

But I believe at that point she was.

Q.   You believe so?

A.   Yes, it was a number of years ago.

Q.   I understand.  This happened in 2017.  I understand.

We talked briefly about the time period between from when Rajesh Shah came in and when Sunita Shah came

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-250

Kenney - Direct/Harfenist

124

in, right?

A.   Yes.

Q.   You said it was a short while after, and the parties have agreed it was between ten and 15 minutes.

Is that consistent with your recollection?

A.   Yes.

Q.   When she came in, were you already upstairs?

A.   I believe I was.

Q.   Where was Rajesh Shah sitting at that point in time?

A.   I don't recall exactly where he was.

I believe he was around the desk.

Q.   There was a desk there, he was sitting somewhere there?

A.   It was a small open office with a desk on the right side.

Q.   At that point in time it's just you, Rajesh and Officer Martone, correct?

A.   I don't recall if there was anyone else in the room.

I don't believe so.

Q.   You actually saw Sunita Shah at that point, at some point shortly thereafter enter into the office, correct?

A.   Yes.

Q.   And when she came in I think you just testified you are not sure where Rajesh was sitting.

Do you know where she first went when she walked

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Kenney - Direct/Harfenist

125

in?

A.   Towards the desk.

Q.   There came a point in time where she sat around the desk with Rajesh Shah, correct?

A.   Yes.

Q.   Do you recall -- there were only a handful of chairs in that little office, correct?

A.   I don't remember the number of chairs.

Q.   You were standing there, right?

A.   Yes, I would have been standing.

Q.   And Police Officer Martone was standing, correct?

A.   Yes.

Q.   And the Shahs at some point were sitting, correct?

A.   I don't recall who was standing or sitting between the two of them.

Q.   Now, by the time that Sunita Shah had arrived at the store, Rajesh Shah had already told you that he had rented out the basement to Surender Bhatty, correct?

A.   He produced a document and attempted to show us what he had.

Q.   And that was before she got there, correct?

A.   I don't recall.

Q.   He was the one who gave it to you, though, correct?

A.   To me?

Q.   Yes.

A-252

Kenney - Direct/Harfenist

126

A.   No.

Officer Martone advised me of that document.

Q.   So you never saw the document -- withdrawn.

There came a point in time you actually saw the document, correct?

A.   Yes.

Q.   When you say Officer Martone advised you of the document, the document was originally given to Officer Martone?

A.   Yes.

Q.   When Officer Martone advised you of the receipt of the document, Sunita Shah had not yet arrived yet, correct?

A.   I don't recall that specific of order of events.

Q.   A long time ago.

You don't remember?

A.   Yeah.

Q.   That's fair.

Let's take a quick look at that document for a second.

(There was a pause in the proceedings.)

BY MR. HARFENIST:

Q.   Do you see that?

A.   This screen isn't on.

LAW CLERK:  That screen doesn't work.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-253

Kenney - Direct/Harfenist

127

MR. HARFENIST:  Let me give him a copy.

May I, Judge?

THE COURT:  Go ahead.

MR. HARFENIST:  Judge, may I stand here so I can look at the screen?  Is that fine?

THE COURT:  That's fine.

MR. HARFENIST:  Thank you.

BY MR. HARFENIST:

Q.    Officer Kenney, I'm showing you what's marked in evidence as Plaintiff Exhibit 11, and you can see it's a short little document.

Correct?

A.    Yes.

Q.    This is the document that Police Officer Martone told you that Surender Bhatty showed him, correct?

A.    That was produced to him or I don't know who handed it to him.

Q.    Just so that I'm trying to keep the time frame slightly accurate, at the time that he told you that, you don't recall whether Sunita Shah was in the office at that point, correct?

A.    Correct.

(Continued on next page.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 84 of 274 PageID #: 1515

Harfenist - Direct/Kenney

128

(continued.)

Q.   Now, and when you first came up -- I'm going to step back for a second because I'm a little confused about something.

When you first came up the stairs you saw Rajesh and Officer Martone in the office, correct?

A.   Correct.

Q.   And you don't recall whether Sunita was there yet, correct?

A.   Correct.

Q.   But we know that Sunita arrived 10 to 15 minutes later correct?

A.   Approximately, yes.

Q.   Okay.  So do you know when you first came -- as you sit here today, you're not sure in order of timeframe when you first saw this from Officer Martone, correct?

A.   During that time I wouldn't have been in that office the entirety of the time.  There would have been detectives arriving at the scene.  Detective Liston had arrived at the front door at that point.  My supervisor had arrived.  I would have had to have conversations with them throughout that timeframe, too.  Explain to them what was in the basement.  I know our supervisor would want to have known what I had observed.  So I would have had walked him as close as I could to that point to the

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 85 of 274 PageID #: 1516

**Harfenist - Direct/Kenney**

129

basement.  So it was in and out of that room.

Q.   So it could have been at any point -- so you were coming back and forth, talking to other officers.  You may have saw it right away, you may not have saw it right away.  You may have seen it certainly later?

A.   At some point I saw it.

Q.   And the person you saw it from was Police Officer Martone?

A.   Yes.

Q.   Now, let's take -- you testified that he sent you something that -- he handed you something or Officer Martone this document we're referring to a lease.  By the way, the stipulation says it's a lease, but you didn't believe it necessarily to be a lease, correct?

A.   No, I didn't, because it says right here this is not a lease.

Q.   Okay.  Now, at the time that you saw this, you reached a conclusion that this document was not a lease when you first saw it, correct?

A.   Correct.

Q.   Now, you don't know the requirements of a lease under New York law, correct?

A.   No.

Q.   So you don't know whether it says -- the fact that it says not a lease doesn't necessarily make it a lease; do

**Harfenist - Direct/Kenney**

130

you?

A.   No.

Q.   You don't know the fact that whether a lease needs to be notarized; do you?

A.   I'm just going based on my own personal experience, correct.

Q.   So the partners have stipulated this is a legal lease under New York Law.

MS. LAGRECA:  Objection, your Honor.  He's testifying.

MR. HARFENIST:  I'm just telling him what the stipulations are.  I'm not testifying.

THE COURT:  You have to ask a question.

MR. HARFENIST:  I'll withdraw it.

Q.   The lease itself indicates that -- this document itself indicates that the basement was rented to Surender Bhatty, correct?

A.   I'm sorry, say that again.

Q.   It indicates the basement was rented to Surender Bhatty, correct?

A.   It's saying that it gives Surender Bhatty --

Q.   It gives him temporary use?

A.   -- it gives him access at some point.

Q.   Now, he when you -- when you learned that the lease -- about this document, did anybody ever ask Rajesh Shah

A-257

Harfenist - Direct/Kenney

131

to try and contact Surender Bhatty?

A.   I believe so.

Q.   Okay.  It wasn't you though, correct?

A.   No.  Detectives would have been there at that point.

Q.   I'm sorry?

A.   There would have been a detective there at that point.  This was their scene and their investigation to continue.

Q.   Why do you believe that someone asked him to contact Surender Bhatty?  Somebody told you that?

A.   You asked the question.  I'm saying I believe that at some point in that investigation, I believe someone, yes. A reasonable officer would believe that they would have been asked to contact that person.

Q.   But as you sit here today you, personally, aren't sure whether that happened?

A.   Correct.

Q.   You just know you didn't?

A.   Correct.

Q.   And you no one asked you whether you had?

A.   No one asked me at that time?

Q.   None of the police officers, or detectives, or supervisors on the scene asked you whether he contacted Surender Bhatty?

A.   No.

TONIANN LUCATORTC, RMK, CRK, RPR
Official Court Reporter

A-258

**Harfenist - Direct/Kenney**

132

Q.   Do you know if at any point in time if anybody from the Nassau County Police Department during the course of this investigation contacted Surender Bhatty?

A.   At that point or during the course, the full course?

Q.   At any point in time?

A.   I believe there was an attempt.

Q.   You do.

     Now, there came a point in time when --

     MR. HARFENIST:  Withdrawn.

Q.   Did you ever learn that the fire department had requested the presence of the key holder?

A.   Yes.

Q.   Okay.  When did you learn -- first off, what do you understand a key holder to be?

A.   During any kind of emergency situation like that, either we request through our communications bureau or the fire department would request that.  It's a term that we use to get in contact with either a business owner or someone responsible for that business in an emergency situation like this.  If access is needed or if there's an alarm going off, if there's a fire, we need some type of contact.  We would see if they had that information.

Q.   A key holder is someone that would be able to get them into the building, correct?

A.   Correct.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 89 of 274 PageID #: 1520

Harfenist - Direct/Kenney

133

Q.   Do you know when the key holder was --

MR. HARFENIST:  Withdrawn.

Q.   Do you know when there was a request for someone to give them access to the building as it relates to when you first went into the building?

A.   When I know that the fire department would need access to that building.  Either myself or someone through the fire department would have requested that someone respond.

Q.   And the fact that the individual was a key holder doesn't necessarily mean they're the owner of the building, correct?  The premises, correct?

A.   They could, but not necessarily.

Q.   Nor does it mean that they have control or custody of the premises, correct?

A.   If they had a key and access to that building, they're responsible for that building.  Especially to the point where if someone from emergency services or the fire department or police department needs to contact that person, then yeah.  I think that would be important.

Q.   It might be important, but it don't mean that they're the owner, correct?

A.   Not necessarily the owner.

Q.   Doesn't necessarily mean that they have control of the property, correct?

**Harfenist - Direct/Kenney**

134

A.   If you have the key and if you're permitted to enter that building, I would have made that assumption.

Q.   So what if the cleaning service has a key?  Does that mean they have control over the property?

MS. LAGRECA:  Objection, your Honor.

A.   If they have access.

THE COURT:  You can answer.

A.   Yes.  They would have access to that building.

Q.   They would have access.  Doesn't mean they have control, correct?  Let's talk about the concept of custody and control for a second.

You went to the Nassau County Police Academy, correct?

A.   Yes.

Q.   As part of your time in the Nassau County Police Academy, they teach you a number of legal concepts as it relates to the penal law, correct?

A.   Yes.

Q.   In order to be guilty of -- tell me if this is your understanding.

In order to have an individual to be guilty of a possessory crime, they have to have custody and control of the illegal instrument, correct?

A.   Yes.

Q.   And what do you understand custody and control to

A-261

**Harfenist - Direct/Kenney**

135

mean?

A.   Possession -- I'm sorry, say that again.

Q.   What is your understanding as to what custody and control means?

A.   Possession of something.

Q.   Okay.  Now, I want to go back to something I missed. I think you testified that the first time you saw the list -- excuse me, the lease, was when someone at the scene showed it to you, correct?

A.   It would have been correct, yeah.

Q.   Now, isn't it a fact that the first time you actually saw the lease was when Mr. Reissman showed it to you at your deposition?

A.   The initial deposition?

Q.   Your initial deposition.

A.   Was the first time I saw it?

Q.   The first time I ever saw it.

A.   Well, I was made aware of it at the date and time at the scene that there was a lease, yes.

Q.   If we can clarify your testimony.

I asked you if you ever saw the lease when you were on the scene.  Is it your testimony that you were made aware there was a lease, but you never saw it?

A.   No, I saw the lease.

Q.   And you saw it when you were on the scene?

**Harfenist - Direct/Kenney**

136

A.    Yes.

MR. HARFENIST:  So I want to turn your attention to your deposition on -- God, it's a long time ago.  I'm looking at page 55, 56.  You're not going to be able to see it there -- may I have one second, your Honor?

THE COURT:  Go ahead.

MR. HARFENIST:  Your Honor, handing the witness pages 55 and 56 from his deposition from June 27, 2019. I'm going to read these questions and ask if you gave these answers back in -- in your deposition.  Start on line 25 on -- the last line on page 55 and here's the question.  Okay.  I'm going to show you a document that was previously marked JL1.

Which, Judge, for the record JL1 is this document.  I can produce it again, but there was never a dispute as to that.

Q.   Let me know whether you have seen this document with Mr. Reissman and we'll go beyond that.

ANSWER:  Yes.

Have you ever seen that document prior to sitting with Mr. Reissman?

ANSWER:  No.

So you didn't see that document on October 4, 2017?

ANSWER:  No.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 93 of 274 PageID #: 1524

**Harfenist - Direct/Kenney**

137

Q.   Do you recall being asked those questions and giving those answers?

A.   Yes.

Q.   So you would agree that your memory on this incident would be a lot better back in 2019 than it is here in 2023?

A.   It would have been closer to the incident.

Q.   So it would have been better, correct?

A.   I also had more time to review and prepare after several years and the last trial.  I had another year to prepare on that topic at that time.  And my memory has been recalled after reviewing numerous pictures from the scene as well.

Q.   So you're telling me that after you've testified twice now in this case, your memory is better today now than it was back in 2019?

A.   No.  I'm just saying certain aspects of that day have been refreshed.

Q.   And in preparing for this trial, you had multiple meetings with your lawyers; did you not?

A.   Yes.

Q.   And you reviewed your prior testimony with your lawyers, correct?

A.   Yes.

Q.   Now, I want to turn your attention back to your trial

A-264

**Harfenist - Direct/Kenney**

138

testimony from the last case last year.  And I'm going to ask you to take a look at pages -- looking at page 35. I'm going to hand you my copy of it.  If I can just have it back.  I'll highlight the questions I'm going to ask you, Officer Kenney.

MR. HARFENIST:  I'll represent to the Court that this is page 35 of your prior testimony in this case.

Q.   I'm going to read these questions and ask you if you remember being asked these questions and giving these answers.  I'm reading from page 35 line six.

Now there came a point in time where you heard a conversation with Rajesh Shah and Officer Martone where he advised him he was the owner of the business, correct?

ANSWER:  Yes.

Q.   Do you recall that question and answer?

A.   Yes.

Q.   QUESTION:  And he explained there came a point in time where he saw -- where you saw the subject lease with Surender Bhatty, correct?

ANSWER:  Yes.

And that sublease was given to you -- was shown to you by Rajesh Shah, correct?

I don't recall that.

So you don't know showed it to you?

ANSWER:  I don't recall.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 95 of 274 PageID #: 1526

**Harfenist - Direct/Kenney**

139

Q.   Do you recall that questions and answers?

A.   Yes.

MS. LAGRECA:  Objection.  Improper impeachment.

THE COURT:  Technically, you shouldn't be showing it up on the screen.

MR. HARFENIST:  Well, under 804(b)(1) it's evidence that's admissible in and of its own right.  I can show the entire transcript from the last case.  I don't need to even impeach the witness.  I can offer the testimony as direct evidence, that's what the rule says.

THE COURT:  Are you going to offer it?

MR. HARFENIST:  I may, I may not.  We talked about that before.  It depends upon how cumbersome it becomes.  I mean, there are some of the trial testimony that I do intend to offer directly as direct evidence.  So I'm happy to leave that alone and do that at the end of my case.  If that's what the Court would prefer.

THE COURT:  You can ask him the question, but if it gets too -- we may just have to introduce it later.

MR. HARFENIST:  That's what we talked about before, okay.  I don't have much more on that, Judge.

Q.   Do you know when you were sitting with Officer Martone whether Rajesh Shah specifically said to you in your presence that he had rented out the property to Surender Bhatty?

A-266

**Harfenist - Direct/Kenney**

140

A.   I don't recall that, no.

Q.   So it may have been it may have happened then or you may have learned about it after?

A.   Correct.

Q.   Now, you were on the scene from approximately a little after two to what, a little after five?  Does that sound about right?

A.   Approximately, yes.

Q.   About three hours.  And as the events progressed, your involvement in the investigation became less and less, correct?

A.   Yes.

Q.   That's because the detectives necessarily took over the investigation, correct?

A.   Correct.

Q.   Did you ever have any conversations with Sunita Shah?

A.   I don't recall.

Q.   Did you ever ask or --

MR. HARFENIST:  Withdrawn.

Q.   Were you ever in the presence of any police officer who asked Sunita Shah whether he was the owner of the premises?

A.   That, I don't recall.

Q.   Do you -- were you ever in the presence of any of the police officers when they asked Rajesh Shah to produce any

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 97 of 274 PageID #: 1528

**Harfenist - Direct/Kenney**

141

documents that related to the ownership of the store?

A.   I don't recall that.

Q.   Did there ever come a point in time in which you told any members of the Nassau County Police Department that Sunita Shah was an owner of the store?

A.   I don't recall.

MR. HARFENIST:   I'm going to show you page 45 of your trial transcript see if this refreshes your recollection.

Q.   Looking at page 45 line 8.   If you can just read through line eight and go through line 17.

A.   Did there come a time when you ever told any member --

MS. LAGRECA:   Objection, your Honor.   This is being used to refresh his recollection.   It shouldn't be up on the screen.

MR. HARFENIST:   Want to just put it into evidence now, Judge?

THE COURT:   You may as well.

MR. HARFENIST:   Judge, I'm going to offer page 45 into evidence.

THE COURT:   It's admitted.

(Whereupon, Joint Exhibit 1 was received in evidence, as of this date.)

Q.   Okay.  Now you can read it.

Harfenist - Direct/Kenney

142

A.    Did there come a time where you ever told any member of the Nassau County Police Department that Rajesh and Sunita Shah were owners of the premises?

ANSWER:  To who?

To any member of the Nassau County Police Department.

Yes.

You told them that they were the owners?

I believe so.

And who did you tell that to?

I don't recall specifically.

What did you base your conclusion that they were the owners on?

That they had responded once we asked for the business and the key holder and at some point they had identified themselves as those persons.

Q.   23 to 25.

A.   So there came a point in time where Rajesh and Sunita Shah advised you that they were the owners of the premises?

For me to reach the conclusion at some point, yes.

Q.   So you testified before that you had no conversations with Sunita Shah.  Your determination wasn't based on anything she said, correct?

A-269

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 99 of 274 PageID #: 1530

**Harfenist - Direct/Kenney**

143

A.   Correct.

Q.   All right.  Now let's talk about some of the police paperwork that was filed in this case.

Did you prepare any of the police paperwork in this case?

A.   So for the initial investigation, we have a system where we had to call a case report line for any investigation that would have a detective on scene.  I would have had to get what's called a case number or hold a case number for them.  So I would have had to call for that.  That would associate my name and serial number as a preliminary investigator before it was provided over to the detectives.

Q.   So what type of police report would you have prepared?

A.   I would, like I said, secured that preliminary report and then assist on any menial paperwork associated with that once we were at the Third Precinct.  Just putting in basic pedigree information, essentially.  Taking pictures and photographs.

Q.   You have the exhibits in front of you?

A.   Yes.

Q.   Take a look at Plaintiff's Exhibit 1 and tell me if there was a document that you had prepared?

A.   Sorry, what was that number?

A-270

**Harfenist - Direct/Kenney**

144

Q.   Plaintiff's 1, the first one.

A.   No.

Q.   Okay.  Do you know -- this document -- do you know what this document is?

A.   It's the case report.

Q.   What is a case report?

A.   It just shows the preliminary testimonials of who was on scene and their involvement in that scene.

Q.   Okay.  And before this case, had you ever seen this document before?

A.   Not in its completion.

Q.   So this document if you look at the top it says by 6584 Reed.  That would mean that Detective Reed prepared this document?

A.   It could have.  The way this system worked it was very old.  It's since been updated.  The way the system worked, it could only have one user at a time.  And if you opened a certain tab on that system, it automatically stamped your serial number and name onto that page.  So it could have been her, it absolutely it could have.  But it could have been another detective that was assisting.

Q.   Just so we understand.  There's nothing malicious about any of this.  The system, when it opened up, automatically put the person's name on it who was the first person to create the document?

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 101 of 274 PageID #: 1532

**Harfenist - Direct/Kenney**

145

A.   Correct documents, correct.

Q.   And back then, anybody else could necessarily go in and type on it, and it still gives the name of the first person?

A.   Correct.  That's why if you saw my name throughout that case report, since I was the one that initialed that preliminary report, I was the preliminary investigating officer until it got further investigated by detectives.

Q.   But it doesn't mean that you put all of the information in, correct?

A.   Correct.

Q.   As the reports are being prepared, multiple police officers are working on the preparation of the report, correct?

A.   Police officers, detectives, yes.

Q.   Let's look at the second page of this document for a second.

Take a look at where it says here arrest narrative.  Now, you didn't write that, correct?

A.   Correct.

Q.   That tells us who wrote it, right?

A.   It says it was written by Detective Liston.  But again, it could have been written by any of the detectives.

Q.   And the top portion of this document says defendants

A-272

**Harfenist - Direct/Kenney**

146

admission says no statement.  Do you see that?

A.    Yes.

Q.    All right.  But we can't tell who put that in, correct?

A.    No.

Q.    Let's look at the next page of the report.

Take a look at this document.  Have you ever seen this document before?

A.    I'm sorry.  Are we on page 3 or Exhibit 2 now?

MR. HARFENIST:  I'm sorry, we're on Plaintiff's Exhibit 2.  My error.

A.    Plaintiff's Exhibit 2.

Q.    Tell me if you understand what this document is?

A.    Yes.  This is the case report which shows your core data.  The basic information regarding the case.  Location and classification, as well as the offenses of that case.

Q.    Is this something that you would have prepared?

A.    No.  I would have put in basic information here, maybe basic pedigree.  Scene, location, that's about it on this case.  You can see the detective number assigned here, so a detective was working on this case.

Q.    You definitely wouldn't have put in the portion where it says offenses, right?

A.    No.

Q.    Can we go to the next page, please?

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 103 of 274 PageID #: 1534

**Harfenist - Direct/Kenney**

147

Okay.  And at the on this page, do you see where it says down there preliminary written by Kenney?

A.   Yes.

Q.   What does that mean?

A.   Again, I was the officer that initiated that preliminary report.  That doesn't necessarily mean that there's any information generated on the case.  But since I generated that preliminary report, it's an open case for the detectives to start their investigation on.  The first thing that we do on any scene when there was an investigating detective is generate that preliminary number for them.

Q.   Now let's look at the bottom where it says preliminary written by 9897KENNE on 10/2017.  Do you see that?

A.   Yes.

MR. REISSMAN:  It's 10/5.

Q.   My apologies.  Is that your badge number?

A.   That's my serial number.

Q.   And that's your -- K-E-N-N-E would be you, correct?

A.   Yes.

Q.   You wrote this, correct?

A.   I did not write that, no.

Q.   So it says here that it was written by you, but it's your testimony that you didn't write it, correct?

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 104 of 274 PageID #: 1535

Harfenist - Direct/Kenney

148

A.   So when you call that case report line, there's an actual person that generates this case.  So there's a civilian sitting behind a computer.  And when it opens up this document, what they will put in that initial document is my serial number and please hold for detective.  So we have that case number secured.  Once we go back and continue the investigation at the Third Precinct, they delete that line of please hold and continue the narrative.  So my serial number would have been written by because, initially, I opened up that preliminary just to hold this case report for our detectives.

Q.   So the fact that it says it's written by you doesn't necessarily mean it was?

A.   No.

Q.   Did you write this?

A.   I did not, no.

Q.   So let's just -- do you know who wrote it?

A.   No.

Q.   So somebody, under your old system, people can write information in these police reports under your name and you may not even know what they're doing.

A.   Again, it was a very antiquated system.  It's since been updated.

Q.   I understand that.  I'm just talking about -- I'm not blaming anybody for anything here, I'm trying to

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 105 of 274 PageID #: 1536

**Harfenist - Direct/Kenney**

149

understand what happened.

This information could have gotten to this police report under your name and you might -- written by somebody else and you may never know who wrote it, correct?

A.   Correct.

Q.   Now, let's take a look at this and let's see if any of the information here is consistent with what you understood.

Now, this document says on October 4th, at approximately 2017 at 14:12.  That's military time 2:12, correct?

A.   Yes.

Q.   Officers Kenney and Martone responded to an odor of gas inside 122 Hillside Avenue in Williston Park.  That's what happened, right?

A.   Yes.

Q.   We agree that's what happened?

A.   Yes.

Q.   Upon arrival, Officer Kenney was met by the Williston Fire Department who accompanied him into 122 Hillside Avenue to check for the possible leak.  That's what happened too, correct?

A.   Leak or odor, correct.

Q.   While inside, it was found that the odor was

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 106 of 274 PageID #: 1537

**Harfenist - Direct/Kenney**

150

emanating from the adjourning business located at 120 Hillside Avenue, Williston Park.  Correct, correct?

A.   Yes.

Q.   At that time, fire chief Schnall requested a key holder respond to the location.  That's, according to your testimony, that's not correct, right?

A.   It could have been chief Schnall or it could have been any other member of the fire department.  There were a number of members.  He was also not the only chief, from my understanding.

Q.   A short time later, the defendants Rajesh and Sunita Shah arrived at 120 Hillside Avenue and opened the door and allowed the fire department, along with Office Kenney into investigate the smell.  That's not what you testified to, is it?

A.   No.

Q.   As they entered basement, they found several bottles of acetone along with other paraphernalia.  That's true, correct?

A.   Yes.

Q.   As a result of the readings the fire department were receiving, they ordered that the building be evacuated in order to air it out and let the levels decrease, correct? Do you remember being evacuated?

A.   That was done after we had left.

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 107 of 274 PageID #: 1538

**Harfenist - Direct/Kenney**

151

Q.   You had all left?

A.   Correct.

Q.   So that happened sometime after 5 o'clock?

A.   If that's what time we left the scene, then yes.  It would have been after 5 o'clock.

Q.   Nothing nefarious, I'm trying to understand what happened.

You're there at 2 o'clock.  You leave sometime, I think your records show you left sometime after 5:15.  During that period of time you never evacuated the building, correct?

A.   I did not, no.  I'm sorry, the karate studio and the adjoining building where we asked the -- I'm sorry, we did ask them to leave.

Q.   You probably did that almost upon arriving at the scene, correct?

A.   We would have.

Q.   That would have been true.  Let's go to the next page.  At about 17:33 hours, the defendants Rajesh and Sunita Shah were placed into custody and transported to the Third Precinct for arrest processing.  Okay.  17:33 is 5:33 in the afternoon?

A.   Yes.

Q.   So if you got there -- so we now know you were there a little over three hours, correct?

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 108 of 274 PageID #: 1539

Harfenist - Direct/Kenney

152

A.   Correct.

Q.   Because you did arrest one of the Shah's, correct?

A.   Yes.  We placed them into custody and transported them to the Third Precinct.

Q.   I believe you arrested Rajesh, correct?

A.   Correct.

Q.   So we know that the arrest took place three hours after upon your initial arrival, correct?

A.   Correct.

MR. HARFENIST:  Judge, may I have a moment, please?

THE COURT:  Yes.

MR. HARFENIST:  Can we take just a couple minutes?  I just want to make sure --

THE COURT:  Go ahead.

(A recess was taken at this time.)

Q.   Now, throughout the period of time with Ms. Shah, would you describe her as being cooperative?

A.   I don't recall.

Q.   Would you say she was very quiet?

A.   Yes.

Q.   And how would you describe her demeanor while she was sitting up there?

A.   Upset.

Q.   Would you say that she was surprised she was sitting

Harfenist - Direct/Kenney

153

there?

A.    She could have been.

Q.    I'm asking what your best that you can recall?

A.    I don't recall if she seemed surprised.

Q.    So just so that I'm clear.  You would say she was basically cooperative and very quiet and upset, correct?

A.    She was quiet.

MR. HARFENIST:  Judge, I have no further questions of the witness.

THE COURT:  Okay.  Do you want to start redirect now or should we break for lunch?

MS. LAGRECA:  It's up to your Honor.

THE COURT:  How long do you anticipate.

MS. LAGRECA:  A while, I have a lot of questions for him.

THE COURT:  Let's break for lunch then and come back at 1:30.

(Jury exits the courtroom.)

(Witness leaves the witness stand.)

THE COURT:  See everyone in an hour.

(A recess was taken at this time.)

A-280

LaGreca - Cross/Kenney

154

**A F T E R N O O N   S E S S I O N**

(In open court.)


COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

(Witness takes the witness stand.)

(Jury enters the courtroom.)

MS. LAGRECA:  May I, your Honor?

THE COURT:  You may.

MS. LAGRECA:  Thank you.

CROSS EXAMINATION

BY MS.  LAGRECA:

Q.   Officer Kenney, how long have you been a police officer with the Nassau County Police Department?

A.   Seven and a half years.

Q.   Did you attend the police academy in order to become a police officer?

A.   I did.

Q.   How long was the police academy?

A.   Approximately seven months.

Q.   When did you start it?

A.   June of 2016.

Q.   Do you remember what types of things you learned in the academy?

A.   I do.

A-281

LaGreca - Cross/Kenney

155

Q.    What were they?

A.    We did many, both classroom settings and field training experience.  Classroom going over the penal law, vehicle and traffic law.  Responding to emergency situations.  We did role playing with those various situations as well.  Multiple lectures on all of those topics.

Q.    Did you have tests in the academy as well?

A.    Yes.

Q.    Did you learn about what probable cause was in the academy?

A.    Yes.

Q.    Was probable cause part of the testing materials?

A.    Yes.

Q.    When did you graduate from the academy?

A.    January of 2017.

Q.    What was your assignment upon graduation?

A.    The Third Precinct patrol.

Q.    How long were you in the Third Precinct?

A.    During which period?

Q.    When you were first assigned there?

A.    That was my first assignment.

Q.    How long did you remain there?

A.    I still work in that Third Precinct.

Q.    So a total of about seven and a half years?

A-282

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 112 of 274 PageID #: 1543

**LaGreca - Cross/Kenney**

156

A.   Correct.

Q.   What are your duties and responsibilities as a patrol officer?

A.   You're given an area of responsibility.  You patrol that area.  You conduct traffic stops, you listen to the radio, you respond to radio assignments as directed.

Q.   On October 4, 2017, were you working as a police officer in the Third Precinct?

A.   Yes.

Q.   What area does that precinct cover?

A.   It's a fairly large precinct.  Covers from East Meadow west to the Queens border.  South from Hempstead Turnpike north to the Northern State Parkway.

Q.   Because that precinct is so large, is there a specific area that you cover?

A.   Yes.

Q.   On October 4, 2017, what was that specific area?

A.   East Williston.

Q.   Do you remember what time you were working that day?

A.   That tour is a 7:00 a.m. to 7 P.M.

Q.   Were you in uniform or were you in plain clothes?

A.   Uniform.

Q.   I think you mentioned earlier that you were working with a partner, however, that partner, Officer Martone, was in a separate vehicle; is that right?

A-283

**LaGreca - Cross/Kenney**

157

A.   Correct.

Q.   Is that common for Nassau County police officers?

A.   Yes.

Q.   At approximately 2:15 that day in the afternoon, did you receive a radio call?

A.   Yes.

Q.   Can you just explain for the jury what a radio call is?

A.   It's a call made to 911 either from a civilian or whoever the complainant is at that point.  911 receives that call and gives to our dispatch, who then dispatches that call over the radio to us.

Q.   What was the nature of this specific call you received?

A.   It would be an odor of noxious gas.

Q.   What was the location given?

A.   122 Hillside Avenue.

Q.   Did you receive any other information from this call?

A.   No.

Q.   What did you do in response to receiving this call?

A.   Went to that location.

Q.   Did anyone go with you at the time?

A.   At that point, I had arrived on sight first.  And observed the fire department already on scene as well.

Q.   Were any other police officers present yet?

A-284

**LaGreca - Cross/Kenney**

158

A.   No.

Q.   What type of location was this?

A.   It's a row of stores on Hillside Avenue.  It's a fairly highly trafficked area, so that would be a storefront on Hillside Avenue.  There are a number of storefronts.

Q.   Do you remember approximately how many firefighters you saw when you arrived?

A.   Several.

Q.   Do you remember how many fire trucks?

A.   One, if not two.  At least one.

Q.   What did do you when you arrived at the scene?

A.   We went to meet the store owner of the karate studio at 122 Hillside Avenue.

Q.   Do you remember his name?

A.   Mr.  Write, I believe was his name.

Q.   Was it Charles water?

A.   I'm sorry, Charles Water.

Q.   When you spoke with Mr. Water, what did he tell you?

A.   He told me when he opened his stop and went into his store, the karate studio, I'm sorry, he experienced a very overpowering odor of some kind of chemical.

Q.   And did you say what he did upon smelling this chemical?

A.   Called 911.

A-285

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 115 of 274 PageID #: 1546

**LaGreca - Cross/Kenney**

159

Q.   Did you smell the chemical as well when you entered the karate studio?

A.   Yes.

Q.   Can you describe it as best you can for the jury?

A.   I would say it's a very overpowering chemical smell, almost like a rubbing alcohol.  Something along those lines.

Q.   Did you speak with any of firefighters at this time?

A.   I would have spoken to one by that point, yes.

Q.   Do you recall any specific conversation you had with them?

A.   No.  Just what their readings were, where they thought the odor was coming from or what they had done, if anything, up to that point.

Q.   Were you walking through this karate studio with them at the time?

A.   Yes.

Q.   You mentioned what their readings were.  What were they reading?  On a device?

A.   Some sort of device, yes.

Q.   Can you just describe what that device was; if you can?

A.   To the best of my remembrance, it was some sort of handheld device that they read as they walk around the building.  I don't want to speak to them, but that's to

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 116 of 274 PageID #: 1547

LaGreca - Cross/Kenney

160

the best of my memory.

Q.   What did they say upon reading their device?

A.   It was determined that that odor was coming from the wall that shared a space with 120 -- shared a wall, rather, I'm sorry, with 120 Hillside Avenue.

Q.   And upon them informing you that it was coming from next door, what did you do?

A.   Followed the fire department to the next door storefront.

Q.   And you mentioned that that address was 120 Hillside Avenue?

A.   Correct.

Q.   What type of business was that?

A.   It was advertised as some sort of a spa or a foot massage.  It had a large sign for a foot massage on the front.  There was a door and windows, the windows had -- it was either a poster or some kind of advertising for the foot spa.  Just obstructing the view to the inside, but you could just see that it was being advertised as a foot or massage spa.

Q.   Did you go inside that location?

A.   Yes.

Q.   Who do you go inside with?

A.   The fire department.

Q.   Was the door to that foot spa unlocked at this time?

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 117 of 274 PageID #: 1548

LaGreca - Cross/Kenney

161

A.    I believe it was locked.

Q.    You believe it was locked?

A.    Yes.  I believe --

Q.    Go ahead.

A.    I believe the fire department did require a forced entry.

Q.    When you say forced entry, what exactly do you mean?

A.    Taking the lock off the front of the door.

Q.    It doesn't mean necessarily breaking the door down, right?

A.    No.

Q.    When the door to the foot spa was opened, did you notice any employees or owners inside of it?

A.    No.

Q.    What did you notice once the door was opened?

A.    It was a small office area with a small desk on the right side.  Another large wall, floor to ceiling or like a partition.  I believe it was a wall with another door to go to a space beyond that.  There was another chair to inside that space.  With some other smoking paraphernalia and some other trinkets on the floor.  In the office.

Q.    You mentioned that this address outside was advertised as a foot spa.  Was it actually a foot spa once you got inside?

A.    No.

A-288

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 118 of 274 PageID #: 1549

LaGreca - Cross/Kenney

162

Q.   Did you ever see a sign that read Accessories By Peak on this address?

A.   No.

Q.   At the time, did you know what Accessories By Peak was?

A.   No.

Q.   Do you know what that is now?

A.   Yes.

Q.   What is that?

A.   They sell smoking paraphernalia.

Q.   When you saw they, are you referring to Mr. And Ms. Shah?

A.   Yes.

Q.   You mentioned that beyond the first small room in this building, there was a warehouse type of room?

A.   Correct.

Q.   What did you see in that warehouse room?

A.   I was floor to ceiling shelves full of boxes.  Boxes on the floor as well, all full of different smoking paraphernalia.  There was another room or two, I believe, off to the side all with the same floor to ceiling paraphernalia.  Just very unorganized, large room, shelves along the side.  Just kind of like boxes placed throughout the floor.

Q.   When you say smoking paraphernalia, what types of

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 119 of 274 PageID #: 1550

LaGreca - Cross/Kenney

163

things are you talking about?

A.    Glass pipes, bongs and different smoking tools, I guess.

Q.    At this point in time when you entered 120 Hillside Avenue, could you still smell that smell?

A.    Yes.

Q.    Can you describe the smell now that you were inside?

A.    It was definitely getting stronger, more potent.  The further we went in from the front of the building as we progressed towards the back of the building, it definitely increased in potency and odor.

Q.    When you say we, who was with you at this time?

A.    The fire department.

Q.    Were there any other police officers who arrived yet?

A.    No.

        MS. LAGRECA:  Your Honor, at this time I'm holding the three photos that we agreed upon be entered into evidence.  I have labelled them as Defendant's K1 through K3.

        THE COURT:  Any objection?

        MR. HARFENIST:  No objection.

        THE COURT:  They're admitted.

        (Whereupon, Defense Exhibit K1-K3 was received in evidence, as of this date.)

        MS. LAGRECA:  Permission to publish to the jury.

A-290

**LaGreca - Cross/Kenney**

164

THE COURT:  Yes.

MS. LAGRECA:  At this time, Defendant's K1 is displayed on the screen.

(The above-referenced exhibit was published to the jury.)

Q.   What does this photo depict?

A.   It's the front of 120 Hillside Avenue.

Q.   Is that how it looked on October 4, 2017?

A.   Yes.

MS. LAGRECA:  At this time I'm displaying Defendant's K2.

(The above-referenced exhibit was published to the jury.)

Q.   Officer Kenney, what does this exhibit depict?

A.   On the right of the picture you can see the very rear of the storefront.  And as you work your way left to right, you can see the stairwell leading down into the basement.

Q.   And did you, in fact, go down that stairwell into the basement?

A.   Yes.

Q.   What did you observe when you went down there?

A.   So the basement was a very large, unfinished basement.  As we walk through the basement, you can see multiple rectangular shaped plastic containers full of

A-291

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 121 of 274 PageID #: 1552

LaGreca - Cross/Kenney

165

some green brown leafy-like substance.  Filled in those containers, again, you saw multiple clear plastic containers with some other type of unknown chemical.  And then, again, we saw multiple packaged and prepackaged aluminum-type material used for packaging narcotics.  We saw some type of cartoon characters, I believe, that were on them.

Q.    How was the smell once you were down in the basement?

A.    At that point it was almost overpowering.

Q.    Were you wearing a mask or respirator at all?

A.    No.

Q.    Before you went down into the basement, we can see in the photo that there is a door at the bottom of the stairs.  Is there a door before that door?

A.    I don't believe so.  It's hard for me to see, I'm sorry.  But no, I don't believe there was another door.

Q.    Was that door to the bottom of the stairs open or closed; if you remember?

A.    I don't recall.  I believe the fire department opened it at that point.  But I don't recall if it was opened or closed specifically.

Q.    When you went into the basement, did anyone go with you?

A.    The fire department.

Q.    Do you remember approximately how large the basement

A-292

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 122 of 274 PageID #: 1553

LaGreca - Cross/Kenney

166

area was?

A.   Fairly large.  I would say it was probably the same -- mirrored the first floor of the business to the second floor.  I would say same square footage.

Q.   How much of that square footage was filled with the tubs and containers of vegetative materials and chemicals that you described?

A.   From my recollection one of the rooms, I believe it was divided into one, maybe two, other additional rooms in that basement.  They were all connected, but it was placed into one of those rooms.

          MS. LAGRECA:  At this time, I'm going to display Defendant's Exhibit K3 on the screen.

          (The above-referenced exhibit was published to the jury.)

Q.   Is that just pretty much a zoomed in view of the bottom of the staircase that was depicted in Defendant's K2?

A.   Yes.

Q.   Upon observing these materials in the basement, did you have an opinion as to what you were smelling and what you were looking at?

A.   Yes.  It appeared to be some kind of larger narcotic operation.

Q.   Did you have an opinion at this point as to what type

A-293

LaGreca - Cross/Kenney

167

of narcotics operation?

A.   That, I'm not trained in observing and identifying, so no.

Q.   What did you do in response to observing this?

A.   I requested that a supervisor respond to scene, as well as our detectives.

Q.   Why did you do that?

A.   Again, after observing what was in the basement, it was clearly something beyond my scope as a patrol officer at that point, and I knew immediately it required further investigation from our detectives.

Q.   Did you go back upstairs at all?

A.   Yes.

Q.   What did you see when you went back upstairs?

A.   We went back upstairs through that larger warehouse-sized area to the front of the office where I observed Andrew Martone.  Officer Martone, I'm sorry.

Q.   When saw we, are you referring to the fire department?

A.   The fire department, yes.  I'm sorry.

Q.   Did you observe anyone else who had recently arrived, other than Officer Martone?

A.   Mr.  Shah.

Q.   And did you observe any other officers or firefighters at this point in time?

A-294

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 124 of 274 PageID #: 1555

LaGreca - Cross/Kenney

168

A.    At that point in time, no.

Q.    When you went upstairs, did you and Officer Martone have any conversation?

A.    Yes, we would have.

Q.    Do you recall the sum and substance of the conversation at all?

A.    Just explaining to him what was observed in the basement.

Q.    Did you have any conversation with Mr. Shah at this point?

A.    I believe I would have.

Q.    Do you remember any substance of that conversation?

A.    Nothing beyond just requesting basic pedigree information and asking if he had any further knowledge of what was occurring in that business.

Q.    And do you remember what his responses were?

A.    I don't recall, no.

Q.    Were you ever formally introduced to Mr. Shah?  Did you know who he was at this point?

A.    Not particularly, no.

Q.    Do you remember what area of the upstairs he was?

A.    He was in the front smaller office.

Q.    At any point in time, did Ms. Shah, the plaintiff, arrive?

A.    Yes.

A-295

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 125 of 274 PageID #: 1556

**LaGreca - Cross/Kenney**

169

Q.   Do you remember when?

A.   Shortly thereafter.

Q.   Did you speak with her at all?

A.   I believe I had requested some of her information as well.

Q.   Do you remember if she gave that to you?

A.   I don't recall.  I believe she would have though. There's no reason why she wouldn't have.

Q.   Do you remember if anyone referred to Mr. And Ms. Shah key holders?

A.   I believe so, yes.

Q.   Do you know who referred to them as that?

A.   It would have been a member of the fire department.

Q.   Did you believe Mr. And Ms. Shah to be owners of the business?

A.   Yes.

Q.   Did you believe them to be owners of the entire store including the basement?

A.   Yes.

Q.   And did you believe them to have constructive possession over what was in the basement?

A.   Yes.

Q.   Can you explain why?

A.   Well, based on the fact that they had both responded to that scene after observing what was on the first floor,

A-296

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 126 of 274 PageID #: 1557

LaGreca - Cross/Kenney

170

being all of the paraphernalia and being the fact that it was initially advertised as a spa and we all clearly saw it was not a spa.  Even from that front office, there was paraphernalia on the floor of that office, let alone walking into the warehouse area.  And then to find some type of narcotic operation in that basement, led me to that belief.

Q.    Did Mr. Or Ms. Shah ever acknowledge what was in the basement?

A.    No.  I don't recall.

Q.    You were asked questions about what is in evidence as Plaintiff's Exhibit 11.  And I'll put that up on the screen for you.

        MS. LAGRECA:  For the record, Plaintiff's Exhibit 1 is now displayed.

        (The above-referenced exhibit was published to the jury.)

Q.    Do you remember the questions regarding this document?

A.    Yes.

Q.    And upon viewing this document, do you believe this to be a legitimate lease?

A.    No.

Q.    Did you believe it on October 4, 2017, to be a legitimate lease?

A-297

Case 2:18-cv-04625-ST   Document 131-3   Filed 11/13/24   Page 127 of 274 PageID #: 1558

**LaGreca - Cross/Kenney**

171

A.    No.

Q.    Why not?

A.    Because it says in the document that this is not a lease.  It is not signed by both parties.  There's no date first and foremost, so this could have been created that morning.  Could have been made months before.  Nothing about this made this seem legitimate to me.

Q.    You mentioned before that you called a supervisor to the scene, right?

A.    Yes.

Q.    Did a supervisor, in fact, come?

A.    Yes.

Q.    Do you remember who?

A.    Sergeant Harverson.

Q.    Did you call emergency services to the location as well?

A.    Either me or Sergeant Harverson or another officer would have.

Q.    Do you know why emergency services were requested there?

A.    To assist ventilating and cleaning or clearing the air in those businesses.

Q.    Was that business and the karate studio store next door ventilated?

A.    Yes.

A-298

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 128 of 274 PageID #: 1559

**LaGreca - Cross/Kenney**

172

Q.    Do you remember when?

A.    No, I don't recall that.

Q.    Was it still when you were on scene?

A.    No.  Partially we did open up the back door.  I know emergency services have large fans that they bring to ventilate these buildings.  I don't recall if they were setting up at that point when I was there.  At the very least or if it was done after.  But at one point they would have set those fans up to ventilate the air.

Q.    Do you remember when emergency services got there or no?

A.    No.

Q.    Do you remember if you ever told another officer or detective that Mr. And Ms. Shah were the key holders of that building?

A.    I would have advised responding detectives that these two individuals had responded to scene after we made that request.  And after getting that basic pedigree information, would have provided that to the detectives.

Q.    Do you remember which detectives you would have said that to?

A.    It would have been Detective Liston initially.

Q.    Do you know if the narcotics squad was also called to the scene?

A.    Yes, they were.

A-299

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 129 of 274 PageID #: 1560

LaGreca - Cross/Kenney

173

Q.   Did you observe them arrive?

A.   Yes.

Q.   Who arrived; if you remember?

A.   Detective Twomey.

Q.   Was Detective Reed there as well?

A.   Yes.

Q.   Why was the narcotics squad called to the store?

A.   Well, as stated prior, there was an narcotics operation occurring in that basement.  And this is the special detective unit for the purpose of investigating those narcotics related incidents.

Q.   So they were going to take over the case, so-to-speak?

A.   Yes.

Q.   Were Mr. And Ms. Shah arrested that day?

A.   Yes.

Q.   Do you know who made the decision to arrest either of them?

A.   I don't personally recall who made that decision. But between the number of police officers and supervisors and detectives and all other units at that scene, if there was a collective agreement made or -- not necessarily agreement but, I'm sorry, decision.  I misspoke there.  A decision made to place them under arrest then it's a decision that yes, I would have been comfortable with.

A-300

Case 2:18-cv-04625-ST    Document 131-3    Filed 11/13/24    Page 130 of 274 PageID #: 1561

LaGreca - Cross/Kenney

174

Q.  Do you remember if you physically placed handcuffs on either one of them?

A.  No.

Q.  Were you labelled as the arresting officer?

A.  Yes.

Q.  Of both of them or just one of them?

A.  I believe it was just one.

Q.  Can you explain what it means to be the arresting officer on paper, even if you are not necessarily the one that places handcuffs on someone?

A.  Well, I was the initial officer who responded to that scene.  That call for the event was originated on the post that I was covering.  So I would have been the primary officer at that scene.  So it would have been my responsibility to generate that initial case report to get the pedigree information, to make proper notifications and be guided by the detectives at that point.  So since it was may area that I was covering, it was my post, I was the primary officer, then I would have been labelled as the arresting officer.

Q.  After they were arrested, where were Mr. And Ms. Shah taken?

A.  To the Third Precinct.

Q.  Did you personally drive them there?

A.  From my memory, I believe I brought Mr. Shah.